Case No. 26-1252, 26-1253

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.,
*Petitioners,*
v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; ED POTOSNAK, in his capacity as Acting Commissioner of the New Jersey Department of Environmental Protection,
*Respondents,*

and

TRANSCONTINENTAL GAS PIPELINE COMPANY, LLC
*Respondent-Intervenor.*

**INITIAL BRIEF ON BEHALF OF THE NEW JERSEY RESPONDENTS**

JEREMY R. FEIGENBAUM
Solicitor General
BENJAMIN M. SHULTZ
Assistant Attorney General
NATHANIEL RUBIN
JORDAN VIANA
SARA TORRES
KRISTINA MILES
Deputy Attorneys General

JENNIFER DAVENPORT
Attorney General of New Jersey
Attorney for State Respondents

R.J. Hughes Justice Complex
P.O. BOX 093
Trenton, NJ 08625-0093

Dated: April 28, 2026

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........ 1

COUNTERSTATEMENT OF JURISDICTION ........ 3

COUNTERSTATEMENT OF ISSUES ON APPEAL ........ 4

STATEMENT OF RELATED CASES ........ 4

STATEMENT OF THE CASE ........ 4

I. Legal Framework ........ 4

A. The Natural Gas Act and the Clean Water Act ........ 4

B. New Jersey's Regulatory Framework ........ 6

II. Factual Background ........ 9

A. The Project ........ 9

B. The 2019 Denial ........ 10

C. Transco's Second Application And The 2020 Denial ........ 13

D. The 2025 Denial ........ 16

STANDARD OF REVIEW ........ 22

SUMMARY OF ARGUMENT ........ 23

ARGUMENT ........ 26

I. The 2025 Approval Is Not An Arbitrary Reversal Of the 2019

Denial ........................................................................................ 26

A. The 2025 Approval Is Well-Reasoned ............................................ 26

B. The 2025 Approval Was Neither A Reversal In DEP's Position Nor An Arbitrary One ........................................................................ 30

1. The 2025 Approval Was Consistent With DEP's Past Positions.. 30

2. The 2025 Approval Did Not Arbitrarily Overlook Relevant Factors ........................................................................................ 32

II. The Department Lawfully Conditioned the 2025 Approval.................... 39

A. The Clean Water Act Permits Conditional Approvals Of A Water Quality Certificate ........................................................................ 41

B. The Certification Adequately Assures Compliance With Water Quality Standards........................................................................ 44

III. The Baykeeper Petitioners Erroneously Assume The Department Relied on A Mixing Zone........................................................................ 50

A. New Jersey Applies Dredging-Specific Standards............................ 50

B. New Jersey Does Not – And The Department Did Not – Use Mixing Zones for Dredging Projects.............................................................. 53

IV. The Department Compiled With the Clean Water Act's Public Participation Requirements........................................................................ 58

CONCLUSION ........................................................................................ 63

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alcoa Power Generating Inc. v. FERC*,
643 F.3d 963 (D.C. Cir. 2011) ............................................................ 41-42

*Appalachian Voices v. State Water Ctrl. Bd.*,
912 F.3d 746 (4th Cir. 2019) ............................................................ 41

*City and County of San Francisco v. EPA*,
604 U.S. 334 (2025) ............................................................ 43

*City of Tacoma v. FERC*,
460 F.3d 53 (D.C. Cir. 2006) ............................................................ 59

*Crema v. NJDEP*,
463 A.2d 910–16 (N.J. 1983) ............................................................ 44

*Delaware Riverkeeper Network v. Sec'y, Pa. Dep't of Env't Prot.*
(Riverkeeper II), 870 F.3d 171 (3d Cir. 2017) ............................................ 23

*Delaware Riverkeeper Network v. Sec'y, Pa. Dep't of Env't Prot.*
(Riverkeeper III), 903 F.3d 65 (3d Cir. 2018) ............................................ 23, 41

*Delaware Riverkeeper v. Pa. Dep't of Envt'l Prot.*
(Riverkeeper I), 833 F.3d 360 (3d Cir. 2016) ............................ 5, 22, 41, 60

*E. Bay Drywall, LLC v. Dep't of Labor & Workforce Dev.*,
278 A.3d 783 (N.J. 2022) ............................................................ 23, 58

*Encino Motorcars v. Navarro*,
579 U.S. 211 (2016) ............................................................ 32

*Prometheus Radio Project v. FCC*
Prom, 373 F.3d 372 (3d Cir. 2004) ............................................................ 30-31

*Food & Water Watch v. EPA*,
20 F.4th 506 (9th Cir. 2021) ............................................................ 43

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) ............................................................ 31

*Hackensack Riverkeeper, Inc. v. N.J. Dep't of Env't Prot.*,
443 N.J. Super. 293 (N.J. App. Div. 2015) .................................................. 6

*In re Eastwick College LPN-RN Bridge Program*,
139 A.3d 1146 (N.J. 2016) ............................................................................ 56

*In re NJPDES Permit No. NJ0025241*,
185 N.J. 474 (2006) ...................................................................................... 55

*In re Stream Encroachment Permit*,
955 A.2d 964 (N.J. App. Div. 2008) ........................................................... 44

*Jackson County v. FERC*,
589 F.3d 1284 (D.C. Cir. 2009) ................................................................... 59

*Liquid Labs LLC v. FDA*,
52 F.4th 533 (3d Cir. 2022) ......................................................................... 61

*Matter of Petition of S. Jersey Gas Co.*,
149 A.3d 13 (N.J. App. Div. 2016) ............................................................. 30

*Murrin v. Commissioner*,
158 F.4th 527 (3d Cir. 2025) ....................................................................... 60

*Port of Seattle v. Pollution Ctrl. H'ngs Bd.*,
90 P.3d 659 (Wash. 2004) ............................................................................ 42

*S.D. Warren Co. v. Maine Bd. of Env't Prot.*,
547 U.S. 370 (2006) ..................................................................................... 43

*Sierra Club v. State Water Control Bd.*,
898 F.3d 383 (4th Cir. 2018) .................................................................. 39, 41

*Township of Bordentown v. FERC*,
903 F.3d 234 (3d Cir. 2018) ......................................................................... 23

*Transcontinental Gas Pipe Line Co. v. Pa. Envt'l H'ng Bd.*,
108 F.4th 144 (3d Cir. 2024) ....................................................................... 32

*United States v. Miller*,
604 U.S. 518 (2025) ..................................................................................... 60

*Waterkeeper Alliance, Inc. v. EPA*,
399 F.3d 486 (2d Cir. 2005) ............................................................... 42, 43, 61

**Statutes**

5 U.S.C. §551 ........................................ 22, 23
15 U.S.C. §717b ........................................ 5, 11
15 U.S.C. §717n ........................................ 4
15 U.S.C. §717r ........................................ 3, 22
15 U.S.C. §717w ........................................ 4
15 U.S.C. §717f ........................................ 4
33 U.S.C. §1251 ........................................ 5, 58, 59
33 U.S.C. §1313 ........................................ 8
33 U.S.C. §1341 ........................................ 5, 6, 41, 59
33 U.S.C. §1362 ........................................ 54
33 U.S.C. §1370 ........................................ 5
N.J. Stat. Ann. §12:5-3 ........................................ 6
N.J. Stat. Ann. §13:9A ........................................ 6
N.J. Stat. Ann. §13:19 ........................................ 6, 62
N.J. Stat. Ann. §47:1A-1 ........................................ 62
N.J. Stat. Ann. §52:14B ........................................ 63

**Other Authorities**

N.J. Admin. Code §7:7 ........................................ *Passim*
N.J. Admin. Code §7:7A ........................................ 7, 16, 17
N.J. Admin. Code §7:8 ........................................ 18
N.J. Admin. Code §7:9B ........................................ *Passim*
N.J. Admin. Code §7:13 ........................................ 7
N.J. Admin. Code §7:14 ........................................ 55
N.J. Admin. Code §7:14A ........................................ 54
N.J. Admin. Code §7:15 ........................................ 55
40 C.F.R. 131.12 ........................................ 36

40 C.F.R. §121.6 .......................................................................... 59
18 N.J.R. 314(a) .......................................................................... 52
17 N.J.R. 1466(a) .......................................................................... 52
37 N.J.R. 3480(a) .......................................................................... 47

## INTRODUCTION

This is a case about an agency doing exactly what the law expects: considering permitting applications carefully and making decisions grounded in the law and the record, including adjusting to reflect changing record evidence on the ground.

The facts of this case began with a proposal by Transcontinental Gas Pipeline Company, LLC (Transco), to build an interstate natural gas pipeline between Pennsylvania and New York. Because portions of the construction would take place in both New York's and New Jersey's waters, Transco needed various permits and certifications from both to proceed, and it undertook a lengthy and iterative process to meet both States' concerns. The New Jersey Department of Environmental Protection (DEP or Department) denied Transco's initial application in 2019, articulating various water quality concerns related to dredging Transco had proposed. Transco responded by making substantial changes to its application to address DEP's concerns, but its second application was then denied in 2020 for the sole reason that New York had rejected the project in the interim—rendering the project moot. But when Transco applied for a third time, the application was different: Transco's 2025 application (based on additional modeling and other adjustments) looked materially different from the application in 2019, and in light of Transco's eventual green light from New York, looked different from

2020 too. So after carefully considering those changes, and consulting with experts and the public, DEP issued the relevant permits and certification. But even then, DEP did not blindly accept Transco's substantially revised submissions. Instead, cognizant of its obligation to safeguard state water quality, the agency imposed additional conditions and restrictions beyond what Transco had proposed.

Unsatisfied with DEP's careful and iterative process, Petitioners demand that this Court set aside DEP's decision as arbitrary and capricious, which they portray as some sort of unexplained shift in position. But this reflects a fundamental misunderstanding of the relevant record and procedural history because there has been no shift at all. From the outset of this process, DEP has been carefully scrutinizing each of Transco's submissions while simultaneously working with Transco to address these concerns. And in the end, DEP reasonably concluded that Transco's proposed changes, plus additional changes that the agency imposed on top of that, sufficed to address the relevant water quality issues. In other words, DEP granted a materially different permit than the one Transco had unsuccessfully sought six years prior.

Petitioners otherwise raise a series of erroneous procedural and substantive quibbles over typical aspects of Clean Water Act implementation. For instance, they assert DEP wrongfully left questions of future water standards compliance to Transco's discretion. But DEP's 2025 Approval is conditional on Transco's

submission of water quality monitoring and management plans, which (as Transco acknowledges) require ongoing approval and supervision from DEP itself, and are also standard in Clean Water Act approvals to boot. Petitioners also claim DEP relied on mixing zones for pollutants that do not meet New Jersey standards. But that is incorrect again: New Jersey water quality standards do not use point source-style mixing zones for dredging projects. While Petitioners claim DEP fell short of the Clean Water Act's public participation requirements, they fail to address the relevant regulations (which New Jersey complied with); fail to identify material documents that were actually withheld from public view; and fail to identify any violations of the applicable New Jersey provisions about public participation. And Petitioners make other assorted errors that fail to account for the governing DEP regulations (the interpretation of which DEP must receive deference on as a binding state law matter) and fail to account for the actual approval DEP issued (as distinguished from Transco's proposals).

In short, DEP acted reasonably and in full compliance with applicable law. This Court should deny the petitions for review.

## COUNTERSTATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 15 U.S.C. §717r(d)(1), which grants "original and exclusive jurisdiction" to the U.S. Court of Appeals for the circuit in which the interstate natural gas facility is proposed to review an order or action of a

"State administrative agency acting pursuant to Federal Law to issue, condition, or deny any permit, license, concurrence, or approval."

## COUNTERSTATEMENT OF ISSUES ON APPEAL

Whether DEP's determination to issue the Water Quality Certification was rational, consistent with the record, and consistent with applicable law.

## STATEMENT OF RELATED CASES

This case has not been before this Court previously. A related challenge to the same pipeline is pending before the Second Circuit at *Raritan Baykeeper v. N.Y State Dep't of Env't Conservation*, No. 25-2938 (2d Cir. Nov. 18, 2025).

## STATEMENT OF THE CASE

### I. Legal Framework

#### A. The Natural Gas Act And The Clean Water Act.

The Natural Gas Act (NGA) creates the legal framework that governs interstate sales and transportation of natural gas—so it is the primary regulatory scheme for projects like the one challenged here. The NGA largely places regulation and approval of interstate natural gas projects in the hands of the Federal Energy Regulatory Commission (FERC). *See* 15 U.S.C. §§ 717-717w. FERC has primary responsibility for issuing certificates of convenience and necessity for interstate natural gas projects, *see id.* § 717f(e), and generally does so pursuant to assessments conducted under federal laws like the National Environmental Policy Act. *See id.* § 717n.

The NGA leaves a role for state-level permitting, principally through "cooperative federalism" style permitting programs, which operate in a federal framework but are administered by the States. Among those is state permitting issued pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq*. *See* 15 U.S.C. § 717b(d)(1)-(3). The Clean Water Act, in turn, embodies a federal policy of preserving the States' primary responsibility to prevent, reduce, and eliminate water pollution, and to plan the development and use of water resources. 33 U.S.C. § 1251(b), (g). States have primary responsibility and authority to protect the waters within their borders. *Id.* § 1370.

Among the tools given to States by the Clean Water Act is the power to issue water quality certifications (Certifications) pursuant to section 401 of the Act, 33 U.S.C. § 1341. Under section 401, applicants for a federal license or permit to conduct activity that may result in a discharge into navigable waters must obtain a Certification from the State in which the discharge originates. 33 U.S.C. § 1341(a)(1). Thus, one federally required authorization for an interstate natural gas project is a section 401 state Certification. *See Delaware Riverkeeper v. Pa. Dep't of Envt'l Prot.* (*Riverkeeper I*), 833 F.3d 360, 369 (3d Cir. 2016). A Certification sets forth effluent or other limitations and monitoring requirements necessary to provide assurance to the state that the project "will comply" with the permitting State's water quality standards and any other state law requirements. 33 U.S.C. §§ 1341(a)(1), (3),

(d). The Certification "shall become a condition on any Federal license or permit" for which it is issued. *Id.* § 1341(d).

### B. New Jersey's Regulatory Framework

Section 401 of the Clean Water Act thus empowers States to condition approval for all manner of activities—including natural gas projects like this one—on compliance with state-level clean water standards. New Jersey, in turn, has enacted a comprehensive legal and regulatory scheme to protect its own waters.

The Department has combined New Jersey's coastal zone permitting review into one regulatory regime, the Coastal Zone Management rules, N.J. Admin. Code § 7:7-1.1 to -29.10, which "establish the rules regarding use and development of coastal resources." *Hackensack Riverkeeper, Inc. v. N.J. Dep't of Env't Prot.*, 443 N.J. Super. 293, 299 (N.J. App. Div. 2015). These rules create an integrated regulatory scheme to implement three different statutory authorities: (1) the Coastal Area Facility Review Act, N.J. Stat. Ann. §§ 13:19-1 to -51, which regulates the coastal zone upland of the mean-high-water line; (2) the Waterfront Development Law, *id.* § 12:5-3, which regulates the coastal zone waterward of the mean high-water line; and (3) the Wetlands Act of 1970, *id.* §§ 13:9A-1 to -10, which regulates coastal wetland resources.[1]

---

[1] The Department regulates additional water resources and areas outside the coastal zone. It regulates freshwater wetlands and state open waters under the Department's

Due to New Jersey's comprehensive permitting authority and built-in safeguards to ensure water quality is maintained, the Department issues Certifications required under section 401 for coastal zone projects through its Coastal Zone Management rules, N.J. Admin. Code § 7:7-1.2(e). If the proposed project meets all the relevant requirements under these rules (which collectively address water quality) and also requires a section 401 Certification, the Department will issue both the coastal permit and the Certification. *Id.* § 7:7-1.2(e)(2).

Relevant here, the Coastal Zone Management rules regulate "new dredging" for submerged pipeline or cable installation. *Id.* § 7:7-12.7 (the New Dredging Rule). As such, a coastal permit is required for any new dredging project within New Jersey's coastal zone. *Id.* § 7:7-2.1(a). Dredging and the management of dredged material must be conducted in accordance with Appendix G to the rules. *Id.* § 7:7-12.7(b). Under Appendix G, "best management practices" to minimize adverse environmental impacts from dredging are "determined by the Department" in accordance with the specific circumstances of the proposed dredging project. *Id.* § 7:7 App'x G.

New dredging projects must also meet applicable Surface Water Quality Standards established under N.J. Admin. Code § 7:9B. *Id.* § 7:7-12.7(c)(10)(iii). Because dredging can have ecological impacts, the Department "may require" water

Freshwater Wetlands Protection Act rules, N.J. Admin. Code §§ 7:7A-1.1 to -22.20, and riparian and flood hazard areas under its Flood Hazard Area Control Act rules, *id.* §§ 7:13-1.1 to -1.7.

quality monitoring "before, during, and after dredging and disposal operations." *Id.* § 7:7-12.7(h). If predicted water quality parameters are likely to exceed surface water quality standards, or if pre-dredging chemical analysis reveals significant contamination, DEP will work cooperatively with the applicant to "fashion acceptable control measures" such as—though not necessarily limited to—best management practices in Appendix G. *Id.* §7:7-12.7(c)(10)(iv).

The Surface Water Quality Standards in turn establish criteria to "protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]." 33 U.S.C. § 1313(c)(2)(A); *see also* N.J. Admin. Code § 7:9B-1.1 (defining scope). The standards contain a wide range of policies, designated uses, and quality criteria applicable to different bodies of water throughout the State. *See id.* §§ 7:9B-1.4, -1.12, -1.14. Relevant here, Raritan Bay and the Atlantic Ocean (both waterbodies where the project will be constructed) includes what the Standards designate as saline estuarine and coastal saline waters. *See id.* § §7:9B-1.4, -1.15(c) (designating Atlantic Ocean as "SC" coastal saline), (g) (designating Raritan Bay as "SE1" saline estuarine).[2] Uses for those waters are diverse. They include shellfish harvesting, "[m]aintenance, migration and propagation of the natural and established biota"—that is, preservation of existing ecosystem—"primary contact recreation"

---

[2] *See also* FERC Environmental Impact Statement, pdf page 218 [JA__] [AR31] (noting the offshore segment of the Raritan Bay Loop would cross waters designated by DEP as "saline estuarine" and "coastal saline waters.")

through activities like swimming, and "[a]ny other reasonable uses." *Id.* § 7:9B-1.12(d), (g). As noted above, the Coastal Zone Management rules incorporate the Surface Water Quality Standards as part of the dredging regulatory regime. *Id.* § 7:7-12.7(c)(10)(iii).

## II. Factual Background

### A. The Project.

Transco first proposed the Northeast Supply Enhancement project in May 2016. The Project would expand Transco's existing natural gas pipeline system between Pennsylvania and New York in the offshore waters between New York and New Jersey. FERC Environmental Impact Statement (FERC EIS), pdf page 25 [JA__] [AR31].[3] It would provide 400,000 dekatherms per day of natural gas to end users in the New York City area—under Transco's estimates, a supply sufficient to meet the needs of 2.3 million homes. *Id.* at 2 [JA__] [AR31]; *Northeast Supply Enhancement*, Williams Cos., https://www.williams.com/expansion-project/northeast-supply-enhancement/ (last visited Apr. 20, 2026).

The Project has three distinct components in New Jersey. The first of these, called the Madison Loop, will run underground in Middlesex County. DEP Environmental Report, pdf page 6 [JA__] [AR27]. The second, called the Raritan Bay Loop,

[3] [JA] refers to the forthcoming joint appendix. [AR] refers to the document number in the certified index of record.

will briefly run underground in the municipality of Sayreville before crossing almost six miles of New Jersey waters under Raritan Bay—the body of water between Staten Island and Monmouth County. *Id.* [JA__] [AR27]. The Raritan Bay Loop will then cross into New York State waters before connecting with existing pipeline infrastructure to bring gas ashore on Long Island. *Id.* [JA__] [AR27]. Transco also plans to build a new compressor station in Franklin Township, in inland Somerset County, *Id.* [JA__] [AR27], to facilitate transport of additional natural gas through the pipeline. FERC EIS, pdf page 3, 65-66 [JA__] [AR31].

As is common for underwater pipeline projects, the Raritan Bay Loop segment will require dredging in the sediments on the bottom of Raritan Bay. Transco would dredge a trench, place the pipeline, and fill the remainder of the trench with clean sandy backfill. FERC EIS, pdf page 94, 115 [JA__] [AR31]; Permit, page 5 [JA__] [AR30]. The material dredged from the seabed would be transported to land disposal sites in Pennsylvania and Ohio. DEP Environmental Report, pdf page 55 [JA__] [AR27].

### B. The 2019 Denial.

After Transco first proposed the Project, it began to move forward with federal-side permitting. In January 2019, FERC issued its environmental impact statement for the Project. FERC EIS, pdf page 1 [JA__] [AR31]. The statement concluded that construction and operation of the project "would impact the

environment," but "[m]ost of these impacts would be temporary and occur during construction." *Id.* at 26, 38 [JA__] [AR31]. FERC then issued its first certificate of public convenience and necessity in May of 2019 authorizing Transco to construct and operate the Project. FERC Certificate of Public Convenience and Necessity (CPCN), page 2 [JA__] [AR405]. The certificate was conditioned on Transco obtaining "all applicable authorizations required under federal law … prior to commencing construction," including water Certifications from New Jersey and New York. *Id.* at 3 [JA__] [AR405].

Transco had simultaneously started the process of obtaining state-level authorizations. Transco first applied for DEP permits under the Clean Water Act and Coastal Zone Management Act in July 2017. *See* 15 U.S.C. § 717b(d). These requested permits included individual permits under the Freshwater Wetlands Protection Act, the Flood Hazard Area Control Act, the Waterfront Development Act (for both in-water and upland activities), and the Wetlands Act of 1970, as well as a flood hazard verification—all permits necessary to construct the project. DEP Environmental Report, pdf page 1 [JA__] [AR27]. The Freshwater Wetlands and Flood Hazard approvals were required before Transco could construct Compressor Station 206 and the Madison Loop pipeline. *Id.* at 7 [JA__] [AR27]. The Waterfront Development and Coastal Wetlands permits were required for the Raritan Bay Loop. *Id.*

[JA__] [AR27]. Transco's application also requested a section 401 Certification. *Id.* [JA__] [AR27].

Transco withdrew its initial application in June 2018 and resubmitted another application that same month. *Id.* at 2 [JA__] [AR27]. Transco's resubmitted application included sediment samples for the Raritan Bay Loop dredging portion of the Project. 2019 Denial, page 12 [JA__] [AR4]. Through June 2019, the Department and Transco exchanged multiple rounds of information, and the Department held a public hearing and a public comment period. DEP Environmental Report, pdf page 2-3 [JA__] [AR27].

In June 2019, the Department denied without prejudice Transco's application for the Permits and Certification (the 2019 Denial). 2019 Denial, page 1 [JA__] [AR4]. The 2019 Denial primarily focused upon Transco's proposed freshwater wetlands impacts surrounding Compressor Station 206 and alternatives to those wetlands impacts that the Department had suggested but Transco had not diligently pursued, none of which are challenged here. *Id.* at 6-8 [JA__] [AR4]. The 2019 Denial also noted that Transco had not demonstrated the Project met the "compelling public need" standard under the Freshwater Wetlands Protection Act rules. *Id.* at 10 [JA__] [AR4].

The Department also noted in the 2019 Denial that it had insufficient information to determine whether, under DEP's New Dredging Rule, N.J. Admin. Code

§7:7-12.7, the as-proposed Raritan Bay Loop could meet water quality standards. 2019 Denial, page 12-13 [JA__] [AR4]. Specifically, the 2019 Denial identified six locations where certain contaminants exceeded the "ecological saline water sediment ER-M criteria," which measures the toxicity of contaminants in sediments. *Id.* at 12-13 [JA__] [AR4]. Those contaminants were bis(2-ethylhexyl)phthalate, phenanthrene, arsenic, manganese, mercury, PCBs, and 4, 4' DDE. *Id.* at 12 [JA__] [AR4]. The 2019 Denial noted that, based on the analyses before DEP at the time, dredging contaminated sediments along the Raritan Bay Loop "could" exceed numeric criteria in the surface water quality standards. *Id.* at 13 [JA__] [AR4]. DEP explained that any resubmission must include a modeling analysis for the areas of concern which modeled "implementation of appropriate best management practices identified in Appendix G ... to avoid adverse water quality impacts." *Id.* at 14 [JA__] [AR4].

### C. Transco's Second Application And The 2020 Denial.

Following the 2019 Denial, Transco met with DEP. The parties discussed the applicable surface water quality criteria for the contaminants and DEP explained that Transco should use acute and chronic thresholds for its modeling analysis. Transco Environmental Report, Appendix A, pdf pages 815, 822 [JA__] [AR64]. DEP noted that the "human health threshold" for water quality should be considered but that "the project may not be held to that directly." *Id.* at 815 [JA__] [AR64]. Transco

also identified that New York's Department of Environmental Conservation was planning to impose a 500-foot "mixing zone" for dredging contaminated sediments. *Id.* [JA__] [AR64] (Although not used in New Jersey dredging permits, a "mixing zone" is understood in some other contexts to refer to an initial area where a point discharge mixes with water, and it may be permissible to exceed water quality standards, *see*, *e.g.*, 40 C.F.R. § 230.3(h)); N.J. Admin. Code §7:9B-1.5(h). DEP noted that a mixing zone could be used in Transco's modeling analysis but did not state that a mixing zone would apply to the Project. *See id.* at 815 [JA__] [AR64]. Instead, DEP sought to determine whether, as required under the New Dredging Rule, Transco's "modeling coupled with best management practices Transco has committed to implement as well as monitoring during construction" indicated that "construction will not have negative impact on water quality and any impacts will be short-term, temporary, and localized." *Id.* at 822 [JA__] [AR64].

That same month, Transco resubmitted its application for permits and a Certification. DEP environmental report, pdf page 3 [JA__] [AR27]. As DEP requested, Transco also submitted supplemental information with an updated modeling analysis and proposed best management practices to reduce water turbidity and minimize the release of contaminated sediments. 2019 Permit Application Supplement, pdf pages 122-124, 180-181 [JA__] [AR3]; DEP Environmental Report, pdf page 3 [JA__] [AR27]. To manage turbidity, Transco proposed using clean, sandy, backfill

material; using a clamshell-style bucket it would lower into the water before releasing material; and using a jet trencher where appropriate to reduce sediment disturbance as compared to clamshell dredging. 2019 Permit Application Supplement, pdf page 181 [JA__] [AR3]. The application also included a contaminant modeling analysis. *Id.* at 122 [JA__] [AR3].

Transco's lengthy proposed best management practices for minimizing the release of contaminated sediments included: using horizontal directional drilling to reduce disturbance to contaminated nearshore sediments; using an environmental bucket for clamshell dredging in contaminated areas; removing dredged material rather than casting it into Raritan Bay; not allowing water overflow from barges filled with dredged material in areas with contaminated sediments; adjusting the dredging rate to meet the surface water quality standards; and developing a DEP-approved water quality monitoring plan prior to offshore Project construction. *Id.* at 180-181 [JA__] [AR3].

Between June 2019 and May 2020, Transco and DEP exchanged additional information, Transco withdrew and resubmitted its permit applications, and DEP took additional public comments. DEP Environmental Report, pdf pages 3-4 [JA__] [AR27]. Despite these discussions, DEP never reached the merits of Transco's second application. Instead, on May 15, 2020, New York denied Transco's parallel application. Without the ability to build in New York, work on the Project in New

Jersey would be futile. So DEP denied Transco's permit applications and Certification request solely because Transco had not demonstrated a "compelling public need" for the Project under the Freshwater Wetlands Protection rules at N.J. Admin. § Code 7:7A-10.4. 2020 Denial, page 8-10 [JA__] [AR5]. And because it rested on futility (effectively a mootness conclusion), the 2020 Denial did not resolve the merits of Transco's then-pending application materials, including Transco's updated modeling analysis. *See id.* [JA__] [AR5]. Transco did not appeal the Department's denial, and in light of these events FERC vacated Transco's certificate of public convenience and necessity in June 2024. FERC CPCN, page 4 [JA__] [AR405].

**D. The 2025 Approval.**

After further adjustments to its project, on May 30, 2025, Transco submitted a new application to New York. DEP Environmental Report, pdf page 5 [JA__] [AR27]. And on that same day, Transco resubmitted applications for permits and a Certification to DEP. *Id.* [JA__] [AR27]. The applications to DEP were "essentially identical" to the resubmitted 2019 applications. 2025 Application Cover Letter, page 1 [JA__] [AR82]. As in the prior application, Transco indicated that its modeling efforts showed no adverse impacts to water quality due to contaminants. Transco 2025 Compliance statement, pdf page 96 [JA__] [AR83]. Any contaminants introduced to the water column would "be localized, temporary and of short duration." *Id.* [JA__] [AR83]. And if exceedances were to occur, Transco "committed to

implementing adaptive management methods" to ensure the dredging project adheres to the Department's water quality criteria. *Id.* at 97 [JA__] [AR83]. The applications included a draft water quality monitoring plan "to document Project compliance with water quality standards of New Jersey" and contained adaptive management strategies "in the event of an exceedance of a compliance threshold." Draft Water Quality Monitoring Plan, pdf pages, 12, 17 [JA__] [AR74]. These applications were administratively complete on June 23, 2025. DEP Environmental Report, pdf page 5 [JA__] [AR27]. While DEP (and New York) continued their review, FERC reissued the certificate of public convenience and necessity for the project. FERC CPCN, page 1 [JA__] [AR405].

In July 2025, DEP posted what then consisted of Transco's applications onto DEP's website (Email RE: Proposed Transco NESE Project, pdf page 2 [JA__] [AR374]), and included the project in DEP's permitting bulletin.[4] The Department then began to solicit public comments. *See* N.J. Admin. Code § 7:7A-19.6(d) (providing a 30-day public comment period). That same month, DEP issued a deficiency letter to Transco seeking "additional information" for "staff to deem the application administratively and technically complete" under DEP's rules. DEP July 21, 2025 Deficiency Letter, page 1 [JA__] [AR377]. The Department requested,

---

[4] DEP Bulletin, July 16, 2025, https://dep.nj.gov/wp-content/uploads/bulletin/bu2025_0716.pdf, page 69.

among other things, information to demonstrate compliance with the Department's stormwater management rules at N.J. Admin. Code § 7:8. *Id.* at 1-2 [JA__] [AR377]. Transco's response included updated stormwater information on August 21, 2025. Transco August 21, 2025 Response [JA__] [AR397] (noting that Transco had "revised the stormwater management plan," and the "revised plans" had been "provided in [Transco's] updated submission.").

Transco's full response (unlike the initial application) was not immediately posted on DEP's website. But the full application materials (including the full response) were made "available for review at the Clerk's office in" three different municipalities, as well as by contacting the DEP's Trenton Office. DEP Notice of Public Hearing [JA__] [AR23]. That availability was also communicated to the public when DEP formally posted a Notice of Public Hearing on its website, and invited the public to both attend a September 2025 public hearing and submit comments. *Id.* [JA__] [AR23].

In addition to the public comments made at the hearing, the Department received over 1,500 written comments. *See* Final Transco NESE Spreadsheet [JA__] [AR12]. Both sets of Petitioners submitted written comments and participated in the public hearing. NRDC Public Comment [JA__] [AR6]; EELC Public Comment [JA__] [AR7]; Public Hearing Transcript [JA__] [AR8].

On November 7, 2025, the Department issued the Permits and a section 401 Certification to Transco (the 2025 Approval). Permit Document (Permit) [JA__] [AR30]. The Department also issued a document responding to public comments and four thorough summary reports that explain the agency's reasoning. DEP Engineering Report [JA__] [AR26]; DEP Environmental Report [JA__] [AR27]; DEP ODST Dredging Report [JA__] [AR28]; DEP Threatened and Endangered Species Report [JA__] [AR29]; DEP Response to Public Comment [JA__] [AR22].

The 2025 Approval contained numerous findings and conditions. With respect to dredging, the Department determined that Transco's modeling analysis "indicated that with the use of best management practices, turbidity concentrations of sediments and sediment plumes will be kept to a minimum level" and "meets the [Department's] water quality standards." DEP Environmental Report, pdf page 61 [JA__] [AR27]. "[A]ny temporary increases in turbidity or contaminant levels are expected to be minimal and will not result in long-term impacts to water quality or aquatic life." DEP Response to Public Comment, page 7 [JA__] [AR22].

The Permits and Certification were also conditioned on compliance with dredging best management practices that limit impacts, reduce turbidity, and minimize sediment plumes. Permit, pages 4-6 [JA__] [AR30]; DEP Environmental Report, pdf page 61 [JA__][AR27]. In some areas with contaminated sediments, the Department required that dredging activities operate at a slower rate than Transco

modeled, to further reduce the likelihood of an exceedance to water quality criteria. *Compare* Permit, page 5, condition 12 [JA__] [AR30] (requiring operation of 4,800 cubic feet per hour for sediment sampling locations VC208 and VC214) *with* Hydrodynamic and Sediment Transport Modeling Results (Hydrodynamic Report), table 7, pdf page 341 [JA__] [AR73] (modeling of operation at rate of 7,500 cubic feet per hour for majority of contaminants). The Permits also require the environmental bucket used for clamshell dredging to remain closed until it reaches the dredge trench, require that it be equipped with sensors to ensure "complete closure of the bucket before lifting," and require that it lifted at a rate of "2 feet per second or less." Permit, page 5, conditions 23, 24 [JA__] [AR30]. Transco must also submit a water quality monitoring plan to DEP (including three points of monitoring (*Id.* at 4, condition 9) [JA__] [AR30]); must record turbidity levels twice daily (*Id.*); and must monitor turbidity using a device that records turbidity in "nephelometric turbidity units." *Id.* at 4, condition 10 [JA__] [AR30]. If Transco exceeds water quality criteria, as determined through water quality monitoring, it must operate according to a Department-approved adaptive management plan, which "consists of a course of action" which "may be employed in any given situation that will reduce or mitigate the effects of observed increases in turbidity." *Id.* at 5, condition 11 [JA__] [AR30]. Transco is further prohibited from discharging water from dredged material back

into the waterbody and may not “side cast” dredged material. *Id.* at 5, condition 13, 26 [JA__] [AR30].

The Department also required Transco to minimize dredging impacts. The project’s dredge trench was reduced to the minimum size necessary to lay the pipe and bury it under the sediment. DEP ODST Dredging Report, pdf page 9 [JA__] [AR28]. Further, certain areas of pipeline will be installed using horizontal directional drilling, “which overall has a smaller footprint of disturbance compared” to other dredging methods. *Id.* at 9 [JA__] [AR28]. The Department also reviewed Transco’s proposed dredge material disposal and found that “[a]ll material was accepted by multiple locations in Pennsylvania and Ohio.” DEP Environmental Report, pdf page 55 [JA__] [AR27].

The Department additionally consulted with its Marine Resources Administration regarding impacts to shellfish and to commercial shellfish harvesters. Marine Resources Administration Memorandum (MRA memo), page 1 [JA__][AR16]. The Administration acknowledged that the Project will “directly and indirectly impact productive surf clam beds” but that impacts “will be temporary.” *Id.* at 3-4 [JA__] [AR16]. Clam habitat and clam populations are expected to “recover within 1 to 3 years.” DEP Environmental Report, pdf page 12, 43 [JA__] [AR27]. The Permits and Certification require Transco to notify commercial harvesters of shellfish for bait thirty days before construction to allow them the opportunity to harvest in

the construction area before construction begins. Permit, page 9, condition 4 [JA__] [AR30].

Finally, the Permits and DEP Engineering Report provide DEP's determination that the Project meets the stormwater management rules, and requires approval for any future alteration of the stormwater management system. Permit, page 13 [JA__] [AR26]; DEP Engineering Report [JA__] [AR26]. DEP also determined that the Project met numerous other regulatory requirements under the freshwater wetlands, and flood hazard regulations, but Petitioners do not challenge these findings here.

On November 18, 2025, Petitioners filed two separate Petitions in the Second Circuit under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), challenging the DEP's approvals issued to Transco. The Second Circuit thereafter transferred both Petitions to this Court.

## STANDARD OF REVIEW

When a state takes action related to an interstate natural gas facility, this Court applies a multi-part standard of review. Questions of federal law, including a state agency's interpretation of federal law, are reviewed *de novo*. *Riverkeeper I*, 833 F.3d at 377. And although the federal Administrative Procedure Act (APA) itself only applies to federal agencies, *see* 5 U.S.C. §551(1), certain state action taken

pursuant to delegated authorities under federal law—including the Clean Water Act—receives APA-style arbitrary-and-capricious review. *Id*.

State law, however, supplies the procedures the state agency follows while acting pursuant to federal law. *See Delaware Riverkeeper Network v. Sec'y, Pa. Dep't of Env't Prot.* (*Riverkeeper III*), 903 F.3d 65, 73-74 (3d Cir. 2018). And "federal courts reviewing state agency action afford agencies the deference they would receive under state law." *Township of Bordentown v. FERC*, 903 F.3d 234, 270 (3d Cir. 2018); *Delaware Riverkeeper Network v. Sec'y, Pa. Dep't of Env't Prot.* (*Riverkeeper II*), 870 F.3d 171, 181 (3d Cir. 2017). Under New Jersey law, that means deferring "to the agency's factual findings if those conclusions are supported by the record," and within the scope of state law, "defer[ring] to an agency's interpretation of both a statute and implementing regulation, within the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable.'" *E. Bay Drywall, LLC v. Dep't of Labor & Workforce Dev.*, 278 A.3d 783, 792 (N.J. 2022).

## SUMMARY OF ARGUMENT

**I.A.** The 2025 Approval rests on sound footing. The Department had the benefit of an extensive evidentiary record when it approved the Project, which was materially distinct from the one it faced in 2019. The record was already better-developed by 2020, and only more so by 2025, allowing DEP to reasonably determine

that the Project—with conditions—could meet New Jersey's water quality standards.

**B.** The 2025 Approval is consistent with DEP's past positions. There is nothing inconsistent about denying an application in 2019, and then approving a materially different application in 2025—especially when the 2025 application was supported by information that specifically addressed the prior identified deficiencies. The Department thus need not justify any change in position, and Petitioners' contrary arguments completely skip over the differences between the Department's 2019 denial (which considered an earlier version of Transco's application) and the Department's 2020 denial (which never considered the merits of Transco's updated application because it was based on New York's actions). Moreover, the 2025 Approval considered all relevant factors. It was not limited to an assessment of public need, adequately considered environmental impacts, and did not abandon any conclusions it had previously reached.

**II.A.** The Department properly made use of conditions in the 2025 Approval. Conditioning a water quality Certification on the submission of binding plans for water quality monitoring and adaptive management is consistent with the well-established practice of issuing conditional approvals under the Clean Water Act and is distinct from cases that inadequately deferred planning to the future where such plans would have no meaningful check for sufficiency.

**B.** Petitioners' remaining substantive objections to these plans also fall short. The plans adequately provide for ensuring water quality through turbidity monitoring, and through best practices Transco will implement. Many of Petitioners' complaints, by contrast, are based on cherry-picking selected pieces of modeling or information that Petitioners fail to accurately situate in the context of the Project that DEP actually approved.

**III.** The Baykeeper Petitioners mistakenly challenge the 2025 Approval as premised on improperly designed mixing zones. That is not the basis for the 2025 Approval, which is instead based on New Jersey's regulatory scheme designed specifically for new dredging projects. Mixing zones, by contrast, are used in New Jersey only for point sources of pollution unlike the Project.

**IV.** The 2025 Approval complies with the Clean Water Act's public participation requirements. The Act's specific public participation requirements for section 401 Certifications are delegated to the States' discretion. Petitioners do not, and on this record cannot, argue that New Jersey failed to abide by any of the public notice obligations it has imposed on itself under state law. So Petitioners instead claim a freestanding violation of the Clean Water Act by the Department. Doing so is inconsistent with the Act's statutory scheme, and in any event, futile given the transparency with which the 2025 Approval proceeded.

## ARGUMENT

### I. The 2025 Approval Is Not An Arbitrary Reversal Of The 2019 Denial.

NRDC erroneously argues that the Department's 2025 Approval constitutes an arbitrary and unexplained reversal of its 2019 Denial. NRDC Br.28-46. To start, the Department provided ample reasoning for the 2025 Approval, which rested on an extensive record reflecting how the Department considered the facts and plans in Transco's 2025 application. That extensive explanation likewise made clear that DEP considered far more than a narrow question of public need. *Contra* NRDC Br.31-32. Rather, by considering a different application, presenting different facts, from the one subject to the 2019 Denial, the 2025 Approval did not represent a reversal from 2019 at all. And it most certainly does not represent an arbitrary or unreasoned one: despite NRDC's claims to the contrary, the 2025 Approval ensured that the Project would adequately protect surface water uses and meet water quality standards.

#### A. The 2025 Approval Is Well-Reasoned.

The Department's 2025 Approval rested on its consideration of an extensive record that went far beyond the one on which it grounded the 2019 Denial. The 2019 Denial was driven by inadequacies particular to that application: Transco failed to show the Project met the freshwater wetlands rules and Transco did not submit sufficient information for the Department to determine whether the Project met the

Surface Water Quality Standards. 2019 Denial [JA__] [AR4]. But the application the Department denied in 2019 was distinct from the one it approved in 2025—and different even from the one it denied in 2020.

Following the 2019 Denial, Transco began the process of substantially revising its application—specifically to meet the concerns the Department had expressed. For example, DEP's 2019 Denial noted that a resubmitted application would need to include additional contaminant modeling analysis that implemented "appropriate best management practices" (laid out in a specific Appendix to DEP's rules, Appendix G) to demonstrate compliance. 2019 Denial, page 14 [JA__] [AR4]. So Transco thereafter submitted additional water quality modeling for further consideration, just as DEP requested. 2019 Permit Application Supplement, pdf pages 111-125 [JA__] [AR3]. This additional modeling incorporated best management practices, and slowed the speed of the dredging operations to determine the effect on water quality. Hydrodynamic Report, pdf page 340-341 [JA__] [AR73].

Accordingly, by the time DEP denied Transco's application in 2020 as moot (in light of New York's denial), DEP already faced a materially different submission from the one it had denied in 2019. And because New Jersey's 2020 Denial thus rested solely on lack of compelling public given New York's actions, (2020 Denial [JA__][AR5]), further discussions between the Department and Transco were essentially frozen. But that has no bearing on whether the updated *substantive* application

Transco had submitted (discussed prior to the 2020 Denial) was different than the one DEP rejected in 2019. And nothing about this procedural history required Transco to stop continuing to develop its application and submissions once it re-started the application process in 2025 with both New York and New Jersey.

Those updated materials also explain why DEP's 2025 Approval reflected the Department's additional reasoning that the Project complies with New Jersey's laws and regulations—including to specifically rely on new modeling in shaping best management practices that the Department ultimately chose to require. DEP issued the Permits and Certification alongside four reports summarizing the agency's reasoning that the proposed activities met the applicable regulatory requirements, *supra* at 19. *See* N.J. Admin. Code § 7:7-1.2(e). Those reports considered the Project's permitting history and the ways in which the 2025 application resolved issues previously identified with the 2019 application. DEP Environmental Report, pdf page 1-5 [JA__] [AR27]. DEP also provided a comprehensive summary of the permitting history, including the prior permit denials, in its environmental summary report. *Id.* at 3, 5 [JA__] [AR27]. Simply put, DEP recognized it was facing a new question than it had not previously resolved, and it chose to evaluate that revised application on its own record materials.

There was thus nothing arbitrary about the Department reviewing Transco's lengthy 2025 applications and reasonably concluding they complied with applicable

Department rules. The Department also extensively documented why Transco's 2025 application met the rules, including addressing at length how the freshwater wetlands issues that were problematic in 2019 had been resolved by 2025. DEP Environmental Report, pdf page 26 [JA__] [AR27]. Relevant here, the Department also issued a lengthy report that focused entirely on how the proposed Project dredging met New Jersey's regulatory standards. DEP ODST Dredging Report [JA__] [AR28]. Those conclusions applied not only to the aspects of the Project affecting Raritan Bay, but determined further that the upland portions of the Project meet the stormwater management regulatory requirements. DEP Engineering Report, pdf page 3-9 [JA__] [AR27].

Nor is the 2025 Approval a rubber stamp for all future activities: the Department imposed numerous best practice, monitoring, and reporting conditions, consistent with the Coastal Zone Management rules, the Surface Water Quality Standards, and Transco's revised modeling, including dredging conditions to limit impacts, reduce turbidity, and minimize sediment plumes, and seasonal construction restrictions to protect aquatic species. *Id.* § 7:7-26.6(a) (permit may include conditions necessary to ensure compliance); *id.* § 7:7-12.7(c)(10)(ii) (new dredging is conditionally acceptable provided project complies with new dredging rule); *id.* § 7:7 App. G. Permit, pages 4-6, 8 [JA__] [AR30]; DEP Environmental Report, pdf page 61 [JA__] [AR27]. And the 2025 Approval requires more information still. The

Permits and Certification require Transco to submit a water quality monitoring plan and an adaptive management plan, both of which are subject to Departmental review and approval. Permit, pages 4-5 [JA__] [AR30]; *see also* Transco Environmental Report, pdf page 125 [JA__] [AR46] (noting that "Transco will adhere to an NJDEP approved water quality monitoring plan.").

The 2025 Approval is thus both well-reasoned and appropriately calibrated to the facts and data facing the Department in 2025.

### B. The 2025 Approval Was Neither A Reversal In DEP's Position Nor An Arbitrary One.

Despite the extensive documentation and reasoning supporting the 2025 Approval, NRDC argues the 2025 Approval represents an arbitrary reversal in DEP's position. NRDC Br.28-46. This Court should reject that view.

#### 1. *The 2025 Approval Was Consistent With DEP's Past Positions.*

To start, NRDC is wrong to characterize the 2025 Approval as an agency reversal in the first place. When an agency issues a reasoned denial of one permit application, and later approves a would-be permittee's subsequent application, the second agency action is distinct from the first, with the subsequent approval not constituting a change in position that requires explanation. *Matter of Petition of S. Jersey Gas Co.*, 149 A.3d 13, 22 (N.J. App. Div. 2016) (recognizing that an agency's decision on a second application is not a decision on the project as initially proposed, since the second application is "in fact, a new matter"); *cf. also, e.g.*, *Prometheus*

*Radio Project v. FCC*, 373 F.3d 372, 389 n.11 (3d Cir. 2004) (rejecting law of the case doctrine as applied between different petitions for review of FCC broadcast ownership rules, "in which a different set of parties participated, a different record was compiled, and different results were reached").

Just so here. The 2025 Approval extensively documented how the freshwater wetlands issues that had prompted the 2019 Denial had been resolved. DEP Environmental Report, pdf page 26 [JA__] [AR27]. And the lack of public need that had prompted the 2020 Denial was no longer applicable as a result of New York's 2025 approval for the Project. With those barriers obviated, the Department's 2025 Approval did not represent a reversal in position. Rather, the Department simply applied its analysis and policies to a new set of facts posed by the new application. And so for the reasons identified above—where DEP marched through new modeling and other new evidence on which its conclusion rested—the very framework of a "change" in position is inapplicable. *See supra*, at 10-22. The *application record* changed; DEP did not.

Even if the 2025 Approval did constitute a reversal in position, NRDC cannot plausibly argue that the Department acted arbitrarily and capriciously in doing so. The Department acknowledged it issued the 2019 and 2020 Denials, so it cannot be the case that the Department failed to "display awareness" of any such change. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); DEP Response to Public

Comments, page 1 [JA__] [AR22]. Nor is it the case that the Department failed to "provide a reasoned explanation for the change." *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016). After all, the Department explained that the freshwater wetlands issues leading to the 2019 Denial had been resolved—and it explained so in detail, identifying in page after page Transco's changes and submissions. DEP Environmental Report, pdf page 3, 26-29, 31, 33-34 [JA__] [AR27]. And the agency's rationale for the 2020 denial (New York's denial) was obviously no longer applicable after New York issued its 2025 approval, which DEP also expressly noted. DEP Response to Public Comments, pages 1-2 [JA__] [AR27].

2. *The 2025 Approval Did Not Arbitrarily Overlook Relevant Factors*.

That leaves NRDC to raise a smorgasbord of disputes with the 2025 Approval that it attempts to cast as arbitrary decision-making, but none prevail. NRDC complains that DEP solely relied on purported public need to support a change in position. NRDC Br.31-32. But the 2025 Approval only acknowledged the change in public need for the Project as a necessary condition, not as a sufficient one. DEP Environmental Report, pdf page 34 [JA__] [AR27]. The reason DEP took steps like issuing no fewer than four separate reports explaining its reasoning is *because* the Department also considered all other "relevant factors" to determine the Project would satisfy water quality standards. *Transcontinental Gas Pipe Line Co. v. Pa. Envt'l H'ng Bd.*, 108 F.4th 144, 155 (3d Cir. 2024). And while the Department did

determine that there is "public need" for the Project under the freshwater wetlands rules (DEP Environmental Report, pdf page 34 [JA__] [AR27]), need alone was not the basis for the approvals. Rather, the Department issued the approvals after receiving additional analyses from Transco that supported the numerous best management practices the Department also imposed to ensure the Project "meets the water quality standards." Transco Environmental Report, page 114 [JA__] [AR46]; Permit, page 4-6 [JA__] [AR30]; DEP ODST Dredging Report, pdf page 7 [JA__] [AR28]. NRDC is thus mistaken in its attempt to characterize the Department's decision as resting on a far narrower ground than it actually did.

NRDC next errs in contending the Department arbitrarily failed to explain why the 2025 Approval was able to conclude that Transco could meet Surface Water Quality Standards. *See* NRDC Br.32-35. NRDC emphasizes that the 2019 Denial concluded it was likely the Project would adversely affect wildlife on the bottom of Raritan Bay—despite mitigation measures Transco proposed at the time. *See* NRDC Br.32-35. But critically, and as explained above, the 2025 Approval was not for "essentially the same" project the Department rejected in 2019, *see* NRDC Br.34 (quoting DEP Response to Public Comments, page 1 [JA__] [AR22]). Instead, the 2025 Approval began with Transco's resubmission of material more similar to what Transco submitted shortly after the 2019 Denial—and *that* submission was different from the submission that led to the 2019 Denial. *Compare* 2018 Transco

Application For NJDEP, pdf pages 78-103 [JA__] [AR2] *with* 2019 Permit Application Supplement, pdf pages 111-124 [JA__] [AR3] *and* Transco Environmental Report, pdf page 90-131 [JA__] [AR46]. And even beyond the evident differences in the opening 2025 *submission* and the 2019 record, the Department's 2025 *approval* rested on still further information-gathering from Transco and other sources, as well as Transco's prospective future compliance with numerous best practices and other DEP-imposed conditions.

Nor are NRDC's more specific complaints persuasive. NRDC claims the Department failed to explain how the project would be consistent with designated and existing uses for Raritan Bay—particularly shellfish harvesting. NRDC Br.35-43. That is inaccurate. The Department designates potential and existing uses for every body of surface water in the State. N.J. Admin. Code § 7:9B-1.4. The existing and designated uses for saline estuarine (SE1) and coastal saline (SC) waters (where the Project will occur) include "shellfish harvesting" and "maintenance, migration and propagation of natural and established biota." *Id.* § 7:9B-1.12(d)(1), (g)(1). These uses apply to *waterbodies* (e.g., to all of Raritan Bay) rather than *areas within a defined waterbody*. *See id.* § 7:9B-1.15(g) (describing Raritan Bay as saline estuarine SE1 waters). The Department never found that these existing and designated uses are no longer applicable in Raritan Bay as a whole. Rather, the Department found that impacts to shellfish "will be temporary." MRA memo, page 4 [JA__]

[AR16]. And the mere existence of temporary impacts within the project's path hardly shows that the existing and designated uses applicable in Raritan Bay are no longer viable. Indeed, the designated use of "shellfish harvesting" still exists in Raritan Bay, and the Certification mitigates for shellfish impacts by requiring Transco to notify commercial shellfisherman before construction to allow them an opportunity to harvest within the project's path. Permit, page 9, condition 4 [JA__] [AR30].[5]

Nor did the Department use that conclusion to ignore any impact the Project would have on shellfish communities. Instead, the Department considered the Project's impacts to shellfish and shellfish harvesting by consulting with its Marine Resources Administration, which found the Project will "directly and indirectly impact productive surf clam beds" but did not disagree with Transco's suggestion that those impacts would be temporary. MRA memo, page 3-4 [JA__] [AR16]. It thus found that, consistent with New Jersey's water quality standards, those temporary impacts

[5] Furthermore, the designated use of "maintenance, migration and propagation of natural and established biota" still exists in Raritan Bay too. The Department specifically found that "the proposed project is not expected to result in significant adverse impacts to the natural behavior and ecological functions of marine fish species or fisheries" including "critical life-cycle processes such as reproduction, spawning and migration, which are anticipated to return to baseline (pre-construction) conditions upon completion of the Raritan Bay Loop." DEP Environmental Report, pdf page 60 [JA__] [AR27].

did not result in "irreversible changes" to the waterbody. *See* N.J. Admin. Code § 7:9B-1.5 (d) (requiring that "[n]o irreversible changes be made to existing water quality that would impair" the "designed uses of the waterway.").[6]

None of NRDC's claims to the contrary change this reality. NRDC claims that the Department abandoned its 2019 conclusion that the exceedance of New Jersey's Ecological Saline Water Sediment Effects Range Medium (ER-M) guidance could harm benthic shellfish communities. NRDC Br.39-40. But that is beside the point: what matters for the 2025 Approval—and New Jersey's water quality standards—is that the Department found that any such harms would be temporary. MRA memo, page 4 [JA__] [AR16]; DEP Response to Public Comment, pdf page 7 [JA__] [AR22] (providing that "any temporary increases in turbidity or contaminant levels are expected to be minimal and will not result in long-term impacts to water quality or aquatic life"). Although NRDC observes that the Department's Marine Resources

[6] NRDC also briefly contends that DEP did not adequately address anti-degradation policies (including those set forth in 40 C.F.R. 131.12(a)(2)) concerning protection of fish, shellfish, and wildlife. NRDC Br.43. The available evidence before DEP, however, indicated that impacts to shellfish would be temporary. MRA memo, page 4 [JA__] [AR16]. Moreover, DEP imposed various conditions to protect fish. Indeed, DEP adjusted project construction around critical monthly time periods for fish, to reduce risk of direct impacts to sensitive habitat. DEP Environmental Report, pdf page 13 [JA__] [AR27]; *see also* Permit, page 8, condition 2 [JA__][AR30] (prohibiting construction in Raritan Bay between March 1 and June 30 to protect Atlantic and short-nosed sturgeon); *Id.*, condition 3 [JA__] [AR30] (imposing additional restrictions to protect river herring and winter flounder).

Administration concluded the Project would impact local surf clam communities, the Administration also expressly linked that impact to (temporary) construction activities, and it quoted without dispute Transco's conclusion that surf clam communities would likely recover within a few years of the Project's completion. MRA Memo, page 2-4 [JA__] [AR16]; DEP Environmental Report, pdf page 12. That conclusion meets the relevant "no irreversible changes" to the waterway's designated uses requirement. *See* N.J. Admin. Code §7:9B-1.5(d).

NRDC next complains that the Department failed to adequately explain why it chose in the 2025 Approval to use water quality mitigation measures that it rejected in the 2019 Denial. *See* NRDC Br.40-41. But that, too, takes a cramped view of the record. The Department did not merely rely on mitigation proposals from 2019, but also pointed to subsequent modeling following the 2019 Denial that allowed DEP to assess the effect of additional best management practices—and as the Department explained in the dredging summary report issued in the 2025 Approval, reliance on that modeling specifically allowed the Department to issue the 2025 Approval. *See* DEP ODST Dredging Report, pdf page 12-13 [JA__] [AR28] (noting that Transco's sediment samples indicated potential impact to water quality, that Transco subsequently prepared a contaminant modeling report, and that the Department determined "predicted changes in surface sediment chemical concentrations are anticipated to be minimal.").

Finally, NRDC incorrectly contends that the Department arbitrarily reversed its conclusion that the Project fails to comply with numeric water quality standards. Br.43-46. DEP did not change any policy on standards with respect to various sea-floor substances (referred to in the record as the "ER-M" sediment standards) because those standards have consistently *never* been binding DEP policy on the ultimate question of whether a project meets water quality standard.[7] DEP has instead maintained that they are applicable only to the narrower question of whether various sampling results showed a *potential* of the Project to affect water quality. 2019 Denial, pages 12-13 [JA__] [AR4]; DEP ODST Dredging Report, pdf page 11-12 [JA__][AR28].[8] It thus does not matter that Transco's results showed such a potential existed. The dredging report that ultimately accompanied the Permits and the Certification in the 2025 Approval showed that potential had been addressed: Transco's best practices—as informed by research projects lead by the Army Corps

---

[7] NRDC concedes that the "ER-M" sediment standards are guidance. *See* Br.36 ("And NJDEP guidance estimates a greater than 50% chance of adverse impacts on benthic communities when the states Ecological Saline Water Sediment Effects Range Medium (ER-M) criteria are exceeded.").

[8] *See also* Department of Environmental Protection, Contaminated Site Remediation & Redevelopment, Ecological Screening Criteria https://dep.nj.gov/srp/guidance/eco-screening/ ("With the exception of the surface water quality standards (SWQS) (N.J. Admin. Code § 7:9B), the ecological screening criteria are not promulgated standards, but are used as screening values for ecological assessments.").

of Engineers—rendered "predicted changes in surface sediment chemical concentrations" "minimal." DEP ODST Dredging Report, pdf pages 12-13 [JA__] [AR28]. There is nothing arbitrary or inconsistent in DEP finding at one point that a potential problem might exist, then finding at a later point that particular practices (made a part of DEP's conditional approval) had addressed that potential problem.[9]

## II. The Department Lawfully Conditioned The 2025 Approval.

Petitioners next challenge the Department's decision to condition the Permits and Certification on Transco's submittal of a water quality monitoring and adaptive management plan, contending it violated the Clean Water Act, *see* NRDC Br.46-62; Baykeeper Br.51, but that challenge is misplaced too. Conditioning permission under the Clean Water Act on further reports, plans, and other binding measures is a well-established practice. And for good reason: because section 401 certifications are "inherently predictive in nature," *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 404 (4th Cir. 2018) (internal quotation marks omitted), conditional approval ensures that a project can adapt to circumstances as they evolve.

---

[9] NRDC also very briefly makes the related assertion that DEP somehow failed to respond to comments about sediment redistribution. But DEP's response to comments noted that while "commenters assert construction will disturb over 1 million cubic yards of sediment…" (DEP Response to Public Comments, page 6 [JA__][AR22]), DEP believed "Best Management Practices … such as using closed environmental buckets, lowering buckets to the trench bottom before release, operating during slack tide, and controlling discharge rates will minimize turbidity and sediment resuspension." *Id.* at 7 [JA__][AR22].

The conditions DEP issued with the 2025 Approval make eminent sense. They include mandating that Transco comply with dredging best management practices (Permit, pages 4-6 [JA__][AR30]; DEP Environmental Report, pdf page 61 [JA__] [AR27]), requiring Transco to operate more slowly than planned (*see* Permit, page 5, condition 12 [JA__] [AR30]), and adding special conditions to how the bucket used for dredging could operate. *Id.* at 5, conditions 16, 22-24 [JA__] [AR30]. That is the sign of a careful agency, not one violating federal law.

The 2025 Approval's requirement that Transco supply water quality and adaptive management plans (which Petitioners particularly protest) is yet another piece in this set of sensible conditions. In both cases, those plans were subject to DEP's further approval. Permit, pages 4-5 [JA__] [AR30]; Transco Environmental Report, pdf page 125 [JA__] [AR46] (noting that "Transco will adhere to an NJDEP approved water quality monitoring plan."). And for both plans, the 2025 Approval contained substantive requirements. The Water Quality Monitoring Plan (referred to in some documents as the "WQMP") required Transco to maintain three monitoring points for turbidity, which need to be recorded twice daily. Permit, page 4, condition 9 [JA__] [AR30]. In the event of excess turbidity, the Adaptive Management Plan (AMP) requires a "corrective course of action" to mitigate the effects of any increases. *Id.* at 5, condition 11 [JA__] [AR30]. These types of conditions comply with the Clean Water Act.

### A. The Clean Water Act Permits Conditional Approvals Of A Water Quality Certificate.

Section 401 provides that a State's water quality Certification shall set out conditions "necessary to assure" that a permittee complies with state water quality standards. 33 U.S.C. § 1341(d). The Clean Water Act does not, however, require that those conditions be satisfied at the time the certification is issued.

This Court and others have therefore repeatedly rejected challenges to States' Certifications that rely on prospective conditions. This Court has even done so twice for previous Transco projects. *Riverkeeper I* turned away a challenge to Pennsylvania's decision to allow a Certification to precede an environmental assessment, noting that the assessment would still take place before construction began., 833 F.3d at 385-86. And in *Riverkeeper III*, this Court explained that under *Riverkeeper I*, Pennsylvania lawfully issued a Certification that itself still depended on a future showing of substantive compliance. 903 F.3d at 76-77. *Accord e.g.*, *Appalachian Voices v. State Water Ctrl. Bd.*, 912 F.3d 746, 758 (4th Cir. 2019) (agencies permissibly based certification on prospective conditions including surveys regarding drinkable water and contingency planning for accidental spills or releases in karst terrain); *Sierra Club*, 898 F.3d at 404 (upholding agency certification contingent on reporting sampling results exceeding state water criteria and subsequently working with State to make appropriate adjustments); *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 974 (D.C. Cir. 2011) (recognizing that a Certification need not be

fully effective at time issued); *Port of Seattle v. Pollution Ctrl. H'ngs Bd.*, 90 P.3d 659, 677 (Wash. 2004) (agency could "rely on future submissions of revised plans, reports, and studies, so long as their implementation and anticipated outcome meet the reasonable assurance test").

Those principles confirm the appropriateness of the Department's conditional Certification here. The Permits and Certification were properly conditioned on submission of finalized water quality monitoring and adaptive management plans, subject to Department approval, that will reduce or mitigate the effects of observed exceedances. N.J. Admin. Code § 7:7-26.6(a); Permit, pages 4-5 [JA__] [AR30]. Transco, moreover, specifically recognized that the plan would require DEP approval, and Transco committed to adhere to it. *See* Transco Environmental Report, pdf page 125 [JA__] [AR46] (noting that "Transco will adhere to an NJDEP approved water quality monitoring plan."). And here, Transco's application included a draft water quality monitoring plan with adaptive management strategies, which was available for public comment and upon which Baykeeper did comment. Draft Water Quality Monitoring Plan [JA__] [AR74]; EELC Public Comment, page 33-34 [JA__] [AR7].

NRDC errs in relying on cases like *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486 (2d Cir. 2005). To start, *Waterkeeper Alliance* addressed a challenge to EPA rulemaking under section 402 of the Clean Water Act, not a permitting decision

under section 401. 399 F.3d at 491. Those sections "are not interchangeable," *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 380 (2006), and a section 402 decision constraining the Federal Government—which rests on a statutory provision establishing a national pollutant emissions scheme, rather than a federal vehicle meant to broadly empower States to enforce their own water quality standards—should not be read to constrain State permitting authority, *see id.* at 380-81. More significantly, the authorities NRDC relies on addressed contexts where regulators failed to exercise any control or guidance over the adequacy of the steps that regulated entities planned to take. *Waterkeeper* itself involved a challenge to EPA rules allowing for permitting programs that required nutrient management plans but did not require any review of such plans. 399 F.3d at 498-99. *City and County of San Francisco v. EPA*, 604 U.S. 334 (2025), involved permits with "end-result" provisions that did not specify what steps permittees would be required to take. *See id.* at 355. And other authorities are similar. *See, e.g.*, *Food & Water Watch v. EPA*, 20 F.4th 506, 515-16 (9th Cir. 2021) (explaining that section 402 permits *without monitoring provisions* are impermissible).

Here, by contrast, the relevant permit conditions require DEP approval before the water quality monitoring and adaptive management plans become final and are incorporated into the Permits. Transco Environmental Report, pdf page 125 [JA__] [AR46] (noting that "Transco will adhere to an NJDEP approved water quality

monitoring plan that incorporates adaptive management strategies"); Permit, pages 4-5 [JA__] [AR30]. And DEP's ability to require additional information that is subject to agency review and approval is well-established under New Jersey law. *See, e.g.*, *In re Stream Encroachment Permit*, 955 A.2d 964, 973 (N.J. App. Div. 2008) (finding permit conditions particularly acceptable "where the nature of the subject matter involves a highly complex project for which there will be a necessary evolution"); *see also Crema v. NJDEP*, 463 A.2d 910, 915–16 (N.J. 1983) (distinguishing between permissible permits that contain conditions impermissible "conceptual approval" permits that allow an applicant to postpone satisfaction of necessary findings until after permit issuance). The Certification's structure thus complies with the Clean Water Act.

### B. The Certification Adequately Assures Compliance With Water Quality Standards.

Unable to establish that the conditions in the 2025 Approval are *per se* impermissible, NRDC and the Baykeeper Petitioners unsuccessfully attempt to cast substantive disagreements with the 2025 Approval as legal problems. In particular, NRDC complains that the Department's approval does not precisely list when Transco would be required to implement adaptive management practices, Br.52, that the approval does not include sufficient specific details about how and for what Transco would conduct monitoring activities, Br.54, and that Transco's draft plan

involved monitoring stations too far from the Project's dredging and insufficiently perceptive of toxic contaminants, Br.56-57.

None of these complaints establish that the 2025 Approval is either noncompliant with the Clean Water Act or unreasoned. That Petitioners spend much of their effort raising issues with Transco's *draft* plan, *see* NRDC Br.56-57; Baykeeper Br.38-39, belies as much: by requiring that Transco submit new, revised plans for review, the Certification constituted a rejection, rather than acceptance, of Transco's preferred terms.[10] DEP cannot be faulted for the submissions in a draft that DEP, too, found required further development to approve.

Similar problems afflict the Baykeeper petitioners' complaint that the Certification fails to assure adequate compliance with turbidity criteria. *See* Baykeeper Br.36-40. To start, Baykeeper alleges the Certification does not assure compliance with the Department's turbidity requirements because Transco's draft water quality monitoring plan uses "total suspended solids" units rather than "nephelometric turbidity units." Baykeeper Br.38-40. But this ignores the monitoring report permit condition, in which DEP required Transco to use nephelometric turbidity units—not

[10] Baykeeper's concerns with Transco's draft monitoring plan appear to substantially rely on the presumption that the plan relies on mixing zones and an absence of monitoring for toxic substances in addition to monitoring for turbidity. *See* Baykeeper Br.28-40. But mixing zones are not an element of approval for dredging projects in New Jersey, *see infra* 50-57, and the belief that separate toxic contaminant monitoring is required is likewise incorrect, *see infra* 57-58, n. 12.

total suspended solids—for monitoring the dredging project. Permit, page 4, condition 10 [JA__] [AR30]. If the dredging operation causes turbidity that exceeds the Department's turbidity standards measured in those units, *see* N.J. Admin. Code § 7:9B-1.14(d)(13), then Transco will have to operate according to its Department-approved water quality monitoring plan with adaptive management strategies. Permit, page 5, condition 11 [JA__] [AR30]. And that also answers Baykeeper's related complaint (Br. 38-40) that Transco's draft supposedly confused the state's turbidity standards for two different kinds of waters ("SC" and "SE1"). Nothing in the Certification itself does that, and since the monitoring plan is subject to DEP approval, DEP can ensure that the proper standards are applied for each type of water.

It does not matter for these purposes that the water quality monitoring plan has not yet been finalized. It is likely to include similar substantive conditions that were in the publicly available draft plan that included adaptive management measures such as "changing the rate of the jet trencher," "slowing the rate of clamshell dredging," "observing a one-hour slack-tide pause in dredging," and "implementing other reasonable operational controls" if a turbidity exceedance occurs. Draft Water Quality Monitoring Plan, pdf pages 17-18 [JA__][AR74]. These proposed measures serve to bring any potential turbidity exceedance back into compliance. And it was not arbitrary and capricious for DEP to reach that conclusion.

The Baykeeper Petitioners similarly err in arguing that the Certification fails to assure compliance with human health standards for the chemical 4,4'-DDE. *See* Baykeeper Br.40. The applicable "human health criteria" are the Surface Water Quality Standards' numeric limits for contaminants that protect human health, N.J. Admin. Code § 7:9B-1.14, which "are designed to protect people from adverse effects due to fish consumption only." 37 N.J. Reg. 3480(a). In Baykeeper's view, the Certification erroneously relied on modeling from Transco suggesting that these limits would be exceeded during construction, leading Baykeeper to infer a material increase in the risk to human health from eating impacted shellfish.

The most central problem with this argument is that because Baykeeper only invokes Transco's modeling analysis, it ignores the actual permit conditions. That matters because Transco's modeling analysis did *not* include all the same best management practices that DEP ultimately required in the Permits and Certification to further reduce impacts to water quality. Indeed, DEP required Transco to keep its clamshell dredge with environmental bucket closed until it reaches near the bottom of the trench, capped the speed when lifting the environmental bucket to "a rate of 2 feet per second or less," and mandated that Transco equip the clamshell dredge with "sensors that ensure complete closure of the bucket before lifting the bucket." Permit, page 5, conditions 16, 23, 24 [JA__][AR30]; *compare* Transco Environmental Report, pdf page 127-128 [JA__][AR46] (which does not list these additional

clamshell dredge best practices for its modeling analysis). The Department then found that the best management practices it selected, coupled with Transco's own modeling analysis, "will not result in long-term impacts to water quality" given the temporary nature of the disruption. DEP Response to Public Comment, page 7 [JA__][AR22].

Baykeeper's error is only underscored by its reliance on data indicating that the 4, 4' DDE concentration for sampling location VC208 will be 0.001 micrograms per liter. Baykeeper Br.40. That output level assumes a dredging operation of 7,500 cubic feet per hour. Hydrodynamic Report, pdf page 341 [JA__][AR73]. But that is not the output DEP authorized: the Permits and Certification require Transco to operate at the much slower rate of 4,800 cubic feet per hour at that sampling location (Permit, page 5, condition 12 [JA__] [AR30]), meaning the DDE concentration is further reduced.

Baykeeper also fails to account for the exceedingly temporary nature of any disruption. As Transco explained in its response to public comments, "ambient conditions are expected to return in 1 to 6 hours following completion of any sediment-disturbing activities" so "increases in DDE concentrations will not persist long enough to affect human health due to fish or shellfish consumption." Transco Response to Public Comment, page 42 [JA__][AR17]. Put another way, even if there is a brief and temporary exceedance of 4, 4' DDE above applicable criteria, it will

be limited and not expected to affect human health through shellfish consumption (which, as noted, is the only thing the criteria measure). And DEP did not act arbitrarily in so concluding.

Baykeeper's contention that potential temporary exceedances warrant vacatur of the Certification does not meet the mark. Baykeeper Br.23-25. The Department's Coastal Zone Management rules for new dredging contemplate that if the "predicted water quality parameters are likely to exceed Surface Water Quality Standards" then "the Department will work cooperatively with the applicant to fashion acceptable control measures." N.J. Admin. Code § 7:7-12.7(c)(10)(iv). And that is what occurred here. The Department worked with Transco on appropriate best practices and monitoring, which are intended to address and mitigate potential exceedances. Thus, vacatur is unnecessary to resolve potential temporary exceedances because methods to protect against exceedances are already included in the Certification.[11]

---

[11] Of note, the area referred to as "Region 1" in DEP's Coastal Zone Management rules includes Raritan Bay, N.J. Admin. Code § 7:7 App'x G, pdf page 4, which is known to have areas with historic contamination. *See Damage Assessment, Remediation, and Restoration Program*, https://darrp.noaa.gov/hazardous-waste/raritan-bay-slag (last visited Apr. 28, 2026)(specific site on Raritan Bay that contains "[s]oil, sediment, and surface water . . . polluted with high levels of lead and other heavy metals."). And so as a matter of practice, dredging activities in contaminated areas may disturb these contaminated sediments and cause temporary numeric water quality exceedances. This includes not only underwater pipeline or cable installations, as here, but also large maintenance dredging projects required to ensure the New York/New Jersey Harbor remains operable. Thus, rather than require strict numeric adherence to water quality

## III. The Baykeeper Petitioners Erroneously Assume The Department Relied On A Mixing Zone.

The Baykeeper Petitioners devote much of their brief to the proposition that the Department's Certification improperly relies on the existence of a mixing zone, *see* Baykeeper Br.28-36, but their premise is not accurate. A mixing zone is a designated area for certain pollutants to exceed otherwise applicable standards, which Petitioners argue fails to meet New Jersey's rules. But New Jersey's surface water standards use mixing zones for point sources, not for dredging projects—the category of project here. Indeed, DEP discussed the existence of a mixing zone only in response to public comments, because the existence of such a mixing zone is relevant to the approval in New York. But the Baykeeper Petitioners cannot show the Department arbitrarily or unlawfully issued the Certification on account of an inadequate mixing zone, or on account of a mixing zone that threatened various species, where such a mixing zone played no role in the 2025 Approval to begin with.

### A. New Jersey Applies Dredging-Specific Standards.

Section 401 requires that new projects comply with state water quality standards. In New Jersey, a special set of standards applies specifically to new dredging projects like the Project here ("New Dredging Rule"). *See* N.J. Admin. Code § 7:7-

standards, DEP's dredging rules require the applicant to work with the Department to fashion best management practices to reduce exceedances to the "maximum extent feasible." N.J. Admin. Code § 7:7-12.7(c)(5).

12.7. These standards are part of a broader regulatory scheme that constitutes DEP's Coastal Zone Management dredging rules, which address dredging impacts and water quality in varied forms. They govern, for instance, maintenance dredging, *id.* § 7:7-12.6, environmental dredging to remove contaminated sediment, *id.* § 7:7-12.8, and dredged material disposal. *Id.* § 7:7-12.9. And they work in conjunction with DEP's Appendix G to those rules, which provide further guidance that addresses when and what type of water and/or sediment testing is required, mechanisms to minimize the water quality impacts, and ways to responsibly address dredge material disposal. *Id.* § 7:7 App'x G, pdf page 10-13. In short, New Jersey has provided a comprehensive scheme that addresses new dredging projects and specifically applies here.

The New Dredging Rule contains substantive standards that dredging permittees should meet, as well as procedures for permittees to follow should a dredging project risk exceeding those standards. As relevant here, the rule applies to "temporary or permanent" sediment displacement to "install[] submerged pipelines and cables" and creates a method to address water quality issues arising from such dredging projects. N.J. Admin. Code §7:7-12.7(a). It requires "[t]urbidity concentrations (that is, suspended sediments) and other water quality parameters at, downstream, and upstream of the dredging site, and discharges from dredged material management areas" to "meet applicable Surface Water Quality Standards at [N.J. Admin. Code

§ 7:9B].” *Id.* § 7:7-12.7(c)(10)(iii). And “[i]f predicted water quality parameters are likely to exceed” either surface water or ground water quality standards “or if pre-dredging chemical analysis of dredged material … reveals significant contamination, *then the Department will work cooperatively with the applicant to fashion acceptable control measures and will impose seasonal restrictions*” under circumstances identified further in the rule. *Id.* § 7:7-12.7(c)(10)(iv) (emphasis added).

The New Dredging Rule’s structure is intentional. Upon the rule’s adoption, the Department explained the rule defines the “review strategy” and “limit[s] testing and monitoring requirements to specific instances of particular environmental concern.” 17 N.J.R. 1466(a) at 1468 (June 17, 1985); *see also* 18 N.J.R. 314(a) at 321 (Feb. 3, 1986) (explaining “the policy provides for imposition of restrictions only when projected water quality as a result of the dredging operation will likely violate State Water Quality Standards or if there is evidence of contaminated sediment.”). In other words, the Department would impose seasonal restrictions and activity requirements to minimize the water quality impacts to the “maximum extent feasible” only if water and its sediments are contaminated. N.J. Admin. Code § 7:7-12.7(c)(5).

These safeguards are part of broader protections that every project approved under the New Dredging Rule must meet. The rule requires new dredging not cause “significant disturbance to special water or water’s edge areas.” *Id.* § 7:7-12.7(c)(4). Proposed dredging activity cannot occur unless and until the Department is satisfied

these other regulations are met or adverse environmental impacts "are minimized to the maximum extent feasible." *Id.* § 7:7-12.7(c)(5). And dredging activity must be conducted in accordance with Appendix G. *Id.* § 7:7-12.7(b). The Appendix explains DEP regulates and manages dredging "to ensure that any potential adverse impacts are minimized." *Id.* § 7:7 App'x G, pdf page 27. It provides detailed instructions for dredge project application requirements, (App'x G pdf pages 2-3), sediment testing for contaminants, (*Id.* at 4-9), and additional testing that may be required depending on where the dredged material will be placed. *Id.* at Table 1, 10-11. These allow staff to select the best management practices that are "anticipated to be most effective and implementable for a" project and then incorporates those practices "as conditions into permits" DEP issues for the activity. *Id.* at 11. It was this comprehensive regulatory background that gave DEP confidence that the Project would meet New Jersey's water quality standards: either through never risking certain adverse impacts in the first place, or through implementing best practices and corrective measures to ensure any impacts would be minimized or temporary.

### B. New Jersey Does Not—And the Department Did Not—Use Mixing Zones for Dredging Projects.

Notably absent from any portion of the New Dredging Rule are discussions of mixing zones. (As previously noted, *see supra* 14, some jurisdictions use the term "mixing zone" to refer to the immediate area where initial discharge mixes with water, and where water quality standards might be exceeded). In New Jersey, mixing

zones are used specifically for "point sources" of pollution from things like pipes or ditches. Indeed, the Department's Surface Water Quality criteria provide for mixing zones "as part of the development of water quality-based effluent limitation(s) to provide for the initial dispersion of the effluent in the receiving water body at or near the discharge point." N.J. Admin. Code § 7:9B-1.5(h). "Effluent limitation[s]" are, in turn, restrictions on point sources, which New Jersey regulations define as "any discernible, confined, and discrete conveyance" "from which pollutants are or may be discharged." *Id.* § 7:14A-1.2 (defining "effluent limitation" in relation to "permit," which governs "point sources"); *see also* 33 U.S.C. § 1362(11) (defining "effluent limitation" as "any restriction" established "on quantities, rates, and concentrations" of pollutants "which are discharged from point sources" into water). Regulatory mixing zones accordingly provide flexibility to allow point source discharges to discharge partially treated water still containing some pollutants that would otherwise exceed the surface water quality criteria. Given this flexibility, the Department's Surface Water Quality Standards limit their use, including, as the Baykeeper Petitioners note, prohibiting "regulatory mixing zones" for new discharges of contaminants and discharges into threatened or endangered species habitat. N.J. Admin. Code § 7:9B-1.5(h)(1)(viii), (5)(vii).

But given those limits, the Baykeeper Petitioners' argument that the Department authorized Transco to use regulatory mixing zones fails both as a matter of law

and as a matter of fact here. To start, regulatory mixing zones are only applicable to New Jersey Pollutant Discharge Elimination System (NJPDES) permits, which are entirely separate from the dredging permit issued here. *See id.* § 7:9B-1.5(h) (noting that a permittee may request a regulatory mixing zone); *id.* § 7:9B-1.4 (defining permittee according to the NJPDES permit rules); *id.* § 7:7 App. G Ch.II (describing permits for dredging-related activities). Indeed, a regulatory mixing zone only applies to the mixing, dispersion, or dissipation of "wastewater effluent." *Id.* § 7:9B-1.4. And the Department defines "wastewater" as "residential, commercial, industrial, or agricultural liquid waste, sewage, septage, stormwater runoff, or any combination thereof, or other residue discharged or collected into wastewater facilities." *Id.* § 7:15-1.5. Here, DEP authorized Transco to dredge a trench to construct the Project, which, at best, is a nonpoint source that creates one-time, temporary discharges. *Id.* at § 7:14-1.2 ("nonpoint source" means any "man-made" activity "other than a point source, that may temporarily" alter a "characteristic" of the water from its "natural, pristine condition"). That differs substantially from a point source like a wastewater treatment facility that can implement technology-based and water quality-based effluent limitations to reduce repeated pollutant discharges. *Id.* at § 7:9B-1.5(e) (water quality-based effluent limitations); *see also In re NJPDES Permit No. NJ0025241*, 185 N.J. 474, 485 (2006) (wastewater treatment facilities implement treatment technologies). So regulatory mixing zones do not apply here as a matter

of law. And that is especially so in light of the deference that DEP receives as a matter of state administrative law (which this Court must follow, *see supra* 22-23) in interpreting its own regulations. *See, e.g.*, *In re Eastwick College LPN-RN Bridge Program*, 139 A.3d 1146, 1151 (N.J. 2016) (explaining that New Jersey courts defer to agencies' interpretations of their own regulations unless such interpretations are "plainly unreasonable" (internal quotation marks omitted)).

The Baykeeper Petitioners also err as a matter of fact as the Department did not authorize either a "mixing zone" or "regulatory mixing zone" here. As noted above, the Coastal Zone Management rules require the Department to select dredging best management practices that will be included as permit conditions. N.J. Admin. Code §7:7 App'x G, pdf page 11-13. Likewise, when regulatory mixing zones apply, they are incorporated as conditions in the point source permit. *Id*. §7:9B-1.5(h) (regulatory mixing zone used as part of water quality-based effluent limitations). Mixing zones are not a condition in the Certification nor are they mentioned in the summary reports. They are not a Project requirement. And it is telling that when the Baykeeper Petitioners claim the Certification "authorizes dredging activities" which would release various substances, the closest they come to linking that to mixing zones is a citation to a Transco report. Baykeeper Br.30. Noticeably absent is any citation to the Permits or Certification.

While it is true that the Department mentions mixing zones in its responses to public comment, this just referenced Transco's modeling analysis. And Transco had in turn incorporated mixing zones largely because New York—where the bulk of the Project will be constructed—does use mixing zones for dredging projects. DEP Response to public comment, page 7 [JA__] [AR22]; Transco Environmental Report, pdf page 125, 127 [JA__][AR46]; *see also* N.Y. Certification, pdf page 14.[12] DEP's responses to these comments do not overcome the basic fact that DEP does not use mixing zones for dredging projects, and instead found compliance with state standards using dredging best management practices. Permit, pages 4-6 [JA__] [AR30] DEP Environmental Report, pdf page 61 [JA__][AR27].

The upshot of both considerations, then, is that no part of the 2025 Approval—Certification, Permit, or otherwise—relied on a mixing zone in New Jersey waters. The Baykeeper Petitioners thus cannot persuasively argue that a failure to abide by mixing zone standards—which do not apply to non-point-source activities like this Project—is arbitrary, capricious, or otherwise unlawful agency action.[13]

---

[12] New York State Department of Conservation, Permit, https://dec.ny.gov/sites/default/files/2025-11/nesewqcandart15permit.pdf.

[13] The inapplicability of the mixing zone framework to the 2025 Approval is sufficient reason to reject Baykeeper Petitioners' argument. But to the extent the Baykeeper Petitioners *also* argue the Certification and Transco's draft water quality monitoring plan are inadequate because they "call for monitoring of turbidity, but not toxic substances," Baykeeper Br.32, their argument is further misplaced. They

## IV. The Department Complied With the Clean Water Act's Public Participation Requirements.

Petitioners are mistaken to suggest DEP failed to follow the Clean Water Act's public participation requirements. NRDC argues the Department erred by granting conditional approval that required the submission of water quality monitoring and adaptive mitigation plans from Transco, which would (they argue) not be subject to the requisite public participation. NRDC Br.58-61. And the Baykeeper Petitioners claim that the Department improperly failed to notice Transco's revised stormwater management plan for comment. Baykeeper Br.41-51. Neither argument has merit.

The Clean Water Act's language on public participation is specific, cabined, and largely delegates authority to the States. As part of 33 U.S.C. § 1251—the Clean Water Act section declaring Congress's "goals and policy"— 33 U.S.C. § 1251(e) says that "[p]ublic participation in the development, revision, and enforcement of any … plan[] or program established by the Administrator or any State under this

---

advance an interpretation of N.J. Administrative Code §7:7-12.7(c)(10)(iii) under which the regulation's separate articulation of "toxic substances" from "turbidity" would per se require that toxic substances be monitored separately. Baykeeper Br.32. But the Department has interpreted §7:7-12.7(c)(10)(iii) to allow for monitoring of turbidity alone where the Department deems such action sufficient to assure water quality standards, (Permit, page 4, conditions 9, 10 [JA__][AR30]; *see also* DEP Environmental Report, pdf page 61 [JA__] [AR27] ("Conditions in the permit will reflect a water monitoring plan for the project in order to maintain levels acceptable to the water quality standards")), and under New Jersey law, such agency constructions of their own regulations are powerful evidence of their meaning. *See, e.g.*, *E. Bay. Drywall, LLC*, 278 A.3d at 792.

chapter shall be provided for, encouraged, and assisted by the Administrator and the States." 33 U.S.C. § 1251(e). The Act then leaves it to EPA's Administrator, "in cooperation with the States," to "develop and publish regulations specifying minimum guidelines for public participation in such processes." *Id.* But since EPA has not issued rules under this provision for section 401 permitting (and Petitioners do not contend otherwise) nothing about this provision imposes any federally-issued minimum standards for public participation.

Meanwhile, the relevant provision in the Clean Water Act here, section 401, has its own provision addressing public notice. That provision explains that States issuing section 401 permits should "establish procedures for public notice in the case of all applications for certification … and, to the extent [the State] deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. §1341(a)(1). That is, States just need to enact their own procedures and comply with them. *S*ee *City of Tacoma v. FERC*, 460 F.3d 53, 68 (D.C. Cir. 2006); *Jackson County v. FERC*, 589 F.3d 1284, 1288 (D.C. Cir. 2009); *see also* 40 C.F.R. §121.6(a)(certification review time period begins once the applicant submits a request "in accordance with the [State's] applicable submission procedures"). DEP has adopted extensive public notice procedures, *see* N.J. Admin. Code §7:7-24.1 to -24.6, and followed them here.

Notably, Petitioners do not argue that DEP failed to comply with any governing EPA regulation implementing section 1251(e). *See* Baykeeper Br.41-51; NRDC Br.58-61. Nor do they point to a specific procedural requirement in state law that they say DEP did not comply with. Indeed, the Baykeeper Petitioners do not even mention section 401's participation requirement, Baykeeper Br.41-51, and NRDC does so only obliquely to distinguish this case from *Riverkeeper I*, *see* NRDC Br.60, whose petitioners relied on that provision, *see* 833 F.3d at 378.

Instead, Petitioners' public participation arguments are framed as freestanding violations of section 1251(e). *See* Baykeeper Br.44-46; NRDC Br.59-60. But even assuming the general section 1251(e) language has relevance to this more specific section 401 case, where section 1251(e) contemplates that the EPA will develop regulations specifying minimum standards for public participation, Petitioners' request for judicially-imposed standards instead undermines the Clean Water Act's statutory scheme and is untenable. *See United States v. Miller*, 604 U.S. 518, 533 (2025) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Murrin v. Commissioner*, 158 F.4th 527, 534 (3d Cir. 2025) (same). That alone is reason their public participation-based claims cannot succeed.

Petitioners once again point to the Second Circuit's decision in *Waterkeeper Alliance*, NRDC Br.59; Baykeeper Br.44-45, but that case is again inapposite. Rather

than address a state-level permitting decision, *Waterkeeper* dealt with EPA rulemaking that barred certain plans from being available to the public as a requirement for EPA approval—hampering citizens' ability to enforce the terms of any such plans. 399 F.3d at 503-04. That posture is a far cry from the case here. EPA rulemaking, unlike individual permitting decisions, could only be evaluated against the Clean Water Act itself for compliance. Moreover, NRDC does not claim it will be unable to challenge the water quality monitoring or adaptive management plans. NRDC Br.60-61. And Transco's updated stormwater report was publicly available at three different municipal clerk's office, plus through DEP's offices, which the public could have learned from a notice on DEP's website (even if DEP did not formally put the updated report *itself* on the website as quickly as petitioners would like). *See supra* 18.

Finally, having forsaken a state-law-based section 401 public participation argument, Petitioners cannot raise one in reply. *See Liquid Labs LLC v. FDA*, 52 F.4th 533, 539 n.6 (3d Cir. 2022). Even then, such an argument would be futile because the record demonstrates that during Transco's application process, the Department *exceeded* state law public participation requirements.[14]

[14] Though public participation in connection with Transco's prior applications is not before this Court, the Department also exceeded requirements there by providing a hearing on November 5, 2018. DEP Environmental Report, pdf page 2–4

Once Transco's application was administratively complete, DEP posted notice and the submitted application documents to its website. N.J. Admin. Code §7:7-26.1(g) (requiring DEP to only publish notice "of the receipt of each new application"). DEP then exceeded public participation requirements by holding a public hearing, and it notified the public about the hearing, the opportunity to submit comments, and where the public could obtain a complete copy of the application, including updated materials (such as the updated stormwater management plan). *See* N.J. Stat. Ann. §13:19-9(a) (Department "may hold" a hearing on a permit application); N.J. Admin. Code §7:7-26.2(h) (general application review provisions do not require a hearing); DEP Environmental Report, pdf page 5 [JA__][AR27]; Notice of Virtual Public Hearing [JA__][AR25]. The relevant materials were also available under the state Open Public Records Law, *see* N.J. Stat. Ann. §47:1A-1 et seq. which parties (including some of the petitioners) used to access project documents. Email RE: DEP point of contact [JA__][AR356]; Email RE: OPRA #37778789 [JA__][AR123]. These steps all reflect reasonable consideration of the record by the Department, and collectively, more public process than even required by statutes and regulations.

---

[JA__][AR27]. Petitioners also provided comments about the Project during and in between Transco's 2019 and 2020 application processes. NRDC March 31, 2020 Public Comments [JA__][AR5g]; EELC April 6, 2020 Comment [JA__][AR5b]; EELC May 7, 2020 Comment [JA__] [AR5e].

Petitioners cannot plausibly show otherwise. Notably, DEP received over 1,500 written comments, including from Petitioners, and then again exceeded requirements by issuing responses. *See* N.J. Stat. Ann. §52:14B-3.1(a); Final Transco NESE Spreadsheet [JA__] [AR12]; NRDC Public Comment [JA__][AR6]; EELC Public Comment [JA__][AR7]; DEP Response to Public Comment [JA__][AR22].

## CONCLUSION

This Court should deny the Petitions.

Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

By: /s/ Jordan Viana
JORDAN VIANA
Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
Jordan.Viana@law.njoag.gov
*Counsel for New Jersey Department of Environmental Protection and Ed Potosnak*

**CERTIFICATE OF COMPLIANCE**

This document complies with the Court's April 23, 2026 text order granting Respondent's motion for leave to file an overlength brief of no more than 16,000 words because this document contains 14,334 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document was prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: April 28, 2026

By: Jordan Viana

JORDAN VIANA
Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ 08625
(609) 900-0897
Jordan.Viana@law.njoag.gov