No. 26-1252 (consolidated with No. 26-1253)

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

NATURAL RESOURCES DEFENSE COUNCIL, INC.,
*Petitioner*,
v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION;
ED POTOSNAK, ACTING COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Respondents*,
and

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,
*Intervenor-Respondent*.

On Petition for Review from
the New Jersey Department of Environmental Protection

**PETITIONER'S FINAL BRIEF**

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Jackson P. Garrity
Natural Resources Defense Council
20 N Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 995-5909
jgarrity@nrdc.org

Mark A. Izeman
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
(212) 727-4453
mizeman@nrdc.org

Dated: June 3, 2026

*Counsel for Petitioner Natural Resources Defense Council*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Petitioner Natural Resources Defense Council, Inc. (NRDC) is a nonprofit environmental and public health membership organization committed to protecting the public and environment through research and advocacy. NRDC has no parent corporation, and no publicly owned corporation has a ten percent or greater ownership interest in NRDC.

*/s/ Jackson P. Garrity*
Jackson P. Garrity
Illinois Bar No. 6344829
Natural Resources Defense Council
20 North Wacker Drive Suite 1600
Chicago, IL 60606
(312) 995-5909
jgarrity@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

# TABLE OF CONTENTS


RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ i

TABLE OF CONTENTS ........................ ii

TABLE OF AUTHORITIES ........................ v

GLOSSARY ........................ x

JURISDICTIONAL STATEMENT ........................ 1

INTRODUCTION ........................ 1

STATEMENT OF THE ISSUES ........................ 4

STATEMENT OF RELATED CASES ........................ 5

STATEMENT OF THE CASE ........................ 6

I. NESE and the New York-New Jersey Harbor ecosystem ........................ 6

II. Legal Framework ........................ 9

III. NJDEP denies Transco's earlier applications for NESE ........................ 11

IV. NJDEP reverses position and approves Transco's 2025 application for NESE ........................ 14

V. NJDEP's water quality certification for NESE ........................ 19

SUMMARY OF ARGUMENT ........................ 22

STANDARD OF REVIEW ........................ 24

ARGUMENT ........................ 26

I. NRDC has standing ........................ 26

II. NJDEP's failure to adequately explain its change in position with respect to water quality impacts was arbitrary ........ 28

A. NJDEP's sole reliance on purported public need for NESE to support its change in position was arbitrary ........ 31

B. NJDEP failed to provide a reasoned explanation for its tacit reversal of its 2019 findings regarding compliance with surface water quality standards ........ 33

1. NJDEP's failure to reasonably explain how NESE would be consistent with designated uses was arbitrary ........ 36

2. NJDEP's failure to reasonably explain how NESE would maintain existing uses was arbitrary ........ 43

3. NJDEP's failure to reasonably explain how NESE would meet numeric standards was arbitrary ........ 44

III. NJDEP's reliance on uncertain, future compliance plans was unlawful ........ 47

A. NJDEP's reliance on future, uncertain compliance plans violated the Clean Water Act and principles of reasoned decisionmaking ........ 49

1. NJDEP's requirement for an Adaptive Management Plan did not assure compliance with water quality standards ........ 49

2. NJDEP's requirement for a Water Quality Monitoring Plan did not assure compliance with water quality standards ........ 54

B. NJDEP's reliance on future, uncertain compliance plans violated the Clean Water Act's public participation requirements ........ 59

IV. The Court should vacate the water quality certification ........ 61

CONCLUSION ........ 62

CERTIFICATE OF COMPLIANCE ........ 64

CERTIFICATE OF BAR MEMBERSHIP ........ 65

CERTIFICATE OF SERVICE ........ 66

# TABLE OF AUTHORITIES

## Cases

*City & Cnty. of San Francisco v. EPA*,
604 U.S. 334 (2025) .......... 48, 50, 58

*Comité de Apoyo a los Trabajadores Agricolas v. Perez*,
774 F.3d 173 (3d Cir. 2014) .......... 25, 28, 35, 42, 61, 62

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .......... 52

*Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.*,
833 F.3d 360 (3d Cir. 2016) .......... 24, 60, 61

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 26, 28

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 29, 30, 46

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) .......... 40

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 31

*Food & Water Watch v. EPA*,
20 F.4th 506 (9th Cir. 2021) .......... 54, 55, 58

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 26

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
399 F.3d 248 (3d Cir. 2005) .......... 26, 28

*Keystone-Conemaugh Projects, LLC v. EPA*,
100 F.4th 434 (3d Cir. 2024) .......... 25

*Logic Tech. Dev. LLC v. FDA*,
84 F.4th 537 (3d Cir. 2023) ........................................................ 26

*Matter of Issuance of a Permit by NJDEP to Ciba-Geigy Corp.*,
576 A.2d 784 (N.J. 1990) .............................................................. 43

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..................................................... 25, 28, 31, 41

*Nat'l Audubon Soc'y v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ....................................................... 48, 58

*Nat'l Parks Conservation Ass'n v. EPA*,
803 F.3d 151 (3d Cir. 2015) ........................................................ 62

*NRDC v. EPA*,
790 F.2d 289 (3d Cir. 1986) ........................................................ 41

*NRDC v. EPA*,
808 F.3d 556 (2d Cir. 2015) ............................................. 48, 52, 54

*Pa. Dep't of Health & Human Servs. v. United States*,
897 F.3d 497 (3d Cir. 2018) ........................................................ 25

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......................... 26, 29, 30, 35, 37, 40, 41, 42, 46

*Prometheus Radio Project v. FCC*,
652 F.3d 431 (3d Cir. 2011) .................................................... 31, 62

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*,
913 F.2d 64 (3d Cir. 1990) .......................................................... 28

*Sierra Club v. EPA*,
863 F.3d 834 (D.C. Cir. 2017) ................................................. 56, 57

*Sierra Club v. EPA*,
972 F.3d 290 (3d Cir. 2020) ............................ 25, 28, 53, 54, 57, 62

*Transcontinental Gas Pipe Line Co. v. Penn. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) ........................................................ 31

*Twp. of Bordentown v. FERC*,
903 F.3d 234 (3d Cir. 2018) .......... 48, 50, 52, 58

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) .......... 61

*Waterkeeper All., Inc. v. EPA*,
399 F.3d 486 (2d Cir. 2005) .......... 47, 48, 50, 51, 52, 54, 55, 58, 59, 60, 61

**Statutes**

5 U.S.C. § 706(2) .......... 24, 61

15 U.S.C. § 717f(e) .......... 9

15 U.S.C. § 717r(d) .......... 1, 24

33 U.S.C. § 1251(e) .......... 59, 61

33 U.S.C. § 1311(b) .......... 47

33 U.S.C. § 1341 .......... 1, 9

33 U.S.C. § 1341(a) .......... 9, 23, 32, 33, 37, 38, 47

33 U.S.C. § 1341(d) .......... 5, 10, 23, 31, 37, 46, 47, 48, 49, 51, 59

33 U.S.C. § 1342(a) .......... 47, 51, 60

33 U.S.C. § 1342(b) .......... 47, 60

33 U.S.C. § 1344(h) .......... 47

33 U.S.C. § 1365(a) .......... 60

42 U.S.C. § 4321 .......... 9

## Regulations

40 C.F.R. § 121.3(a) .................... 10
40 C.F.R. § 121.7(c) .................... 9
40 C.F.R. § 121.7(d) .................... 47
40 C.F.R. § 131.12(a) .................... 43
N.J.A.C. 7:7-1.2(e) .................... 33
N.J.A.C. 7:7-9.2(b) .................... 21, 38
N.J.A.C. 7:7A-10.4 .................... 14, 32
N.J.A.C. 7:7A-2.1(a) .................... 10
N.J.A.C. 7:7A-2.1(d) .................... 10
N.J.A.C. 7:9B-1.1 .................... 10
N.J.A.C. 7:9B-1.5(a) .................... 5, 10, 11, 33, 43, 45
N.J.A.C. 7:9B-1.5(d) .................... 11, 33, 43
N.J.A.C. 7:9B-1.12 .................... 5, 33
N.J.A.C. 7:9B-1.12(d) .................... 10, 36, 38
N.J.A.C. 7:9B-1.12(g) .................... 10
N.J.A.C. 7:9B-1.14(d) .................... 5, 10, 11, 33, 36, 38
N.J.A.C. 7:9B-1.14(f) .................... 5, 10, 33, 44
N.J.A.C. 7:9B-1.14(g) .................... 5, 33, 44
N.J.A.C. 7:9B-1.15(c) .................... 10, 36
N.J.A.C. 7:9B-1.15(h) .................... 10

## Other Authorities

*Transcon. Gas Pipe Line Co.*,
187 FERC ¶ 61,145 (June 10, 2024) .............................................. 14

*Transcon. Gas Pipe Line Co.*,
192 FERC ¶ 61,184 (Aug. 28, 2025) .............................................. 17

## GLOSSARY

| | |
|---|---|
| APA | Federal Administrative Procedure Act |
| ER-M | Ecological Saline Water Sediment Effects Range Medium |
| FERC | Federal Energy Regulatory Commission |
| NESE | Northeast Supply Enhancement natural gas pipeline project |
| NJDEP | New Jersey Department of Environmental Protection |
| NRDC | Natural Resources Defense Council |
| MRA | New Jersey Department of Environmental Protection Marine Resources Administration |
| Transco | Transcontinental Gas Pipe Line Company |
| WQC | Section 401 Water Quality Certification issued by NJDEP for NESE on November 7, 2025 |
| Section 401 | Section 401 of the federal Clean Water Act, 33 U.S.C. § 1341 |

## JURISDICTIONAL STATEMENT

This petition seeks review of the New Jersey Department of Environmental Protection (NJDEP)'s November 7, 2025 issuance of a water quality certification under Section 401 of the federal Clean Water Act, 33 U.S.C. § 1341, for the Transcontinental Gas Pipe Line Company (Transco)'s proposed Northeast Supply Enhancement natural gas pipeline project (NESE). For challenges to state permits related to interstate natural gas pipelines, the Natural Gas Act allows suit in the U.S. Court of Appeals for the Circuit where the pipeline facility would be "constructed, expanded, or operated." 15 U.S.C. § 717r(d)(1). This Court has jurisdiction because NESE will be constructed and operated, in part, within New Jersey and Pennsylvania.

NRDC timely petitioned for review of NJDEP's water quality certification on November 18, 2025. ECF No. 1-1.

## INTRODUCTION

Section 401 of the Clean Water Act requires a state agency to affirmatively conclude that a project will comply with the state's water quality standards before issuing a water quality certification. In 2019, NJDEP denied Transco's application for a water quality certification for

NESE, a pipeline that would run through miles of New Jersey waters, tearing up miles of seafloor in the process. One of several independent reasons for NJDEP's denial was its determination that Transco had failed to show that construction of NESE's offshore Raritan Bay Loop pipeline segment would comply with New Jersey's surface water quality standards. Modeling showed that the Raritan Bay Loop's construction would resuspend contaminated sediment, increase water turbidity, and expose the ecosystem to toxic substances. NJDEP thus found that the pipeline's construction could violate the state's numerical standards for several toxic substances and would likely harm benthic communities like shellfish. Although Transco reapplied, NJDEP denied the application again in 2020, that time based on a lack of "public need" for NESE. In that denial, NJDEP did not revisit its prior findings on water quality impacts or Transco's failure to show compliance with surface water quality standards.

Last year, considering an essentially identical application from Transco, NJDEP reversed course and issued a water quality certification for NESE. In so doing, NJDEP violated the federal Clean Water Act and principles of rational decisionmaking. NJDEP failed to

acknowledge, let alone provide a detailed justification for, its turnaround from its 2019 conclusions that the Raritan Bay Loop's construction could violate state surface water quality standards. Instead, NJDEP simply cited New York State's same-day approval for NESE to justify its reversal, without explaining how the pipeline would now comply with applicable clean water standards. Making matters worse, NJDEP failed to include in the water quality certification key details about how Transco would monitor and ensure compliance with state water quality standards, instead punting decisions about those critical compliance plans to a future process outside of public scrutiny.

NJDEP's thin rationale and uncertain plans for compliance cannot support the agency's about-face on NESE's application. Its failures to explain in detail its departure from its past findings on water quality impacts, assess impacts on relevant water quality standards, and determine necessary compliance requirements before issuing the certification, do not satisfy the Clean Water Act's core requirement: assurance that NESE "will comply" with all water quality standards. The Court should grant the petition and vacate NJDEP's approval.

## STATEMENT OF THE ISSUES

1. To justify a change in position, an agency must both acknowledge and reasonably explain the reversal. In 2019, NJDEP denied a Section 401 certification for NESE on the grounds that Transco had not shown it would comply with the state's surface water quality standards. But when it granted a certification for NESE's essentially identical application last year, NJDEP did not acknowledge or explain its implicit departure from those 2019 findings. Was NJDEP's unacknowledged change in position arbitrary?

2. An agency must provide a more detailed justification when its change in position depends on factual findings that contradict those underlying the original decision. In 2019, NJDEP concluded that Transco had not shown it could comply with surface water quality standards protecting shellfish. In granting the certification last year, NJDEP failed to address those prior conclusions or explain why they no longer applied. Was NJDEP's change in position arbitrary?

3. New Jersey regulations implementing federal law require NJDEP to consider a project's potential to increase concentrations of toxic substances in, and to impact designated and existing uses for,

affected waterbodies. *See* N.J.A.C. 7:9B-1.5(a)(4), (6), -1.12, -1.14(d), (f), (g). Did NJDEP violate the Clean Water Act and its own regulations by failing to consider multiple classes of contaminants and impacts to shellfish protected under state and federal law?

4. The Clean Water Act requires that a Section 401 certification include terms needed to "assure" that the project "will comply" with state water quality standards. 33 U.S.C. § 1341(d). NJDEP's Section 401 certification requires Transco to prepare plans for how it would monitor water quality and apply adaptive management practices to limit pollution. Was NJDEP's deferral of those key compliance terms to future, uncertain, non-public plans contrary to the Clean Water Act or otherwise arbitrary and capricious?

## STATEMENT OF RELATED CASES

Pursuant to 3d Cir. L.A.R. 28.1(a)(2), NRDC affirms that this case has not previously been before this Court and identifies the following cases as related:

1. *NY/NJ Baykeeper v. NJ. Dep't of Env't Prot.*, No. 26-1253 (3d Cir.), which this Court has consolidated with this petition. ECF No. 2.

2. *Raritan Baykeeper v. N.Y. State Dep't of Env't Conservation*, No. 25-2938 (2d Cir. filed Nov. 18, 2025), a challenge to New York's water quality certification for NESE. NRDC is a petitioner in that case.

## STATEMENT OF THE CASE

### I. NESE and the New York-New Jersey Harbor ecosystem

NESE is a proposed expansion of Transco's existing natural gas pipeline that runs from Texas to New York City. NRDC's Sept. 25, 2025 Public Comment (NRDC Comment) at 1 [JA_0233]. NESE's largest component is called the Raritan Bay Loop, which would require installation of over 23 miles of offshore, underwater pipeline "looping through New Jersey and New York waters" from Sayreville, New Jersey, to an existing offshore pipeline at the Rockaway Transfer Point in Queens, New York. NJDEP Env't Report at 6, 19 [JA_0465, 0478]. In total, around six miles of the Raritan Bay Loop would be built in New Jersey state waters, with the remaining seventeen miles in New York state waters. *Id.* at 6 [JA_0465]. Along its path, the Raritan Bay Loop would cross in and out of New Jersey and New York waters through three major waterbodies—the Raritan Bay, Lower New York Bay, and Atlantic Ocean.

The Raritan and Lower New York Bays, both part of the broader New York-New Jersey Harbor, are an environmental and public health success story. Over the centuries, sewage, solid waste, and industrial pollution depleted the health of the Harbor. NRDC Comment at 4 [JA_0236]. But in the past fifty years, thanks to the efforts of local governments and non-profit organizations, the Harbor has been slowly cleaned up. *Id.* at 5 [JA_0237].

Today, the Harbor is at its healthiest point in over a century. It hosts myriad wildlife species including horseshoe crabs, hard clams and surf clams, winter flounder, and multiple species of sturgeon. NRDC Comment at 5–6 [JA_0237–38]; NJDEP Public Comment Response on the NESE Project (RTC) at 17–19 [JA_0435–37]. And the improved water quality and increased diversity of marine life have revitalized recreation on the Harbor, which supports recreational and sport fishing, rowing, kayaking, canoeing, sailing, and swimming. NRDC Comment at 6–7 [JA_0238–39]; RTC at 28 [JA_0446].

While water quality in the Harbor has improved drastically in recent decades, the legacy of historic pollution lives on. Seafloor sediments along the New Jersey portions of the Raritan Bay Loop

contain heavy metals and other toxic pollutants, including mercury, arsenic, manganese, polychlorinated biphenyls (PCBs), and 4,4'-DDE (the primary breakdown product of the banned pesticide DDT). *See* Transco Hydrodynamic and Sediment Transport Modeling Report (Hydrodynamic Report) at 323 [JA_0805]. All these substances are present at levels exceeding New Jersey's state sediment screening criteria (called ER-M), *see id.* at 335 [JA_0817], which "are measures of toxicity in marine sediment that are used in assessing toxicity hazards for trace metals and organic contaminants," *see* NJDEP 2019 Denial of Application Letter (2019 Denial) at 12 [JA_0112]. Samples that "exceed the ER-M value indicate there is a greater than 50% incidence of adverse effects to benthic communities," such as shellfish or other seafloor-dwelling organisms. *Id.* [JA_0112].

Construction of the Raritan Bay Loop will require both dredging (digging a trench for the pipeline) and burial (backfilling over the pipeline with sediment). *See* Hydrodynamic Report at 323 [JA_0805]. This process will tear up the seafloor, contaminating benthic habitat and resuspending the sediments—including buried contaminants—into the waterbodies. *See id.* [JA_0805]. This resuspension will increase

turbidity (the cloudiness of the water) and the levels of toxic pollutants in the water, with potential immediate and long-term effects on marine life. *See* NRDC Comment at 18–24 [JA_0250–56].

## II. Legal Framework

Before building NESE, Transco needed to obtain a certificate of public convenience and necessity from the Federal Energy Regulatory Commission (FERC) under the Natural Gas Act. To grant such a certificate, FERC must determine that NESE is required by present or future convenience and necessity, *see* 15 U.S.C. § 717f(e), and must assess NESE's potential environmental impacts under the National Environmental Policy Act, *see* 42 U.S.C. § 4321.

Transco also needed to obtain water quality certifications under Section 401 of the federal Clean Water Act, 33 U.S.C. § 1341, from the states where NESE would be built and operated, including from New Jersey and New York. To issue a Section 401 certification, a state agency must be able to "certify" that a project's potential discharges into that state's waters "will comply" with, among other things, the state's water quality standards. 33 U.S.C. § 1341(a)(1); *see also* 40 C.F.R. § 121.7(c). A Section 401 certification must include any "effluent

limitations and other limitations, and monitoring requirements necessary to assure that the [project] will comply" with the state's water quality standards. 33 U.S.C. § 1341(d); *see* 40 C.F.R. § 121.3(a). In New Jersey, NJDEP is charged with considering applications for Section 401 certifications. *See* N.J.A.C. 7:7A-2.1(a), (d).

NJDEP is also responsible for setting and enforcing the state's water quality standards. *See generally* N.J.A.C. 7:9B-1.1. As part of those standards, NJDEP has classified the waters that the Raritan Bay Loop will cut through as either SE1 (saline estuarine) or SC (coastal saline) waters. *See* N.J.A.C. 7:9B-1.15(c), (h); *accord* FERC Final Env't Impact Statement at 4-50 [JA_0561]. The state's "designated uses" for those waters include shellfish harvesting; maintenance, migration, and propagation of the natural and established biota; primary contact recreation; and "any other reasonable uses." N.J.A.C. 7:9B-1.12(d), (g).

NJDEP has also set surface water quality criteria for SE1 and SC waters, including standards for suspended and settleable solids, turbidity, and toxic pollutants. *See* N.J.A.C. 7:9B-1.14(d), (f); *see also* N.J.A.C. 7:9B-1.5(a)(4). Some of those standards set numeric limits. *See*, *e.g.*, N.J.A.C. 7:9B-1.14(f) (setting mercury concentration limit of 0.051

micrograms per liter). Other standards apply narrative limits. *See*, *e.g.*, N.J.A.C. 7:9B-1.14(d)(7) (prohibiting suspended solid concentrations that "would render the water unsuitable for the designated uses").

On top of those pollutant-specific standards, an "antidegradation" standard requires SE1 and SC waters be "maintained within a range of quality that shall protect the existing/designated uses of that waterbody." N.J.A.C. 7:9B-1.5(d)(2)(iv). And, as with all waters within the state, "toxic substances . . . shall not be at levels that are toxic to humans or the aquatic biota, or that bioaccumulate in the aquatic biota so as to render them unfit for human consumption." N.J.A.C. 7:9B-1.5(a)(4).

## III. NJDEP denies Transco's earlier applications for NESE

In March 2017, Transco applied to FERC for a certificate of public convenience and necessity for NESE. NJDEP Env't Report at 1 [JA_0460].

A few months later, in July 2017, Transco submitted its initial application to NJDEP for several permits, including a Section 401 water quality certification for NESE. NJDEP Env't Report at 1 [JA_0460]. At the same time, Transco applied for Section 401 certification from New

York State regulators for the portions of NESE's Raritan Bay Loop that would slice through New York state waters. Transco withdrew its initial application to NJDEP on June 15, 2018, and resubmitted its application five days later. *Id.* at 2 [JA_0461].

From July 2018 to June 2019, NJDEP issued a series of deficiency letters asking Transco to supplement and cure numerous problems with its application. NJDEP Env't Report at 2–3 [JA_0461–62]. NJDEP also received public comment on the application. *Id.* at 3 [JA_0462]. Meanwhile, FERC finalized a federal environmental impact statement for NESE in January 2019 and issued a certificate of public convenience and necessity in May 2019. 2019 Denial at 3 [JA_0103].

On June 5, 2019, NJDEP denied Transco's application for NESE without prejudice for failing to demonstrate compliance with state water quality standards. 2019 Denial at 1 [JA_0101]. With respect to the Raritan Bay Loop, NJDEP emphasized that sediment testing along the Loop's proposed path showed exceedances of state criteria for numerous toxic pollutants. *Id.* at 12–13 [JA_0112–13]. This indicated that NESE's "proposed dredging could adversely impact surface water quality," including by "exceed[ing] the applicable surface water criteria

for toxic substances." *Id.* at 13 [JA_0113]. NJDEP also explained that Transco had not provided modeling to show that "turbidity concentrations and water quality parameters" during dredging operations would meet state water quality standards. *Id.* at 14 [JA_0114]. Based on this information, NJDEP concluded that "the proposed dredging could adversely impact surface water quality and that Transco ha[d] not sufficiently demonstrated how it would avoid adverse impacts to surface water quality." *Id.* [JA_0114].

A week later, Transco submitted a new application to NJDEP. NJDEP Env't Report at 3 [JA_0462]. NJDEP quickly sent Transco a letter identifying multiple deficiencies in its technical modeling. *Id.* [JA_0462]. From then until May 2020, NJDEP and Transco exchanged multiple rounds of information. *Id.* at 3–4 [JA_0462–63]. NJDEP again fielded public comments. *Id.* at 4 [JA_0463].

On May 15, 2020, New York (for a third time) denied Transco's parallel application for a Section 401 certification for the Raritan Bay Loop. *See* NJDEP Env't Report at 5 [JA_0464]. NJDEP followed suit the same day, once again denying Transco's application. *See* NJDEP 2020 Denial of Application Letter (2020 Denial) at 2 [JA_0117]. This time,

NJDEP gave a single, narrow rationale for its Denial: that Transco had failed to show "a compelling public need" for NESE required under the state's Freshwater Wetlands Protection Act. *Id.* at 9 [JA_0124] (citing N.J.A.C. 7:7A-10.4). NJDEP predicated its conclusion on New York's denial, reasoning that there was no "public need" because New York regulators rejected the project. *Id.* [JA_0124]. The 2020 Denial expressly did "not resolve any further issues presented by the subject applications," *id.* [JA_0124], including whether Transco's renewed application had cured the water quality defects NJDEP identified in its 2019 Denial letter.

Transco did not appeal either NJDEP's or New York's 2020 denials. Transco allowed FERC's certificate of public convenience and necessity for NESE to lapse, and in June 2024 FERC officially vacated the certificate. *Transcon. Gas Pipe Line Co.*, 187 FERC ¶ 61,145, P 2–3 (June 10, 2024).

## IV. NJDEP reverses position and approves Transco's 2025 application for NESE

After Transco's FERC certification lapsed, NESE was presumed dead. But that changed in spring 2025. In March, President Trump complained on Truth Social that New York was holding up the

construction of "Pipelines" in the Northeast.[1] And then, in mid-May, New York Governor Hochul affirmed she would work with the Trump administration on "new energy projects" after the federal government lifted a month-long stop-work order for an offshore wind project off of Long Island.[2] That same day, the Secretary of Interior posted on X that he was "encouraged by Governor Hochul's comments about her willingness to move forward on critical pipeline capacity."[3] Within two weeks, Transco was again formally seeking approvals for NESE.

On May 29, 2025, Transco returned to FERC, asking the agency for "expedited reissuance" of the certificate of public convenience and necessity that Transco had abandoned a year before. 2025 Application Cover Letter at 3 [JA_0566]. Transco submitted renewed applications for NESE to NJDEP and New York the next day—more than five years after the states' denials in 2020. *Id.* at 1–2 [JA_0564–65].

---

[1] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 13, 2025, at 12:21 pm ET), https://perma.cc/L4L4-5JPR.

[2] Press Release, Statement from Governor Kathy Hochul (May 19, 2025), https://perma.cc/EH98-VCNA.

[3] Secretary Doug Burgum (@Secretary Burgum), X (May 19, 2025, at 9:32 pm ET), https://perma.cc/Y7SV-UJRT?type=image.

In its cover letter to NJDEP, Transco acknowledged that NESE's "scope has not changed and thus, the applications are essentially identical to the applications reviewed by [NJDEP] in 2020." 2025 Application Cover Letter at 1 [JA_0564]. Indeed, Transco submitted as support for its application numerous reports it had prepared in 2016 and 2017, simply with new "May 2025" cover sheets. *See, e.g.*, Hydrodynamic Report at 1, 5 [JA_0773, 0777].

Among these past reports was a *Hydrodynamic Transport and Sediment Modeling* report that Transco had updated in 2019 to include a "transport model" for contaminants of concern. Hydrodynamic Report at 323 [JA_0805]. Transco's modeling assumed that New Jersey would allow a "500-ft dredging mixing zone at key locations along the route"—a "zone" in which Transco could exceed applicable water quality standards during construction activities. *Id.* [JA_0805]. Even with the mixing zone's safe harbor, Transco predicted that violations could occur more than 500 feet from construction activities. *Id.* at 341 [JA_0823]. Transco proposed to implement "best management practices" to minimize those violations. *Id.* [JA_0823].

NJDEP declared the permit application "administratively complete" in June 2025. NJDEP Env't Report at 5 [JA_0464]. In August, FERC granted Transco's petition to reissue the certificate of public convenience and necessity. *See Transcon. Gas Pipe Line Co.*, 192 FERC ¶ 61,184 (Aug. 28, 2025).[4]

In September 2025, NJDEP held a public hearing and solicited public comment on Transco's permit application. NJDEP Env't Report at 5 [JA_0464]. Numerous public comments raised concerns with NESE's ability to comply with state water quality standards, particularly for the offshore Raritan Bay Loop. Commenters emphasized that the 2025 application was "nearly identical" to the others NJDEP had rejected, and that the limited new materials that Transco submitted contained no information "specifically related to water quality." *See* NRDC Comment at 9–10 [JA_0241–42]. Among their key concerns, commenters highlighted that Transco's modeling still indicated that sediment contaminant levels along the Raritan Bay

[4] NRDC is a petitioner in a challenge to that FERC decision, which is pending before the U.S. Court of Appeals for the D.C. Circuit. *Central Jersey Safe Energy Coalition et al. v. FERC*, No. 25-1252 (D.C. Cir. filed Nov. 30, 2025).

Loop's path exceeded limits for numerous toxic pollutants, *see* Princeton Hydro's Review of Transco's NESE NJDEP Permit Applications (Princeton Hydro Report) at 24 [JA_0299]; NRDC Comment at 18 [JA_0248]; that Transco's draft water quality monitoring plan would only track turbidity, not the toxic substances found in the Harbor's seafloor sediments, *see* Princeton Hydro Report at 24 [JA_0299]; and that Transco's draft monitoring plan called for monitoring too far from the dredging activities to assess compliance, even after applying Transco's proposed 500-foot mixing zone, *see id.* at 24–25 [JA_0299–300].

After the comment period closed, NJDEP and Transco continued to exchange information. *E.g.*, June 25–Nov. 7, 2025 Emails re Application at 2–6 [JA_0900–04]. This continued until November 7, 2025, when Transco informed NJDEP that New York had issued a Section 401 certification that morning.[5] *Id.* at 1 [JA_0899]. As it had done in 2020, NJDEP quickly followed New York's lead. Later that day, NJDEP granted Transco's permit for NESE, including a Section 401

[5] NRDC is also a petitioner in the challenge to New York's Section 401 certification. *See Raritan Baykeeper v. N.Y. State Dep't of Env't Conservation,* No. 25-2938 (2d Cir. filed Nov. 18, 2025).

water quality certification covering the Raritan Bay Loop. Nov. 7, 2025 Permit (WQC) at 1 [JA_0013].

NJDEP did not issue a letter explaining its decision, as it had with its denials in 2019 and 2020. Despite issuing the permit on November 7, 2025, NJDEP was still working on its responses to public comment as late as November 13, 2025. Nov. 7–Nov. 14, 2025 Emails re Documentation at 1 [JA_1376]. And neither the permit nor the responses to comment (once finalized) acknowledged, let alone explained, NJDEP's apparent change in position from the agency's 2019 Denial regarding NESE's compliance with state water quality standards in the Raritan Bay Loop.

## V. NJDEP's water quality certification for NESE

NJDEP's permit contains several distinct approvals for NESE, including the Section 401 water quality certification (WQC) for the construction and operation of the Raritan Bay Loop.

The WQC contains several special conditions, including requiring Transco's future submission of water quality monitoring and adaptive management plans to the agency for its offshore construction of the Raritan Bay Loop. WQC at 3–7 [JA_0015–19]. The WQC's requirements

for the future monitoring plan lack key details, including where Transco must place the monitors and what contaminants Transco must monitor for. *Id.* at 4 [JA_0016]. And although NJDEP claims the WQC requires Transco to implement adaptive management practices when its monitoring detects "turbidity and water quality" exceedances, *see* RTC at 7 [JA_0425], the WQC contains no guidance defining what those practices might be or what exceedances would trigger them. Instead, it kicks those details to the separate plan that Transco would submit later. WQC at 5 [JA_0017]. The WQC also contains no condition making those future monitoring and adaptive management plans enforceable parts of the WQC, or even requiring NJDEP to approve the plans before any construction begins.

NJDEP primarily relies on Transco's 2019 hydrodynamic report to analyze dredging impacts for purposes of Transco's 2025 application. *See* RTC at 7 [JA_0425]. NJDEP acknowledges that while Transco's modeling did not show exceedances for arsenic or mercury, it showed exceedances would occur for PCBs. *Id.* [JA_0425]. Nonetheless, NJDEP states that "the overall levels of contaminants in the mixing zone decrease with best management practices," and that PCB exceedances

would not occur. *Id.* [JA_0425]. NJDEP does not consider the consequences of contaminant levels for bis(2-ethylhexyl)phthalate, phenanthrene, manganese, and 4,4'-DDE (pesticides) potentially exceeding the numerical levels set by New Jersey regulations, including the surface water quality standards and ER-Ms, or explain why the best management practices it found insufficient under its 2019 Denial are now adequate to ensure compliance with the state's water quality standards.

NJDEP also says little about NESE's impacts on the protection and propagation of shellfish, including hard clams and surf clams, which are relevant to protecting existing and designated uses for the waterbodies. NJDEP claims that it need not consider impacts on shellfish because the area is not a "designated habitat" for hard clams under New Jersey's coastal zone management rules, N.J.A.C. 7:7-9.2(b). RTC at 17 [JA_0435]. NJDEP otherwise does not discuss potential impacts of increased turbidity and sedimentation on native biota, and does not explain why it has changed its position on the relevance of shellfish and benthic habitat impacts since its 2019 Denial. *Id.* [JA_0435].

As to surf clams, NJDEP asserts that it “consulted” with its Marine Resources Administration (MRA) and “determined that” NESE “will not result in destruction, condemnation or contamination of surf clam habitat.” RTC at 18 [JA_0436]. But the MRA’s memorandum of findings emphasized the unique vulnerability of surf clams to turbidity and contaminated suspended sediments associated with NESE’s construction, and otherwise drew no express conclusions about impacts to surf clams. *See* Sept. 30, 2025 MRA Memo. at 3 [JA_0313].

NRDC filed this petition for review on November 18, 2025, in the U.S. Court of Appeals for the Second Circuit. ECF No. 1-1. The petition was transferred to this Court on February 3, 2026. ECF No. 1-2.

## SUMMARY OF ARGUMENT

NJDEP’s decision to grant the WQC, after denying an essentially identical application based on Transco’s failure to show it could comply with the state’s water quality standards, is arbitrary and contrary to law.

NJDEP’s decision to grant the WQC arbitrarily departs, without acknowledgment or detailed justification, from its conclusions in its 2019 Denial that NESE would violate state surface water quality

standards, including those related to toxic pollution and protection of shellfish and benthic communities. Rather than explain why it can now conclude that NESE "will comply" with the state's water quality standards, *see* 33 U.S.C. § 1341(a)(1), the agency points to New York's approval as the reason for its own approval. NJDEP says little about water quality impacts, does not acknowledge its 2019 rationale at all, and ignores relevant factors by failing to even cite, let alone assess, the relevant surface water quality standards. And what little NJDEP does say about water quality is arbitrary because it does not respond to specific concerns raised by commenters, runs counter to the evidence in the record, and contradicts, again without acknowledgement or the required detailed justification, its conclusions from the 2019 Denial.

NJDEP's WQC also violates the Clean Water Act by omitting key monitoring requirements and adaptive management practices, instead deferring plans for those measures to a future, non-public process. The WQC's requirement for these future, uncertain plans does nothing to "assure" the compliance with state water quality standards that the Clean Water Act requires. *See* 33 U.S.C. § 1341(d). For the same reason, NJDEP could not rationally rely on these deferred compliance plans to

conclude that NESE will comply with New Jersey's water quality standards. The deferral also violates the Clean Water Act's public participation requirements.

For these reasons, the Court should vacate the WQC. Vacatur is the only way to ensure NJDEP cures its significant errors before NESE is built and the proposed dredging causes the pollution that NJDEP inadequately considered and controlled when it granted the WQC.

## STANDARD OF REVIEW

In reviewing Section 401 water quality certifications under Natural Gas Act section 19(d)(1), 15 U.S.C. § 717r(d)(1), this Court "review[s] *de novo* state agency interpretation of federal law, and review[s] under the arbitrary and capricious standard state action taken pursuant to federal law." *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.*, 833 F.3d 360, 377 (3d Cir. 2016).

The federal Administrative Procedure Act (APA) requires the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under arbitrary-and-capricious review, an "agency cannot reach whatever conclusion it likes and then defend it with vague

allusions to its own expertise; instead, the agency must support its conclusion with demonstrable reasoning based on the facts in the record." *Sierra Club v. EPA*, 972 F.3d 290, 298 (3d Cir. 2020). In other words, the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Keystone-Conemaugh Projects, LLC v. EPA*, 100 F.4th 434, 445 (3d Cir. 2024) (cleaned up). "Agency action will be arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Pa. Dep't of Health & Human Servs. v. United States*, 897 F.3d 497, 504 (3d Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

An agency action is also arbitrary and capricious where the agency fails to adequately explain a reversal of position. *Comité de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 187–88 (3d Cir. 2014). An agency must both show "awareness that it is changing

[its] position" and provide a "reasoned explanation" for the change. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (cleaned up). And an agency must provide an even "more substantial justification" when the factual basis for its new position contradicts prior findings. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015); *see also Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023) (requiring "extra explanation").

## ARGUMENT

### I. NRDC has standing

NRDC has standing to bring this case on behalf of its members who would be harmed by NESE's construction and operation. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The case is germane to NRDC's organizational interests, *see* Yeung Decl. ¶¶ 6–9, and the relief requested (vacatur of the WQC) does not require participation of individual members, *see Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005).

NRDC's members would have standing to challenge the WQC. NRDC's members regularly use and enjoy the waterways where NESE's Raritan Bay Loop would be constructed. These members enjoy wading,

swimming, kayaking, canoeing, and fishing in these waters. Scarcella Decl. ¶¶ 8–9, 12; Zandoli Decl. ¶¶ 4, 6. They also enjoy walking, hiking, and biking along the shoreline, *see* Scarcella Decl. ¶ 8; Stark Decl. ¶ 9; Zandoli Decl. ¶¶ 4, 5, and watching the wildlife, including birds, that live in and depend on those waters, *see* Stark Decl. ¶¶ 10–12; Leung Decl. ¶¶ 3–6; Zandoli Decl. ¶¶ 4, 6. And some members regularly consume locally-caught seafood. *See* Scarcella Decl. ¶¶ 9, 11–12; Leung Decl. ¶ 7. These members are concerned that pollution from NESE's construction and operation will degrade water quality, lessening their enjoyment of recreation in and around the affected waterways, harming the wildlife they enjoy observing, and tainting local seafood they enjoy eating. *See* Leung Decl. ¶¶ 6–8; Scarcella Decl. ¶¶ 11–13; Stark Decl. ¶¶ 11–13; Zandoli Decl. ¶¶ 6–7. They are, in short, concerned about harms from the same pollution from NESE that led NJDEP to reject the water quality certification in 2019. *See* 2019 Denial at 12–14 [JA_0112-–14].

These harms to NRDC members' recreational, aesthetic, and health interests are concrete, cognizable injuries in fact for purposes of Article III standing. *See Friends of the Earth, Inc. v. Laidlaw Env't*

*Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Sierra Club*, 972 F.3d at 298–99*; Interfaith Cmty. Org.*, 399 F.3d at 255–57; *Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 71 (3d Cir. 1990). Because these injuries are traceable to NESE, and redressable by a Court order vacating the WQC, NRDC has standing to sue on behalf of its members.

## II. NJDEP's failure to adequately explain its change in position with respect to water quality impacts was arbitrary

NJDEP's decisional documents fail to either acknowledge the agency's change in position on several key issues or explain why it changed course. Instead, NJDEP appears to rely on only New York's approval of NESE to support its reversal on the WQC.

An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). When an agency changes its position, it must provide a reasoned basis for doing so. *See Encino Motorcars*, 579 U.S. at 221; *Comité de Apoyo*, 774 F.3d at 187. It must both acknowledge that it has changed its position and demonstrate that there are good reasons for

the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This requires an explanation that wrestles with the facts that supported the initial position. Indeed, where the factual basis for the agency's new position contradicts the basis for its earlier position, the agency is obligated to offer an even "more substantial justification," *Perez*, 575 U.S. at 106, to justify "disregarding facts and circumstances that underlay or were engendered" by the earlier position, *Fox*, 556 U.S. at 516.

In its 2019 Denial, NJDEP determined NESE could violate New Jersey's surface water quality standards, including by resuspending toxic chemicals and increasing turbidity, and that those violations would bear a "greater than 50% incidence of adverse effects to benthic communities." 2019 Denial at 12 [JA_0112]. NJDEP also declined to certify NESE pursuant to special permitting conditions, despite Transco proposing best management practices to minimize water quality risks. *Id.* at 12–13 [JA_0112–13]. NJDEP's subsequent 2020 Denial did not revisit the agency's 2019 determination that Transco had failed to show that NESE would comply with water quality standards, and instead focused solely on the lack of public need for NESE. *See* 2020 Denial at

9–10 [JA_0124–25] (withholding consideration of "any further issues presented by" the application). The 2019 Denial's assessment of NESE's compliance with water quality standards thus remained NJDEP's most recent conclusion on the matter before Transco's 2025 application.

NJDEP's 2025 decisional documents, however, ignore that its WQC rests on findings that contradict its 2019 conclusions about NESE's water quality impacts. NJDEP acknowledges that the 2025 application "is essentially the same project as was submitted in January of 2020." RTC at 1 [JA_0419]; *see also* 2025 Application Cover Letter at 1 [JA_0564] (same admission, from Transco). And NJDEP admits that its water quality analysis is based off the hydrodynamic modeling report that Transco originally submitted with its 2017 application. RTC at 7 [JA_0425]. But the agency never re-examined the reasons for its 2019 Denial in its 2020 Denial, and does not acknowledge those conclusions in its 2025 decisional documents either. This failure to "display awareness that it *is* changing position" alone renders the WQC arbitrary and capricious. *See Fox*, 556 U.S. at 515.

Nor does NJDEP provide a reasoned explanation—much less the required "more substantial justification," *Perez*, 575 U.S. at 106—for its

unacknowledged change in position from the 2019 Denial. Instead, NJDEP premises its 2025 decision on the purported public need for NESE—a factor that does not address numerous relevant water quality impacts. NJDEP otherwise arbitrarily dismisses the relevance of water quality standards, screening criteria, and agency guidance it had relied on in 2019, while failing to rationally explain how it has "assure[d]" that an essentially identical project that it found would not meet water quality standards in 2019 "will comply" with those same standards today. *See* 33 U.S.C. § 1341(d).

### A. NJDEP's sole reliance on purported public need for NESE to support its change in position was arbitrary

Agency action is arbitrary and capricious if "the agency has not considered all relevant factors," *see Transcontinental Gas Pipe Line Co. v. Penn. Env't Hearing Bd.*, 108 F.4th 144, 155 (3d Cir. 2024) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)), or has failed to "examine the relevant data and articulate a satisfactory explanation for its action," *see Prometheus Radio Project v. FCC*, 652 F.3d 431, 469 (3d Cir. 2011) (quoting *State Farm*, 463 U.S. at 43). Section 401 requires that the state agency determine whether the

project "will comply with" federal and state water quality protections. *See* 33 U.S.C. § 1341(a)(1).

NJDEP's sole reliance on a purported "public need" for NESE to justify its decision to grant the WQC, after denying it twice before, is arbitrary and capricious. NJDEP justifies its decision to grant the WQC by saying that New York's approval of NESE demonstrated "compelling public need." RTC at 1–2 (citing N.J.A.C. 7:7A-10.4) [JA_0419–20]. But while "public need" may be a *necessary* condition under certain New Jersey water quality standards, public need alone is not a *sufficient* condition for issuing a WQC under the Clean Water Act. Indeed, the purported "public need" for NESE and the natural gas it would carry says nothing about NESE's compliance with NJDEP's surface water quality standards—standards that the agency said in 2019 precluded the issuance of a certification for NESE. *See* 2019 Denial at 13–14 [JA_0113–14]. Because NJDEP's reliance on purported public need alone fails to address NESE's compliance with many other state water quality standards, that reliance was arbitrary and contrary to federal law.

### B. NJDEP failed to provide a reasoned explanation for its tacit reversal of its 2019 findings regarding compliance with surface water quality standards

The Clean Water Act allows a state to issue a water quality certification only if the state determines that the project "will comply with" state water quality standards. 33 U.S.C. § 1341(a)(1). For projects in New Jersey's coastal areas, those standards include the state's surface water quality standards. N.J.A.C. 7:7-1.2(e).

New Jersey's surface water quality standards set numeric effluent limits for specific contaminants and overall turbidity, N.J.A.C. 7:9B-1.14(d)(13), (f)(7), (g), and set narrative conditions for a range of issues, including toxic substances concentrations, N.J.A.C. 7:9B-1.14(d)(12), and designated uses for water bodies, N.J.A.C. 7:9B-1.12. They also establish an antidegradation policy that requires, absent a special finding justifying waiver, that water quality "shall be maintained within a range of quality that shall protect the existing/designated uses." N.J.A.C. 7:9B-1.5(d)(2)(iv); *see also* N.J.A.C. 7:9B-1.5(a)(6).

In 2019, NJDEP determined that NESE "could adversely impact surface water quality," that resulting contamination "may exceed the applicable surface water criteria for toxic substances," and that toxins

released by dredging posed a "greater than 50% incidence of adverse effects to benthic communities." 2019 Denial at 12–13 [JA_0112–13]. NJDEP relied on those findings to conclude that Transco had not shown that NESE would comply with New Jersey's water quality standards. *Id.* at 14 [JA_0114]. NJDEP reached that conclusion despite Transco's promises to "implement appropriate best management practices to control [total suspended solids] in a manner that complies with the surface water quality standards." *Id.* at 13 [JA_0113].

More than five years later, considering "essentially the same project," RTC at 1 [JA_0419], NJDEP reversed course. This time, it concluded that Transco can meet surface water quality standards, that most shellfish species are irrelevant because the area is not listed as shellfish habitat under separate regulations, and that surf clam impacts will be minimal. RTC at 7, 18 [JA_0425, 0436]. NJDEP completes this 180-degree flip without acknowledging its prior findings. *See supra* p. 30. And it provides no justification for its stark reversal of position. Indeed, NJDEP does not even cite the relevant surface water quality standards at N.J.A.C. 7:9B in its decision documents. Nor does it

explain why best management practices that were presumably available in 2019 are now adequate to ensure Transco's compliance.

NJDEP's sparse rationale cannot satisfy the basic commands of rational decisionmaking, much less the "more substantial justification" required when agency reversals are based on purported changes in factual findings. *See Perez*, 575 U.S. at 106. Because NJDEP's decision documents omit the state surface water quality standards, they also do not explain how Transco's 2025 application ensured compliance with those standards while the 2019 application did not. NJDEP also fails to explain why the conditions it has imposed are sufficient to ensure compliance, despite the availability of those same conditions in 2019. And NJDEP fails to explain why standards that were critical in 2019, such as the waters' designated uses with respect to shellfish and the agency's screening criteria for contaminants, are now somehow irrelevant to its analysis. NJDEP's failure to provide a forthright and reasoned explanation for these substantial departures was arbitrary and capricious. *See Comité de Apoyo,* 774 F.3d at 187–88.

#### 1. NJDEP's failure to reasonably explain how NESE would be consistent with designated uses was arbitrary

NESE's Raritan Bay Loop would slice through New Jersey waters that NJDEP has designated for shellfish harvesting; maintenance, migration, and propagation of the natural and established biota, like shellfish; and primary contact recreation, like swimming and wading. N.J.A.C. 7:9B-1.15(c) (designating all waters in the Atlantic Ocean within three miles of the coast as SC), (h) (designating Sandy Hook Bay as SE1); N.J.A.C. 7:9B-1.12(d) (designated uses for SE1 waters), (g) (designated uses for SC waters). New Jersey's water quality standard for turbidity likewise requires that "settleable solids" shall not be "noticeable in the water or deposited along the shore or on the aquatic substrata in quantities detrimental to the natural biota," or "render the waters unsuitable for the designated uses." N.J.A.C. 7:9B-1.14(d)(3). And NJDEP guidance estimates a greater than 50% chance of adverse impacts on benthic communities when the state's *Ecological Saline Water Sediment Effects Range Medium (ER-M)* criteria are exceeded.[6]

[6] *See* NJDEP, *Guidance for Sediment Quality Evaluations* 10 (Nov. 1998), available at https://perma.cc/CL2Q-D9FX.

Section 401 required NJDEP "to assure" that NESE "will comply" with those standards. *See* 33 U.S.C. § 1341(d). NJDEP thus had to consider impacts to natural biota, like shellfish. And NJDEP did so in 2019, determining that toxic sediments released by the Raritan Bay Loop's construction posed a greater than 50% chance of harming benthic communities, including shellfish, in the project area. 2019 Denial at 12–14 [JA_0112–14]. But NJDEP's 2025 decision reaches the opposite conclusion without explaining why. Indeed, NJDEP does not cite its 2019 Denial, or the designated uses of the waters in the Raritan Bay Loop's path, in its decisional documents.

NJDEP's failure to consider NESE's compliance with designated use protections raises a critical question: why does the agency refuse to address that issue, when its 2019 analysis under identical facts and legal standards relied on it? NJDEP's silence on that question violated both its obligation to ensure NESE "will comply" with all water quality standards, 33 U.S.C. § 1341(a)(1), and its obligation to acknowledge and give a "substantial justification" for its apparent change in position, *see Perez*, 575 U.S. at 106.

Rather than complying with these basic legal mandates, NJDEP cites irrelevant rules to justify ignoring impacts to shellfish maintenance, migration, and propagation. NJDEP claims that because the Raritan Bay Loop would traverse areas "contaminated by toxins," those areas are not considered "shellfish habitat" under the state's coastal zone management rules. RTC at 18 [JA_0436] (citing N.J.A.C. 7:7-9.2(b)). But the fact that none of the waterbodies warrant special *legal protection* as "shellfish habitat" under the state's coastal zone management rules does not mean that, as a *factual matter*, no shellfish live there, much less that "there will be no impact to shellfish habitat" from suspended sediments that are admittedly "contaminated by toxins." *Contra id.* [JA_0436].

NJDEP's rationale attempts to dodge, rather than fulfill, its duty to affirmatively determine whether NESE "will comply" with the state water quality standards that protect all marine life, including shellfish, that inhabit these waters. *See* 33 U.S.C. § 1341(a); *see also* N.J.A.C. 7:9B-1.12(d) and (g) (protecting "maintenance, migration and propagation" of shellfish); N.J.A.C. 7:9B-1.14(d)(3) (forbidding sediment deposition in "quantities detrimental to the natural biota"). These

standards contain no exemption for waters that elude special treatment under the coastal zone management rules. NJDEP had a distinct obligation to evaluate NESE's compliance with those standards as they related to shellfish, even if discrete protections under the coastal zone management rules did not apply. Its failure to do so was arbitrary and contrary to its fundamental obligation under Section 401.

The little that NJDEP does say about impacts to shellfish, moreover, runs contrary to the guidance the agency relied on in 2019, and is based entirely on Transco's analysis—and without any engagement with commenters' concerns with that analysis. *See* RTC at 17–18 [JA_0435–36]. In its 2019 Denial, NJDEP relied on its guidance on the relationship between toxic substances and benthic respirators, which are seafloor-dwelling organisms such as shellfish. *See* 2019 Denial at 12 [JA_0112]. That guidance anticipates a greater than 50% chance of adverse impacts on benthic communities when the *Ecological Saline Water Sediment Effects Range Medium (ER-M)* criteria are exceeded.[7] NJDEP previously found that NESE's dredging would release toxins at levels exceeding the ER-M criteria, and relied on the

---

[7] *See Guidance for Sediment Quality Evaluations*, *supra* note 6, at 10.

guidance to conclude that NESE could harm "benthic communities," like the surf and hard clam species that live in the project area. 2019 Denial at 12–13 [JA_0112–13]. Similarly, public comments continued to note that re-suspended sediment will fall back to the seafloor once construction stops, potentially burying shellfish in toxic sediment. *See* NRDC Comment at 17 [JA_0249] (citing FERC Final Env't Impact Statement at 4-113, -116 [JA_0562, 0563]).

NJDEP does not mention its ER-M criteria in its 2025 decisional documents, much less explain why it no longer relies on them. *See FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 586–87 (2025) (recognizing that agency's unexplained refusal to consider factors previously described as "critical" violated the APA). Nor does NJDEP respond to commenters' concerns about the impacts of sediment redistribution. *See Perez,* 575 U.S. at 96 ("An agency must consider *and respond to* significant comments" (emphasis added)).

Instead, NJDEP cites a memo from one of its offices—the MRA—that it claims found impacts on surf clams will be minimal. RTC at 18 [JA_0436]. But the memo says no such thing. While the MRA memo references Transco's analysis of shellfish impacts, nowhere does it

endorse it. At most, the MRA only agrees that Transco must notify shellfisheries of construction in light of likely negative impacts, *see* MRA Memo. at 3 [JA_0313]—evidence that "contradict[s]" NJDEP's conclusion that impacts will be minimal. *See NRDC v. EPA*, 790 F.2d 289, 302 (3d Cir. 1986).

Indeed, to the extent the MRA memo includes any original analysis, that analysis suggests that surf clams *are* likely to be harmed by dredging. MRA Memo. at 3 [JA_0313] ("Unlike hard clams, surf clams do not have the ability to close their shells completely in the presence of increased turbidity. . . . As a result, surf clams are more sensitive and susceptible to the impacts of increased turbidity and smothering related to the sediment plumes."). NJDEP nonetheless relies on the MRA as the only source for its conclusion that impacts to surf clams will be minimal. RTC at 18 [JA_0436]. This is arbitrary. *See State Farm*, 463 U.S. at 43 (requiring a "rational connection between the facts found and the choice made"). That memo could not support NJDEP's decision on a blank slate and, without more, does not provide the "more substantial justification" required for NJDEP's reversal from its 2019 conclusions about shellfish impacts. *See Perez*, 575 U.S. at 106.

NJDEP similarly fails to explain its reliance on best management practices that it chose not to use in 2019. This too was arbitrary. NJDEP's proposed solutions to avoid water quality violations—including using a slow clamshell dredge and use of a clamshell bucket to minimize contamination—were available in 2019, *see* Transco Env't Report at 21, 111 [JA_0572, 0612], but the agency rejected them, 2019 Denial at 13 [JA_0113]. NJDEP's "scant explanation[]" for how those practices would ensure shellfish habitability or adequately prevent or reduce turbidity now, when they were inadequate to do so in 2019, is "insufficient to comply with APA requirements." *See Comité de Apoyo*, 774 F.3d at 188–89 (holding agency acted arbitrarily when it endorsed data it previously found unreliable with only "scant explanations").

In sum, NJDEP arbitrarily fails to acknowledge, let alone reasonably explain, its implicit reversal on NESE's compliance with designated use protections, particularly related to shellfish. NJDEP's limited treatment of shellfish impacts is otherwise also arbitrary, and falls far short of the "more substantial justification" required under the change-in-position doctrine in this context. *See Perez*, 575 U.S. at 106.

### 2. NJDEP's failure to reasonably explain how NESE would maintain existing uses was arbitrary

New Jersey's surface water quality standards also require that "[e]xisting uses shall be maintained and protected." N.J.A.C. 7:9B-1.5(a)(6)*; see also id.* N.J.A.C. 7:9B-1.5(d)(2)(iv) (regulating category two waters). This "antidegradation policy seeks to maintain and protect the existing uses" by "ensur[ing] that water pollution will not worsen." *Matter of Issuance of a Permit by NJDEP to Ciba-Geigy Corp.*, 576 A.2d 784, 790–91 (N.J. 1990) (cleaned up). The policy extends to places "[w]here the quality of the waters exceeds levels necessary to support the *protection and propagation of fish, shellfish, and wildlife* and recreation in and on the water." 40 C.F.R. § 131.12(a)(2) (emphasis added).

The antidegradation policy applies on top of the obligation to protect designated uses. Yet NJDEP also fails to address the antidegradation standards in its decisional documents, including as they relate to shellfish. As shown above, NJDEP's limited statements about shellfish do not provide the substantial justification necessary to support NJDEP's implicit change in position on NESE's harms to shellfish. *Supra* pp. 37–42. NJDEP's failure to consider NESE's impacts

on existing uses for the waterways, including shellfish protection and propagation, is therefore arbitrary and contrary to law as well.

### 3. NJDEP's failure to reasonably explain how NESE would meet numeric standards was arbitrary

As noted, NJDEP's decision also reverses, without explanation, its 2019 conclusions about NESE's non-compliance with numeric water quality standards for toxic substances. Dredging for NESE will resuspend toxic substances for which NJDEP has set numeric limits under N.J.A.C. 7:9B-1.14(f)(7) and (g). *See* Hydrodynamic Report at 323 [JA_0805].

In 2019, NJDEP determined that the affected seafloor is contaminated with toxins including mercury, arsenic, manganese, bis(2-ethylhexyl)phthalate, phenanthrene, PCBs, and 4,4'-DDE, *see* 2019 Denial at 12–13 [JA_0112–13]; that "the proposed dredging could adversely impact surface water quality," *id.* at 14 [JA_0114]; and "Transco has not sufficiently demonstrated how it would avoid adverse impacts to surface water quality," *id.* [JA_0114].

In 2025, without addressing those prior findings, NJDEP flipped its position. NJDEP inexplicably fails to mention the ER-M standards for 4,4' DDE, manganese, bis(2-ethylhexyl)phthalate, and phenanthrene

that it had relied on in 2019. *See* 2019 Denial at 12–14 [JA_0112–14]. It fails to address these contaminants even though the water quality standards require that "[t]oxic substances . . . shall not be at levels that are toxic to humans or the aquatic biota, or that bioaccumulate in the aquatic biota so as to render them unfit for human consumption." *See* N.J.A.C. 7:9B-1.5(a)(4). Instead, NJDEP claims that "criteria do not exist" for those substances and that "levels of [those] contaminants in the mixing zone will decrease with best management practices." RTC at 7 [JA_0425].[8] Despite this, NJDEP still recognizes that PCB concentrations and turbidity from NESE could exceed state water quality standards, yet dismisses that issue, saying only that undefined "additional measures" will be implemented when (and if) those exceedances are detected. *See id.* [JA_0425].[9]

---

[8] This assertion exemplifies the standardless approach NJDEP has taken. Appropriate best management practices can, of course, "decrease" overall contaminant levels compared to worse alternatives. But NJDEP was required to analyze whether those practices would decrease toxic pollution to a point that satisfies surface water quality standards, for which it has said nothing other than "no criteria exist" for 4,4' DDE, manganese, bis(2-ethylhexyl)phthalate, and phenanthrene (a departure from its conclusions in 2019, which applied the ER-M).

[9] NJDEP's reliance on these undefined additional measures underscores its unlawful decision to delay determination of what many of those

Basic principles of reasoned decisionmaking required NJDEP to explain its stark departures from its past conclusions. *Fox*, 556 U.S. at 515. It was arbitrary for NJDEP "to ignore such matters." *Id.* Indeed, NJDEP's conclusions that the ER-M criteria do not apply to entire classes of known contaminants, despite its finding that they *did* apply in 2019; that best management practices can avoid certain water quality exceedances now, when they could not in 2019; and that the risks of PCB and turbidity violations are acceptable based on undefined "additional measures," precluded any rational conclusion that NJDEP had "assure[d]" NESE "will comply" with the state's water quality standards. *See* 33 U.S.C. § 1341(d).

* * *

In sum, no parties dispute that the same water quality standards apply, the same toxic sediments exist, and the same species of shellfish will be harmed today as in 2019. Yet NJDEP has not provided the required "substantial justification" for its departure from the 2019 Denial. *See Perez*, 575 U.S. at 106.

---

practices are, and when they would apply, until *after* it issued the WQC. *Infra* pp. 49–53.

## III. NJDEP's reliance on uncertain, future compliance plans was unlawful

"The Clean Water Act demands regulation in fact, not only in principle." *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005). Section 401(a) fulfills this demand by requiring a state agency issuing a water quality certification to make an affirmative finding that the project "will comply" with applicable water quality standards. 33 U.S.C. § 1341(a). If the agency determines that additional requirements are necessary to make that mandatory finding, the agency may grant the certification "with conditions." 40 C.F.R. § 121.7(d). In those circumstances, Section 401(d) requires that the certification "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that [the project] will comply" with applicable water quality standards. 33 U.S.C. § 1341(d).

On these points, Section 401's structure is not unique within the Clean Water Act. Other permitting provisions in the Act similarly require that permits "assure compliance" with applicable water quality requirements. *See* 33 U.S.C. § 1342(a)(2); *see also id.* § 1311(b)(1)(C) ("necessary to meet"); *id.* § 1342(b) ("insure compliance"); *id.* § 1344(h)(1)(A)(i), (B) ("assure compliance").

To do so, a permit must do more than "state[] the desired result"—that is, compliance. *See City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 347 (2025). Instead, it must "set[] out actions that must be taken," *id.*, or otherwise provide "specific guidance" on how to comply, *see NRDC v. EPA*, 808 F.3d 556, 578 (2d Cir. 2015). Those terms must be included in the permit itself, not developed outside of the permit process. *Waterkeeper All.*, 399 F.3d at 502. And their efficacy must be "supported by substantial evidence." *Twp. of Bordentown v. FERC*, 903 F.3d 234, 259 (3d Cir. 2018) (quoting *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997)).

NJDEP violated these requirements by allowing Transco to wait until after WQC approval before developing and submitting to NJDEP a "water quality monitoring plan" and an "adaptive management plan" for NESE. *See* WQC at 4–5 [JA_0016–17]. Despite considering these plans critical to NESE's compliance with water quality standards, NJDEP deferred their substance to a later, non-public process. Without these necessary compliance plans in place *when it issued* the WQC, NJDEP could not rationally "assure" that NESE "will comply" with state water quality standards. *See* 33 U.S.C. § 1341(d). NJDEP's

deferral of these plans until after it issued the WQC was thus arbitrary and contrary the Clean Water Act.

### A. NJDEP's reliance on future, uncertain compliance plans violated the Clean Water Act and principles of reasoned decisionmaking

#### 1. NJDEP's requirement for an Adaptive Management Plan did not assure compliance with water quality standards

NJDEP acknowledges that Transco must implement adaptive management practices to prevent and respond to water quality violations. *See, e.g.*, WQC at 5 [JA_0017]. Yet it does not define those practices in the WQC. Instead, the WQC requires that Transco "shall submit" an adaptive management plan at some unknown point in the future, and that the plan "must consist of a course of action, some or all of which may be employed in any given situation that will reduce or mitigate the effects of observed increases in turbidity." *Id.* [JA_0017].

These vague requirements for a future, Transco-prepared adaptive management plan do not "assure" compliance with water quality standards, because they leave both Transco and the public in the dark about the practices needed to achieve compliance. 33 U.S.C. § 1341(d). The Clean Water Act requires that the WQC "set[] out actions that

must be taken" for adaptive management practices to assure (or regain) compliance. *See San Francisco*, 604 U.S. at 347. NJDEP could not avoid that obligation by punting the determination of those actions to a future plan outside of the Section 401 permitting process. Those actions needed to be identified, supported by substantial evidence, and incorporated as "mandatory conditions" in the WQC. *See Twp. of Bordentown*, 903 F.3d at 259.

The Second Circuit's decision in *Waterkeeper Alliance* illustrates NJDEP's error. There, the Court considered an EPA rule requiring certain agricultural operations seeking a Clean Water Act section 402 permit to prepare a "nutrient management plan" to "minimiz[e] nitrogen and phosphorous movement to surface waters." 399 F.3d at 499. The rule did not, however, require EPA to review the plan before issuing the permit. *Id.* at 498. Nor did it require that the permit incorporate the nutrient management plan's terms as special conditions. *Id.*

The Second Circuit held that the rule was both arbitrary and contrary to the Clean Water Act. *Id.* The Court explained that the rule did "nothing to *ensure*" compliance with water quality standards

because it did not require EPA to "review the nutrient management plans developed by [permittees] *before issuing a permit*." *Id.* at 499 (second emphasis added). The Court also held that the rule's failure to include the terms of the plans in the permit violated the Clean Water Act's mandate that "all applicable effluent limitations must be included in each [section 402] permit." *Id.* at 502. In short, rather than ensuring compliance, the rule's design of punting material conditions to separate, post-approval plans prevented anyone—EPA, the public, or the Court—from determining that compliance was assured when a permit issued.

So too here. Section 401, like section 402, requires that permits include the conditions needed to "assure" compliance with water quality standards. *Compare* 33 U.S.C. § 1341(d), *with id.* § 1342(a)(2). While NJDEP admits that an adaptive management plan is necessary to avoid excess turbidity and contamination, it did not require Transco to submit that plan before issuing the WQC. Nor are that future plan's uncertain terms part of the WQC. Indeed, the WQC does not even require NJDEP's review, let alone approval, of the plan once submitted.

NJDEP thus failed "to fulfill its duty to 'regulat[e] in fact, not only in principle.'" *NRDC*, 808 F.3d at 578 (quoting *Waterkeeper All.*, 399 F.3d at 498); *see also Sierra Club*, 972 F.3d at 308 ("That 'honor code' approach might suffice in the type of world we aspire to. But it is more than a little fanciful to base a regulatory enforcement regime upon such aspirations."). The WQC's requirement of a future, uncertain plan "does nothing to ensure" compliance with water quality standards. *Waterkeeper All.*, 399 F.3d at 499. And because the purpose of the adaptive management plan is to explain how Transco will ensure (or regain) compliance with water quality standards, NJDEP could not rationally rely on that future, uncertain plan to conclude NESE will comply with those water quality standards. *See id.*; *see also Twp. of Bordentown*, 903 F.3d at 259 (requiring reliance on mitigation plans to be supported by substantial evidence); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (explaining that "generalized contingencies" and "hopeful plans" are inadequate).

NJDEP's error is compounded by its omission of terms specifying what would trigger Transco's obligation to implement adaptive management practices. In emails, NJDEP insists that adaptive

management practices should "kick in" when total suspended solids are "greater than 50% over background" levels. Oct. 29–Oct. 30, 2025 Emails re Application at 1 [JA_1373]. Nevertheless, the WQC lacks any term codifying that (or any other) trigger for adaptive management. Without such a term, the already uncertain adaptive management plan has "no discernible enforcement mechanism." *Sierra Club*, 972 F.3d at 308. Instead, Transco appears to retain discretion to decide not only *what* the adaptive management practices will be, but also *when* they apply, subject only to limitations that NJDEP may be able to impose in a future, non-public process. This Court has explained that "[e]ffective regulation must not depend on the candor or veracity of the very entities being regulated." *Id.* at 308. Yet that kind of "fanciful," "honor code" approach to regulation, *id.*, is exactly what the WQC's reliance on the future, uncertain adaptive management plan allows.

For these reasons, NJDEP's issuance of the WQC, in reliance on the requirement for a future, uncertain adaptive management plan, was both arbitrary and contrary to Section 401.

### 2. NJDEP's requirement for a Water Quality Monitoring Plan did not assure compliance with water quality standards

Ensuring compliance with applicable standards "necessarily depends" on effective monitoring and reporting. *Sierra Club*, 972 F.3d at 307–09; *see also NRDC*, 808 F.3d at 580–81. NJDEP recognized this by requiring Transco to develop a water quality monitoring plan. WQC at 4 [JA_0016]. But NJDEP again defers key details of that plan to a "review" process after it had already issued the WQC. This too is arbitrary and contrary to law. *See Waterkeeper All.*, 399 F.3d at 502–03; *Food & Water Watch v. EPA*, 20 F.4th 506, 515–16 (9th Cir. 2021).

NJDEP repeatedly cites "monitoring" as a key element in its plan to ensure "dredging impacts will be minimized" and that any "increases in turbidity or contaminant levels" will be "minimal" and "not result in long-term impacts." RTC at 7 [JA_0425]. But the WQC—while including *some* requirements for monitoring—punts critical details to a future, Transco-developed plan. For instance, the WQC does not specify the location or distance of monitoring stations relative to dredging activities. Nor does it specify which contaminants Transco must monitor, or what levels those contaminants can reach before Transco

violates the WQC. Without these basic details—where to monitor and what to monitor for—neither Transco nor NJDEP can ensure turbidity and contaminant levels comply with state water quality standards. It is arbitrary for NJDEP to conclude the WQC will assure compliance when these key monitoring details are deferred to a later, non-public process. *See Waterkeeper All.*, 399 F.3d at 499; *see also Food & Water Watch*, 20 F.4th at 515–16, 518 (holding that a permit that "does not require monitoring that would ensure compliance with its effluent limitations" is "arbitrary, capricious, and a violation of law").

The record further underscores the problem with NJDEP's deferral. Transco submitted a draft monitoring plan to NJDEP with its application. NJDEP asked Transco twice to update the plan in response to public comments but did not *require* Transco to do so. June 25–Nov. 7, 2025 Emails re Application at 2, 4 [JA_0900, 0902]. NJDEP instead allowed Transco to delay resolution of those issues until after the WQC's issuance. WQC at 4 [JA_0016].

Those unresolved issues in the draft plan are also material. First, the draft proposes compliance stations 2,500 feet downstream of dredging. Draft Monitoring Plan at 2-3 [JA_0841]. As commenters

explained, this distance "is five-fold greater than" the 500-foot mixing zone and "thus provides no means of assessing compliance at the mixing zone boundary." Princeton Hydro Report at 24 [JA_0299]. NJDEP arbitrarily failed to address this concern in its response to comments. *See Sierra Club v. EPA*, 863 F.3d 834, 838 (D.C. Cir. 2017) (explaining an agency's failure to respond to "major substantive comments" is arbitrary). And the WQC says only that "[m]onitoring locations should be calculated based on the modeling analysis for the rate of operation," WQC at 4 [JA_0016], leaving the determination of what that means to Transco's future plan.

The draft plan also suggests that placing the monitoring stations far away is to Transco's benefit, because Transco's modeling shows it cannot comply with water quality standards even with its preferred 500-foot mixing zone. Transco assumes that New York's standard for total suspended solids is "roughly equivalent" to "New Jersey's water quality standard for the maximum turbidity threshold." Draft Monitoring Plan at 1-5 [JA_0837]. But Transco contemplates using a jet trencher and hand jetting in multiple areas, *id.* at 1-2 tbl. 1 [JA_0836], and Transco's modeling shows that jet trenching would cause total

suspended solid "concentrations at or above" the New York limit "up to 2,346 feet from the pipeline trench," *id.* at 1-5 [JA_0837]. While these exceedances would extend nearly 2,000 feet beyond the edge of Transco's proposed *compliance* mixing zone, they would be just shy of—and thus would not be consistently detected by—the 2,500-foot distance Transco had proposed for *monitoring* in the draft plan.[10]

Finally, the draft plan also omits toxic contaminant monitoring altogether. Commenters highlighted this omission. *See* Princeton Hydro Report at 24 [JA_0299]. And yet again, NJDEP arbitrarily failed to respond to those comments, *see Sierra Club*, 863 F.3d at 838, or otherwise explain how the WQC can assure compliance with water quality standards related to toxic contaminants without requiring Transco to monitor those pollutants, *see Sierra Club*, 972 F.3d at 307–08 (rejecting as arbitrary EPA's failure to require adequate monitoring and reporting for key temperature limit); *Food & Water Watch*, 20 F.4th

[10] Transco also projected total suspended solid "concentrations greater than 50 mg/L above ambient conditions . . . to extend up to 5,299 feet from backfill locations in New Jersey waters." Draft Monitoring Plan at 1-6 [JA_0838].

at 516–18 (rejecting as arbitrary a permit that lacked monitoring requirements for two types of discharges).

These serious, unresolved issues with the draft plan only further confirm that NJDEP's reliance on a future, uncertain monitoring plan is not supported by the required substantial evidence. *See Twp. of Bordentown*, 903 F.3d at 259; *see also Waterkeeper All.*, 399 F.3d at 499; *Nat'l Audubon Soc'y*, 132 F.3d at 17. So does the relationship between the monitoring plan and adaptive management plan. NJDEP intends monitoring to determine when adaptive management practices for sediment control would kick in. RTC at 7 [JA_0425]. The inadequacy of the monitoring plan thus also portends the failure of any adaptive management practices. *See supra* pp. 51–52.

NJDEP's deferral of the water quality monitoring plan violated the Clean Water Act's requirement that plans necessary to ensure compliance be subject to prior agency review and incorporated into the terms of the permit. *Waterkeeper All.*, 399 F.3d at 502-03; *see also San Francisco*, 604 U.S. at 347–48 ("Simply telling a permittee to ensure that the end result is reached is not a 'concrete plan'"). On this point, Section 401(d) could not be clearer: a water quality certificate "shall set

forth any . . . monitoring requirements necessary to assure that [the project] will comply." 33 U.S.C. § 1341(d). NJDEP's failure to do so here was arbitrary and contrary to law.

### B. NJDEP's reliance on future, uncertain compliance plans violated the Clean Water Act's public participation requirements

NJDEP's deferral of its adaptive management and monitoring plans also violates the Clean Water Act's separate requirements for public participation.

*Waterkeeper Alliance* is again instructive. In addition to holding that the EPA rule at issue in that case violated the Clean Water Act's mandate to "regulat[e] in fact, not only in principle," 399 F.3d at 498, the Second Circuit also held that the rule violated the Act's "public participation requirements," *id.* at 503. The Court explained that "Congress clearly intended to guarantee the public a meaningful role" in the Clean Water Act's implementation. *Id.* Specifically, the Court pointed to the Act's broad requirement that "public participation in the development, revision, and enforcement" of any regulation or program "shall be provided for, encouraged, and assisted by [EPA] and the States," 33 U.S.C. § 1251(e); the requirements for public participation

under section 402, *id.* § 1342(a), (b)(3); and the Act's private enforcement provisions, *id.* § 1365(a). *Waterkeeper All.*, 399 F.3d at 503. The Court held that EPA's failure to include the terms of the nutrient management plans at issue in the permits themselves and to guarantee public access to those plans once submitted, "deprive[d] the public of the opportunity for the sort of regulatory participation that the Act guarantees" by "effectively shield[ing]" those plans "from public scrutiny and comment" and public enforcement, *id.* at 503–04.

This Court's decision in *Delaware Riverkeeper Network* is also instructive. There, petitioners complained that NJDEP violated their public participation rights under Section 401 by relying on revised analyses submitted by Transco after the close of public comment. 833 F.3d at 378. But this Court disagreed. It concluded that petitioners' rights to participation were not violated when they in fact "reviewed the revised analysis and submitted additional written comments" to NJDEP, which then "asked Transco to respond to the concerns raised" before issuing the permit. *Id.*

This case is far closer to *Waterkeeper* than *Delaware Riverkeeper Network*. The compliance plans—which would dictate how Transco will

determine if it is exceeding water quality standards and how it would respond to perceived exceedances—are "a critical indispensable feature" of the WQC. *Waterkeeper All.*, 399 F.3d at 504. Yet NJDEP's deferral of those compliance plans "forestalls—rather than 'provid[es] for, encourag[es], and assist[s]'—public participation in the development and enforcement of" the plans. *Id.* (quoting 33 U.S.C. § 1251(e)). There has been—and is no—formal process for the public to engage on the content of these critical plans, which have been entirely kicked to a later, non-public process. *Contra Del. Riverkeeper Network*, 833 F.3d at 378.

NJDEP's wait-until-later approach on these compliance plans was therefore arbitrary and violated the "plain dictates" of the Clean Water Act. *Waterkeeper All.*, 399 F.3d at 504.

## IV. The Court should vacate the water quality certification

Vacatur is the default remedy when agency action is found to be arbitrary, capricious, or contrary to law. *Comité de Apoyo*, 774 F.3d at 191; *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). Indeed, this Court routinely vacates agency actions that it finds arbitrary or contrary to

law. *See Sierra Club*, 972 F.3d at 309; *Nat'l Parks Conservation Ass'n v. EPA*, 803 F.3d 151, 167 (3d Cir. 2015); *Prometheus Radio Project*, 652 F.3d at 472.

The Court should apply the normal remedy of vacatur here. There is no reason to depart from this default remedy where NJDEP had previously rejected a water quality certification for this exact project for failure to assure compliance with state water quality standards and did not provide a rational, lawful basis for granting the WQC this time around. Indeed, here "it is particularly appropriate to remand the case with a *vacatur*" because doing otherwise would "leave in place" a WQC that threatens the "very adverse effect" that NJDEP "is charged with preventing" under Section 401. *Comité De Apoyo*, 774 F.3d at 191.

## CONCLUSION

The Court should grant the petition and vacate and remand NJDEP's WQC.

DATED: June 3, 2026

Respectfully submitted,

*<u>/s/ Jackson P. Garrity</u>*
Jackson P. Garrity
Illinois Bar No. 6344829

Natural Resources Defense Council
20 North Wacker Drive Suite 1600
Chicago, IL 60606
(312) 995-5909
jgarrity@nrdc.org

Jared E. Knicley
DC Bar No. 1027257
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Mark A. Izeman
New York Bar No. 2524171
Natural Resources Defense Council
40 West 20th Street 11th Floor
New York, NY 10011
(212) 727-4453
mizeman@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and 3d Cir. L.A.R. 31.1(c), I certify:

(a) that this brief complies with the type-volume limitations of Rule 32(a)(7)(B) because it contains 11,714 words, excluding parts of the document exempted by Rule 32(f);

(b) that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count);

(c) that that the electronic brief filed is identical to the text of the paper copies submitted to the Court; and

(d) that this brief was scanned with CrowdStrike Falcon Complete (v. 7.33.20505), a virus detection program, and no virus was detected.

Dated: June 3, 2026

*/s/ Jackson P. Garrity*
Jackson P. Garrity

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3d Cir. L.A.R. 28.3(d), I certify that Jared E. Knicley, Mark A. Izeman, and Jackson P. Garrity, counsel for Petitioner Natural Resources Defense Council, Inc., are members of the bar of this Court.

Dated: June 3, 2026

*/s/ Jackson P. Garrity*
Jackson P. Garrity

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I certify that this final opening brief was filed electronically through the court's docketing system. All parties to this case are Filing Users and are served electronically by the Notice of Docket Activity.

Dated: June 3, 2026

*<u>/s/ Jackson P. Garrity</u>*
Jackson P. Garrity

No. 26-1252 (consolidated with No. 26-1253)

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

NATURAL RESOURCES DEFENSE COUNCIL, INC.,
*Petitioner*,
v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION;
ED POTOSNAK, ACTING COMMISSIONER, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Respondents*,
and

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,
*Intervenor-Respondent*.

---

On Petition for Review from
the New Jersey Department of Environmental Protection

---

**ADDENDUM TO PETITIONER'S BRIEF**

---

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
(202) 513-6242
jknicley@nrdc.org

Mark A. Izeman
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, NY 10011
(212) 727-4453
mizeman@nrdc.org

Jackson P. Garrity
Natural Resources Defense Council
20 N Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 995-5909
jgarrity@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

# ADDENDUM TABLE OF CONTENTS

## Statutes

5 U.S.C. § 706(2) .......... ADD-001

15 U.S.C. § 717f(e) .......... ADD-002

15 U.S.C. § 717r(d) .......... ADD-004

33 U.S.C. § 1251(e) .......... ADD-006

33 U.S.C. § 1311(b) .......... ADD-007

33 U.S.C. § 1341 .......... ADD-009

33 U.S.C. § 1342(a) .......... ADD-010

33 U.S.C. § 1342(b) .......... ADD-011

33 U.S.C. § 1344(h) .......... ADD-012

33 U.S.C. § 1365(a) .......... ADD-014

42 U.S.C. § 4321 .......... ADD-016

## Regulations

40 C.F.R. § 121.3 .......... ADD-017

40 C.F.R. § 121.7 .......... ADD-018

40 C.F.R. § 131.12 .......... ADD-019

N.J.A.C. 7:7-1.2 .......... ADD-021

N.J.A.C. 7:7-9.2(b) .......... ADD-024

N.J.A.C. 7:7A-2.1(a) ........ ADD-025

N.J.A.C. 7:7A-2.1(d) ........ ADD-026

N.J.A.C. 7:7A-10.4 ........ ADD-027

N.J.A.C. 7:9B-1.1 ........ ADD-028

N.J.A.C. 7:9B-1.5(a) ........ ADD-029

N.J.A.C. 7:9B-1.5(d) ........ ADD-031

N.J.A.C. 7:9B-1.12 ........ ADD-034

N.J.A.C. 7:9B-1.14(d) ........ ADD-037

N.J.A.C. 7:9B-1.14(f) ........ ADD-044

N.J.A.C. 7:9B-1.14(g) ........ ADD-051

N.J.A.C. 7:9B-1.15(c) ........ ADD-054

N.J.A.C. 7:9B-1.15(h) ........ ADD-067

**Declarations**

Declaration of Joyce Yeung ........ ADD-071

Declaration of Katie Leung ........ ADD-074

Declaration of James Scarcella ........ ADD-077

Declaration of Judith C. Stark ........ ADD-083

Declaration of Valerie Zandoli ........ ADD-089

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ‘‘This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].’’

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(D) For any rule submitted under subparagraph (A), if the Federal agency promulgating

those terms are used in section 78j(b) of this title) in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers. Nothing in this section shall be construed to create a private right of action.

(June 21, 1938, ch. 556, §4A, as added Pub. L. 109–58, title III, §315, Aug. 8, 2005, 119 Stat. 691.)

### § 717d. Fixing rates and charges; determination of cost of production or transportation

#### (a) Decreases in rates

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however*, That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

#### (b) Costs of production and transportation

The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas.

(June 21, 1938, ch. 556, §5, 52 Stat. 823.)

### § 717e. Ascertainment of cost of property

#### (a) Cost of property

The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

#### (b) Inventory of property; statements of costs

Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 21, 1938, ch. 556, §6, 52 Stat. 824.)

### § 717f. Construction, extension, or abandonment of facilities

#### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided*, That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

#### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

#### (c) Certificate of public convenience and necessity

(1)(A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the

determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however*, That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity**

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity**

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate consumers**

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served**

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

(June 21, 1938, ch. 556, §7, 52 Stat. 824; Feb. 7, 1942, ch. 49, 56 Stat. 83; July 25, 1947, ch. 333, 61 Stat. 459; Pub. L. 95–617, title VI, §608, Nov. 9, 1978, 92 Stat. 3173; Pub. L. 100–474, §2, Oct. 6, 1988, 102 Stat. 2302.)

**Editorial Notes**

AMENDMENTS

1988—Subsec. (f). Pub. L. 100–474 designated existing provisions as par. (1) and added par. (2).

1978—Subsec. (c). Pub. L. 95–617, §608(a), (b)(1), designated existing first paragraph as par. (1)(A) and existing second paragraph as par. (1)(B) and added par. (2).

Subsec. (e). Pub. L. 95–617, §608(b)(2), substituted "subsection (c)(1)" for "subsection (c)".

1947—Subsec. (h). Act July 25, 1947, added subsec. (h).

1942—Subsecs. (c) to (g). Act Feb. 7, 1942, struck out subsec. (c), and added new subsecs. (c) to (g).

''Chapter 51 and subchapter III of chapter 53 of title 5'' substituted in text for ''the Classification Act of 1949, as amended'' on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

AMENDMENTS

1949—Act Oct. 28, 1949, substituted ''Classification Act of 1949'' for ''Classification Act of 1923''.

**Statutory Notes and Related Subsidiaries**

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

### § 717r. Rehearing and review

#### (a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

#### (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

#### (c) Stay of Commission order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

#### (d) Judicial review

##### (1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as ''permit'') required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

##### (2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission

schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, § 19, 52 Stat. 831; June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, § 313(b), Aug. 8, 2005, 119 Stat. 689.)

**Editorial Notes**

References in Text

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, which is classified generally to chapter 33 (§ 1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

Codification

In subsec. (b), ''section 1254 of title 28'' substituted for ''sections 239 and 240 of the Judicial Code, as amended [28 U.S.C. 346, 347]'' on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

Amendments

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

1958—Subsec. (a). Pub. L. 85–791, § 19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, § 19(b), in second sentence, substituted ''transmitted by the clerk of the court to'' for ''served upon'', substituted ''file with the court'' for ''certify and file with the court a transcript of'', and inserted ''as provided in section 2112 of title 28'', and, in third sentence, substituted ''petition'' for ''transcript'', and ''jurisdiction, which upon the filing of the record with it shall be exclusive'' for ''exclusive jurisdiction''.

**Statutory Notes and Related Subsidiaries**

Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted ''court of appeals'' for ''circuit court of appeals'' wherever appearing.

## § 717s. Enforcement of chapter

**(a) Action in district court for injunction**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

**(b) Mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys by Commission**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Violation of market manipulation provisions**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or

(2) engaging in the business of—

(A) the purchasing or selling of natural gas; or

(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, § 20, 52 Stat. 832; June 25, 1948, ch. 646, § 1, 62 Stat. 875, 895; Pub. L. 109–58, title III, § 318, Aug. 8, 2005, 119 Stat. 693.)

mental Protection Agency (hereinafter in this chapter called ''Administrator'') shall administer this chapter.

**(e) Public participation in development, revision, and enforcement of any regulation, etc.**

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

**(f) Procedures utilized for implementing chapter**

It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government.

**(g) Authority of States over water**

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

(June 30, 1948, ch. 758, title I, § 101, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816; amended Pub. L. 95–217, §§ 5(a), 26(b), Dec. 27, 1977, 91 Stat. 1567, 1575; Pub. L. 100–4, title III, § 316(b), Feb. 4, 1987, 101 Stat. 60.)

**Editorial Notes**

AMENDMENTS

1987—Subsec. (a)(7). Pub. L. 100–4 added par. (7).

1977—Subsec. (b). Pub. L. 95–217, § 26(b), inserted provisions expressing Congressional policy that the States manage the construction grant program under this chapter and implement the permit program under sections 1342 and 1344 of this title.

Subsec. (g). Pub. L. 95–217, § 5(a), added subsec. (g).

**Statutory Notes and Related Subsidiaries**

SHORT TITLE OF 2021 AMENDMENT

Pub. L. 117–58, div. E, § 50001, Nov. 15, 2021, 135 Stat. 1135, provided that: ''This division [see Tables for classification] may be cited as the 'Drinking Water and Wastewater Infrastructure Act of 2021'.''

Pub. L. 116–337, § 1, Jan. 13, 2021, 134 Stat. 5120, provided that: ''This Act [amending section 1330 of this title] may be cited as the 'Protect and Restore America's Estuaries Act'.''

Pub. L. 116–294, § 1, Jan. 5, 2021, 134 Stat. 4899, provided that: ''This Act [amending section 1268 of this title] may be cited as the 'Great Lakes Restoration Initiative Act of 2019' or the 'GLRI Act of 2019'.''

SHORT TITLE OF 2019 AMENDMENT

Pub. L. 115–436, § 1, Jan. 14, 2019, 132 Stat. 5558, provided that: ''This Act [enacting section 1377a of this title and section 4370j of Title 42, The Public Health and Welfare, amending sections 1319, 1342, and 1362 of this title, enacting provisions set out as a note under section 4370j of Title 42, and renumbering provisions set out as a note under this section] may be cited as the 'Water Infrastructure Improvement Act'.''

SHORT TITLE OF 2018 AMENDMENT

Pub. L. 115–282, title IX, § 901, Dec. 4, 2018, 132 Stat. 4322, provided that: ''This title [enacting sections 4729 and 4730 of Title 16, Conservation, amending sections 1319, 1322, 1365, and 1369 of this title, sections 4712 and 4725 of Title 16, section 42 of Title 18, Crimes and Criminal Procedure, and section 11301 of Title 46, Shipping, repealing section 4711 of Title 16, enacting provisions set out as a note under section 1322 of this title and section 4711 of Title 16, and repealing provisions set out as a note under section 1342 of this title] may be cited as the 'Vessel Incidental Discharge Act of 2018'.''

SHORT TITLE OF 2017 AMENDMENT

Pub. L. 115–91, div. C, title XXXV, § 3508(a), Dec. 12, 2017, 131 Stat. 1915, provided that: ''This section [amending sections 1321, 2701, and 2715 of this title] may be cited as the 'Foreign Spill Protection Act of 2017'.''

SHORT TITLE OF 2008 AMENDMENT

Pub. L. 110–365, § 1, Oct. 8, 2008, 122 Stat. 4021, provided that: ''This Act [amending sections 1268 and 1271a of this title] may be cited as the 'Great Lakes Legacy Reauthorization Act of 2008'.''

Pub. L. 110–288, § 1, July 29, 2008, 122 Stat. 2650, provided that: ''This Act [amending sections 1322, 1342, and 1362 of this title] may be cited as the 'Clean Boating Act of 2008'.''

SHORT TITLE OF 2002 AMENDMENT

Pub. L. 107–303, § 1(a), Nov. 27, 2002, 116 Stat. 2355, provided that: ''This Act [enacting section 1271a of this title, amending sections 1254, 1266, 1268, 1270, 1285, 1290, 1324, 1329, 1330, and 1375 of this title, enacting provisions set out as notes under this section, section 1254 of this title, and section 1113 of Title 31, Money and Finance, and repealing provisions set out as a note under section 50 of Title 20, Education] may be cited as the 'Great Lakes and Lake Champlain Act of 2002'.''

Pub. L. 107–303, title I, § 101, Nov. 27, 2002, 116 Stat. 2355, provided that: ''This title [enacting section 1271a of this title and amending section 1268 of this title] may be cited as the 'Great Lakes Legacy Act of 2002'.''

Pub. L. 107–303, title II, § 201, Nov. 27, 2002, 116 Stat. 2358, provided that: ''This title [amending section 1270 of this title] may be cited as the 'Daniel Patrick Moynihan Lake Champlain Basin Program Act of 2002'.''

SHORT TITLE OF 2000 AMENDMENTS

Pub. L. 106–457, title II, § 201, Nov. 7, 2000, 114 Stat. 1967, provided that: ''This title [amending section 1267 of this title and enacting provisions set out as a note under section 1267 of this title] may be cited as the 'Chesapeake Bay Restoration Act of 2000'.''

Pub. L. 106–457, title IV, § 401, Nov. 7, 2000, 114 Stat. 1973, provided that: ''This title [amending section 1269 of this title] may be cited as the 'Long Island Sound Restoration Act'.''

Pub. L. 106–457, title V, § 501, Nov. 7, 2000, 114 Stat. 1973, provided that: ''This title [enacting section 1273 of this title] may be cited as the 'Lake Pontchartrain Basin Restoration Act of 2000'.''

Pub. L. 106–457, title VI, § 601, Nov. 7, 2000, 114 Stat. 1975, provided that: ''This title [enacting section 1300 of this title] may be cited as the 'Alternative Water Sources Act of 2000'.''

Pub. L. 106–284, § 1, Oct. 10, 2000, 114 Stat. 870, provided that: ''This Act [enacting sections 1346 and 1375a of this

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





(5) a description of existing challenges concerning the use of new and emerging, but proven, stormwater control infrastructure.

**(e) Authorization of appropriations**

**(1) In general**

There is authorized to be appropriated to carry out this section (except for subsection (b)) $10,000,000 for each of fiscal years 2022 through 2026.

**(2) Limitation on use of funds**

Of the amounts made available for grants under paragraph (1), not more than 2 percent may be used to pay the administrative costs of the Administrator.

(Pub. L. 117–58, div. E, title II, § 50217, Nov. 15, 2021, 135 Stat. 1175.)

**Editorial Notes**

CODIFICATION

Section was enacted as part of the Drinking Water and Wastewater Infrastructure Act of 2021 and also as part of the Infrastructure Investment and Jobs Act, and not as part of the Federal Water Pollution Control Act which comprises this chapter.

**Statutory Notes and Related Subsidiaries**

''ADMINISTRATOR'' DEFINED

Administrator means the Administrator of the Environmental Protection Agency, see section 50002 of Pub. L. 117–58, set out as a note under section 300j–18a of Title 42, The Public Health and Welfare.

## SUBCHAPTER III—STANDARDS AND ENFORCEMENT

### § 1311. Effluent limitations

**(a) Illegality of pollutant discharges except in compliance with law**

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

**(b) Timetable for achievement of objectives**

In order to carry out the objective of this chapter there shall be achieved—

(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.

(2)(A) for pollutants identified in subparagraphs (C), (D), and (F) of this paragraph, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 1325 of this title), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 1317 of this title;

(B) Repealed. Pub. L. 97–117, § 21(b), Dec. 29, 1981, 95 Stat. 1632.

(C) with respect to all toxic pollutants referred to in table 1 of Committee Print Numbered 95–30 of the Committee on Public Works and Transportation of the House of Representatives compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989;

(D) for all toxic pollutants listed under paragraph (1) of subsection (a) of section 1317 of this title which are not referred to in subparagraph (C) of this paragraph compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable, but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989;

(E) as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989, compliance with effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which in the case of pollutants identified pursuant to section 1314(a)(4) of this title

shall require application of the best conventional pollutant control technology as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(4) of this title; and

(F) for all pollutants (other than those subject to subparagraphs (C), (D), or (E) of this paragraph) compliance with effluent limitations in accordance with subparagraph (A) of this paragraph as expeditiously as practicable but in no case later than 3 years after the date such limitations are established, and in no case later than March 31, 1989.

(3)(A) for effluent limitations under paragraph (1)(A)(i) of this subsection promulgated after January 1, 1982, and requiring a level of control substantially greater or based on fundamentally different control technology than under permits for an industrial category issued before such date, compliance as expeditiously as practicable but in no case later than three years after the date such limitations are promulgated under section 1314(b) of this title, and in no case later than March 31, 1989; and

(B) for any effluent limitation in accordance with paragraph (1)(A)(i), (2)(A)(i), or (2)(E) of this subsection established only on the basis of section 1342(a)(1) of this title in a permit issued after February 4, 1987, compliance as expeditiously as practicable but in no case later than three years after the date such limitations are established, and in no case later than March 31, 1989.

**(c) Modification of timetable**

The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

**(d) Review and revision of effluent limitations**

Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph.

**(e) All point discharge source application of effluent limitations**

Effluent limitations established pursuant to this section or section 1312 of this title shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this chapter.

**(f) Illegality of discharge of radiological, chemical, or biological warfare agents, high-level radioactive waste, or medical waste**

Notwithstanding any other provisions of this chapter it shall be unlawful to discharge any radiological, chemical, or biological warfare agent, any high-level radioactive waste, or any medical waste, into the navigable waters.

**(g) Modifications for certain nonconventional pollutants**

**(1) General authority**

The Administrator, with the concurrence of the State, may modify the requirements of subsection (b)(2)(A) of this section with respect to the discharge from any point source of ammonia, chlorine, color, iron, and total phenols (4AAP) (when determined by the Administrator to be a pollutant covered by subsection (b)(2)(F)) and any other pollutant which the Administrator lists under paragraph (4) of this subsection.

**(2) Requirements for granting modifications**

A modification under this subsection shall be granted only upon a showing by the owner or operator of a point source satisfactory to the Administrator that—

(A) such modified requirements will result at a minimum in compliance with the requirements of subsection (b)(1)(A) or (C) of this section, whichever is applicable;

(B) such modified requirements will not result in any additional requirements on any other point or nonpoint source; and

(C) such modification will not interfere with the attainment or maintenance of that water quality which shall assure protection of public water supplies, and the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities, in and on the water and such modification will not result in the discharge of pollutants in quantities which may reasonably be anticipated to pose an unacceptable risk to human health or the environment because of bioaccumulation, persistency in the environment, acute toxicity, chronic toxicity (including carcinogenicity, mutagenicity or teratogenicity), or synergistic propensities.

**(3) Limitation on authority to apply for subsection (c) modification**

If an owner or operator of a point source applies for a modification under this subsection with respect to the discharge of any pollutant, such owner or operator shall be eligible to apply for modification under subsection (c) of this section with respect to such pollutant only during the same time period as he is eligible to apply for a modification under this subsection.

**(4) Procedures for listing additional pollutants**

**(A) General authority**

Upon petition of any person, the Administrator may add any pollutant to the list of pollutants for which modification under this section is authorized (except for pollutants identified pursuant to section 1314(a)(4) of this title, toxic pollutants subject to section 1317(a) of this title, and the thermal component of discharges) in accordance with the provisions of this paragraph.

**(B) Requirements for listing**

**(i) Sufficient information**

The person petitioning for listing of an additional pollutant under this subsection

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





SUBCHAPTER IV—PERMITS AND LICENSES

### § 1341. Certification

#### (a) Compliance with applicable requirements; application; procedures; license suspension

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is re-

ceived from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

(June 30, 1948, ch. 758, title IV, § 401, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 877; amended Pub. L. 95–217, §§ 61(b), 64, Dec. 27, 1977, 91 Stat. 1598, 1599.)

**Editorial Notes**

AMENDMENTS

1977—Subsec. (a). Pub. L. 95–217 inserted reference to section 1313 of this title in pars. (1), (3), (4), and (5), struck out par. (6) which provided that no Federal agency be deemed an applicant for purposes of this subsection, and redesignated par. (7) as (6).

## § 1342. National pollutant discharge elimination system

**(a) Permits for discharge of pollutants**

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objectives of this chapter to issue permits for discharges into the navigable waters within the ju-

risdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

**(b) State permit programs**

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which—

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

(D) control the disposal of pollutants into wells;

(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

**(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator**

(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

under section 1288(b)(4) of this title which meets the requirements of subparagraphs (B) and (C) of such section,

is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

**(g) State administration**

(1) The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program.

(2) Not later than the tenth day after the date of the receipt of the program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall provide copies of such program and statement to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service.

(3) Not later than the ninetieth day after the date of the receipt by the Administrator of the program and statement submitted by any State, under paragraph (1) of this subsection, the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, shall submit any comments with respect to such program and statement to the Administrator in writing.

**(h) Determination of State's authority to issue permits under State program; approval; notification; transfers to State program**

(1) Not later than the one-hundred-twentieth day after the date of the receipt by the Administrator of a program and statement submitted by any State under paragraph (1) of this subsection, the Administrator shall determine, taking into account any comments submitted by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, pursuant to subsection (g) of this section, whether such State has the following authority with respect to the issuance of permits pursuant to such program:

(A) To issue permits which—

(i) apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title;

(ii) are for fixed terms not exceeding five years; and

(iii) can be terminated or modified for cause including, but not limited to, the following:

(I) violation of any condition of the permit;

(II) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(III) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge.

(B) To issue permits which apply, and assure compliance with, all applicable requirements of section 1318 of this title, or to inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title.

(C) To assure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application.

(D) To assure that the Administrator receives notice of each application (including a copy thereof) for a permit.

(E) To assure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing.

(F) To assure that no permit will be issued if, in the judgment of the Secretary, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby.

(G) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement.

(H) To assure continued coordination with Federal and Federal-State water-related planning and review processes.

(2) If, with respect to a State program submitted under subsection (g)(1) of this section, the Administrator determines that such State—

(A) has the authority set forth in paragraph (1) of this subsection, the Administrator shall

approve the program and so notify (i) such State and (ii) the Secretary, who upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsections (a) and (e) of this section for activities with respect to which a permit may be issued pursuant to such State program; or

(B) does not have the authority set forth in paragraph (1) of this subsection, the Administrator shall so notify such State, which notification shall also describe the revisions or modifications necessary so that such State may resubmit such program for a determination by the Administrator under this subsection.

(3) If the Administrator fails to make a determination with respect to any program submitted by a State under subsection (g)(1) of this section within one-hundred-twenty days after the date of the receipt of such program, such program shall be deemed approved pursuant to paragraph (2)(A) of this subsection and the Administrator shall so notify such State and the Secretary who, upon subsequent notification from such State that it is administering such program, shall suspend the issuance of permits under subsection (a) and (e) of this section for activities with respect to which a permit may be issued by such State.

(4) After the Secretary receives notification from the Administrator under paragraph (2) or (3) of this subsection that a State permit program has been approved, the Secretary shall transfer any applications for permits pending before the Secretary for activities with respect to which a permit may be issued pursuant to such State program to such State for appropriate action.

(5) Upon notification from a State with a permit program approved under this subsection that such State intends to administer and enforce the terms and conditions of a general permit issued by the Secretary under subsection (e) of this section with respect to activities in such State to which such general permit applies, the Secretary shall suspend the administration and enforcement of such general permit with respect to such activities.

**(i) Withdrawal of approval**

Whenever the Administrator determines after public hearing that a State is not administering a program approved under subsection (h)(2)(A) of this section, in accordance with this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, the Administrator shall so notify the State, and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days after the date of the receipt of such notification, the Administrator shall (1) withdraw approval of such program until the Administrator determines such corrective action has been taken, and (2) notify the Secretary that the Secretary shall resume the program for the issuance of permits under subsections (a) and (e) of this section for activities with respect to which the State was issuing permits and that such authority of the Secretary shall continue in effect until such time as the Administrator makes the determination described in clause (1) of this subsection and such State again has an approved program.

**(j) Copies of applications for State permits and proposed general permits to be transmitted to Administrator**

Each State which is administering a permit program pursuant to this section shall transmit to the Administrator (1) a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State, and (2) a copy of each proposed general permit which such State intends to issue. Not later than the tenth day after the date of the receipt of such permit application or such proposed general permit, the Administrator shall provide copies of such permit application or such proposed general permit to the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. If the Administrator intends to provide written comments to such State with respect to such permit application or such proposed general permit, he shall so notify such State not later than the thirtieth day after the date of the receipt of such application or such proposed general permit and provide such written comments to such State, after consideration of any comments made in writing with respect to such application or such proposed general permit by the Secretary and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, not later than the ninetieth day after the date of such receipt. If such State is so notified by the Administrator, it shall not issue the proposed permit until after the receipt of such comments from the Administrator, or after such ninetieth day, whichever first occurs. Such State shall not issue such proposed permit after such ninetieth day if it has received such written comments in which the Administrator objects (A) to the issuance of such proposed permit and such proposed permit is one that has been submitted to the Administrator pursuant to subsection (h)(1)(E), or (B) to the issuance of such proposed permit as being outside the requirements of this section, including, but not limited to, the guidelines developed under subsection (b)(1) of this section unless it modifies such proposed permit in accordance with such comments. Whenever the Administrator objects to the issuance of a permit under the preceding sentence such written objection shall contain a statement of the reasons for such objection and the conditions which such permit would include if it were issued by the Administrator. In any case where the Administrator objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing or, if no hearing is requested within 90 days after the date of such objection, the Secretary may issue the permit pursuant to subsection (a) or (e) of this section, as the case may be, for such source in accordance with the guidelines and requirements of this chapter.

(2)(A) Each member appointed by the President shall hold office for a term of three years, except that (i) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed for the remainder of such term, and (ii) the terms of office of the members first taking office after June 30, 1956, shall expire as follows: three at the end of one year after such date, three at the end of two years after such date, and three at the end of three years after such date, as designated by the President at the time of appointment, and (iii) the term of any member under the preceding provisions shall be extended until the date on which his successor's appointment is effective. None of the members appointed by the President shall be eligible for reappointment within one year after the end of his preceding term.

(B) The members of the Board who are not officers or employees of the United States, while attending conferences or meetings of the Board or while serving at the request of the Administrator, shall be entitled to receive compensation at a rate to be fixed by the Administrator, but not exceeding $100 per diem, including traveltime, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by law for persons in the Government service employed intermittently.

**(b) Functions**

The Board shall advise, consult with, and make recommendations to the Administrator on matters of policy relating to the activities and functions of the Administrator under this chapter.

**(c) Clerical and technical assistance**

Such clerical and technical assistance as may be necessary to discharge the duties of the Board shall be provided from the personnel of the Environmental Protection Agency.

(June 30, 1948, ch. 758, title V, § 503, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 887.)

**Editorial Notes**

REFERENCES IN TEXT

Travel expenses, including per diem in lieu of subsistence as authorized by law, referred to in subsec. (a)(2)(B), probably means the allowances authorized by section 5703 of Title 5, Government Organization and Employees.

**Statutory Notes and Related Subsidiaries**

CONTINUATION OF TERM OF OFFICE

Pub. L. 87–88, § 6(c), July 20, 1961, 75 Stat. 207, provided that members of the Water Pollution Control Advisory Board holding office immediately preceding July 20, 1961 were to remain in office as members of the Board as established by section 6(a) of Pub. L. 87–88 until the expiration of the terms of office for which they were originally appointed.

TERMS OF OFFICE OF MEMBERS OF WATER POLLUTION CONTROL ADVISORY BOARD

Act July 9, 1956, ch. 518, § 3, 70 Stat. 507, provided that the terms of office of members of the Water Pollution Control Advisory Board, holding office on July 9, 1956, were to terminate at the close of business on that date.

TERMINATION OF ADVISORY BOARDS

Advisory boards in existence on Jan. 5, 1973, to terminate not later than the expiration of the 2-year period following Jan. 5, 1973, unless, in the case of a board established by the President or an officer of the Federal Government, such board is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a board established by the Congress, its duration is otherwise provided for by law. See sections 1001(2) and 1013 of Title 5, Government Organization and Employees.

**§ 1364. Emergency powers**

**(a) Emergency powers**

Notwithstanding any other provision of this chapter, the Administrator upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to the livelihood of such persons, such as inability to market shellfish, may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary.

**(b) Repealed. Pub. L. 96–510, title III, § 304(a), Dec. 11, 1980, 94 Stat. 2809**

(June 30, 1948, ch. 758, title V, § 504, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 888; amended Pub. L. 95–217, § 69, Dec. 27, 1977, 91 Stat. 1607; Pub. L. 96–510, title III, § 304(a), Dec. 11, 1980, 94 Stat. 2809.)

**Editorial Notes**

AMENDMENTS

1980—Subsec. (b). Pub. L. 96–510 struck out subsec. (b) which related to emergency assistance, establishment of an emergency fund, and preparation of a contingency plan for such emergencies.

1977—Pub. L. 95–217 designated existing provisions as subsec. (a) and added subsec. (b).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–510 effective Dec. 11, 1980, see section 9652 of Title 42, The Public Health and Welfare.

**§ 1365. Citizen suits**

**(a) Authorization; jurisdiction**

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

**(b) Notice**

No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

**(c) Venue; intervention by Administrator; United States interests protected**

(1) Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.

(2) In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

(3) PROTECTION OF INTERESTS OF UNITED STATES.—Whenever any action is brought under this section in a court of the United States, the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator. No consent judgment shall be entered in an action in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator.

**(d) Litigation costs**

The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

**(e) Statutory or common law rights not restricted**

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

**(f) Effluent standard or limitation**

For purposes of this section, the term ''effluent standard or limitation under this chapter'' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.

**(g) "Citizen" defined**

For the purposes of this section the term ''citizen'' means a person or persons having an interest which is or may be adversely affected.

**(h) Civil action by State Governors**

A Governor of a State may commence a civil action under subsection (a), without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State.

(June 30, 1948, ch. 758, title V, § 505, as added Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 888; amended Pub. L. 100–4, title III, § 314(c), title IV, § 406(d)(2), title V, §§ 504, 505(c), Feb. 4, 1987, 101 Stat. 49, 73, 75, 76; Pub. L. 115–282, title IX, § 903(c)(3), Dec. 4, 2018, 132 Stat. 4356.)

**Editorial Notes**

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (d), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2018—Subsec. (f). Pub. L. 115–282 substituted ''(5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.'' for ''(5) certification under section 1341 of this title; (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (7) a regulation under section 1345(d) of this title,.''

Sec.
4362a. Membership of Task Force on Environmental Cancer and Heart and Lung Disease.
4363. Continuing and long-term environmental research and development.
4363a. Pollution control technologies demonstrations.
4364. Expenditure of funds for research and development related to regulatory program activities.
4365. Science Advisory Board.
4366. Identification and coordination of research, development, and demonstration activities.
4366a. Omitted.
4367. Reporting requirements of financial interests of officers and employees of Environmental Protection Agency.
4368. Grants to qualified citizens groups.
4368a. Utilization of talents of older Americans in projects of pollution prevention, abatement, and control.
4368b. General assistance program.
4369. Miscellaneous reports.
4369a. Reports on environmental research and development activities of Agency.
4370. Reimbursement for use of facilities.
4370a. Assistant Administrators of Environmental Protection Agency; appointment; duties.
4370b. Availability of fees and charges to carry out Agency programs.
4370c. Environmental Protection Agency fees.
4370d. Percentage of Federal funding for organizations owned by socially and economically disadvantaged individuals.
4370e. Working capital fund in Treasury.
4370f. Availability of funds after expiration of period for liquidating obligations.
4370g. Availability of funds for uniforms and certain services.
4370h. Availability of funds for facilities.
4370i. Regional liaisons for minority, tribal, and low-income communities.
4370j. Municipal Ombudsman.

SUBCHAPTER IV—FEDERAL PERMITTING IMPROVEMENT

4370m. Definitions.
4370m–1. Federal Permitting Improvement Steering Council.
4370m–2. Permitting process improvement.
4370m–3. Interstate compacts.
4370m–4. Coordination of required reviews.
4370m–5. Delegated State permitting programs.
4370m–6. Litigation, judicial review, and savings provision.
4370m–7. Reports.
4370m–8. Funding for governance, oversight, and processing of environmental reviews and permits.
4370m–9. Application.
4370m–10. GAO report.
4370m–11. Savings provision.
4370m–12. Repealed.

## § 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

(Pub. L. 91–190, §2, Jan. 1, 1970, 83 Stat. 852.)

### Statutory Notes and Related Subsidiaries

SHORT TITLE OF 2020 AMENDMENT

Pub. L. 116–260, div. S, §102(a), Dec. 27, 2020, 134 Stat. 2243, provided that: ''This section [enacting section 16298 of this title, amending sections 4370m and 7403 of this title, and enacting provisions set out as a note under section 4370m of this title] may be cited as the 'Utilizing Significant Emissions with Innovative Technologies Act' or the 'USE IT Act'.''

SHORT TITLE

Pub. L. 91–190, §1, Jan. 1, 1970, 83 Stat. 852, provided: ''That this Act [enacting this chapter] may be cited as the 'National Environmental Policy Act of 1969'.''

ENVIRONMENTAL PRODUCT DECLARATION ASSISTANCE

Pub. L. 117–169, title VI, §60112, Aug. 16, 2022, 136 Stat. 2072, provided that:

''(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $250,000,000, to remain available until September 30, 2031, to develop and carry out a program to support the development, enhanced standardization and transparency, and reporting criteria for environmental product declarations that include measurements of the embodied greenhouse gas emissions of the material or product associated with all relevant stages of production, use, and disposal, and conform with international standards, for construction materials and products by—

''(1) providing grants to businesses that manufacture construction materials and products for developing and verifying environmental product declarations, and to States, Indian Tribes, and nonprofit organizations that will support such businesses;

''(2) providing technical assistance to businesses that manufacture construction materials and products in developing and verifying environmental product declarations, and to States, Indian Tribes, and nonprofit organizations that will support such businesses; and

''(3) carrying out other activities that assist in measuring, reporting, and steadily reducing the quantity of embodied carbon of construction materials and products.

''(b) ADMINISTRATIVE COSTS.—Of the amounts made available under this section, the Administrator of the Environmental Protection Agency shall reserve 5 percent for administrative costs necessary to carry out this section.

''(c) DEFINITIONS.—In this section:

''(1) GREENHOUSE GAS.—The term 'greenhouse gas' means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

''(2) STATE.—The term 'State' has the meaning given to that term in section 302(d) of the Clean Air Act (42 U.S.C. 7602(d)).''

LOW-EMBODIED CARBON LABELING FOR CONSTRUCTION MATERIALS

Pub. L. 117–169, title VI, §60116, Aug. 16, 2022, 136 Stat. 2077, provided that:

''(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $100,000,000, to remain available until September 30, 2026, for necessary administrative costs of the Administrator of the Environmental Protection Agency to carry out this section and to develop and carry out a program, in consultation with the Administrator of the Federal Highway Administration for construction materials used in transportation projects and the Administrator of General Services for construction materials used for Federal buildings, to identify and

reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation.

(e) *Indian Tribe* or *Tribe* means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a Federal Indian Reservation.

(f) *License* or *permit* means any license or permit issued or granted by an agency of the Federal Government to conduct any activity which may result in any discharge into waters of the United States.

(g) *Neighboring jurisdiction* means any state, or Tribe with treatment in a similar manner as a state for Clean Water Act section 401 in its entirety or only for Clean Water Act section 401(a)(2), other than the jurisdiction in which the discharge originates or will originate.

(h) *Project proponent* means the applicant for a Federal license or permit, or the entity seeking certification.

(i) *Regional Administrator* means the Regional designee appointed by the Administrator, Environmental Protection Agency.

(j) *Water quality requirements* means any limitation, standard, or other requirement under sections 301, 302, 303, 306, and 307 of the Clean Water Act, any Federal and state or Tribal laws or regulations implementing those sections, and any other water quality-related requirement of state or Tribal law.

### § 121.2 When certification is required.

Certification or waiver is required for any Federal license or permit that authorizes any activity which may result in any discharge from a point source into waters of the United States.

### § 121.3 Scope of certification.

(a) When a certifying authority reviews a request for certification, the certifying authority shall evaluate whether the activity will comply with applicable water quality requirements. The certifying authority's evaluation is limited to the water quality-related impacts from the activity subject to the Federal license or permit, including the activity's construction and operation.

(b) Consistent with the scope of review identified in paragraph (a) of this section, a certifying authority shall include any conditions in a grant of certification necessary to assure that the activity will comply with applicable water quality requirements.

### § 121.4 Pre-filing meeting requests.

The project proponent shall request a pre-filing meeting with the certifying authority at least 30 days prior to submitting a request for certification in accordance with the certifying authority's applicable submission procedures, unless the certifying authority waives or shortens the requirement for a pre-filing meeting request.

### § 121.5 Request for certification.

(a) Where a project proponent is seeking certification from any certifying authority, the request for certification shall include the following minimum contents:

(1) If the request for certification is for an individual Federal license or permit, it shall be in writing, signed, and dated and shall include the following:

(i) A copy of the Federal license or permit application submitted to the Federal agency; and

(ii) Any readily available water quality-related materials that informed the development of the application.

(2) If the request for certification is for the issuance of a general Federal license or permit, it shall be in writing, signed, and dated and shall include the following:

(i) A copy of the draft Federal license or permit; and

(ii) Any readily available water quality-related materials that informed the development of the draft Federal license or permit.

(b) Where a project proponent is seeking certification from the Regional Administrator, if not already included in the request for certification in accordance with paragraph (a) of this section, a request for certification shall also include the following, as applicable:

(1) A description of the proposed activity, including the purpose of the

**§ 121.7 Certification decisions.**

(a) A certifying authority may act on a request for certification in one of four ways: grant certification, grant certification with conditions, deny certification, or expressly waive certification.

(b) A certifying authority shall act on a request for certification within the scope of certification and within the reasonable period of time.

(c) A grant of certification shall be in writing and should include the following:

(1) Identification of the decision as a grant of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement that the activity will comply with water quality requirements; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(d) A grant of certification with conditions shall be in writing and should include the following:

(1) Identification of the decision as a grant of certification with conditions;

(2) Identification of the applicable Federal license or permit;

(3) A statement explaining why each of the included conditions is necessary to assure that the activity will comply with water quality requirements; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(e) A denial of certification shall be in writing and should include the following:

(1) Identification of the decision as a denial of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement explaining why the certifying authority cannot certify that the activity will comply with water quality requirements, including but not limited to a description of any missing water quality-related information if the denial is based on insufficient information; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(f) An express waiver shall be in writing and should include the following:

(1) Identification of the decision as an express waiver of certification;

(2) Identification of the applicable Federal license or permit;

(3) A statement that the certifying authority expressly waives its authority to act on the request for certification; and

(4) An indication that the certifying authority complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1).

(g) If the certifying authority determines that no water quality requirements are applicable to the activity, the certifying authority shall grant certification.

**§ 121.8 Extent of Federal agency review.**

To the extent a Federal agency verifies compliance with the requirements of Clean Water Act section 401, its review is limited to whether: the appropriate certifying authority issued the certification decision; the certifying authority confirmed it complied with its public notice procedures established pursuant to Clean Water Act section 401(a)(1); and the certifying authority acted on the request for certification within the reasonable period of time.

**§ 121.9 Failure or refusal to act.**

(a) The certification requirement shall be waived only if a certifying authority fails or refuses to act on a request for certification within the reasonable period of time.

(b) If the Federal agency determines that the certifying authority did not act on a request for certification within the reasonable period of time, the Federal agency shall promptly notify the certifying authority and project proponent in writing that the certification requirement has been waived in accordance with §121.8. Such notice shall satisfy the project proponent's requirement to obtain certification.

**§ 121.10 Modification to a grant of certification.**

(a) Provided that the Federal agency and the certifying authority agree in writing that the certifying authority

101(a)(2) use. In this instance, as required by paragraph (a) of this section, the State must submit documentation justifying how its consideration of the use and value of water for those uses listed in paragraph (a) appropriately supports the State's action, which may be satisfied through a use attainability analysis.

[48 FR 51405, Nov. 8, 1983, as amended at 80 FR 51047, Aug. 21, 2015]

### § 131.11 Criteria.

(a) *Inclusion of pollutants:* (1) States must adopt those water quality criteria that protect the designated use. Such criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use. For waters with multiple use designations, the criteria shall support the most sensitive use.

(2) *Toxic pollutants*. States must review water quality data and information on discharges to identify specific water bodies where toxic pollutants may be adversely affecting water quality or the attainment of the designated water use or where the levels of toxic pollutants are at a level to warrant concern and must adopt criteria for such toxic pollutants applicable to the water body sufficient to protect the designated use. Where a State adopts narrative criteria for toxic pollutants to protect designated uses, the State must provide information identifying the method by which the State intends to regulate point source discharges of toxic pollutants on water quality limited segments based on such narrative criteria. Such information may be included as part of the standards or may be included in documents generated by the State in response to the Water Quality Planning and Management Regulations (40 CFR part 130).

(b) *Form of criteria:* In establishing criteria, States should:

(1) Establish numerical values based on:

(i) 304(a) Guidance; or

(ii) 304(a) Guidance modified to reflect site-specific conditions; or

(iii) Other scientifically defensible methods;

(2) Establish narrative criteria or criteria based upon biomonitoring methods where numerical criteria cannot be established or to supplement numerical criteria.

[48 FR 51405, Nov. 8, 1983, as amended at 51047, Aug. 21, 2015]

### § 131.12 Antidegradation policy and implementation methods.

(a) The State shall develop and adopt a statewide antidegradation policy. The antidegradation policy shall, at a minimum, be consistent with the following:

(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

(2) Where the quality of the waters exceeds levels necessary to support the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

(i) The State may identify waters for the protections described in paragraph (a)(2) of this section on a parameter-by-parameter basis or on a water body-by-water body basis. Where the State identifies waters for antidegradation protection on a water body-by-water body basis, the State shall provide an opportunity for public involvement in any decisions about whether the protections described in paragraph (a)(2) of this section will be afforded to a water body, and the factors considered when making those decisions. Further, the State shall not exclude a water body from the protections described in paragraph (a)(2) of this section solely

because water quality does not exceed levels necessary to support all of the uses specified in section 101(a)(2) of the Act.

(ii) Before allowing any lowering of high water quality, pursuant to paragraph (a)(2) of this section, the State shall find, after an analysis of alternatives, that such a lowering is necessary to accommodate important economic or social development in the area in which the waters are located. The analysis of alternatives shall evaluate a range of practicable alternatives that would prevent or lessen the degradation associated with the proposed activity. When the analysis of alternatives identifies one or more practicable alternatives, the State shall only find that a lowering is necessary if one such alternative is selected for implementation.

(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected.

(4) In those cases where potential water quality impairment associated with a thermal discharge is involved, the antidegradation policy and implementing method shall be consistent with section 316 of the Act.

(b) The State shall develop methods for implementing the antidegradation policy that are, at a minimum, consistent with the State's policy and with paragraph (a) of this section. The State shall provide an opportunity for public involvement during the development and any subsequent revisions of the implementation methods, and shall make the methods available to the public.

[48 FR 51405, Nov. 8, 1983, as amended at 80 FR 51047, Aug. 21, 2015]

**§ 131.13 General policies.**

States may, at their discretion, include in their State standards, policies generally affecting their application and implementation, such as mixing zones, low flows and variances. Such policies are subject to EPA review and approval.

**§ 131.14 Water quality standards variances.**

States may adopt WQS variances, as defined in § 131.3(o). Such a WQS variance is subject to the provisions of this section and public participation requirements at § 131.20(b). A WQS variance is a water quality standard subject to EPA review and approval or disapproval.

(a) *Applicability.* (1) A WQS variance may be adopted for a permittee(s) or water body/waterbody segment(s), but only applies to the permittee(s) or water body/waterbody segment(s) specified in the WQS variance.

(2) Where a State adopts a WQS variance, the State must retain, in its standards, the underlying designated use and criterion addressed by the WQS variance, unless the State adopts and EPA approves a revision to the underlying designated use and criterion consistent with §§ 131.10 and 131.11. All other applicable standards not specifically addressed by the WQS variance remain applicable.

(3) A WQS variance, once adopted by the State and approved by EPA, shall be the applicable standard for purposes of the Act under § 131.21(d) through (e), for the following limited purposes. An approved WQS variance applies for the purposes of developing NPDES permit limits and requirements under 301(b)(1)(C), where appropriate, consistent with paragraph (a)(1) of this section. States and other certifying entities may also use an approved WQS variance when issuing certifications under section 401 of the Act.

(4) A State may not adopt WQS variances if the designated use and criterion addressed by the WQS variance can be achieved by implementing technology-based effluent limits required under sections 301(b) and 306 of the Act.

(b) *Requirements for Submission to EPA.* (1) A WQS variance must include:

(i) Identification of the pollutant(s) or water quality parameter(s), and the water body/waterbody segment(s) to which the WQS variance applies. Discharger(s)-specific WQS variances must also identify the permittee(s) subject to the WQS variance.

(ii) The requirements that apply throughout the term of the WQS variance. The requirements shall represent

**7:7-1.2 Scope**

(a) This chapter shall apply to actions and decisions by the Department, as described at (d) through (h) below, on uses and development of coastal resources within or affecting the coastal zone, which is described at (b) below.

(b) This chapter shall apply geographically to the New Jersey coastal zone, which comprises:

1. The CAFRA area;

2. Coastal waters, which are any tidal waters of the State and all lands lying thereunder. Coastal waters of the State of New Jersey extend from the mean high water line out to the three-geographical-mile limit of the New Jersey territorial sea, and elsewhere to the interstate boundaries of the States of New York, and Delaware and the Commonwealth of Pennsylvania, except as provided at (c) below;

3. All lands outside of the CAFRA area extending from the mean high water line of a tidal water body to the first paved public road, railroad, or surveyable property line existing on September 26, 1980, generally parallel to the waterway, provided that the landward boundary of the upland area shall be no less than 100 feet and no more than 500 feet from the mean high water line;

4. All areas containing tidal wetlands; and

5. The Hackensack Meadowlands District as defined by N.J.S.A. 13:17-4.

(c) In accordance with the decree of the United States Supreme Court in State of New Jersey v. State of Delaware, 552 U.S.597, 623-24 (2008), the State of New Jersey may, under its laws, grant and thereafter exercise governing authority over ordinary and usual riparian rights for the construction, maintenance, and use of wharves and other riparian improvements appurtenant to the eastern shore of the Delaware River within the 12-mile circle and extending outshore of the low-water mark. The 12-mile circle is the circle the radius of which is 12 miles, and the center of which is the building used prior to 1881 as the courthouse at New Castle, Delaware, the arcs of which are as set forth in the decree of the United States Supreme Court in New Jersey v. Delaware, 295 U.S. 694 (1935).

1. The State of Delaware may, under its laws and subject to New Jersey's authority over riparian rights as stated at (c) above, exercise governing authority over the construction, maintenance, and use of those same wharves and other improvements appurtenant to the eastern shore of the Delaware River within the 12-mile circle and extending outshore of the low-water mark, to the extent that they exceed ordinary and usual riparian uses.

(d) This chapter shall apply to all coastal permits.

(e) This chapter shall apply to decisions on the consistency or compatibility of proposed actions by Federal, State, and local agencies within or affecting the coastal zone, including, but not limited to Federal consistency determinations, determinations of consistency or compatibility under the Federal Coastal Zone Management Act, comments on Draft and Final Environmental Impact Statements prepared under the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and comments on other public and private plans, programs, projects, and policies. This chapter shall also apply to decisions on proposed activities that require a water quality certificate. Requests for water quality certificates shall also be reviewed in accordance with all applicable statutes and regulations administered by the Department including the Surface Water Quality Standards, N.J.A.C. 7:9B.

1. An activity requiring a Federal consistency determination may also require a coastal permit. In this instance, the coastal permit is the Federal consistency determination.

2. An activity requiring a water quality certificate may also require a coastal permit. In this instance, the coastal permit will include the water quality certificate.

3. A water quality certificate not issued in conjunction with a coastal permit shall be valid for five years from the date of issuance or for the duration of the underlying Federal permit (without renewals), whichever period is shorter.

4. A Federal consistency determination or a water quality certificate issued in conjunction with an authorization under a coastal general permit-by-certification or a general permit shall be valid for the duration of that authorization.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

5. A Federal consistency determination issued in conjunction with an individual coastal permit shall be valid for the duration of that individual permit.

(f) This chapter shall apply to State aid financial assistance decisions by the Department under the Shore Protection Program and Green Acres Program within the coastal zone, to the extent permissible under existing statutes and regulations.

(g) This chapter shall apply, to the extent statutorily permissible, to Department management actions, including permit decisions, approvals, certifications, conveyances, and compliance activities, in or affecting the coastal zone.

(h) This chapter shall provide the basic policy direction for planning actions undertaken by the Department in the coastal zone as the lead state agency for Coastal Management under Section 306 of the Federal Coastal Zone Management Act.

**7:7-1.3 Review, revision, and expiration**

As provided by the Federal Coastal Zone Management Act, the Department shall periodically review the rules and revise, amend, or readopt the rules in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq.

**7:7-1.4 Standards for evaluating permit applications**

(a) All applications for coastal permits shall be approved, conditionally approved, or denied pursuant to this chapter.

(b) The Department shall issue a permit pursuant to CAFRA only upon a finding as required by N.J.S.A. 13:19-10 that the development:

1. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards;

2. Prevents air emissions and water effluents in excess of the existing dilution, assimilative and recovery capacities of the air and water environments at the site and within the surrounding region;

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

**7:7-9.2 Shellfish habitat**

(a) Shellfish habitat is defined as an estuarine bay or river bottom that currently supports or has a history of production for hard clams (*Mercenaria mercenaria*), soft clams (*Mya arenaria*), eastern oysters (*Crassostrea virginica*), bay scallops (*Argopecten irradians*), or blue mussels (*Mytilus edulis*), or otherwise listed below in this section. A shellfish habitat area is defined as an area that meets one or more of the following criteria:

1. The area has a current shellfish density equal to or greater than 0.20 shellfish per square foot;

2. The area has a history of natural shellfish production according to data available to the New Jersey Bureau of Shellfisheries, or is depicted as having high or moderate commercial value in the Distribution of Shellfish Resources in Relation to the New Jersey Intracoastal Waterway (U.S. Department of the Interior, 1963) and/or "Inventory of New Jersey's Estuarine Shellfish Resources" The referenced mapping is available at https://www.nj.gov/dep/landuse/shellfish.html;

3. The area is designated by the State of New Jersey as a shellfish culture area as authorized by N.J.S.A. 50:1 et seq. Shellfish culture areas include estuarine areas presently leased by the State for shellfish aquaculture activities or hard clam relay, transplant and transfer as well as those areas suitable for future shellfish aquaculture development; or

4. The area is designated as productive at N.J.A.C. 7:25-24, Leasing of Atlantic and Delaware Bay Bottom for Aquaculture.

(b) Any area determined by the Department to be contaminated by toxins is excluded from this definition. The List of Water Quality Limited Segments (known as the 303(d) list), prepared by the Department pursuant to the Federal Clean Water Act, 33 U.S.C. § 1313(d), identifies these known contaminated areas. Also excluded from this definition are those sites for which the Department is presented with clear and convincing evidence that the sites lack the physical features necessary for the support of a shellfish population, excluding those waterways listed at N.J.A.C. 7:7-15.3 and (l) below.

(c) The water located under any boat mooring facility (including docks and associated structures) is automatically condemned and reduced to "prohibited" status pursuant to N.J.A.C. 7:12-2.1(a)1ii.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

**7:7A-1.5 Liberal construction**

This chapter shall be liberally construed to effectuate the purpose of the Acts under which it was adopted.

**7:7A-1.6 Severability**

If any subchapter, section, subsection, provision, clause, or portion of this chapter, or the application thereof to any person, is adjudged unconstitutional or invalid by a court of competent jurisdiction, such judgment shall be confined in its operation to the subchapter, section, subsection, provision, clause, portion, or application directly involved in the controversy in which the judgment was rendered and it shall not affect or impair the remainder of this chapter or the application thereof to other persons.

**SUBCHAPTER 2. APPLICABILITY AND ACTIVITIES FOR WHICH A PERMIT IS REQUIRED**

**7:7A-2.1 When a permit is required**

(a) No person shall engage in a regulated activity subject to this chapter without a permit or authorization listed in (b) below. Initiation of a regulated activity without a permit or conducting a regulated activity beyond that specifically authorized by a permit is considered a violation of this chapter and shall subject the person or persons responsible for the regulated activity to enforcement action in accordance with N.J.A.C. 7:7A-22.

(b) A person undertaking any regulated activity under this chapter shall do so only in accordance with:

1. An authorization under a general permit-by-certification, pursuant to N.J.A.C. 7:7A-5 and 6;

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

2. An authorization under a general permit, pursuant to N.J.A.C. 7:7A-5 and 7;

3. A transition area waiver, pursuant to N.J.A.C. 7:7A-8;

4. An individual permit, pursuant to N.J.A.C. 7:7A-9 and 10; or

5. An emergency authorization, pursuant to N.J.A.C. 7:7A-14.

(c) On March 2, 1994, the Department assumed responsibility for administering the Federal wetlands program (also known as the 404 program) in delegable waters. In non-delegable waters, the USACE retains jurisdiction under Federal law, and both Federal and State requirements apply. Accordingly, a person proposing to engage in a regulated activity in non-delegable waters shall obtain two permits, one from the Department under this chapter and one from the USACE under the Federal 404 program.

(d) A permit issued under this chapter shall constitute the water quality certificate required under the Federal Act at 33 U.S.C. § 1341 for any activity covered by this chapter. If a discharge of dredged or fill material into waters of the United States does not require a permit under this chapter but does require a water quality certificate, the Department shall use the standards and procedures in this chapter to determine whether to issue the water quality certificate, except in the New Jersey coastal zone, as described at N.J.A.C. 7:7-1.2(b). For a discharge of dredged or fill material in the coastal zone, the Department shall use the standards and procedures in the Coastal Zone Management rules, N.J.A.C. 7:7, to determine whether to issue a water quality certificate.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

**7:7A-10.4 Additional requirements for a non-water dependent activity in exceptional resource value wetlands or trout production waters**

(a) If an applicant proposes a non-water-dependent activity in wetlands of exceptional resource value or in trout production waters, the applicant, in addition to complying with all other requirements in this subchapter, shall also demonstrate either:

1. That there is a compelling public need for the proposed activity greater than the need to protect the freshwater wetland or trout production water, and that the need cannot be met by essentially similar projects in the region which are under construction or expansion, or which have received the necessary governmental permits and approvals; or

2. That denial of the permit would impose an extraordinary hardship on the applicant brought about by circumstances peculiar to the subject property.

**SUBCHAPTER 11. MITIGATION**

**7:7A-11.1 Definitions**

In addition to the terms defined at N.J.A.C. 7:7A-1.3, the following words and terms, when used in this subchapter, shall have the following meanings unless the context clearly indicates otherwise.

"Council" means the Wetlands Mitigation Council.

"Creation" means the establishment of freshwater wetland or State open water characteristics and functions in uplands.

"Credit purchase" means the purchase of credits from a mitigation bank, as that term is defined at N.J.A.C. 7:7A-1.3, as a substitute for performance of restoration, creation,

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

CHAPTER 9B SURFACE WATER QUALITY STANDARDS

SUBCHAPTER 1. SURFACE WATER QUALITY STANDARDS

**7:9B-1.1 Scope of subchapter**

Unless otherwise provided by rule or statute, this subchapter shall constitute the rules of the Department of Environmental Protection governing matters of policy with respect to the protection and enhancement of surface water resources, class definitions, quality criteria, use designation and quality criteria for the mainstem of the Delaware River including the Delaware Bay, the classification of surface waters of the State, procedures for establishing water quality-based effluent limitations, modification of water quality-based effluent limitations, procedures for reclassifying specific segments for less restrictive uses, procedures for reclassifying specific segments for more restrictive uses, and procedures for establishing water quality standards variances, pursuant to N.J.S.A. 13:1D-1 et seq., the New Jersey Water Pollution Control Act, 58:10A-1 et seq., and the Water Quality Planning Act, 58:11A-1 et seq.

**7:9B-1.2 Construction**

This subchapter shall be liberally construed to permit the Department and its various divisions to discharge their statutory functions.

**7:9B-1.3 Severability**

If any subchapter, section, subsection, provision, clause, or portion of this chapter, or the application thereof to any person, is adjudged unconstitutional or invalid by a court of competent jurisdiction, such judgment shall be confined in its operation to the subchapter, section, subsection, clause, portion, or application directly involved in the controversy in which such judgment shall have been rendered and it shall not affect or impair the remainder of this chapter or the application thereof to other persons.

**7:9B-1.4 Definitions**

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

"Acute toxicity" means a lethal or severe adverse sublethal effect (for example, immobilization of daphnids) to an organism exposed to a toxic substance for a relatively short period of time. Acute toxicity is measured by short-term bioassays, generally of 48 or 96 hour duration.

"Agricultural water supply" means water used for field crops, livestock, horticulture, and silviculture.

"Best management practices" or "BMPs" means the methods, measures or practices to prevent or reduce the amount of pollution from point or nonpoint sources including structural and nonstructural controls and operation and maintenance procedures.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

"Wetlands" means those areas that are inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation. The Department shall evaluate the parameters of hydrology, soils, and vegetation to determine the presence and extent of wetlands.

**7:9B-1.5 Statements of policy**

(a) General policies are as follows:

1. These Surface Water Quality Standards apply to all surface waters of the State.
2. Water is vital to life and comprises an invaluable natural resource which is not to be abused by any segment of the State's population or economy. It is the policy of the State to restore, maintain and enhance the chemical, physical and biological integrity of its waters, to protect the public health, to safeguard the aquatic biota, protect scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial, agricultural and other reasonable uses of the State's waters.
3. The restoration, maintenance and preservation of the quality of the waters of the State for the protection and preservation of public water supplies is a paramount interest of the citizens of New Jersey. In order to provide adequate, clean supplies of potable water, it is the policy of the State that all fresh waters be protected as potential sources of public water supply. Therefore, point and nonpoint sources of pollutants shall be regulated to attain compliance with the Surface Water Quality Standards human health criteria outside of regulatory mixing zones.
4. Toxic substances in waters of the State shall not be at levels that are toxic to humans or the aquatic biota, or that bioaccumulate in the aquatic biota so as to render them unfit for human consumption.
5. The introduction of carcinogenic, mutagenic, or teratogenic substances into the environment is of particular concern to the Department. Human health-based ambient criteria have been established in freshwaters due to consumption of fish and water, and in saline water due to consumption of fish. For carcinogens, the criteria have been established at levels which would result in no greater than a one-in-one-million lifetime excess cancer risk. For non-carcinogens, the criteria have been established which would result in no appreciable risk of deleterious effect.
6. Existing uses shall be maintained and protected. Designated uses shall, as soon as technically and economically feasible, be attained wherever these uses are not precluded by natural conditions. Where existing criteria are inadequate to support the existing or designated uses, the criteria shall be changed to support the existing uses.
7. The restoration of saline waters to levels which permit unrestricted shellfish harvesting is an objective of the Department.
8. The Department encourages the use of reclaimed water for beneficial reuse to help preserve the highest quality water and reduce the export of freshwater out of basins in support of meeting water supply needs and natural resource protection.
9. The Department uses the Integrated Water Quality Monitoring and Assessment Methods developed pursuant to N.J.A.C. 7:15-5.2 to evaluate water quality data and

identify waters where water quality does not meet the Surface Water Quality Standards at N.J.A.C. 7:9B as required by Section 303(d) and 305(b) of the Federal Clean Water Act.

(b) Interstate waters policies are as follows:

1. The designated uses and water quality criteria for the fresh and saline waters under the jurisdiction of the Delaware River Basin Commission shall be as established in accordance with N.J.A.C. 7:9B-1.13 and 1.14I through (g).
2. The designated uses and water quality criteria for waters under the jurisdiction of the Interstate Environmental Commission in the New Jersey/New York metropolitan area shall be as established in this subchapter, or in accordance with the prevailing Water Quality Regulations of the Interstate Environmental Commission, including all amendments and future supplements thereto, whichever are more stringent.

(c) General technical policies are as follows:

1. The natural water quality shall be used in place of the promulgated water quality criteria of N.J.A.C. 7:9B-1.14 for all water quality characteristics that do not meet the promulgated water quality criteria as a result of natural causes.
2. Water quality criteria are expected to be maintained during periods when nontidal or small tidal stream flows are at or greater than the MA7CD10 flow, except as provided below:
   i. For acute aquatic life protection criteria, the design flow shall be the MA1CD10 flow;
   ii. For chronic aquatic life protection criteria for ammonia, the design flow shall be the MA30CD10 flow; and
   iii. For human health criteria for carcinogens listed at N.J.A.C. 7:9B-1.14(f)7, the design flow shall be the flow which is exceeded 75 percent of the time for the appropriate "period of record" as determined by the United States Geological Survey.
3. Water quality criteria are expected to be maintained in intermittent streams during all natural flow conditions. When an intermittent stream does not contain natural flow of sufficient magnitude to determine water quality, the criteria to be maintained in the intermittent stream will be those pertaining to the measurable natural flow immediately downstream of the intermittent stream.
4. All analytical data to be incorporated by the Department in water quality monitoring or other activities shall be from laboratories approved or certified by the Department for the analysis of those specific parameters. If certification is not offered for the specific parameter, the laboratory performing the analysis shall, at a minimum, hold certification in the category of certification covering that type of parameter.
5. The Department shall utilize the parameter specific criteria contained in N.J.A.C. 7:9B-1.14 in the development of chemical specific water quality-based effluent limitations for point source discharges. Whenever parameter specific criteria have not been adopted, the Department will utilize the best available scientific information in the development of chemical specific water quality-based effluent limitations for

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

point source discharges. Ambient criteria published by the United States Environmental Protection Agency pursuant to section 304(a) of the Federal Clean Water Act represent the minimum acceptable best scientific information to be used in the development of water quality-based effluent limitations for point source discharges.

6. When the Department promulgates a new or revised maximum contaminant level (MCL) in the Safe Drinking Water Act rules at N.J.A.C. 7:10 for a parameter for which there is an established human health based criterion at N.J.A.C. 7:9B-1.14(f)7, the Department shall modify the human health based criterion based on the toxicity factor used to establish the MCL and shall incorporate the modified criterion into N.J.A.C. 7:9B-1.14(f)7. The Department shall publish a notice of administrative change in the New Jersey Register.
7. The Department shall utilize a geometric mean to assess compliance with the bacterial quality indicators at N.J.A.C.7:9B-1.14(d)1ii-iii. The Department shall issue beach notifications in accordance with N.J.A.C. 8:26.
8. The Department shall implement the geometric mean and statistical threshold values (STV), where applicable, for bacterial quality criteria established at N.J.A.C. 7:9B1.14(d)1ii and iii, over a 30-day period in the NJPDES permits, in accordance with N.J.S.A. 58:10A-3 and N.J.A.C. 7:14A-13.15(a)2.
9. Temperature criteria at N.J.A.C. 7:9B-1.14(d) apply unless an alternative effluent limitation is approved in accordance with Section 316(a) of the Clean Water Act, 33 U.S.C. 1326(a).
   i. Properly treated wastewater discharge shall be deemed in compliance with the temperature criteria if the ambient stream temperature measured outside the regulatory heat dissipation area does not increase by more than:
      (1) 0.6 degrees Celsius in FW2-TP waters
      (2) 1.2 degrees Celsius in FW2-TM waters
      (3) 2.8 degrees Celsius in FW2-NT waters
      (4) 2.2 degrees Celsius in SE and SC waters from September through May
      (5) 0.8 degrees Celsius in SE and SC waters from June through August
   ii. Thermal alterations to lakes, ponds, or reservoirs shall not be permitted unless it can be shown to be beneficial to the designated and existing uses.
10. The Department may adopt an alternative freshwater total ammonia criterion pursuant to the Aquatic Life Ambient Water Quality Criteria For Ammonia – Freshwater 2013, EPA 822-R-13-001, April 2013, https://www.epa.gov/sites/default/files/2015-08/documents/aquatic-life-ambient-water-quality-criteria-for-ammonia-freshwater-2013.pdf, if a permittee demonstrates to the satisfaction of the Department, that an alternative criterion is applicable in place of the freshwater total ammonia criteria at N.J.A.C. 7:9B-1.14(e)2.

(d) Antidegradation policies applicable to all surface waters of the State are as follows:

1. Existing uses shall be maintained and protected. Designated uses shall be maintained or, as soon as technically and economically feasible, be attained wherever these uses are not precluded by natural conditions.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

i. The maintenance, migration, and propagation of threatened or endangered species (as defined under the Federal Endangered Species Act of 1973 as amended, 16 U.S.C. 1531 *et seq*., and/or the New Jersey Endangered and Nongame Species Conservation Act N.J.S.A. 23:2A-1 et seq.) is considered an existing use that must be maintained.

ii. No irreversible changes may be made to existing water quality that would impair or preclude attainment of the designated uses of a waterway.

iii. No changes shall be allowed in waters which constitute an outstanding National or State resource or in waters that may affect these outstanding resource waters.

iv. Where water quality exceeds levels necessary to support the designated uses, including but not limited to, propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the Department finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the Department's continuing planning process (see N.J.A.C. 7:15-2.2), which includes, but is not limited to, the NJPDES Regulations (N.J.A.C. 7:14A), that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located.

v. Where a lower classification of water (including the antidegradation designation) may impinge upon a higher classification/antidegradation designation of water, the Department shall ensure that the quality and uses of the higher classification/antidegradation water are protected.

vi. A waterway or waterbody from which water is transferred to another waterway or waterbody shall be treated as a tributary to the waterway or waterbody receiving the transferred water.

vii. Modifications of water quality-based effluent limitations established to implement the antidegradation policy may be granted pursuant to N.J.A.C. 7:9B-1.8 and 1.9.

2. Antidegradation policies applicable to a waterbody are as follows:

i. The quality of nondegradation waters shall be maintained in their natural state (set aside for posterity) and shall not be subject to any manmade wastewater discharges. The Department shall not approve any activity which, alone or in combination with any other activities, might cause changes, other than toward natural water quality, in the existing surface water quality characteristics.

ii. For Pinelands waters, the Department shall not approve any activity which alone or in combination with any other activities, might cause changes, other than toward natural water quality, in the existing surface water quality characteristics. This policy shall apply as follows:

(1) This policy is not intended to interfere with water control in the operation of cranberry bogs or blueberry production.

(2) New or expanded discharges are not allowed, unless authorized by the Pinelands Commission in accordance with Pinelands Comprehensive Management Plan, N.J.A.C. 7:50-4.61 through 4.70.

iii. Category One Waters shall be protected from any measurable changes (including calculable or predicted changes) to the existing water quality. Water quality characteristics that are generally worse than the water quality criteria,

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

except as due to natural conditions, shall be improved to maintain or provide for the designated uses where this can be accomplished without adverse impacts on organisms, communities, or ecosystems of concern.

iv. For Category Two Waters, water quality characteristics that are generally better than, or equal to the water quality standards shall be maintained within a range of quality that shall protect the existing/designated uses as determined by studies acceptable to the Department, relating existing/designated uses to water quality. Where such studies are not available or are inconclusive, water quality shall be protected from changes that might be detrimental to the attainment of the designated uses or maintenance of the existing uses. Water quality characteristics that are generally worse than the water quality criteria shall be improved to meet the water quality criteria.

v. For waters of mainstem of the Delaware River designated as Special Protection Waters pursuant to the DRBC Water Quality Regulations Article 3 Section 3.10.3A2, the antidegradation policies are as specified in the DRBC Water Quality Regulations.

(e) Water quality-based effluent limitation policies are as follows:

1. Water quality-based effluent limitations may be established so as to minimize total expenditures, subject to social and environmental constraints, so that the provisions of the water quality standards (which includes the antidegradation policies) are met. This policy may result in the assignment of different levels of treatment to different dischargers where this proves more beneficial on a study area basis.
2. Modifications of water quality-based effluent limitations established to implement the water quality standards (which includes the antidegradation policies) granted pursuant to N.J.A.C. 7:9B-1.8 and 1.9, shall provide for effluent limits at least as stringent as those required pursuant to sections 301, 306, and 307 of the Federal Clean Water Act or the minimum BOD5 effluent standards at N.J.A.C. 7:14A-12.4, where applicable, whichever are more stringent.
3. Water quality-based effluent limitations developed in accordance with N.J.A.C. 7:14A-13.6 shall not interfere with the attainment of the Surface Water Quality Standards, including the antidegradation policies.
4. When a discharge is made to a tidal waterway in the reach where the salinity varies from less than 3.5 ppt. to greater than 3.5 ppt., or the salinity data are inconclusive, the Department shall establish as water quality-based effluent limitations the more stringent of the limitations, on a parameter specific basis, required for the upstream FW waters or the downstream SE waters.
5. Where the effluent limitations developed pursuant to N.J.A.C. 7:14A-13.6 are below the level of detectability of the procedures in N.J.A.C. 7:18 the Department will use an effluent limitation of nondetectable in any NJPDES permit.
6. Compliance schedules may be issued in accordance with N.J.A.C. 7:14A-6.4 when it is demonstrated by a discharger that new or revised water quality-based effluent limitations, based on ambient criteria adopted or revised after July 1, 1977, cannot be consistently met with the facility's existing treatment process. No schedule of compliance may be allowed for parameter specific water quality-based effluent

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

(f) A reclassification for more restrictive uses may be made when:
1. It is demonstrated to the satisfaction of the Department that the waters should be set aside to represent the natural aquatic environment and its associated biota; or
2. It is demonstrated to the satisfaction of the Department that a more restrictive use is necessary to protect a unique ecological system or threatened/endangered species.

(g) In those cases in which a thermal discharge is involved, the procedures for reclassifying segments for more restrictive uses shall be consistent with section 316 of the Federal Clean Water Act.

**7:9B-1.12 Designated uses of FW1, PL, FW2, SE1, SE2, SE3, and SC waters**

(a) In all FW1 waters the designated uses are:
1. Set aside for posterity to represent the natural aquatic environment and its associated biota;
2. Primary contact recreation;
3. Maintenance, migration and propagation of the natural and established aquatic biota; and
4. Any other reasonable uses.

(b) In all PL waters the designated uses are:
1. Cranberry bog water supply and other agricultural uses;
2. Maintenance, migration and propagation of the natural and established biota indigenous to this unique ecological system;
3. Public potable water supply after conventional filtration treatment (a series of processes including filtration, flocculation, coagulation, and sedimentation, resulting in substantial particulate removal but no consistent removal of chemical constituents) and disinfection;
4. Primary contact recreation; and
5. Any other reasonable uses.

(c) In all FW2 waters the designated uses are:
1. Maintenance, migration and propagation of the natural and established biota;
2. Primary contact recreation;
3. Industrial and agricultural water supply;
4. Public potable water supply after conventional filtration treatment (a series of processes including filtration, flocculation, coagulation, and sedimentation, resulting in substantial particulate removal but no consistent removal of chemical constituents) and disinfection; and
5. Any other reasonable uses.

(d) In all SE1 waters the designated uses are:
1. Shellfish harvesting in accordance with N.J.A.C. 7:12;
2. Maintenance, migration and propagation of the natural and established biota;
3. Primary contact recreation; and

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

4. Any other reasonable uses.

(e) In all SE2 waters the designated uses are:

1. Maintenance, migration and propagation of the natural and established biota;
2. Migration of diadromous fish;
3. Maintenance of wildlife;
4. Secondary contact recreation; and
5. Any other reasonable uses.

(f) In all SE3 waters the designated uses are:

1. Secondary contact recreation;
2 Maintenance and migration of fish populations;
3 Migration of diadromous fish;
4. Maintenance of wildlife; and
5. Any other reasonable uses.

(g) In all SC waters the designated uses are:

1. Shellfish harvesting in accordance with N.J.A.C. 7:12;
2. Primary contact recreation;
3. Maintenance, migration and propagation of the natural and established biota; and
4. Any other reasonable uses.

**7:9B-1.13 Designated uses of mainstem Delaware River and Delaware Bay**

(a) The designated uses for the mainstem Delaware River and Delaware Bay are those contained in the DRBC Water Quality Regulations.

(b) The designated uses for other waters under the jurisdiction of the DRBC are as set forth at N.J.A.C. 7:9B-1.12.

**7:9B-1.14 Surface water quality criteria**

(a) Surface water quality criteria for FW1 waters shall be maintained as to quality in their natural state.

(b) Surface water quality criteria for PL waters are as follows:

1. These waters shall be maintained as to quality in their existing state or that quality necessary to attain or protect the designated uses, whichever is more stringent.
   i. For Nitrate-Nitrogen a level of 2 mg/L shall be maintained in the surface waters unless it is shown that a lower level must be maintained to protect the existing surface water quality.
   ii. A pH level between 3.5 and 5.5 shall be maintained unless it is demonstrated that a pH level outside of that range is necessary to protect the existing/ designated uses.
2. The water quality criteria for existing discharges are the water quality criteria contained in "Surface Water Quality Standards" as adopted in March 1981, except that:

i. The criteria for Nitrate-Nitrogen and pH promulgated in N.J.A.C. 7:9B-1.14(b)1 for PL waters apply instead of the 1981 criteria, and;

ii. The criteria for phosphorous, bacterial quality, and toxic substances promulgated in N.J.A.C. 7:9B-1.14(c) through (g) apply instead of the 1981 criteria, as though the freshwater portions of the PL waters were classified as FW2 and the saline portions were classified as SE1.

(c) Unless site-specific criteria are established at (g) below, State-wide criteria apply for FW2, SE, and SC waters as listed in accordance with (d) through (f) below.

(d) Surface Water Quality Criteria for FW2, SE and SC Waters:

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| Substance | Criteria | Classifications |
|---|---|---|
| 1. Bacterial quality (Counts/100 ml) | i. Shellfish Harvesting: Bacterial Indicators shall not exceed, in all shellfish waters, the standard for approved shellfish waters as established by the National Shellfish Sanitation Program as set forth in its current manual of operations. | Shellfish Waters |
| | ii. Primary Contact Recreation: | |
| | (1) Enterococci levels shall not exceed a geometric mean of 30/100 ml over a 90-day period and a Statistical Threshold Value of 110/100 ml, which shall not be greater than 10 percent excursion frequency over a 90-day period. | SE1 and SC |
| | (2) *E. coli* levels shall not exceed a geometric mean of 100/100 ml over a 90-day period and a Statistical Threshold Value of 320/100 ml, which shall not be greater than 10 percent excursion frequency over a 90-day period. | All FW2 |
| | iii. Secondary Contact Recreation: | |
| | (1) Fecal coliform levels shall not exceed a geometric mean of 770/100 ml. | SE2 |
| | (2) Fecal coliform levels shall not exceed a geometric mean of 1500/100ml. | SE3 |
| 2. Dissolved oxygen (mg/L) | i. Not less than 7.0 at any time; | FW2-TP |
| | ii. 24 hour average not less than 6.0. Not less than 5.0 at any time (see paragraph viii below); | FW2-TM |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| | Substance | | Criteria | Classifications |
|---|---|---|---|---|
| | | iii. | 24 hour average not less than 5.0, but not less than 4.0 at any time (see paragraph viii below); | FW2-NT (except as in iv below), SE1 |
| | | iv. | Not less than 4.0 at any time; | Tidal portions of FW2-NT tributaries to the Delaware River, between Rancocas Creek and Big Timber Creek inclusive. |
| | | v. | Not less than 5.0 at any time; | SC |
| | | vi. | Not less than 4.0 at any time; | SE2 |
| | | vii. | Not less than 3.0 at any time; and | SE3 |
| | | viii. | Supersaturated dissolved oxygen values shall be expressed as their corresponding 100 percent saturation values for purposes of calculating 24 hour averages. | FW2-TM, FW2-NT, SE1 |
| 3. | Floating, colloidal, color and settleable solids; petroleum hydrocarbons and other oils and grease | i. | None noticeable in the water or deposited along the shore or on the aquatic substrata in quantities detrimental to the natural biota. None which would render the waters unsuitable for the designated uses. | All Classifications |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| Substance | Criteria | Classifications |
|---|---|---|
| 4. Nutrients | i. Except as due to natural conditions, nutrients shall not be allowed in concentrations that render the waters unsuitable for the existing or designated uses due to objectionable algal densities, nuisance aquatic vegetation, diurnal fluctuations in dissolved oxygen or pH indicative of excessive photosynthetic activity, detrimental changes to the composition of aquatic ecosystems, or other indicators of use impairment caused by nutrients. | All Classifications |
| | ii. Phosphorus (mg/L)* | |
| | (1) Non Tidal Streams: Concentrations of total P shall not exceed 0.1 in any stream, unless site-specific criteria or watershed-specific translators are established pursuant to N.J.A.C. 7:9B-1.5(g)2 or if the Department determines that concentrations do not render the waters unsuitable in accordance with (d)4i. above. | FW2 |
| | (2) Lakes: Concentrations of total P shall not exceed 0.05 in any lake, pond or reservoir, or in a tributary at the point where it enters such bodies of water, unless site-specific criteria or watershed-specific translators are developed pursuant to N.J.A.C. 7:9B-1.5(g)2 or if the Department determines that concentrations do not render the waters unsuitable in accordance with (d)4i. above. | FW2 |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| | Substance | | Criteria | Classifications |
|---|---|---|---|---|
| 5. | pH (Standard Units) | i. | 6.5-8.5 | FW2 waters listed at 1.15(d), (f), (g) and (i), All SE |
| | | ii. | 4.5 – 7.5 | FW2 waters listed at 1.15(c), (e) and (h) |
| | | iii. | Natural pH conditions shall prevail. | SC |
| 6. | Radioactivity | i. | Prevailing regulations including all amendments and future supplements thereto adopted by the U.S. Environmental Protection Agency pursuant to Sections 1412, 1445, and 1450 of the Public Health Services Act, as amended by the Safe Drinking Water Act (PL 93-523) | All Classifications |
| 7. | Solids, Suspended (mg/L) (Non-filterable residue) | i. | 25.0 | FW2-TP, FW2-TM |
| | | ii. | 40.0 | FW2-NT |
| | | iii. | None of which would render the water unsuitable for the designated uses. | All SE, SC |
| 8. | Solids, Total Dissolved (mg/L) (Filterable Residue) | i. | No increase in background which may adversely affect the survival, growth or propagation of the aquatic biota. Compliance with water quality-based WET limitations or $LC_{50} \geq 50$ percent, whichever is more stringent, shall be deemed to meet this requirement. | FW2 |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| | Substance | | Criteria | Classifications |
|---|---|---|---|---|
| | | ii. | No increase in background which would interfere with the designated or existing uses, or 500 mg/L, whichever is more stringent. | FW2 |
| | | iii. | None which would render the water unsuitable for the designated uses. | All SE |
| 9. | Sulfate (mg/L) | i. | 250 | FW2 |
| 10. | Taste and odor producing substances | i. | None offensive to humans or which would produce offensive taste or odors in water supplies and biota used for human consumption. None which would render the water unsuitable for the designated uses. | All Classifications |
| 11. | Temperature | i. | Temperatures shall not exceed a daily maximum of 22 degrees Celsius or rolling seven-day average of the daily maximum of 19 degrees Celsius, unless due to natural conditions | FW2-TP |
| | | ii. | Temperatures shall not exceed a daily maximum of 25 degrees Celsius or rolling seven-day average of the daily maximum of 23 degrees Celsius, unless due to natural conditions | FW2-TM |
| | | iii. | Temperatures shall not exceed a daily maximum of 31 degrees Celsius or rolling seven-day average of the daily maximum of 28 degrees Celsius, unless due to natural conditions | FW2-NT |
| | | iv. | No thermal alterations which would cause temperatures to exceed 29.4 degrees Celsius (85 degree Fahrenheit) Summer seasonal average | SE |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| | Substance | | Criteria | Classifications |
|---|---|---|---|---|
| | | v. | No thermal alterations which would cause temperatures to exceed 26.7 degrees Celsius (80 degree Fahrenheit) Summer seasonal average | SC |
| 12. | Toxic Substances (general) | i. | None, either alone or in combination with other substances, in such concentrations as to affect humans or be detrimental to the natural aquatic biota, produce undesirable aquatic life, or which would render the waters unsuitable for the designated uses. | All Classifications |
| | | ii. | None which would cause standards for drinking water to be exceeded after appropriate treatment. | FW2 |
| | | iii. | Toxic substances shall not be present in concentrations that cause acute or chronic toxicity to aquatic biota, or bioaccumulate within an organism to concentrations that exert a toxic effect on that organism or render it unfit for consumption. | All Classifications |
| | | iv. | The concentrations of nonpersistent toxic substances in the State's waters shall not exceed one-twentieth (0.05) of the acute definitive $LC_{50}$ or $EC_{50}$ value, as determined by appropriate bioassays conducted in accordance with N.J.A.C. 7:18. | All Classifications |
| | | v. | The concentration of persistent toxic substances in the State's waters shall not exceed one-hundredeth (0.01) of the acute definitive $LC_{50}$ or $EC_{50}$ value, as determined by appropriate bioassays conducted in accordance with N.J.A.C. 7:18. | All Classifications |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

7:9B-1.14(d) General Surface Water Quality Criteria for FW2, SE and SC Waters:
(Expressed as Maximum concentrations unless otherwise noted)

| | Substance | | Criteria | Classifications |
|---|---|---|---|---|
| 13. | Turbidity (Nephelometric Turbidity Unit-NTU) | i. | Maximum 30-day average of 15 NTU, a maximum of 50 NTU at any time. | FW2, SE3 |
| | | ii. | Maximum 30-day average of 10 NTU, a maximum of 30 NTU at any time. | SE1, SE2 |
| | | iii. | Levels shall not exceed 10.0 NTU. | SC |

* See N.J.A.C. 7:9B-1.14(g) for site-specific criteria.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

(f) Surface Water Quality Criteria for Toxic Substances are as follows:

1. Acute aquatic life protection criteria are determined with no exceedance at or above the MA1CD10 flow and expressed as one-hour average except,
   i. for copper the criteria are expressed as 24-hour average, and
   ii. for cadmium, chromium, lead, mercury, nickel, silver, and zinc the criteria are expressed as 6-hour average.
2. Chronic aquatic life protection criteria are determined with no exceedance at or above the MA7CD10 flow and expressed as four-day average.
3. Freshwater aquatic criteria for cadmium, chromium III, copper, nickel, silver, and zinc are expressed as a function of water hardness. Criteria can be calculated at any hardness using these equations as listed below. Criteria thus calculated are multiplied by appropriate conversion factor (CF) to convert total recoverable metal into dissolved metal and by the default Water Effect Ratio (WER) of 1.0.

General formula $WER\ [e^{(V[\ln\ (hardness)] + \ln A - V[\ln Z])}]\ CF$

where:

V = pooled slope
A = FAV at given hardness
Z = selected value of hardness

Cadmium:

*Acute dissolved criterion* $WER\ [e^{(1.0166\ (\ln\ [hardness])-3.924)}]\ 0.651$

*Chronic dissolved criterion* $WER\ [e^{(0.7409\ (\ln\ [hardness])-4.719)}]\ 0.651$

Chromium III:

*Acute dissolved criterion* $WER\ [e^{(0.819\ (\ln\ [hardness])+3.7256)}]\ 0.277$

*Chronic dissolved criterion* $WER\ [e^{(0.819\ (\ln\ [hardness])+0.6848)}]\ 0.277$

Copper:

*Acute dissolved criterion* $WER\ [e^{(0.9422\ (\ln\ [hardness])-1.7)}]\ 0.908$

*Chronic dissolved criterion* $WER\ [e^{(0.8545\ (\ln\ [hardness])-1.702)}]\ 0.908$

Nickel:

*Acute dissolved criterion* $WER\ [e^{(0.846\ (\ln\ [hardness])+2.255)}]\ 0.846$

*Chronic dissolved criterion* $WER\ [e^{(0.846\ (\ln\ [hardness])+0.0584)}]\ 0.846$

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

Silver:

| | |
|---|---|
| *Acute dissolved criterion* | $WER\ [e^{(1.72\ (\ln[hardness])-6.59)}]\ 0.85$ |

Zinc:

| | |
|---|---|
| *Acute or dissolved criterion* | $WER\ [e^{(0.8473\ (\ln[hardness])+0.884)}]\ 0.950$ |
| *Chronic dissolved criterion* | $WER\ [e^{(0.8473\ (\ln[hardness])+0.884)}]\ 0.950$ |

4. Freshwater criteria for pentachlorophenol are expressed as a function of pH. Criteria are derived in accordance with the formula set forth below:

   $Acute\ criterion = e^{(1.005[pH]-4.869)}$

   $Chronic\ criterion = e^{(1.005[pH]-5.134)}$

5. Human health noncarcinogenic effect-based criteria are expressed as a 30-day average with no frequency of exceedance at or above the MA7CD10 flow.
6. Human health carcinogenic effect-based criteria are based on a risk level of one-in-one-million and are expressed as a 70-year average with no frequency of exceedance at or above the design flow as specified at N.J.A.C. 7:9B-1.5(c)2iii.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

## 7. SURFACE WATER QUALITY CRITERIA FOR TOXIC SUBSTANCES:

(µg/L)

| Toxic Substance | CAS Number | Fresh Water (FW2) Criteria | | | Saline Water (SE & SC) Criteria | | |
|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health |
| | | Acute | Chronic | | Acute | Chronic | |
| Acenaphthene | 83-32-9 | | | 670(h) | | | 990(h) |
| Acrolein | 107-02-8 | | | 6.1(h) | | | 9.3(h) |
| Acrylonitrile | 107-13-1 | | | 0.051(hc) | | | 0.25(hc) |
| Aldrin | 309-00-2 | 3.0 | | 0.000049(hc) | 1.3 | | 0.000050(hc) |
| Ammonia, un-ionized | 7664-41-7 | See N.J.A.C. 7:9B-1.14(e) | | | See N.J.A.C. 7:9B-1.14(e) | | |
| Anthracene | 120-12-7 | | | 8,300(h) | | | 40,000(h) |
| Antimony | 7440-36-0 | | | 5.6(h)(T) | | | 640(h)(T) |
| Arsenic | 7440-38-2 | 340(d)(s) | 150(d)(s) | 0.017(hc)(T) | 69(d)(s) | 36(d)(s) | 0.061(hc)(T) |
| Asbestos | 1332-21-4 | | | $7x10^6$fibers/L >10µm(h) | | | |
| Barium | 7440-39-3 | | | 2,000(h)(T) | | | |
| Benz(a)anthracene | 56-55-3 | | | 0.038(hc) | | | 0.18(hc) |
| Benzene | 71-43-2 | | | 0.15(hc) | | | 3.3(hc) |
| Benzidine | 92-87-5 | | | 0.000086(hc) | | | 0.00020(hc) |
| 3,4-Benzofluoranthene (Benzo(b)fluoranthene) | 205-99-2 | | | 0.038(hc) | | | 0.18(hc) |
| Benzo(k)fluoranthene | 207-08-9 | | | 0.38(hc) | | | 1.8(hc) |
| Benzo(a)pyrene (BaP) | 50-32-8 | | | 0.0038(hc) | | | 0.018(hc) |
| Beryllium | 7440-41-7 | | | 6.0(h)(T) | | | 42(h)(T) |
| alpha-BHC (alpha-HCH) | 319-84-6 | | | 0.0026(hc) | | | 0.0049(hc) |
| beta-BHC (beta-HCH) | 319-85-7 | | | 0.0091(hc) | | | 0.017(hc) |
| gamma-BHC (gamma-HCH/Lindane) | 58-89-9 | 0.95 | | 0.98(h) | 0.16 | | 1.8(h) |
| Bis(2-chloroethyl) ether | 111-44-4 | | | 0.030(hc) | | | 0.53(hc) |
| Bis(2-chloroisopropyl) ether | 108-60-1 | | | 1,400(h) | | | 65,000(h) |
| Bis(2-ethylhexyl) phthalate | 117-81-7 | | | 1.2(hc) | | | 2.2(hc) |
| Bromodichloromethane (Dichlorobromomethane) | 75-27-4 | | | 0.55(hc) | | | 17(hc) |
| Bromoform | 75-25-2 | | | 4.3(hc) | | | 140(hc) |
| Butyl benzyl phthalate | 85-68-7 | | | 150(h) | | | 190(h) |
| Cadmium | 7440-43-9 | (a) | (a) | 3.4(h)(T) | 40(d)(s) | 8.8(d)(s) | 16(h)(T) |
| Carbon tetrachloride | 56-23-5 | | | 0.33(hc) | | | 2.3(hc) |
| Chlordane | 57-74-9 | 2.4 | 0.0043 | 0.00010(hc) | 0.09 | 0.0040 | 0.00011(hc) |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| Toxic Substance | CAS Number | Fresh Water (FW2) Criteria | | | Saline Water (SE & SC) Criteria | | |
|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health |
| | | Acute | Chronic | | Acute | Chronic | |
| Chloride | 16887-00-6 | 860,000 | 230,000 | 250,000(ol) | | | |
| Chlorine Produced Oxidants (CPO) | 7782-50-5 | 19 | 11 | | 13 | 7.5 | |
| Chlorobenzene | 108-90-7 | | | 210(h) | | | 2,500(h) |
| Chloroform | 67-66-3 | | | 68(h) | | | 2,100(h) |
| 2-Chloronaphthalene | 91-58-7 | | | 1,000(h) | | | 1,600(h) |
| 2-Chlorophenol | 95-57-8 | | | 81(h) | | | 150(h) |
| Chlorpyrifos | 2921-88-2 | 0.083 | 0.041 | | 0.011 | 0.0056 | |
| Chromium | 7440-47-3 | | | 92(h)(T) | | | 750(h)(T) |
| $Chromium^{+3}$ | 16065-83-1 | (a) | (a) | | | | |
| $Chromium^{+6}$ | 18540-29-9 | 15(d)(s) | 10(d)(s) | | 1,100(d)(s) | 50(d)(s) | |
| Chrysene | 218-01-9 | | | 3.8(hc) | | | 18(hc) |
| Copper* | 7440-50-8 | (a) | (a) | 1,300(h)(T) | 4.8(d)(s) | 3.1(d)(s) | |
| Cyanide (Total) | 57-12-5 | 22(fc) | 5.2(fc) | 140(h) | 2.7(fc) | 2.7(fc) | 140(h) |
| 4,4'-DDD (p,p'-TDE) | 72-54-8 | | | 0.00031(hc) | | | 0.00031(hc) |
| 4,4'-DDE | 72-55-9 | | | 0.00022(hc) | | | 0.00022(hc) |
| 4,4'-DDT | 50-29-3 | 1.1 | 0.0010 | 0.00022(hc) | 0.13 | 0.0010 | 0.00022(hc) |
| Demeton | 8065-48-3 | | 0.1 | | | 0.1 | |
| Dibenz(a,h)anthracene | 53-70-3 | | | 0.0038(hc) | | | 0.018(hc) |
| Dibromochloromethane (Chlorodibromomethane) | 124-48-1 | | | 0.40(hc) | | | 13(hc) |
| Di-n-butyl phthalate | 84-74-2 | | | 2,000(h) | | | 4,500(h) |
| 1,2-Dichlorobenzene | 95-50-1 | | | 2,000(h) | | | 6,200(h) |
| 1,3-Dichlorobenzene | 541-73-1 | | | 2,200(h) | | | 8,300(h) |
| 1,4-Dichlorobenzene | 106-46-7 | | | 550(h) | | | 2,200(h) |
| 3,3'-Dichlorobenzidine | 91-94-1 | | | 0.021(hc) | | | 0.028(hc) |
| 1,2-Dichloroethane | 107-06-2 | | | 0.29(hc) | | | 28(hc) |
| 1,1-Dichloroethylene | 75-35-4 | | | 4.7(h) | | | 100(h) |
| trans-1,2-Dichloroethylene | 156-60-5 | | | 590(h) | | | 43,000(h) |
| 2,4-Dichlorophenol | 120-83-2 | | | 77(h) | | | 290(h) |
| 1,2-Dichloropropane | 78-87-5 | | | 0.50(hc) | | | 15(hc) |
| 1,3-Dichloropropene (cis and trans) | 542-75-6 | | | 0.34(hc) | | | 21(hc) |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| Toxic Substance | CAS Number | Fresh Water (FW2) Criteria | | | Saline Water (SE & SC) Criteria | | |
|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health |
| | | Acute | Chronic | | Acute | Chronic | |
| Dieldrin | 60-57-1 | 0.24 | 0.056 | 0.000052(hc) | 0.71 | 0.0019 | 0.000054(hc) |
| Diethyl phthalate | 84-66-2 | | | 17,000(h) | | | 44,000(h) |
| 2,4-Dimethyl phenol | 105-67-9 | | | 380(h) | | | 850(h) |
| 4,6-Dinitro-o-cresol | 534-52-1 | | | 13(h) | | | 280(h) |
| 2,4-Dinitrophenol | 51-28-5 | | | 69(h) | | | 5,300(h) |
| 2,4-Dinitrotoluene | 121-14-2 | | | 0.11(hc) | | | 3.4(hc) |
| 1,2-Diphenylhydrazine | 122-66-7 | | | 0.036(hc) | | | 0.20(hc) |
| Endosulfans (alpha and beta) | 115-29-7 | 0.22 | 0.056 | 62(h) | 0.034 | 0.0087 | 89(h) |
| Endosulfan sulfate | 1031-07-8 | | | 62(h) | | | 89(h) |
| Endrin | 72-20-8 | 0.086 | 0.036 | 0.059(h) | 0.037 | 0.0023 | 0.060(h) |
| Endrin aldehyde | 7421-93-4 | | | 0.059(h) | | | 0.060(h) |
| Ethylbenzene | 100-41-4 | | | 530(h) | | | 2,100(h) |
| Fluoranthene | 206-44-0 | | | 130(h) | | | 140(h) |
| Fluorene | 86-73-7 | | | 1,100(h) | | | 5,300(h) |
| Guthion | 86-50-0 | | 0.01 | | | 0.01 | |
| Heptachlor | 76-44-8 | 0.52 | 0.0038 | 0.000079(hc) | 0.053 | 0.0036 | 0.000079(hc) |
| Heptachlor epoxide | 1024-57-3 | 0.52 | 0.0038 | 0.000039(hc) | 0.053 | 0.0036 | 0.000039(hc) |
| Hexachlorobenzene | 118-74-1 | | | 0.00028(hc) | | | 0.00029(hc) |
| Hexachlorobutadiene | 87-68-3 | | | 0.44(hc) | | | 18(hc) |
| Hexachlorocyclopenta-diene | 77-47-4 | | | 40(h) | | | 1,100(h) |
| Hexachloroethane | 67-72-1 | | | 1.4(hc) | | | 3.3(hc) |
| Indeno(1,2,3-cd)pyrene | 193-39-5 | | | 0.038(hc) | | | 0.18(hc) |
| Isophorone | 78-59-1 | | | 35(hc) | | | 960(hc) |
| Lead | 7439-92-1 | 38(d)(s) | 5.4(d)(s) | 5.0(h)(T) | 210(d)(s) | 24(d)(s) | |
| Malathion | 121-75-5 | | 0.1 | | | 0.1 | |
| Manganese | 7439-96-5 | | | | | | 100(h)(T) |
| Mercury | 7439-97-6 | 1.4(d)(s) | 0.77(d)(s) | 0.050(h)(T) | 1.8(d)(s) | 0.94(d)(s) | 0.051(h)(T) |
| Methoxychlor | 72-43-5 | | 0.03 | 40(h) | | 0.03 | |
| Methyl bromide (bromomethane) | 74-83-9 | | | 47(h) | | | 1,500(h) |
| Methyl t-butyl ether (MTBE) | 1634-04-4 | | | 70(h) | | | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| Toxic Substance | CAS Number | Fresh Water (FW2) Criteria | | | Saline Water (SE & SC) Criteria | | |
|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health |
| | | Acute | Chronic | | Acute | Chronic | |
| Methylene chloride | 75-09-2 | | | 2.5(hc) | | | 310(hc) |
| Mirex | 2385-85-5 | | 0.001 | | | 0.001 | |
| Nickel | 7440-02-0 | (a) | (a) | 500(h)(T) | 64(d)(s) | 22(d)(s) | 1,700(h)(T) |
| Nitrate (as N) | 14797-55-8 | | | 10,000(h) | | | |
| Nitrobenzene | 98-95-3 | | | 17(h) | | | 690(h) |
| N-Nitrosodi-n-butylamine | 924-16-3 | | | 0.0063(hc) | | | 0.22(hc) |
| N-Nitrosodiethylamine | 55-18-5 | | | 0.00023(hc) | | | 0.13(hc) |
| N-Nitrosodimethylamine | 62-75-9 | | | 0.00069(hc) | | | 3.0(hc) |
| N-Nitrosodiphenylamine | 86-30-6 | | | 3.3(hc) | | | 6.0(hc) |
| N-Nitrosodi-n-propylamine (Di-n-propylnitrosamine) | 621-64-7 | | | 0.0050(hc) | | | 0.51(hc) |
| N-Nitrosopyrrolidine | 930-55-2 | | | 0.016(hc) | | | 34(hc) |
| Parathion | 56-38-2 | 0.065 | 0.013 | | | | |
| Pentachlorobenzene | 608-93-5 | | | 1.4(h) | | | 1.5(h) |
| Pentachlorophenol | 87-86-5 | (b) | (b) | 0.27(hc) | 13 | 7.9 | 3.0(hc) |
| Phenol | 108-95-2 | | | 10,000(h) | | | 860,000(h) |
| Phosphorous (yellow) | 7723-14-0 | | | | | 0.1 | |
| Polychlorinated biphenyls (PCBs) | 1336-36-3 | | 0.014 | 0.000064(hc) | | 0.030 | 0.000064(hc) |
| Pyrene | 129-00-0 | | | 830(h) | | | 4,000(h) |
| Selenium | 7782-49-2 | 20(s) | 5.0(s) | 170(h)(T) | 290(d)(s) | 71(d)(s) | 4,200(h)(T) |
| Silver | 7440-22-4 | (a) | | 170(h)(T) | 1.9(d)(s) | | 40,000(h)(T) |
| Sulfide-hydrogen sulfide (undissociated) | 7783-06-4 | | 2 | | | 2 | |
| 1,2,4,5-Tetrachlorobenzene | 95-94-3 | | | 0.97(h) | | | 1.1(h) |
| 2,3,7,8-Tetrachlorodibenzo-p-dioxin (TCDD) | 1746-01-6 | | | 0.0000000050(hc) | | | 0.0000000051(hc) |
| 1,1,2,2-Tetrachloroethane | 79-34-5 | | | 4.7(h) | | | 110(h) |
| Tetrachloroethylene | 127-18-4 | | | 0.34(hc) | | | 1.6(hc) |
| Thallium | 7440-28-0 | | | 0.24(h)(T) | | | 0.47(h)(T) |
| Toluene | 108-88-3 | | | 1,300(h) | | | 15,000(h) |
| Toxaphene | 8001-35-2 | 0.73 | 0.0002 | 0.00028(hc) | 0.21 | 0.0002 | 0.00028(hc) |
| 1,2,4-Trichlorobenzene | 120-82-1 | | | 21(h) | | | 42(h) |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| Toxic Substance | CAS Number | Fresh Water (FW2) Criteria | | | Saline Water (SE & SC) Criteria | | |
|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health |
| | | Acute | Chronic | | Acute | Chronic | |
| 1,1,1-Trichloroethane | 71-55-6 | | | 120(h) | | | 2,600(h) |
| 1,1,2-Trichloroethane | 79-00-5 | | | 13(h) | | | 350(h) |
| Trichloroethylene | 79-01-6 | | | 1.0(hc) | | | 12(hc) |
| 2,4,5-Trichlorophenol | 95-95-4 | | | 1,800(h) | | | 3,600(h) |
| 2,4,6-Trichlorophenol | 88-06-2 | | | 0.58(hc) | | | 1.0(hc) |
| Vinyl chloride | 75-01-4 | | | 0.082(hc) | | | 8.1(hc) |
| Zinc | 7440-66-6 | (a) | (a) | 7,400(h)(T) | 90(d)(s) | 81(d)(s) | 26,000(h)(T) |

(a) Criteria as listed at (f)3 above as formula

(b) Criteria as listed at (f)4 above as formula

(d) Criterion is expressed as a function of the Water Effect Ratio (WER). For criterion in the table, WER equates to the default value of 1.0.

(fc) Criteria expressed as free cyanide (as CN)/L

(h) Human health noncarcinogen

(hc) Human health carcinogen

(ol) Organoleptic effect-based criterion with no frequency of exceedance at or above the MA7CD10 flow

(s) Dissolved criterion

(T) Total recoverable criterion

* See N.J.A.C. 7:9B-1.14(g) for site-specific criteria.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

(g) Site-specific surface water quality criteria listed below apply to specific waterbodies that supersede the State-wide criteria listed at (d), (e), and (f) above. Any site-specific criterion developed through a Total Maximum Daily Load (TMDL) adopted as an amendment to the Statewide Water Quality Management Plan or the applicable Areawide Water Quality Management Plan in accordance with N.J.A.C. 7:15-5.4 shall be incorporated into this section. The Department shall publish a notice of administrative change in the New Jersey Register.

1.

| Toxic Substance | CAS Number | Freshwater Criteria | | | Saline water Criteria | | | Waterbodies |
|---|---|---|---|---|---|---|---|---|
| | | Aquatic | | Human Health | Aquatic | | Human Health | |
| | | Acute | Chronic | | Acute | Chronic | | |
| Copper (µg/L dissolved) | 7440508 | | | | 7.9 | 5.6 | | Newark Bay, Raritan Bay, Arthur Kill, Kill Van Kull, saline portions of the Passaic, Hackensack, and Hudson Rivers and saline portions of tributaries to all of these waters. |

2.

| Substance | Criteria | Duration | Waterbody | Associated HUC14 Name | Associated HUC14 Number |
|---|---|---|---|---|---|
| Total Phosphorus (mg/L)[(A)] | 0.050 | Annual average | Carnegie Lake (Mercer & Middlesex Counties) | Stony Bk (Princeton) | 02030105090090 |
| | | | | Millstone R (Rt. 1 to Cranbury Bk) | 02030105100140 |
| | | | | Millstone R (Heathcote Bk to Harrison St.) | 02030105110020 |
| | 0.053 | Annual average | Gordon Pond (Middlesex County) | Devils Brook | 02030105100110 |
| | 0.040 | Annual average | Grovers Mill Pond (Mercer County) | Bear Brook (below Trenton Road) | 02030105100130 |
| | 0.059 | Annual average | Peddie Lake (Mercer County) | Rocky Brook (below Monmouth Co line) | 02030105100050 |
| | 0.043 | Annual average | Plainsboro Pond (Middlesex County) | Cranbury Brook (below NJ Turnpike) | 02030105100090 |

(A) In accordance with the Amendment to the Lower Raritan/Middlesex, Mercer County, Monmouth County, Northeast, Upper Delaware and Upper Raritan Water Quality Management Plans; Total Maximum Daily Load Report for the Non-Tidal Raritan River Basin Addressing Total Phosphorus, Dissolved Oxygen, pH and Total Suspended Solids Impairments Watershed Management Areas 8, 9 and 10; adopted May 24, 2016 at 48 N.J.R. 1321(a)). The TMDL Report may be downloaded at https://www.nj.gov/dep/wms/bears/docs/raritan_tmdl_adopted.pdf.

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

3.

| Substance | Criteria | Duration | Waterbody | Associated HUC14 Name | Associated HUC14 Number |
|---|---|---|---|---|---|
| Chlorophyll *a* (μg/L)[(B)] | 20 | Seasonal average (June 15th to September 1st) | Dundee Lake | Passaic R Lwr (Dundee Dam to F.L. Ave) | 02030103120080 |
| | 10 | Seasonal average (June 15th to September 1st) | Wanaque Lake | Wanaque Reservoir (below Monks gage) | 02030103070050 |

(B) Chlorophyll *a* is a watershed-specific translator applicable for the lakes identified above where the total phosphorus criterion of 0.1 mg/L does not apply to the upstream waterbodies identified in Table (i) below in accordance with the Amendment to the Northeast, Upper Raritan, Sussex County and Upper Delaware Water Quality Management Plans; Total Maximum Daily Load Report for the Non-Tidal Passaic River Basin Addressing Phosphorus Impairments. Watershed Management Areas 3, 4 and 6; adopted April 24, 2008 at 40 N.J.R. 2574(b)). The TMDL Report may be downloaded at https://www.nj.gov/dep/wms/bears/docs/passaic_tmdl.pdf.

i. The total phosphorus criterion of 0.1 mg/L at N.J.A.C. 7:9B-1.14(d)4ii(1) does not apply to the following waterbodies:

| Waterbody | Associated HUC14 Name | Associated HUC14 Number |
|---|---|---|
| Passaic River from source to Dundee Lake Dam, including all named and unnamed tributaries | Passaic R Upr (above Osborn Mills) | 02030103010010 |
| | Passaic R Upr (Dead R to Osborn Mills) | 02030103010070 |
| | Passaic R Upr (Plainfield Rd to Dead R) | 02030103010110 |
| | Passaic R Upr (Snyder to Plainfield Rd) | 02030103010120 |
| | Passaic R Upr (40d 45m to Snyder Ave) | 02030103010130 |
| | Passaic R Upr (Columbia Rd to 40d 45m) | 02030103010150 |
| | Passaic R Upr (Hanover RR to Columbia Rd) | 02030103010160 |
| | Passaic R Upr (Rockaway to Hanover RR) | 02030103010170 |
| | Passaic R Upr (Pine Bk br to Rockaway) | 02030103010180 |
| | Passaic R Upr (Pompton R to Pine Bk) | 02030103040010 |
| | Passaic R Lwr (pump stn to Pompton R) | 02030103120100 |
| | Passaic R Lwr (Goffle Bk to pump stn) | 02030103120110 |
| | Passaic R Lwr (Fair Lawn Ave to Goffle) | 02030103120070 |
| | Passaic R Lwr (Dundee Dam to F.L. Ave) | 02030103120080 |
| High Mountain Brook, entire length | Meadow Brook/High Mountain Brook | 02030103070060 |
| Meadow Brook, entire length | Meadow Brook/High Mountain Brook | 02030103070060 |
| Wanaque River from Wanaque Reservoir dam to Pequannock River including all named and unnamed tributaries | Meadow Brook/High Mountain Brook | 02030103070060 |
| | Wanaque R/Posts Bk (below reservoir) | 02030103070070 |
| Posts Brook including all named and unnamed tributaries | Wanaque R/Posts Bk (below reservoir) | 02030103070070 |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | | |
|---|---|---|
| Ramapo River from Pompton Lake to Pompton River including all named and unnamed tributaries | Ramapo R (below Crystal Lake bridge) [P] | 02030103100070 [P] |
| Pompton River from confluence with Pequannock River to Passaic River, including all named and unnamed all tributaries | Pequannock R (below Macopin gage) [P] | 02030103050080 [P] |
| | Pompton River | 02030103110020 |
| Beaver Brook including all named and unnamed all tributaries | Lincoln Park tribs (Pompton River) | 02030103110010 |
| Preakness (Singac) Brook, entire length | Preakness Brook / Naachtpunkt Brook | 02030103120030 |
| Goffle Brook, entire length | Goffle Brook | 02030103120050 |
| Molly Ann Brook, entire length | Molly Ann Brook | 02030103120040 |
| Deepavaal Brook, entire length | Deepavaal Brook | 02030103120060 |
| Peckman River, entire length | Peckman River (above CG Res trib) | 02030103120010 |
| | Peckman River (below CG Res trib) | 02030103120020 |
| Canoe Brook, entire length | Canoe Brook | 02030103010140 |
| Slough Brook, entire length | Slough Brook | 02030103010190 |
| Crooked Brook including all named and unnamed all tributaries | Montville tribs. | 02030103030160 |
| Rockaway River, from downstream boundary of Jersey City (Boonton) Reservoir to Passaic River including all named and unnamed tributaries | Rockaway R (Passaic R to Boonton dam) | 02030103030170 |
| Whippany River from Washington Valley Road to Passaic River including all named and unnamed all tributaries | Greystone / Watnong Mtn tribs | 02030103020030 |
| | Whippany R (Lk Pocahontas to Wash Val Rd) | 02030103020040 |
| | Whippany R (Malapardis to Lk Pocahontas) | 02030103020050 |
| | Whippany R (Rockaway R to Malapardis Bk) | 02030103020100 |
| Dead River, entire length | Dead River (above Harrisons Brook) | 02030103010080 |
| | Dead River (below Harrisons Brook) | 02030103010100 |
| Harrisons Brook, entire length | Harrisons Brook | 02030103010090 |
| Primrose Brook, entire length | Primrose Brook | 02030103010020 |
| Loantaka Brook, entire length | Loantaka Brook | 02030103010040 |
| Great Brook including all named and unnamed all tributaries | Great Brook (above Green Village Rd) | 02030103010030 |
| | Great Brook (below Green Village Rd) | 02030103010050 |
| Malapardis Brook, entire length | Malapardis Brook | 02030103020060 |
| Black Brook, entire length | Black Brook (Hanover) | 02030103020070 |
| Black Brook including all named and unnamed all tributaries | Black Brook (Great Swamp NWR) | 02030103010060 |
| Troy Brook including all named and unnamed tributaries | Troy Brook (above Reynolds Ave) | 02030103020080 |
| | Troy Brook (below Reynolds Ave) | 02030103020090 |

P Partial HUC14

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

(c) The following surface water classifications are for waters of the Atlantic Coastal Basin:

| Waterbody | Classification |
|---|---|
| ABRAMS CREEK | |
| (Marmora) - Entire length, except portion outside the boundaries of the MacNamara Wildlife Management Area | FW2-NT/SE1(C1) |
| (Griscom) - Portions of the Creek and tributaries outside of the MacNamara Wildlife Management Area | FW2-NT/SE1 |
| ABSECON BAY (Absecon) - All waters within Absecon Wildlife Management Area | SE1(C1) |
| ABSECON CREEK | |
| (Egg Harbor) - North and South Branches from their origins downstream to the boundary of the Pinelands Protection and Preservation Area | PL |
| (Absecon) – Boundary of the Pinelands Protection and Preservation Area to Mill Road Dam | FW2-NT |
| (Absecon) - Mill Road Dam to Absecon Bay, except portions within Absecon Wildlife Management Area | SE1 |
| ARNOLD POND (Barnegat) | FW2-NT/SE1(C1) |
| ATLANTIC OCEAN | |
| (Offshore) - Waters from the shoreline out to the three mile limit, except areas described below | SC |
| (Beach Haven) - Waters of the Atlantic Ocean out to the State's three mile limit from Beach Haven Inlet to Cape May Point, excluding waters classified as Prohibited in accordance with N.J.A.C. 7:12 | SC(C1) |
| TRIBUTARIES, ATLANTIC OCEAN | |
| (New Jersey Coast) - All those streams or segments of streams that flow directly into the Atlantic Ocean or into back bays of the Ocean which are not included elsewhere in this list, are not within the boundaries of the Pinelands Protection or Preservation Areas | FW2-NT/SE1 |
| (Pinelands) - All streams or segments of streams which flow directly into the Atlantic Ocean or into back bays of the Ocean, are within the boundaries of the Pinelands Protection and Preservation Areas and are not classified as FW1 in this Table | PL |
| (New Jersey Coast) - All streams or segments of streams which flow directly into the Atlantic Ocean or into back bays of the Ocean, are not trout maintenance waters, and are not classified as FW1 in this Table | FW2-NT/SE1(C1) |
| BABCOCK CREEK (Marmora) - Entire length | FW2-NT/SE1(C1) |
| BALLANGER CREEK | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| (New Gretna) - Source to Pollys Ditch | FW2-NT/SE1 |
| (New Gretna) - Pollys Ditch to Bay | SE1(C1) |
| BANKS CREEK (Marmora) - Entire length | SE1(C1) |
| BARNEGAT BAY | |
| (Barnegat National Wildlife Refuge) - All waters within the boundaries of the Barnegat National Wildlife Refuge | SE1(C1) |
| (Barnegat Bay) - All waters of the Bay | SE1(C1) |
| (Island Beach State Park) - All freshwater ponds within the boundaries of Island Beach State Park | FW1 |
| (Island Beach State Park) - All waters in the Park, not classified as FW1 above | FW2-NT/SE1(C1) |
| BARNEGAT BAY TRIBUTARIES - See ATLANTIC OCEAN, TRIBUTARIES | |
| BASS RIVER | |
| (Oswego Lake) - Source to Pineland Protection and Preservation Area boundary at the Garden State Parkway, except those branches described separately below | PL |
| (New Gretna) - Pineland Protection and Preservation Area boundary to the boundary of shellfish waters | FW2-NT/SE1 |
| (New Gretna) - Boundary of shellfish waters to Mullica River | SE1(C1) |
| (Bass River State Forest) - Tommy's Branch from its headwaters to the Bass River State Forest Recreation Area service road | FW1 |
| (Bass River State Forest) - Falkenburg Branch of Lake Absegami from its headwaters to the Lake | FW1 |
| BATSTO RIVER | |
| (Browns Mills) - Entire length, except waters described separately below | PL |
| (Wharton) - Skit Branch and tributaries from their headwaters to the confluence with Robert's Branch | FW1 |
| (Wharton) - The easterly branches of the Batsto River from Batsto Village upstream to the confluence with Skits Branch | FW1 |
| BEACH THOROFARE (Margate) - Entire length | SE1(C1) |
| BEAR SWAMP BROOK | |
| (Howell)- Entire Length | FW2-NT(C1) |
| BIG ELDER CREEK | |
| (Sea Isle City) - Segment within the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1(C1) |
| (Sea Isle City) - Segment outside the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1 |
| BIG GRAVELING CREEK (Great Bay) - Entire length | SE1(C1) |
| BIG GREAVES CREEK | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| (MacNamara) - Segment of the Creek outside the boundaries of MacNamara Wildlife Management Area | SE1 |
| (MacNamara) - Creek and tributaries within the boundaries of MacNamara Wildlife Management Area | SE1(C1) |
| BIG THOROFARE | |
| (Tuckerton) - Source to boundary of Great Bay Blvd. Wildlife Management Area | SE1 |
| (Tuckerton) - Segment within the boundaries of Great Bay Blvd. Wildlife Management Area | SE1(C1) |
| BLUEFISH BROTHERS (Stone Harbor) - Entire length | SE1(C1) |
| BLUEFISH CREEK (Stone Harbor) - Entire length | SE1(C1) |
| BOG BRANCH CREEK (Middletown) - Entire length, except portions within the Pinelands Protection and Preservation Area | SE1(C1) |
| (Middletown) - Portions within the Pinelands Protection and Preservation Area | PL |
| BRIGANTINE (Edwin B. Forsythe National Wildlife Refuge) - All waters within the boundaries of the Edwin B. Forsythe National Wildlife Refuge, except portions of Cedar Creek and Cedar Run | FW2-NT/SE1(C1) |
| BRISBANE LAKE | |
| (Allaire State Park) - The Lake and its tributaries | FW2-NT(C1) |
| BROAD CREEK (New Gretna) - Entire length | SE1(C1) |
| BROAD THOROFARE | |
| (Longport) - South of Rt. 152 | SE1 |
| (Longport) - North of Rt. 152 | SE1(C1) |
| BROTHERS CREEK (Burleigh) - Entire length | SE1(C1) |
| CAPE MAY COASTAL WETLANDS WILDLIFE MANAGEMENT AREA | |
| (Strathmere) - All waters within the boundaries of Cape May Coastal Wetlands Wildlife Management Area | FW2-NT/SE1(C1) |
| CABBAGE THOROFARE (Great Bay) - Entire length | SE1(C1) |
| CEDAR BRIDGE BRANCH (Lakewood) - Entire length | FW2-NT |
| CEDAR CREEK | |
| (Manahawkin) - Source to boundaries of the Manahawkin Wildlife Management Area | FW2-NT/SE1 |
| (Manahawkin) - Creek and tributaries within the boundaries of the Manahawkin Wildlife Management Area | FW2-NT/SE1(C1) |
| CEDAR CREEK | |
| (Cedar Crest) - Source to the boundaries of the Pinelands Protection and Preservation Area at the Garden State Parkway, except branches described separately below | PL |
| (Berkeley) - Garden State Parkway to US Highway 9, except portions within Edwin B. Forsythe National Wildlife Refuge | FW2-NT |
| (Berkeley) – Portions within Edwin B. Forsythe National Wildlife Refuge | FW2-NT(C1) |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| (Berkeley) - US Highway 9 to Barnegat Bay, except portions within Edwin B. Forsythe National Wildlife Refuge | FW2-NT/SE1 |
| (Greenwood Forest) - Webbs Mill Branch and tributaries located entirely within the boundaries of Greenwood Forest Wildlife Management Area | FW1 |
| (Greenwood Forest) - Chamberlain's Branch from its origins to a point 1000 feet west of Route 539 | FW1 |
| (Greenwood Forest) - Those portions of the tributaries to Chamberlain's Branch originating and wholly contained within the boundaries of the Greenwood Forest Wildlife Management Area | FW1 |
| CEDAR HAMMOCKS CREEK (English Creek Landing) - Entire length | SE1(C1) |
| CEDAR RUN | |
| (Stafford) - Source to the boundaries of the Pinelands Protection and Preservation Area at the Garden State Parkway | PL |
| (Cedar Run) - Garden State Parkway to US Highway 9, except portions within Edwin B. Forsythe National Wildlife Refuge | FW2-NT |
| (Cedar Run) – portions within Edwin B. Forsythe National Wildlife Refuge upstream of US Highway 9 | FW2-NT(C1) |
| (Cedar Run) - US Highway 9 to the boundaries of the Barnegat National Wildlife Refuge, except portions within Edwin B. Forsythe National Wildlife Refuge | FW2-NT/SE1 |
| (Cedar Run) – portions within Edwin B. Forsythe National Wildlife Refuge downstream of US Highway 9 | FW2-NT/SE1(C1) |
| (Barnegat) - National Wildlife Refuge boundaries to Barnegat Bay | FW2-NT/SE1(C1) |
| CEDAR SWAMP CREEK | |
| (Cedar Spring) - Entire length, except segment described separately below | FW2-NT/SE1 |
| (Marmora) - Creek and tributaries within the boundaries of the MacNamara Wildlife Management Area | FW2-NT/SE1(C1) |
| CHAMBERLAIN BRANCH - See CEDAR CREEK | |
| CHANNEL CREEK (Barnegat Bay) - Entire length | SE1(C1) |
| CHARLEY CREEK (Marmora) - Entire length | FW2-NT/SE1(C1) |
| CLEAR STREAM (JACKSON) - Entire length | FW2-TM(C1) |
| COLLINS TIDE PONDS (Barnegat) | FW2-NT/SE1(C1) |
| COMMANDO CREEK (Marmora) - Entire length | SE1(C1) |
| CRANBERRY BROOK (Monmouth) - Entire length | FW2-NT/SE1 |
| DAVENPORT BROOK | |
| (Berkeley) - Source to the boundaries of the Pinelands Protection and Preservation Area at the Penn Central railroad tracks | PL |
| (Toms River) - Railroad tracks to confluence with Wrangel Brook | FW2-NT |

| | |
|---|---|
| DEEP CREEK (Herbertsville) - Entire length | FW2-NT |
| DEEP RUN (Wharton) - Run and tributaries from their sources to Springer's Brook | FW1 |
| DICKS BROOK (Larrabee's Crossing) - Entire length | FW2-NT(C1) |
| DINNER POINT CREEK (Staffordsville) - Entire length | SE1(C1) |
| DOCK THOROFARE (Northfield) - Entire length | SE1(C1) |
| DOUGHTY RESERVOIR (Atlantic city) | FW2-NT(C1) |
| DOVE MILL BRANCH - See TOMS RIVER | |
| EDWARD CREEK | |
| (Ocean City) - Source to the boundary of Cape May Coastal Wetlands Wildlife Management Area | SE1 |
| (Ocean City) - Boundary of Cape May Coastal Wetlands Wildlife Management Area to Horn Creek | SE1(C1) |
| FALKENBURG BRANCH - See BASS RIVER | |
| FLAT CREEK (Marmora) - Entire length | FW2-NT/SE1(C1) |
| FLATTERAS CREEK (Beach Haven Heights) - Entire length | SE1(C1) |
| FORKED RIVER | |
| (Lacey) - River and branches from their sources to the boundaries of the Pinelands Protection and Preservation Area at the Garden State Parkway | PL |
| (Forked River) - Garden State Parkway to Barnegat Bay | FW2-NT/SE1 |
| FORTESCUE (Fortescue) - All waters within the Fortescue Wildlife Management Area | FW2-NT/SE1(C1) |
| GIBSON CREEK | |
| (Gibson Landing) - Entire length, except segment described below | PL |
| (Marmora) - Segment and tributaries within the MacNamara Wildlife Management Area | FW2-NT/SE1(C1) |
| GLENDOLA RESERVOIR (Glendola) | FW2-NT(C1) |
| GO THROUGH CREEK | |
| (Burleigh) - Entire length, outside the boundaries of the Cape May Coastal Wetlands Wildlife Management Area | SE1 |
| (Burleigh) - Segment within the boundaries of the Cape May Coastal Wetlands Wildlife Management Area | SE1(C1) |
| GOING THROUGH CREEK (English Creek Landing) | SE1(C1) |
| GREAT BAY (Brigantine) - All waters of the Bay and all natural waterways which are tributary to the Bay and all waters, including both natural and manmade channels and ponds within the boundaries of the Edwin B. Forsythe National Wildlife Refuge and the Great Bay Wildlife Management Area | FW2-NT/SE1(C1) |
| GREAT EGG HARBOR RIVER | |
| (Berlin) - Source to confluence with Tinker Branch | FW2-NT |
| (Berlin) - Tinker Branch, the River from its confluence with Tinker Branch, and all tributaries within the Pinelands Protection and Preservation Area, | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| downstream to the boundary at the Rt. 40 bridge in Mays Landing | PL |
| (Winslow) - All tributaries or segments of tributaries outside of the boundaries of the Pinelands Protection and Preservation Area, downstream to Rt. 40 at Mays Landing | FW2-NT |
| (Mays Landing) - Rt. 40 bridge to Great Egg Harbor, except those tributaries described separately below | SE1 |
| (Mays Landing) - All tributaries or segments of tributaries within the boundaries of the Pinelands Protection and Preservation Areas | PL |
| (Egg Harbor) - Tributaries and all other waters within MacNamara Wildlife Management Area, except tributary described below | FW2-NT/SE1(C1) |
| (Tuckahoe) - Hawkins Creek and the stream adjacent to and north of Hawkin's Creek, and their tributaries, from their origins to the point where the influence of impoundment begins | FW1 |
| GREAT SOUND (Avalon) - All waters within Great Sound State Park | SE1(C1) |
| GREAT THOROFARE | |
| (Ventnor) - West of Rt. 40 | SE1(C1) |
| (Ventnor) - East of Rt. 40 | SE1 |
| GRISCOM CREEK (Gibson Landing) - Entire length | FW2-NT/SE1(C1) |
| GUNNING RIVER | |
| (Barnegat) - Entire length, except segment described below | FW2-NT/SE1 |
| (Barnegat) - Stream and tributaries within the boundaries of Barnegat National Wildlife Refuge | FW2-NT/SE1(C1) |
| HALFWAY CREEK | |
| (Middletown) - Source to the boundary of the MacNamara Wildlife Management Area | FW2-NT/SE1 |
| (MacNamara) - Creek and tributaries within the boundaries of the MacNamara Wildlife Management Area | SE1(C1) |
| HARRY POND (Barnegat) | FW2-NT/SE1(C1) |
| HATFIELD CREEK (Beach Haven Heights) - Entire length | SE1(C1) |
| HAWKINS CREEK | |
| (Tuckahoe) - Source to the point where the influence of impoundment begins | FW1 |
| (Tuckahoe) - Downstream of the influence of impoundment | SE1(C1) |
| HAY STACK BROOK (Howell) - Entire length | FW2-NT(C1) |
| HOSPITALITY CREEK (Longport) - Entire length | SE1(C1) |
| JACOVY CREEK (Stone Harbor) - Entire length | SE1(C1) |
| JAKES BRANCH | |
| (Berkeley) - Source to the boundaries of the Pinelands Protection and Preservation Area at the Garden State Parkway | PL |
| (Beachwood) - Garden State Parkway to Toms River | FW2-NT/SE1 |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| JAY CREEK | SE1(C1) |
| JIMMIES CREEK | |
| (Great Bay) - Source to the boundary of Great Bay Wildlife Management Area | SE1(C1) |
| (Parkers Landing) - Segments of the Creek outside the boundaries of Great Bay Wildlife Management Area | SE1 |
| JOSH CREEK (Stone Harbor) - Entire length | SE1(C1) |
| JUDIES CREEK | |
| (Great Bay) - Source to widening of creek | SE1 |
| (Great Bay) - Widening of creek to mouth | SE1(C1) |
| JUMPING BROOK (Neptune) - Entire length | FW2-NT/SE1 |
| KNOLL POND (Barnegat) | FW2-NT/SE1(C1) |
| LAKES BAY (Ventnor) | SE1(C1) |
| LAKES CHANNEL (Ventnor) - Entire length | SE1(C1) |
| LITTLE GREAVES CREEK (MacNamara) - Entire length | SE1(C1) |
| LITTLE SCOTCH BONNET | |
| (Stone Harbor) - Entire length, outside the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1 |
| (Stone Harbor) - Segment within the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1(C1) |
| LITTLE THOROFARE (Tuckerton) - Entire length | SE1(C1) |
| LONG BROOK (JACKSON) - Entire length | PL |
| LONG POINT CREEK (Marmora) - Entire length | FW2-NT/SE1(C1) |
| LONG SWAMP BROOK | |
| (Squankum) - Entire length | FW2-NT(C1) |
| LOWER LONG REACH (Stone Harbor) - Entire length | SE1(C1) |
| LUDLAM CREEK (Marmora) - Entire length | SE1(C1) |
| MAIN MARSH CREEK (Brigantine) - Entire length | SE1(C1) |
| MANAHAWKIN CREEK | |
| (Manahawkin) - Source to the boundaries of Manahawkin Wildlife Management Area | FW2-NT/SE1 |
| (Manahawkin) - Within the boundaries of the Wildlife Management Area | FW2-NT/SE1(C1) |
| MANASQUAN RESERVOIR (Oak Glen) | FW2-NT(C1) |
| TRIBUTARIES | |
| (Oak Glen) -All tributaries upstream of Manasquan Reservoir from source to the Reservoir | FW2-NT(C1) |
| MANASQUAN RIVER | |
| MAIN STEM | |
| (Freehold) - Source to Rt. 9 bridge, except tributaries described separately under Tributaries, below | FW2-NT |
| (Howell) - Rt. 9 bridge to the West Farms Road Bridge in Howell Township, except tributaries described separately under Tributaries, below | FW2-TM |
| (Howell) - West Farms Road Bridge in Howell Township to the downstream boundary of Manasquan River | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| Wildlife Management Area, except tributaries described separately | FW2-TM(C1) |
| (Brick) - Downstream boundary of Manasquan River Wildlife Management Area to surf waters | SE1 |
| TRIBUTARIES, MANASQUAN RIVER | |
| (Adelphia) - Entire length | FW2-NT |
| (Allaire) - Those portions of the first and second southerly tributaries west of the Hospital Rd. which are located entirely within the boundaries of Allaire State Park | FW1(tm) |
| (Mill Run) - Entire length of Mill Run, including Brisbane Lake and its tributaries, except easterly tributary to Mill Run described as FW1 below | FW2-NT(C1) |
| (Allaire State Park) - The easterly tributary to Mill Run upstream of Brisbane Lake, located entirely within the Allaire State Park boundaries | FW1 |
| (Freehold) - Tributaries within the boundaries of Turkey Swamp Wildlife Management Area | FW2-NT(C1) |
| MARSH BOG BROOK | |
| (Farmingdale) - Entire length | FW2-NT(C1) |
| MASONS CREEK (Marmora) - Entire length | SE1(C1) |
| MCNEALS BRANCH - See TUCKAHOE RIVER | |
| METEDECONK RIVER | |
| SOUTH BRANCH | |
| (Lakewood) - Entire length, including all tributaries | FW2-NT(C1) |
| NORTH BRANCH METEDECONK RIVER | |
| (Freehold) - Source to Aldrich Rd., including all tributaries | FW2-NT(C1) |
| (Lakewood) - Aldrich Rd. to Lanes Mills, except Haystack Brook listed separately | FW2-TM(C1) |
| (Brick) - Lanes Mills to confluence with Metedeconk River, South Branch, including the westerly tributary | FW2-NT(C1) |
| MAIN STEM METEDECONK RIVER | |
| (Brick) - Confluence of North and South branches to Forge Pond | FW2-NT(C1) |
| (Brick) - Forge Pond to Barnegat Bay | FW2-NT/SE1 |
| MIDDLE RIVER | |
| (Tuckahoe) - Entire length, except the segment described below | FW2-NT/SE1 |
| (Middletown) - Segment within the boundaries of MacNamara Wildlife Management Area | FW2-NT/SE1(C1) |
| MILE THOROFARE (Brigantine) - Entire length | SE1(C1) |
| MILL RUN (Allaire) - See BRISBANE LAKE | |
| MINGAMAHONE BROOK | |
| MAINSTEM | |
| (Farmingdale) - Entire length, except East Branch described separately below | FW2-TM(C1) |
| EAST BRANCH | |

| | |
|---|---|
| (Farmingdale) - Source to confluence with mainstem north of Farmingdale | FW2-NT(C1) |
| MIREY RUN | |
| (MacNamara) – Entire length, outside the boundaries of Pinelands Protection and Preservation Area | FW2-NT/SE1(C1) |
| (MacNamara) – Portion of the Run within the boundaries of the Pinelands Protection and Preservation Area | PL |
| MIRY RUN | |
| (Thelma) – Source to boundaries of the Pinelands Protection and Preservation Area | PL |
| (Catowba) – Boundaries of the Pinelands Protection and Preservation Area to Thelma Ave. | FW2-NT |
| (Catowba) – Thelma Ave. to Great Egg Harbor River | FW2-NT/SE1 |
| MOTT CREEK (Brigantine) - Entire length | SE1(C1) |
| MUD CREEK (MacNamara) - Entire length | SE1(C1) |
| MUDDY FORD BROOK (Larrabee's Crossing) - Entire length | FW2-TM(C1) |
| MULBERRY THOROFARE (Northfield) - Entire length | SE1(C1) |
| MULLICA RIVER | |
| (Berlin) - Source to Pinelands Protection and Preservation Area boundaries at the Garden State Parkway, except branches and tributaries described below | PL |
| (Wharton) - Stream in the southeasterly corner of the Wharton State Forest located between Ridge Rd. and Seaf Weeks Rd., downstream to the boundaries of the Wharton State Forest | FW1 |
| (Wharton) - Gun Branch from its headwaters to US Rt. 206 | FW1 |
| (New Gretna) - River and tributaries from the Pinelands Protection and Preservation Area boundary to Great Bay | SE1(C1) |
| (Wharton) - Brooks and tributaries between and immediately to the west of Tylertown and Crowleytown, from their headwaters to the head of tide at mean high water | FW1 |
| NARROWS CREEK (Middletown) - Entire length | SE1(C1) |
| NORTH CHANNEL POND (Stone Harbor) | FW2-NT/SE1(C1) |
| OLDMAN CREEK (Stone Harbor) - Entire length | SE1(C1) |
| OLD ROBINS BRANCH | |
| (North Dennis) –Source to Pinelands Area boundary | PL |
| (North Dennis) –Pinelands Area boundary to Dennis Creek | FW2-NT/SE1(C1) |
| OTTER CREEK (Middletown) - Entire length | SE1(C1) |
| OYSTER CREEK | |
| (Brookville) - Source to the boundaries of the Pinelands Protection and Preservation Area at the Garden State Parkway | PL |
| (Forked River) - Garden State Parkway to Barnegat Bay | FW2-NT/SE1 |
| OYSTER CREEK (Great Bay) - Entire length | SE1(C1) |
| REEVY BRANCH - See SHARK RIVER | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| RING ISLAND CREEK (Stone Harbor) - Entire length | SE1(C1) |
| RISLEY CHANNEL (Margate) - Entire length | SE1(C1) |
| ROUNDABOUT CREEK (New Gretna) - Entire length | SE1(C1) |
| SALT CREEK (Stone Harbor) - Entire length | SE1(C1) |
| SCULL BAY (Linwood) | SE1(C1) |
| SEDGE CREEK (MacNamara) - Entire length | SE1(C1) |
| SHARK CREEK (Stone Harbor) - Entire length | SE1(C1) |
| SHARK RIVER (See also SHARK RIVER BROOK) | |
| (Glendola) - Remsen Mill Road to Atlantic Ocean | SE1 |
| SHARK RIVER BROOK (See also SHARK RIVER) | |
| (Colts Neck) - Source to Rt. 33, including all tributaries | FW2-NT(C1) |
| (Neptune) - Rt. 33 to Remsen Mill Road, including all tributaries, except Reevy Branch designated otherwise | FW2-TM(C1) |
| REEVY BRANCH (Reevytown) - Source to confluence with Shark River Brook, including all tributaries | FW2-NT(C1) |
| SHELL THOROFARE (Wildwood Gables) - Entire length | SE1(C1) |
| SHELTER ISLAND BAY (Margate) | SE1(C1) |
| SHELTER ISLAND WATERS (Margate) - Entire length | SE1(C1) |
| SKIT BRANCH - See BATSTO RIVER | |
| SOD THOROFARE (Linwood) - Entire length | SE1(C1) |
| SOUTHEAST CREEK (Stone Harbor) - Entire length | SE1(C1) |
| SQUANKUM BROOK | |
| (Squankum) - Entire length | FW2-NT(C1) |
| STEELMAN BAY (Somers Point) | SE1(C1) |
| SWAN POND (Marmora) | FW2-NT/SE1(C1) |
| SWAN POND RACE (Marmora) - Entire length | FW2-NT/SE1(C1) |
| TAUGH CREEK | |
| (Whitesboro) - Entire length, within the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1(C1) |
| (Whitesboro) - Portions outside the boundaries of Cape May Coastal Wetlands Wildlife Management Area | SE1 |
| TIMBER SWAMP BROOK | |
| (Oak Glen) - Manasquan Reservoir dam to its confluence with the Manasquan River | FW2-NT(C1) |
| TINKER BRANCH - See GREAT EGG HARBOR RIVER | |
| TITMOUSE BROOK (Howell) - Entire length | FW2-TM(C1) |
| TOMMYS BRANCH - See BASS RIVER | |
| TOMS RIVER | |
| MAIN STEM | |
| (Holmeson) - Source to Cassville Road bridge except those tributaries described separately under Tributaries below | FW2-NT |
| (Cassville) – Cassville Road bridge to the Route 528 bridge, including all tributaries | FW2-NT(C1) |
| (Whitesville) - Route 528 bridge to Pinelands Protection and Preservation Area boundaries at the NJ Central | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| Railroad tracks, except tributaries described separately, under Tributaries below | PL(tm) |
| (Manchester) - NJ Central Railroad tracks to the Route 571 bridge, except tributaries described separately, under Tributaries below | FW2-TM(C1) |
| (Toms River) - Route 571 bridge to the Route 37 bridge, except tributaries described separately, under Tributaries below | FW2-NT(C1) |
| (Toms River) - Route 37 bridge to Barnegat Bay, except tributaries described separately, under Tributaries below | FW2-NT/SE1 |
| TRIBUTARIES, TOMS RIVER | |
| (Holmeson) - Tributaries within the boundaries of the Pinelands Protection and Preservation Area | PL |
| (West of Pleasant Grove) – Source to the Pinelands Protection and Preservation Area boundary, including all tributaries | FW2-TM(C1) |
| (Toms River) - All tributaries within the boundaries of the Pinelands Protection and Preservation Area | PL |
| (Archer's Corners) - All tributaries outside the boundaries of the Pinelands Protection Area and within the boundaries of Colliers Mills Wildlife Management Area | FW2-NT(C1) |
| DOVE'S MILL BRANCH | |
| (Van Hiseville) - Source to Bunker Hill Lake, including all tributaries | FW2-NT(C1) |
| MAPLE ROOT BRANCH (Jackson) - Source to confluence with Toms River | PL |
| WRANGEL BROOK | |
| (Whiting) – Source to Green Branch, including all tributaries but not including Green Branch and portions within the boundaries of the Pinelands Protection and Preservation Area | FW2-NT(C1) |
| (Manchester) – Green Branch to the confluence with Davenport Branch, except portions within the boundaries of the Pinelands Protection and Preservation Area | FW2-NT |
| (Berkeley) – Davenport Branch to Toms River, except portions within the boundaries of the Pinelands Protection and Preservation Area | FW2-NT/SE1 |
| TUCKAHOE LAKE (Tuckahoe) | FW2-NT(C1) |
| TUCKAHOE RIVER | |
| (Milmay) - Source to Pinelands Protection and Preservation Area boundary at Rt. 49 | PL |
| (Head of River) - McNeals Branch and the River within the boundaries of the Peaselee Wildlife Management Area, except tributaries within the boundaries of the | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| Pinelands Protection and Preservation Area, described separately below | FW2-NT/SE1(C1) |
| (Head of River) - Tributaries within the Pinelands Protection and Preservation Area boundaries | PL |
| (Tuckahoe) - Edge of Fish and Wildlife Management Area at confluence with Warners Mill Stream to Great Egg Harbor, except segment described separately below | FW2-NT/SE1(C1) |
| (Tuckahoe) - River, tributaries and all other waters within boundaries of the MacNamara Wildlife Management Area | FW2-NT/SE1(C1) |
| TUCKERTON CREEK | |
| (Tuckerton) – Source to Pinelands Area boundary | PL |
| (Tuckerton) – Pinelands Area boundary to Pohatcong Lake, including all tributaries | FW2-NT/SE1(C1) |
| (Tuckerton) - Pohatcong Lake to Little Egg Harbor | FW2-NT/SE1 |
| TULPEHOCKEN CREEK | |
| (Wharton) - Creek and tributaries from their origin to the confluence with Featherbed Branch | FW1 |
| (Wharton) - The westerly tributaries and those natural ponds within the lands bounded by Hawkins (Bulltown-Hawkins) Rd., Hampton Gate (Tuckerton) Rd., and Sandy Ridge Rd. | FW1 |
| TURTLE GROUND CREEK (Jeffers Landing) - Entire length | SE1(C1) |
| TURTLE GUT (Ventnor) - Entire length | SE1(C1) |
| WADING RIVER | |
| (Chatsworth) - Entire length, except tributaries described separately below | PL |
| (Greenwood Forest) - Westerly tributary to Howardsville Cranberry Bog Reservoir and other tributaries located entirely within the boundaries of the Greenwood Forest Wildlife Management Area | FW1 |
| WARNERS MILL STREAM | |
| (Head of River) - Source to Pinelands Protection and Preservation Area boundary at Aetna Dr. | PL |
| (Head of River) - Aetna Dr. to boundary of the Peaselee Wildlife Management Area | FW2-NT/SE1 |
| (Head of River) - Within the boundaries of the Peaselee Wildlife Management Area to the Tuckahoe River | FW2-NT/SE1(C1) |
| WEBBS MILL BRANCH - See CEDAR CREEK | |
| WESTECUNK CREEK | |
| (Eagleswood) - Source to Pinelands Area boundary | PL |
| (Eagleswood) - Pinelands Area boundary to Railroad Ave., including all tributaries | FW2-NT/SE1(C1) |
| (Eagleswood) - Railroad Ave. to Little Egg Harbor | FW2-NT/SE1 |
| WIGWAM CREEK | |
| (Great Bay) - Source to Rt. 9 | FW2-NT/SE1 |
| (Great Bay) - Rt. 9 to Mott Creek | SE1(C1) |

| | |
|---|---|
| WINTER CREEK (New Gretna) - Entire length | SE1(C1) |
| WHIRLPOOL CHANNEL (Margate) - Entire length | SE1(C1) |
| WORLDS END CREEK (New Gretna) - Entire length | SE1(C1) |
| WRANGLE CREEK (Forked River) - Entire length and all waters within Forked River Game Farm | FW2-NT/SE1(C1) |
| WRECK POND BROOK (Wall) - Entire length | FW2-NT |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

(h) The following surface water classifications are for waters of the Lower Raritan River and Raritan Bay Basin:

| Waterbody | Classification |
|---|---|
| BARCLAY BROOK (Redshaw Corners) - Entire length | FW2-NT |
| BEAR BROOK (West Windsor) - Entire length | FW2-NT |
| BIG BROOK (Vanderberg) - Entire length, including all tributaries and lakes | FW2-NT(C1) |
| BLACKBERRY CREEK | |
| (Oceanport) - Source to a line beginning on the easternmost extent of Gooseneck Point and bearing approximately 162 degrees True North to its terminus on the westernmost extent of an unnamed point of land in the vicinity of the western extent of Cayuga Ave. in Oceanport | SE1 |
| (Oceanport) - Creek below the line described above | SE1(C1) |
| BRANCHPORT CREEK | |
| (Long Branch) - Source to a line beginning on the northernmost extent of an unnamed point of land lying north of Pocano Ave. in Oceanport and bearing approximately 055 degrees True North to its terminus on the westernmost extent of the northern bulkhead at the lagoon located between France Rd. and Lori Rd. in Monmouth Beach | FW2-NT/SE1 |
| (Monmouth Beach) - Creek below line described above | SE1(C1) |
| CEDAR BROOK (Spotswood) - Entire length | FW2-NT |
| CHEESEQUAKE STATE PARK WATERS (S. Amboy) - Fresh waters within the park upstream of the limits of tidal influence | FW2-NT(C1) |
| CLAYPIT CREEK | |
| (Navesink) - Source to widening of the Creek near Linden Ave. and just north to the Locust Ave. bridge in Navesink | FW2-NT/SE1 |
| (Navesink) - Widening of Creek to Navesink River | SE1(C1) |
| CRANBURY BROOK (Old Church) - Entire length | FW2-NT |
| DEEP RUN (Old Bridge) - Entire length | FW2-NT |
| DEVILS BROOK (Schalks) - Entire length | FW2-NT |
| GANDER BROOK (Manalapan) - Entire length | FW2-NT |
| GREAT DITCH (S. Brunswick) - That portion of Great Ditch and its tributaries within Pigeon Swamp State Park | FW2-NT(C1) |
| IRELAND BROOK (Paulus Corners) - Entire length | FW2-NT |
| IRESICK BROOK (Spotswood) - Entire length | FW2-NT |
| LAWRENCE BROOK | |
| (Deans) - Source to the intake of the New Brunswick Water Department at Weston's Mill Dam | FW2-NT |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| (New Brunswick) - Weston's Mill Dam to Raritan River | SE1 |
| LITTLE SILVER CREEK | |
| (Shrewsbury) - Source to a line beginning on the eastern bank of that unnamed lagoon located between Wardell Ave. and Oakes Rd. in Rumson and bearing approximately 171 degrees T (True North) to its terminus on the south shore of Little Silver Creek | FW2-NT/SE1 |
| (Rumson) - Creek below line described above | SE1(C1) |
| MANALAPAN BROOK | |
| (Jamesburg) - Source to Duhernal Lake dam, except tributary described separately below | FW2-NT |
| (Tennent) - That portion of the tributary at Tennent along the boundary of Monmouth Battlefield State Park | FW2-NT(C1) |
| MATCHAPONIX BROOK (WEAMACONK CREEK) | |
| (Mount Mills) - Entire length, except segments described below | FW2-NT |
| (Freehold) - The brook and tributaries within the boundaries of Monmouth Battlefield State Park | FW2-NT(C1) |
| MCGELLAIRDS BROOK | |
| (Englishtown) - Entire length, except tributary described separately below | FW2-NT |
| (Freehold) - Tributary within Monmouth Battlefield State Park | FW2-NT(C1) |
| MILLSTONE RIVER (Hightstown) - Entire length | FW2-NT |
| MINE BROOK (Colts Neck) - Entire length, including all tributaries | FW2-NT(C1) |
| NAVESINK RIVER | |
| (Red Bank) - Source to a line starting at a point at the northeast end of Blossom Cove, bearing approximately 142 degrees T (True North), through navigational aid C23 to the south bank near Riverview Hospital | SE1 |
| (Rumson) - River southeast of the line described above, except segment described below | SE1(C1) |
| (Monmouth Beach) - All water south and east of a line beginning on the northwesternmost point of land on Raccoon Island (in the vicinity of the western extent of Highland Ave.) in Monmouth Beach, and bearing approximately 056 degrees T (True North) to the southernmost point of a small unnamed island, and then bearing approximately 091 degrees T (True North) to its terminus on the northernmost point of land located at the northern extent of Monmouth Parkway in Monmouth Beach and all waters south of a line beginning on the western shoreline (just east of Monmouth Parkway in Monmouth Beach) and bearing approximately 081 degrees T (True North), intersecting Channel Marker Flashing Red 4 and | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| Channel Marker Flashing Red 2 and terminating on the eastern shoreline of the Galilee section of Monmouth Beach. | SE1 |
| OAKEYS BROOK (Deans) - Entire length | FW2-NT |
| OCEANPORT CREEK | |
| (Fort Monmouth) - Source to a line beginning on the easternmost extent of Horseneck Point and bearing approximately 140 degrees T (True North) to its terminus on the westernmost extent of an unnamed point of land located at the westernmost extent of Monmouth Boulevard in Oceanport | FW2-NT/SE1 |
| (Oceanport) - Creek downstream of line described above | SE1(C1) |
| PARKERS CREEK | |
| (Fort Monmouth) - Source to a line beginning on the easternmost extent of Horseneck Point and bearing approximately 000 degrees T (True North) to its terminus on Breezy Point on the Little Silver side (north) side of the creek | FW2-NT/SE1 |
| (Fort Monmouth) - Creek downstream of line described above | SE1(C1) |
| PINE BROOK (Clarks Mills) - Entire length | FW2-NT |
| PINE BROOK (Cooks Mill) - Entire length | FW2-TM |
| RAMINESSIN (HOP) BROOK (Holmdel) - Entire length, including all tributaries | FW2-TM(C1) |
| SANDY HOOK BAY (Sandy Hook) | SE1 |
| SHREWSBURY RIVER | |
| (Little Silver) - Source to Rt. 36 highway bridge | SE1(C1) |
| (Highlands) - Rt. 36 bridge to Sandy Hook Bay | SE1 |
| SOUTH RIVER | |
| (Old Bridge) - Duhernal Lake to intake of the Sayreville Water Department | FW2-NT |
| (Sayreville) - Below the intake of the Sayreville Water Department | SE1 |
| SWIMMING RIVER RESERVOIR (Red Bank) | FW2-NT(C1) |
| TRIBUTARIES (Swimming River Reservoir) – All unnamed and unlisted tributaries to Swimming River Reservoir | FW2-NT(C1) |
| SWIMMING RIVER | |
| (Red Bank) - Swimming River Reservoir dam to Normandy Road | FW2-NT |
| (Red Bank) - Normandy Road to the Navesink River | SE1 |
| TENNENT BROOK (Old Bridge) - Entire length | FW2-NT |
| TEPEHEMUS BROOK (Manalapan) - Entire length | FW2-NT |
| TOWN NECK CREEK | |
| (Little Silver) - Source to a line beginning on the easternmost extent of the unnamed point of land located just east of Paag Circle on the south bank of Town Neck | |

THIS IS A COURTESY COPY OF THIS RULE. ALL OF THE DEPARTMENT'S RULES ARE COMPILED IN TITLE 7 OF THE NEW JERSEY ADMINISTRATIVE CODE.

| | |
|---|---|
| Creek and bearing approximately 095 degrees True North and terminating on Silver Point | FW2-NT/SE1 |
| (Little Silver) - Creek below the line described above | SE1(C1) |
| WEAMACONK CREEK - See MATCHAPONIX BROOK | |
| WEMROCK BROOK | |
| (Millhurst) - Entire length, except that segment described below | FW2-NT |
| (Monmouth Battlefield State Park) - Those segments of the brook and its tributaries within the boundaries of Monmouth Battlefield State Park | FW2-NT(C1) |
| WEMROCK POND (Monmouth Battlefield State Park) | FW2-NT(C1) |
| WILLOW BROOK (Holmdel) - Entire length, including all tributaries | FW2-NT(C1) |
| YELLOW BROOK (Colts Neck) - Entire length, including all tributaries | FW2-NT(C1) |

# DECLARATION OF JOYCE YEUNG

I, Joyce Yeung, declare as follows:

1. I am the Associate Director of Membership at the Natural Resources Defense Council, Inc. (NRDC). I have held this position since 2022 and have worked at NRDC in the membership department for more than 21 years.

2. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission. My duties also include supervising the maintenance and updating of NRDC's membership database, which is a listing of those persons who are members of NRDC.

3. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under Section 501(c)(3) of the United States Internal Revenue Code.

4. NRDC currently has hundreds of thousands of members nationwide, including more than 10,000 members in New Jersey and more than 25,000 members in New York.

5. When an individual becomes a member of NRDC, they authorize NRDC to take legal action on their behalf to protect the environment and public health.

6. NRDC's mission statement declares that the organization's purpose is "to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends."

7. In support of this mission, for over fifty years NRDC has worked to protect water quality and natural resources throughout the New York-New Jersey Harbor Estuary. Since the 1970s, for example, NRDC has been at the forefront of efforts to address toxic PCB contamination in the Hudson River, pollution that over time has also spread throughout the Harbor. Beginning in the 1970s, NRDC also helped expand the federal Gateway National Recreation Area, which provides important recreational space for urban residents and now covers 26,000 acres in New Jersey and New York. And for many decades NRDC has sought—including through federal court litigation—to limit the dredging and the release of toxic sediments buried throughout the Harbor, and has advocated for the protection of whales, dolphins, and other marine life throughout the New York-New Jersey Harbor Estuary.

8. As a continuation of this longstanding body of work to protect the Harbor Estuary, NRDC has opposed the construction and operation of the Northeast Supply Enhancement (NESE) natural gas pipeline expansion project through the Estuary since it was first proposed in 2017.

9. NRDC's lawsuits challenging approvals for the NESE Project further NRDC's mission and its longstanding efforts to protect the Estuary from harmful pollution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 4, 2026, in New York, NY.

Joyce Yeung

**DECLARATION OF KATIE LEUNG**

I, Katie Leung, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC in 2020 because of its work protecting wildlife and ecosystems, particularly in the New York City area.

2. I currently work as the Senior Volunteer and Outreach Coordinator at Riverkeeper, which is a nonprofit focused on issues affecting the Hudson River. I previously worked at the New York City Department of Parks & Recreation. I submit this declaration in my personal capacity.

3. I was born and raised on Staten Island, near Rossville, and lived there for over 30 years. Since 2021, I have spent most of my time in Westchester County for work, but my home remains in Staten Island. I return to Staten Island multiple times monthly to see my parents, cousins, aunts, and uncles, and to enjoy the natural resources I grew up around, including the Raritan Bay and Conference House Park, on the southernmost tip of the Island. I return to Conference House Park several times each year to walk through its natural areas and observe wildlife on the beach. I also frequent parks on the interior of Staten Island, including Greenbelt and Fresh Kills. I particularly enjoy observing horseshoe crabs along Raritan Bay, which are an ecologically important local species and are living fossils, capturing the history of New York City's natural ecosystems.

4. Due in part to my previous work for New York City's Department of Parks & Recreation, I am passionate about New York City's various natural resources. This includes Rockaway Beach, which is home to a rare colony of endangered piping plovers. I enjoy visiting Rockaway Beach and Breezy Point to observe those birds and other wildlife off the coast, including ospreys, dolphins, and whales. I deeply value the biodiversity of New York City's parks, which has noticeably improved over the course of my lifetime.

5. I also am invested in New York's special places and wildlife with my growing extended family. My sister in Georgia has two children, a five- and one-year-old, and my sister-in-law in Westchester is currently pregnant and expecting a baby girl soon. I want to show all three children the natural areas I have grown to love and to teach them about the local wildlife.

6. I am concerned that the construction of the Northeast Supply Enhancement (NESE) pipeline would harm my interests in enjoying these special places and the wildlife that live there. I worry that the pipeline, if constructed along its proposed route, would irreparably damage New York City's biodiversity by contaminating the water in the Lower Bay, around the Rockaway Peninsula and Breezy Point, and in the New York Bight. All those areas have seen a return of wildlife as the legacy pollutants settled into the sediment on the ocean floor. The NESE pipeline's construction would re-release those harmful pollutants into the

water column. I worry that the damage to water quality in those areas would be so disruptive that the wildlife I love, and the ecosystems they rely on, would be at risk of disappearing. For similar reasons, I worry that the NESE pipeline would prevent me from introducing the children in my family to the natural ecosystems and wildlife that are so important to me.

7. I also currently enjoy eating locally sourced seafood. If the NESE pipeline is constructed, I would be concerned about eating any seafood from the Bay because of the risk of seafood containing the legacy contaminants stirred up by pipeline's construction.

8. I support NRDC's lawsuit challenging approvals for the NESE pipeline because I believe that the pipeline will cause devastating pollution to Raritan Bay, the Rockaway Peninsula, the Lower Harbor, and the New York Bight, harming the wildlife that I care deeply about and the larger New York City community that enjoys those special natural resources.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on 17 November, 2025.

Katie Leung

Katie Leung

**DECLARATION OF JAMES SCARCELLA**

I, James Scarcella, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC). My wife, Margaret, and I joined NRDC in 2020 because of its work to protect New York's waters and wetlands, an issue that I am very passionate about. In fact, before I joined NRDC, I had been aware of and supported NRDC's work from the sidelines for decades. Starting in the early 1990s, I volunteered with the Natural Resources Protective Association (NRPA) as part of its Dredge Material Management Group, which worked in coalition with NRDC, Port Authority, New York State Department of Environmental Conservation, and other interested parties. We met regularly at NRDC's New York offices to review digging projects that were being proposed in the New York–New Jersey Harbor Estuary and to discuss innovative solutions to the harms of dredging, such as using dredge spoils as landfill cover or in remediation of brownfield sites.

2. I am also a member of NY/NJ Baykeeper.

3. I am now retired, but I previously worked at the New York City Housing Authority.

4. I was born and raised on Staten Island, and the water around the Island has always been at the center of my life. I even like to say that loving the

water is in my family's blood: My grandfather was a boatbuilder who immigrated to the United States from Portugal.

5. I grew up near Great Kills Harbor, which has a large boating and recreational fishing community. My father and my uncle were members of the Great Kills Yacht Club. My three brothers, sister, and I would go out boating, sailing, and crabbing with our dad and uncle throughout our childhoods.

6. I have many fond memories of going out on the water with my family, and I continued the tradition with my own son, Christopher. My younger brother John had a boat that we would go out on every summer of Christopher's childhood to fish and swim. I also taught Christopher about the importance of protecting the water, and he would join me to volunteer with NY/NJ Baykeeper. Together, we collected samples for water quality testing and kept a list of the trash that we collected on the beaches to help with the Floatables Monitoring Program. It was wonderful to be able to pass down my love of the water to Christopher, and I hope that future generations will also be able to experience everything that the water has to offer.

7. My wife and I still live on Staten Island with Christopher, Christopher's partner, and our family dog, Nala. Our current home is less than a 15-minute walk to the Lower New York Bay waterfront.

8. Enjoying the waterfront is a daily part of my life. I try to get out for a walk or bike ride along the waterfront every day. I also swim in either the Lower New York Bay or Raritan Bay nearly every day that is warm enough, from early spring through late fall. I even take a plunge on New Year's Day after my annual hike at Gateway National Recreation Area. Swimming in the ocean gives me a psychological boost that I cannot get anywhere else. My brother John and I have continued our family tradition of kayaking and canoeing together a few times each year. Just earlier this summer, we went kayaking near Sandy Hook in Raritan Bay.

9. I also take advantage of the local seafood the bays have to offer. About six to eight times a year, I cast out a lure to fish from Great Kills Park, about where Raritan Bay meets Lower New York Bay. While I generally don't catch a ton myself, I enjoy the chance to spend more time out on the water and the occasional good luck of bringing some fish home to cook and eat. My brother's neighbor is a more avid fisherman, and my family and I greatly enjoy eating the delicious filets from the striped bass that he catches and occasionally shares with us.

10. Given the central role the waters around Staten Island play in my life, I have spent much of my retirement volunteering to safeguard them. I serve as a beach captain with the American Littoral Society, where I partner with groups like NYC H2O to help organize beach sweeps at least once to twice a month to clean

up the beaches, shorelines, and waterfront parks on Staten Island. The sweeps are often attended by high school students that are trying to serve their community while also learning about New York's local ecology. I have also volunteered with the New York City Department of Parks and Recreation's Natural Resources Group to help restore New York's salt marshes by helping to plant saltmarsh cordgrass and other native plants. I have continued to volunteer with NY/NJ Baykeeper to help protect water quality through water sampling and beach cleanups, and I am a dues-paying member of several environmental organizations.

11. Because of my love for the water, I am very worried about the plans to construct the Northeast Supply Enhancement (NESE) pipeline and the damage that it will cause to the underwater ecology of the Lower New York Bay and Raritan Bay. The pipeline's construction will cause massive sediment disturbance that will be harmful to the bays' marine life, from microorganisms all the way up to large marine mammals. I fear that many fish and shellfish will die and wash up onto the beaches that I and many others love to frequent. Even animals who do not live in the water will be affected. For instance, the small but growing bald eagle population on Staten Island would be severely harmed by any reduction of menhaden, a small fish that is a key element of the eagles' diet. Furthermore, the toxins and heavy metals that the dredging will release into the water can

bioaccumulate up the food chain, risking the health of the animals and people who eat seafood from the bays—including me and my family.

12. Construction of the NESE pipeline would have a large impact on me personally. If construction moves forward, I will be concerned about the water pollution in the parts of the bays I swim, fish, and kayak in. I would no longer feel comfortable going out to swim in the bays, which would take a significant toll on my mental health. My brother and I would not go out to kayak or canoe as often, if ever. I would stop going out to fish, and I would be nervous about eating any fish or other seafood from the bays due to my fears about toxins bioaccumulating up the food chain.

13. I fully support NRDC's lawsuit challenging approvals for the NESE pipeline because I believe that the pipeline will cause devastating harm to the water that I have loved, enjoyed, and sought to protect since my childhood. I have worked to oppose the pipeline going back several years, including volunteering with Food and Water Watch to urge New York's government to deny the pipeline's construction permit because of its incompatibility with the state's water quality standards. While I understand that underwater infrastructure requires updates and maintenance, the construction of an entirely new, incredibly damaging pipeline does not make any sense to me. I hope that this lawsuit can prevent the

construction of the pipeline and the inevitable harm it will cause, so that I, others in my community, and future generations can continue enjoying the water.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on 18 November, 2025.

James Scarcella

**DECLARATION OF JUDITH C. STARK**

I, Judith C. Stark, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC in 2023 because of its international membership and reach. So many of our environmental issues, especially the climate crisis, must be addressed at a global level, and so I want to support groups that work internationally. I also joined NRDC because I appreciate its use of legal action to advocate for and defend our environment.

2. I live in South Orange, New Jersey.

3. I am a professor of philosophy and the environment at Seton Hall University. I have worked and taught at Seton Hall for 45 years, during which time I helped establish its environmental studies program. I currently teach several seminars, including a seminar to help other professors incorporate environmental topics into their existing courses. Throughout my time at Seton Hall, I have educated students on local, regional, and global environmental issues. I often take students to Sandy Hook, a barrier spit on the eastern edge of Raritan Bay. There, we observe the wetlands and wildlife, and the ways that climate change and pollution greatly affect them.

4. In addition to my work at Seton Hall, I regularly volunteer with church and other community groups, where I give talks about climate change and

present the ways we can work to help protect the environment. I have also volunteered at Delia Bolden Elementary School in Maplewood, New Jersey. During my visits, I take students on a walk to the nearby East Branch Rahway River—a tributary of the Raritan River, which flows into Raritan Bay—and explain its importance and its role in our local ecosystems.

5. The waters in and around New Jersey and New York have always been an important part of my life. I grew up in Bayonne, New Jersey, which is located on the southern tip of a peninsula between Newark Bay and Upper New York Bay. My childhood home was about a half a mile walk from the waterfronts of both bays, although I usually visited the water by biking to Collins Park at Bayonne's southern tip. I had my first experiences birdwatching at Hudson County Park on Bayonne's western shoreline.

6. As a teenager, I spent almost all of my summer free time outside. My friends and I would bike over Bayonne Bridge to Staten Island to go swimming at South Beach on Lower New York Bay. Once we got our drivers' licenses, we had the freedom to explore even more of New Jersey and New York's beaches, like Lawrence Harbor Beach on Raritan Bay in Old Bridge, New Jersey, and the Rockaways in Queens, New York. I had so much fun getting to bike, walk, swim, and birdwatch in and along these shorelines, and I hope that my students and many more generations to come will have the same wonderful experiences.

7. Even with these fond memories, I also remember how polluted the waters around New Jersey and New York were during my childhood and how worried I was about the pollution's effects on me and my family. For instance, I remember being horrified when my Mom ate shad that was caught out of the Hudson River after the fish completed their spring run from the Atlantic Ocean through the New York–New Jersey Harbor Estuary. Even though the fish were only in those waters for a short time, I was concerned that any contact with New York Harbor or the Hudson River would contaminate them and harm my mother.

8. Since then, the water quality throughout the Estuary and its nearby rivers has greatly improved. Having spent so much of my life in New Jersey, I have been able to witness the ways that its land, air, and especially water have gotten so much cleaner over the last 35 years. I credit these changes, in large part, to legislation like the Clean Water Act and to work by both community groups and organizations like NRDC.

9. I have personally been able to enjoy these positive changes and dramatic improvements in New Jersey's environment. Outside of my work and volunteering, I continue to spend as much time as I can outside in nature. I hike frequently, including at Palisades Interstate Park along the Hudson River. I enjoy the practice of forest bathing, where I spend time intentionally in nature to enjoy

the beauties of nature and de-stress. I believe that nature is healing both for one's mental and physical health.

10. Birdwatching continues to be one of my greatest passions. At least two or three times a month, and even more during the migratory seasons of April to June and August to November, I go out to observe the different birds that live in or migrate through New Jersey. I especially love getting to see the great variety of birds that the Raritan Bay has to offer, from shorebirds like piping plovers and red knots, to wading birds like great blue herons and egrets, to the many different species of gulls. One of my favorite places to birdwatch is Sandy Hook's portion of Gateway National Recreation Area in Raritan Bay. It is a wonderful place for birding because of the extent of undeveloped coastline, which leads many birds migrating along the Atlantic Flyway to stop there. I also frequently visit Cheesequake State Park (right off of Raritan Bay) to see its shoreline and upland birds, and Great Kills Park in Staten Island (on Lower New York Bay). I feel fortunate to live just a short drive away from all these wondrous places.

11. I am very concerned that the planned construction of the Northeast Supply Enhancement (NESE) pipeline will harm New Jersey and New York's waters and the wildlife that depend on them. I fear that the pipeline's construction will undo some of the tremendous work that has been done to improve water quality over the last 35 years. The construction's disruption to the seabed would

release toxins into the water that could have serious negative effects on entire local ecosystems. I am particularly concerned about the impacts of this pollution on the shore birds that live on or migrate through Raritan and Lower New York Bay, as any toxins in the water can bioaccumulate up the food chain into the fish that they eat.

12. The NESE pipeline's pollution would undermine my enjoyment of New Jersey and New York's waters and nature as well. I would be devastated by any harm to the birds that I observe. I and many others use birding as a way to relax, reduce stress, and connect with nature. Any reduction in bird populations would greatly diminish my enjoyment of birding and nature in general. And even knowing that the birds I am watching may be ingesting fish with heightened levels of toxic chemicals will make my birding in and around Raritan and Lower New York Bay far less enjoyable.

13. For these reasons, I strongly support NRDC's litigation challenging approvals for the NESE pipeline. The pipeline will harm the waters and the animals that I care deeply about. I have spent my entire life enjoying New Jersey and New York's nature and have committed my career to educating future generations about how to protect it so that they, too, can appreciate all that our environment has to offer. I believe all the steps—large and small—we take to protect our environment add up. Preventing the harmful pollution this pipeline

would cause is essential for the health of Raritan Bay and New York Bay, along with all of their inhabitants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on _9_ December, 2025.

Judith C. Stark

Judith C. Stark

**DECLARATION OF VALERIE ZANDOLI**

I, Valerie Zandoli, declare as follows:

1. I am a member of the Natural Resources Defense Council (NRDC). I joined NRDC because Earth and our environment are my greatest passions and reason for life, from which all else flows. My late father's involvement in and support of environmental causes since the 1940s inspired my active membership with NRDC.

2. I have lived near the Atlantic Ocean all my life. I grew up in Queens and, for nearly 10 years, I have lived in Wolfe's Pond Park, an area of Staten Island located on the Raritan Bay. I moved to Wolfe's Pond Park to be with my partner, who has lived there for 30 years. Our home is about 500 feet from the waterfront, and the walk from our from door to the water's edge takes about two minutes.

3. I was the sole caregiver for my parents until they recently passed, and I am currently wrapping up their estates while also processing my bereavement. I have prior experience in healthcare as a care manager and in commercial dining as a business development associate for a global fast-casual restaurant brand.

4. My life in Staten Island is interwoven with Raritan Bay. I enjoy the water in a number of ways. I take frequent walks by the Bay and sometimes sit by it on a blanket, chair, or in a car to take in its beauty and observe wildlife, including dolphins, osprey, cormorant, porpoises, horseshoe crabs, and Brandt

geese. I also wade into it daily when weather permits, up to three or four feet. I enjoy kayaking monthly during warmer months, especially with my cousin, and kayak along the Bay and lower New York Harbor, often as far as one to two thousand feet from the shore.

5. My partner and I also enjoy and maintain a salt-water aquarium in our living room that is home to several local, native species including algae, anemone, a blue claw crab, herbivorous snails, and killifish collected during our walks along Raritan Bay's tidepools. The snails that we collect from Raritan Bay to place in the tank eat the algae to maintain the tank's ecological balance, as they do in the wild, and thus maintain the tank's overall health. We enjoy having the tank in our home. We rehome the various species in the tank instead of purchasing species because our household budget is tight. The population of each species near our home already fluctuates significantly, corresponding to the presence of local algal blooms, and sometimes finding any of them is hard.

6. If construction of the Northeast Supply Enhancement (NESE) pipeline proceeds, I would be afraid to wade or kayak in the Bay because of the potential exposure to contaminants in the water, including mercury and copper, that would be released by the construction. I also worry that the construction will harm the local ecosystem, including by reducing the populations of the animals that I enjoy observing in the wild and that we collect for our aquarium. I tear up thinking of

that potential. Those changes would be devastating for my lifestyle. I hope that my efforts in filing this declaration will help stop the project so that those harms to the Bay and the wildlife that live there do not occur.

7. I support NRDC's lawsuit because I want to protect my lifestyle and the Raritan Bay, which has given me daily joy for the past decade. I believe that if NESE were built, it would disrupt the recreational activities on the Bay that I enjoy and damage the ecosystem that my partner and I rely on. If NRDC prevails in this litigation, I will be able to continue enjoying the Bay as I do currently and have for years.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on 17 November, 2025.

Valerie Zandoli

Valerie Zandoli