# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 26-1252 and 26-1253

NATURAL RESOURCES DEFENSE COUNCIL, INC. NY/NJ BAYKEEPER; PRINCETON MANOR HOMEOWNERS ASSOCIATION; CENTRAL JERSEY SAFE ENERGY COALITION; FOOD & WATCH; NEW JERSEY LEAGUE OF CONSERVATION VOTERS EDUCATION FUND; SIERRA CLUB,

*Petitioners,*

– v. –

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION,

*Respondent,*

– and –

TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC,

*Intervenor-Respondent.*

ON PETITION FOR REVIEW OF PERMITS ISSUED BY
THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION
(AGENCY PERMIT NO. 0000-25-012.1 LUP250001)

## PETITION FOR REHEARING OR REHEARING *EN BANC*

YVONNE E. HENNESSEY
BARCLAY DAMON LLP
*Attorneys for Respondent-Intervenor*
Four Tower Place, 10th Floor
Albany, New York 12203
(518) 429-4200

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (396661)

## United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and Statement of Financial Interest

No. 26-1252/1253

NATURAL RESOURCES DEFENSE COUNCIL; NY/NJ BAYKEEPER; PRINCETON MANOR HOMEOWNERS ASSOCIATION; CENTRAL JERSEY SAFEENERGY COALITION; FOOD & WATER WATCH; NEW JERSEY LEAGUE OF CONSERVATION VOTERS EDUCATION FUND; SIERRA CLUB, Petitioners

v.

New Jersey Department of Environmental Protection, Respondent

and

Transcontinental Gas Pipe Line Company, LLC, Intervenor-Respondent

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Transcontinental Gas Pipe Line Company, LLC makes the following disclosure:

(Name of Party)

1) For non-governmental corporate parties please list all parent corporations: Williams Partners Operating LLC owns 100% of Transcontinental Gas Pipe Line Company, LLC. The Williams Companies, Inc. owns 100% of Williams Partners Operating LLC.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

No other publicly held corporation holds 10% or more of the stock of Transcontinental Gas Pipe Line Company, LLC.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

Publicly-traded corporations that are not party to this proceeding include KeySpan Gas East Corporation, which is a customer of Transcontinental Gas Pipe Line Company, LLC's Northeast Supply Enhancement Project. KeySpan Gas East Corporation is a wholly-owned subsidiary of National Grid USA.

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.

/s Richard G. Scott

(Signature of Counsel or Party)

Dated: 6/3/26

# TABLE OF CONTENTS


| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| INTRODUCTION AND RULE 40(b) STATEMENT | 1 |
| STATEMENT OF FACTS | 3 |
| ARGUMENT | 6 |
| POINT I | |
| THE PANEL FAILED TO APPLY CIRCUIT PRECEDENT | 6 |
| A. Circuit Precedent Required Application of the Prometheus Test | 6 |
| POINT II | |
| THE IDENTIFIED DEFICIENCIES ARE CREDIBLY REMEDIED UPON REMAND AND VACATUR WOULD BE DISRUPTIVE | 10 |
| POINT III | |
| FEDERAL LAW FURTHER SUPPORTS REMAND WITHOUT VACATUR | 16 |
| CONCLUSION | 19 |
| LOCAL RULE 35.1 STATEMENT | 20 |
| CERTIFICATION OF ADMISSION TO BAR | 21 |
| CERTIFICATE OF COMPLIANCE | 22 |
| CERTIFICATE OF FILING AND SERVICE | 23 |
| EXHIBIT: | |
| Opinion dated September 8, 2026 | 24 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n.*,
988 F.2d 146 (D.C. Cir. 1993) .......... 2, 7, 9

*Am. Great Lakes Ports Assoc. v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) .......... 8

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271 (11th Cir. 2015) .......... 8-9

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .......... 9

*Cent. Me. Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) .......... 9

*City of Port Isabel v. FERC*,
130 F.4th 1034 (D.C. Cir. 2025) .......... 8, 12

*Comité de Apoyo a los Trabajadores Agricolas v. Perez*,
774 F.3d 173 (3d Cir. 2014) .......... 6

*Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't. Prot.*,
833 F.3d 360 (3d Cir. 2016) .......... 11

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 10

*Healthy Gulf v. FERC*,
107 F.4th 1033 (D.C. Cir. 2024) .......... 8

*Millennium Pipeline Co., L.L.C. v. Seggos*,
860 F.3d 696 (D.C. Cir. 2017) .......... 17

*Nat. Res. Def. Council v. EPA*,
808 F.3d 556 (2d Cir. 2015) .......... 8

*Nazareth Hosp. v. HHS*,
747 F.3d 172 (3d Cir. 2014) .......... 6

*Prometheus Radio Project v. F.C.C.*,
824 F.3d 33 (3d Cir. 2016) .......... 2, 6, 7, 8, 9, 10, 12

*Raritan Baykeeper, Inc. v. N.Y. State Dep't of Env't Conservation*,
No. 25-2938, 2026 LX 456546 (2d Cir. Aug. 21, 2026) ....................................5

*Sierra Club v. EPA*,
972 F.3d 290 (3d Cir. 2020)....................................................................10

*Tex. Ass'n. of Mfrs. v. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ....................................................................8

*Town of Weymouth v. Mass. Dep't. of Env't Prot.*,
961 F.3d 34 (1st Cir. 2020).......................................................................9

*Transcon. Gas Pipe Line Co., LLC v. 1.451 Acres of Permanent Easement*,
No. 26-18, 2026 U.S. Dist. LEXIS 34923 (D.N.J. Feb. 20, 2026).....................15

*W. Watersheds Project v. Haaland*,
69 F.4th 689 (10th Cir. 2023) ....................................................................8

**Statutes & Other Authorities:**

3 U.S.C. § 1341 ..........................................................................................17

15 U.S.C. § 717n(b) ....................................................................................16

15 U.S.C. § 717n(c) ....................................................................................16

15 U.S.C. § 717n(d)(2).................................................................................17

15 U.S.C. § 717r(d)(1) ............................................................................. 9, 16

15 U.S.C. § 717r(d)(3) .................................................................................17

15 U.S.C. § 717r(d)(5) .................................................................................16

18 C.F.R. § 157.20(b) ..................................................................................16

40 C.F.R. § 121.6(a).....................................................................................17

40 C.F.R. § 121.6(b) ....................................................................................18

40 C.F.R. § 121.6(c).....................................................................................18

CWA § 401 ....................................................................................................1

Exec. Order No. 14156, 90 Fed. Reg. 8433,
*Declaring a National Energy Emergency* (Jan. 20, 2025)..................................13

Fed. R. App. P. 40(a) ......................................................................................1

Fed. R. App. P. 40(b) ......................................................................................1

Natural Gas Symposium Before the S. Comm. on Energy & Natural. Res., 109th Cong. 41 (2005) ....................16

*Order Regarding Long-Term Gas Plan and Requiring Further Actions,* NYSPSC, Case No. 24-G-0248 (Sept. 18, 2025) ....................4

Pub. L. No. 109-58, § 313(b), 119 Stat. 594 (2005) ....................16

*Transcon. Gas Pipe Line Co., LLC*, 192 FERC (2025) ....................4

## INTRODUCTION AND RULE 40(b) STATEMENT

Intervenor-Respondent, Transcontinental Gas Pipe Line Company, LLC ("Transco") respectfully brings this Petition for Panel Rehearing and Rehearing *En Banc* pursuant to Rule 40(a) of the Federal Rules of Appellate Procedure, focused solely on the panel's selected remedy of vacatur and remand – an issue that the panel did not meaningfully address and is contrary to (or at least overlooks) Third Circuit precedent and controlling law.

In this consolidated appeal, certain environmental advocacy organizations challenged the New Jersey Department of Environmental Protection's ("NJDEP") issuance of a water quality certification ("WQC") under Section 401 of the Clean Water Act ("CWA") for Transco's Northeast Supply Enhancement ("NESE") Project, an interstate natural gas pipeline project found to be in the public convenience and necessity by the Federal Energy Regulatory Commission ("FERC").

Although the panel rejected the argument that NJDEP arbitrarily reversed its prior certification denial for NESE and declined to decide the public participation claims, it held that "NJDEP improperly left material monitoring and adaptive management terms for later resolution without making NJDEP approval of the final plans a prerequisite to dredging" and that "NJDEP failed to adequately explain its

finding that NESE will meet state water quality criteria." Op., p. 19. The panel then elected to vacate and remand the WQC, citing its "ordinary course" to do so where "an agency fails to adequately explain the basis for its decision[.]" Op., p. 40.

The panel's decision to vacate the certification is contrary to Third Circuit precedent, which provides that vacatur "typically is inappropriate where it is 'conceivable' that the [agency] can, if given the opportunity," cure the defects in its decision. *Prometheus Radio Project v. F.C.C.*, 824 F.3d 33, 52 (3d Cir. 2016) (quoting *Allied-Signal, Inc.* v. *U.S. Nuclear Regul. Comm'n.*, 988 F.2d 146, 151 (D.C. Cir. 1993)). The panel decision in this case identified specific, discrete aspects of NJDEP's certification decision that it determined to be deficient. *See, e.g.*, Op., pp. 24-26, 31-33, 35-38. But the panel also identified specific aspects of NJDEP's certification decision that were adequately supported, *see, e.g.*, Op. 20, 24, 26, 29-30, 35, and its decision provided guidance as to how NJDEP could cure the deficiencies on remand. That reasoning makes it more than "conceivable"—and indeed makes it obvious—that NJDEP can cure the defects in its decision on remand. *Prometheus*, 824 F.3d at 52 (quoting *Allied-Signal*, 988 F.3d at 151).

The panel's chosen remedy also contravenes this Court's recognition that, before imposing vacatur, courts "must also consider 'the disruptive consequences of vacating.'" *Prometheus*, 824 F.3d at 52 (quoting *Allied-Signal*, 988 F.3d at 151).

Here, the disruptive consequences of vacatur could not be more catastrophic: NESE is on the brink of construction in New Jersey, which was originally set to begin on October 1, 2026, with a November 1, 2027 in-service date. Vacating NJDEP's certification will delay construction in New Jersey, representing a significant portion of the project. That delay, in turn, will jeopardize the delivery of natural gas that is urgently needed by National Grid for the 2027-2028 winter heating season. It will also undermine the settled expectations and transactions of Transco's business partners and customers, and will likewise undermine Transco's ability to meet its contractual obligations. Those consequences underscore why vacatur is inappropriate. The panel's decision to vacate NJDEP's certification thus conflicts with decisions of this Court and presents a question of exceptional importance.

The petition for panel rehearing or rehearing *en banc* should be granted, and the panel opinion should be modified to remove the vacatur remedy.

## STATEMENT OF FACTS

NESE is a proposed expansion of Transco's existing natural gas transmission system in Pennsylvania and New Jersey and its existing offshore natural gas pipeline system in New York and New Jersey waters. [JA_1293] The project will connect to the existing Rockaway Delivery Lateral in Queens and will "provide 400,000 dekatherms per day (Dth/d) of incremental firm natural gas transportation services

to Brooklyn Union Gas Company and KeySpan Gas East Corporation (collectively, "National Grid") in order to serve National Grid's residential and commercial customers in the New York City area." [JA_0550] The New York State Public Service Commission ("NYSPSC") determined that the project "is needed to ensure the continued provision of safe, adequate, and reliable gas service to customers in New York City and on Long Island[.]"[1]

FERC issued a Certificate of Public Convenience and Necessity for the project on August 28, 2025 ("Certificate Order"),[2] wherein it "found there is a demonstrated need for the project" based on the long-term, binding contracts for 100% of the project's capacity and acknowledged "that there are credible market studies that show that the project may help alleviate reliability issues for project shippers and end-users, provide reliability and system resilience benefits to the wider New York region, and reduce energy prices for consumers[.]" Certificate Order ¶ 42. FERC also concluded that the project will not result in any significant adverse environmental impacts. *Id.* ¶ 49.

Given its geographic footprint, the project triggered the need for permitting

---

1 *Order Regarding Long-Term Gas Plan and Requiring Further Actions,* NYSPSC, Case No. 24-G-0248 (Sept. 18, 2025) ("NYSPSC Order") at p. 58.

2 *Transcon. Gas Pipe Line Co., LLC*, 192 FERC ¶ 61,184 (2025).

from New York, New Jersey and Pennsylvania. Only the New Jersey and New York permits were challenged. The Second Circuit upheld the New York permit.[3]

***Panel Opinion***

The panel held that NJDEP acted arbitrarily and capriciously by: (1) "improperly [leaving] material monitoring and adaptive management terms for later resolution without making NJDEP approval of the final plans a prerequisite to dredging" and (2) failing to "adequately explain its finding that NESE will meet state water quality criteria." Op., p. 19. The panel did not decide the environmental advocacy organizations' public participation claims. *Id.*

In discussing the remedy, the panel stated that the court's "ordinary course is to vacate and remand so the agency may exercise its delegated authority in the first instance" and that "[o]n remand, NJDEP remains free to supplement its explanation, require additional submissions or analyses, issue a new or revised certification, or reach a different result." Op., p. 40. The panel did not consider the possibility of remand without vacatur.

---

3 *Raritan Baykeeper, Inc. v. N.Y. State Dep't of Env't Conservation*, No. 25-2938, 2026 LX 456546 (2d Cir. Aug. 21, 2026), Doc. 87.

# ARGUMENT

## POINT I

## THE PANEL FAILED TO APPLY CIRCUIT PRECEDENT

### A. Circuit Precedent Required Application of the Prometheus Test

Rehearing is warranted to correct the panel's decision to impose vacatur. That decision overlooks controlling Third Circuit precedent that limits the availability of vacatur in certain circumstances, requiring courts to consider whether the agency can cure the deficiencies in its decision on remand, and whether the imposition of vacatur would have disruptive consequences.

This Court has recognized on multiple occasions that vacatur may not always be the appropriate remedy for deficient agency action. Indeed, although this Court often vacates agency action that violates the Administrative Procedure Act, *see Comité de Apoyo a los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014), it has nevertheless recognized that "the general remedy" for an agency's failure to adequately explain its decision "is *not* complete vacatur of an agency rule, but rather remand for additional consideration." *Nazareth Hosp. v. HHS*, 747 F.3d 172, 185 (3d Cir. 2014) (emphasis added). Indeed, in *Prometheus*, this Court formally adopted the standard that the D.C. Circuit has long applied to determine when it is appropriate to remand an agency action without vacating it. 824 F.3d at

52; *see Allied-Signal,* 988 F.3d at 151.[4]

Under that standard, the appropriateness of vacatur (as opposed to a remand without vacatur) depends on two factors:

1. "[T]he seriousness of the order's deficiencies," which includes evaluating whether there is a significant or "serious possibility that the [agency] will be able to substantiate its decision on remand"; and
2. "[T]he disruptive consequences of an interim change," *i.e.*, the interim change effected by vacatur, "that may itself be changed."

*Allied-Signal,* 988 F.2d at 150-151 (citations omitted). In *Allied-Signal*, the D.C. Circuit found that "[a]n inadequately supported rule . . . need not necessarily be vacated." *Id*. at 150. Instead, the court reasoned that the deficiencies were not "serious" because the agency might be able to easily provide the required explanation on remand. *Id*. at 151. Further, the court found that the consequences of an interim rule change would be extremely disruptive. *Id*.

In *Prometheus,* this Court adopted that standard and reiterated that vacatur is

[4] The panel's opinion cites an earlier *Prometheus* decision but only for a different proposition. Op., p. 40, n. 102.

typically inappropriate where it is "conceivable" that the action can be cured and where the consequences of vacatur would be disruptive. 824 F.2d at 52. Moreover, this Court held that vacatur is appropriate only "when an agency gives its reasoning for retaining a rule and a court concludes that it is insufficient and *incapable of being cured* . . ." *Id.* (emphasis added).

Remand without vacatur is also supported by precedent from other circuit courts. *See, e.g., City of Port Isabel v. FERC*, 130 F.4th 1034, 1036-1039 (D.C. Cir. 2025) (granting rehearing and remanding without vacatur to allow FERC to conduct further proceedings); *Healthy Gulf v. FERC*, 107 F.4th 1033, 1047-1048 (D.C. Cir. 2024) (remanding without vacatur where it is "reasonably likely" that the deficiencies can be cured and vacatur would "needlessly disrupt" construction plans); *W. Watersheds Project v. Haaland*, 69 F.4th 689, 722-723 (10th Cir. 2023); *Am. Great Lakes Ports Assoc.* v. *Schultz*, 962 F.3d 510, 518-520 (D.C. Cir. 2020); *Tex. Ass'n. of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (holding that vacatur is inappropriate if "there is at least a serious possibility that the agency will be able to substantiate its decision"); *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015) (holding that vacatur is inappropriate "when equity demands the regulation can be left in place while the agency follows the necessary procedures" on remand); *Black Warrior Riverkeeper, Inc. v. U.S. Army*

*Corps of Eng'rs*, 781 F.3d 1271, 1290-1291 (11th Cir. 2015) (remanding without vacatur where vacatur could suspend surface mining for agency error that could turn out to be "inconsequential"); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-994 (9th Cir. 2012) (remanding without vacatur where vacatur would delay a power plant coming online).

Notably, there are very few cases addressing the proper remedy for federal authorizations issued by state agencies subject to review in federal court under section 717r(d)(1) of the Natural Gas Act ("NGA"). But even in the few cases that have arisen in this context, courts have still addressed the propriety of vacatur by considering the same two-part standard applied in *Allied-Signal* and *Prometheus*. *See, e.g.*, *Town of Weymouth v. Mass. Dep't. of Env't Prot.*, 961 F.3d 34, 58 (1st Cir. 2020). Although that court ultimately concluded vacatur was appropriate, it did so based on the specifics of the agency proceedings at issue, and only after considering the severity of the agency's errors and the "balance of the equities." *Id*. (citing *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001)). Ultimately, the court elected to vacate the challenged permit for reasons that do not exist here, including a lack of information in the record to correct the identified deficiencies and the permittee's stated desire to pursue a redesign. *Id.* at 58-59.

## POINT II

## THE IDENTIFIED DEFICIENCIES ARE CREDIBLY REMEDIED UPON REMAND AND VACATUR WOULD BE DISRUPTIVE

The considerations for imposing vacatur that this Court adopted in *Prometheus* weigh heavily in favor of remand without vacatur. The panel overlooked that standard in the decision below; because the standard plainly counsels in favor of remand without vacatur, the panel opinion should be modified to narrow the remedy. Rehearing is warranted to correct that error.

Rather than applying the *Prometheus* standard, the panel relied upon two cases to support its holding that "[w]hen an agency fails to adequately explain the basis for its decision, our ordinary course is to vacate and remand[.]" Op., p. 40, n.103 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) and *Sierra Club v. EPA,* 972 F.3d 290 (3d Cir. 2020)). Neither case arises under the NGA, nor does either case concern a challenge to a specific permitting decision. *Fla. Power & Light Co.*, 470 U.S. at 731 (concerning jurisdiction by court of appeals); *Sierra Club,* 972 F.3d at 293 (challenging EPA approval of a state implementation plan under the Clean Air Act).

First, the deficiencies identified by the panel can and will be remedied with ease upon remand. With respect to the panel's concerns over the NJDEP's deferral of certain plans, NJDEP can simply reissue the WQC with the condition that the

Water Quality Monitoring and Adaptive Management Plans be reviewed "and approved" prior to construction. Op., pp. 24-28 (focusing on absence of approval requirement for the plans); *see Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't. Prot.,* 833 F.3d 360, 367 (3d Cir. 2016).

Similarly, NJDEP's decisional documents can be easily remedied on remand. Op., p. 31 (noting typical deference to agency's regulatory interpretations but declining to do so where agency first supplied interpretation in litigation). The panel identified three specific points in the record that require further agency elaboration: "its treatment of the 500-foot modeling boundary and predicted 4,4'–DDE concentrations, its reliance on turbidity monitoring, and its assessment of the shellfish evidence in the record." *Id.* pp. 28-29.

Regarding the modeling boundary, NJDEP already provided further explanation for its rationale during merits briefing, which rationale can be confirmed and expanded upon on remand. Op., p. 33 (providing recommendations for NJDEP to remedy its decisional documents). For turbidity, the record reflects discussions with NJDEP that it typically only requires turbidity monitoring. *Id.* p. 35 (stating that "NJDEP's explanation falls short"). On remand, NJDEP can provide further explanation that turbidity is a valid proxy for contaminant monitoring. Finally, with respect to shellfish impacts, NJDEP need only confirm in its rationale that it adopted

Transco's analysis that impacts will be temporary. *Id.* p. 37 (faulting NJDEP for not adequately explaining its view on shellfish impacts).

Accordingly, it is beyond "conceivable" that NJDEP "can, if given the opportunity," remedy the deficiencies identified by the panel. *See Prometheus*, 824 F.3d at 52.

Second, the disruptive consequences of vacating NJDEP's certification also strongly cut against vacatur. *See City of Port Isabel*, 130 F.4th at 1038 ("the seriousness of the reauthorization orders' deficiencies does not outweigh the disruptive effects of vacatur"). This billion-dollar infrastructure project serves a compelling public need. FERC, the agency charged by Congress to oversee and authorize critical interstate natural gas infrastructure, "found there is a demonstrated need for the project" based on the long-term, binding contracts for 100% of the project's capacity. Certificate Order ¶ 42. FERC further found that NESE would "enhance reliability, flexibility, and efficiency on a critical part of Transco's system and provide access to supplies of natural gas in a constrained market" and "improve the efficiency resiliency and reliability of gas service to residential and commercial loads and help to reduce gas prices in New York City." *Id.* FERC considered, among other things, National Grid's Long-Term Plan Addendum, which projects that the Project:

- "reduces the probability of a catastrophic gas outage in Downstate New York, protecting against the loss of life and significant economic costs;" and

- "is the 'only material, near-term proposal that can efficiently and cost effectively address the full scope of downstate New York's gas system resilience challenges.'"

*Id.* ¶ 27 (citations omitted); *see also* NYSPSC Order, pp. 58, 61 (finding that the project "is needed to ensure the continued provision of safe, adequate, and reliable gas service to customers" and "the experience with Winter Storm Elliot in late December 2022 further demonstrated the critical importance of ensuring the reliability of the gas system"). NJDEP also found compelling public need for project. [JA_0493]

Not only has FERC, NYSPSC, and NJDEP found a demonstrated need for the project, but the Administration has expressly determined that "[t]he integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security." *See* Exec. Order No. 14156, 90 Fed. Reg. 8433, *Declaring a National Energy Emergency* (Jan. 20, 2025). The delay caused by vacatur would

only exacerbate the Northeast's already stretched energy supply, risk existing reliability concerns and further impact already rising energy costs.

Construction must be commenced in 2026 and completed in 2027 since the gas is urgently needed by National Grid for the 2027-2028 winter heating season. The project's construction schedule was carefully structured, taking into account how a linear project is constructed both onshore and offshore, related compressor station work, and the myriad of permitting conditions and time of year restrictions that limit how and when construction activities can occur. It also was developed to ensure that this critically important natural gas infrastructure project is in service for the 2027-28 winter heating season. Vacatur will seriously jeopardize this schedule—a result that is in direct conflict with national policy.[5]

Furthermore, the alleged deficiencies identified by the panel relate only to the Raritan Bay Loop, which Transco does not propose starting construction until March/April 2027. Yet the WQC covers Compressor Station 206 ("CS 206") and Madison Loop, the environmental impacts of which were not challenged.

---

[5] If rehearing is granted, Transco is prepared to submit affidavits further detailing the disruptive consequences of vacatur, including the harm to National Grid and its ratepayers.

CS 206 is a critical path component and its construction will take approximately 13-months to complete, meaning any delay risks Transco's ability to meet the November 1, 2027 in-service date. As the New Jersey District Court has concluded, given this schedule, Transco would suffer irreparable harm if immediate possession of easements for CS 206 were not granted. *See Transcon. Gas Pipe Line Co., LLC v. 1.451 Acres of Permanent Easement*, No. 26-18, 2026 U.S. Dist. LEXIS 34923, *10-13 (D.N.J. Feb. 20, 2026) (also finding NESE to be in the public interest given the need for natural gas in the Northeast).

Transco's construction schedule was painstakingly put together to comply with numerous permitting requirements from multiple states. This includes very specific windows on when construction activities can and cannot occur. *See, e.g.*, JA_0019-JA_0021 (detailing time of year restrictions for in-water and onshore construction in New Jersey). As such, pushing the start of construction in New Jersey, and perhaps elsewhere along the route, will cause more than a brief delay. It will jeopardize the project's in-service date, potentially leaving the Northeast without needed infrastructure during next year's critical heating season.

## POINT III

## FEDERAL LAW FURTHER SUPPORTS REMAND WITHOUT VACATUR

The NGA and CWA ensure timely consideration and decision-making for approvals, such as WQCs, to construct interstate natural gas infrastructure. Vacatur is therefore inappropriate here as it jeopardizes the timing of the amended WQC and the project's November 1, 2027 in-service date in contravention of federal law.

Under the NGA, FERC, as the lead federal agency, establishes both a schedule by which all federal authorizations must be obtained as well as a schedule for project completion. 15 U.S.C. §§ 717n(b), (c) (designating FERC as lead agency "coordinating all applicable Federal authorizations" and granting FERC the express authority to set a schedule for all Federal authorizations to "ensure expeditious completion of all such proceedings"); 18 C.F.R. § 157.20(b). The NGA also establishes a framework designed to streamline and accelerate review of non-FERC permitting actions related to natural gas projects. Pub. L. No. 109-58, § 313(b), 119 Stat. 594, 689-90 (2005); 15 U.S.C. § 717r(d)(1), (5) (providing for expedited resolution of civil actions challenging administrative agency actions taken pursuant to the federal law); see also Natural Gas Symposium Before the S. Comm. on Energy & Natural. Res., 109th Cong. 41 (2005) (statement of Mark Robinson, Director, Office of Energy Projects, FERC) (explaining that NGA applicants were subject to

a "series of sequential administrative and State court and Federal court appeals that [could] kill a project with a death by a thousand cuts just in terms of the time frames associated with going through all those appeal processes").

Further, consistent with the mandate of timely review of federal permits, the NGA provides the remedy of remand (only) where a state agency denies or fails to act upon a federally required authorization. 15 U.S.C. § 717r(d)(3). It also requires the courts to set a reasonable schedule and deadline for agency action. *Id.* Where a court finds an agency unreasonably delays action and fails to act within FERC's established schedule, 717(d)(3) applies and the remedy is remand. *Id.* § 717(d)(2); Millennium Pipeline Co., L.L.C. v. Seggos, 860 F.3d 696, 700 (D.C. Cir. 2017). Collectively, these provisions show that the federal statutory scheme contemplates remand as a general matter when agency action regarding an NGA project is deficient. *See* 15 U.S.C. §§ 717n(d)(2), 717r(d)(3).

Likewise, under the CWA, a state or interstate certifying agency must act on a WQC request within a "reasonable period of time," which cannot exceed an absolute statutory maximum of one year after the receipt of the request. 3 U.S.C. § 1341. The "reasonable period of time" begins on the date the certifying authority receives a request for certification. 40 C.F.R. § 121.6(a). The federal agency and the certifying authority may jointly determine the "reasonable period of time" for a

specific certification request, provided it does not exceed one year, or, where there is no agreement, the default period is six months. *Id.* §§ 121.6(b), (c).

For FERC to issue a Notice to Proceed with construction of the New Jersey components of the project, Transco must have a WQC from New Jersey in time to allow construction to commence in 2026 and be completed in 2027 given urgent need for the 2027-2028 winter heating season. It is therefore imperative that NJDEP act on remand as soon as possible. Doing so would be consistent with Federal law.

Further, the panel held "[o]n remand, NJDEP remains free to supplement its explanation, require additional submissions or analyses, issue a new or revised certification, or reach a different result." Op., p. 40. In doing so, the panel explicitly recognized the "years of agency review, repeated requests for additional information, and numerous project-specific restrictions[.]" *Id.* Thus, remand without vacatur is the appropriate remedy given the limited deficiencies identified by the panel that can all be addressed without vacatur, consistent with the NGA and CWA.

## CONCLUSION

For the foregoing reasons, Transco respectfully requests that the panel modify the remedy and, if not, that the Court grant rehearing en banc and vacate the panel's selection of vacatur as the appropriate remedy. Transco also respectfully requests that the court set a reasonable schedule and deadline for NJDEP to act on remand so that construction in New Jersey can commence no later than October 30, 2026.

Dated: September 22, 2026

Respectfully Submitted,

**BARCLAY DAMON, LLP**
By: s\ Yvonne E. Hennessey
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent,*
*Transcontinental Gas Pipe Line Company, LLC*
4 Tower Place
Albany, New York 12203
(518) 429-4293
yhennessey@barclaydamon.com

## LOCAL RULE 35.1 STATEMENT

In support of this Petition, Counsel represents the following: I express a belief, based on a reasoned and studied professional judgment, that the panel's opinion in *Natural Resource Defense Council, Inc. v. New Jersey Department of Environmental Protection*, No. 26-1252 (3d Cir. September 8, 2026), conflicts with prior decisions of this Court, and that this appeal involves a question of exceptional importance.

Dated: September 22, 2026 Respectfully Submitted,

**BARCLAY DAMON, LLP**
By: s\ *Yvonne E. Hennessey*
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent,*
*Transcontinental Gas Pipe Line Company, LLC*
4 Tower Place
Albany, New York 12203
(518) 429-4293
yhennessey@barclaydamon.com

## CERTIFICATION OF ADMISSION TO BAR

I, Yvonne E. Hennessey, certify as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Date: September 22, 2026

**BARCLAY DAMON LLP**

/s/ *Yvonne E. Hennessey*
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent, Transcontinental Gas Pipe Line Company, LLC*
4 Tower Place
Albany, New York 12203
(518) 429-4293
yhennessey@barclaydamon.com

## CERTIFICATE OF COMPLIANCE

1. This petition complies with the type-volume limitation of Fed. R. App. P. 40(d)(3)(A). It contains 3,885 words, excluding parts of the petition exempted by Fed. R. App. P. 32 (f).

2. This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using MS Word in 14 point Times New Roman.

3. This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Date: September 22, 2026

**BARCLAY DAMON LLP**

/s/ *Yvonne E. Hennessey*
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent, Transcontinental Gas Pipe Line Company, LLC*
4 Tower Place
Albany, New York 12203
(518) 429-4293
yhennessey@barclaydamon.com

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 22nd day of September 2026, the foregoing Petition was filed via CM/ECF and served on all parties or their counsel of record via CM/ECF.

Date: September 22, 2026

**BARCLAY DAMON LLP**

/s/ *Yvonne E. Hennessey*
Yvonne E. Hennessey
*Attorneys for Intervenor-Respondent, Transcontinental Gas Pipe Line Company, LLC*
4 Tower Place
Albany, New York 12203
(518) 429-4293
yhennessey@barclaydamon.com

# EXHIBIT

## Opinion dated September 8, 2026

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 26-1252

NATURAL RESOURCES DEFENSE COUNCIL, INC.,

Petitioner

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

TRANSCONTINENTAL GAS PIPE LINE CO., LLC,

Intervenor Respondent

---

No. 26-1253

---

NY/NJ BAYKEEPER; PRINCETON MANOR HOMEOWNERS ASS’N; CENTRAL JERSEY SAFE ENERGY COALITION; FOOD & WATER WATCH; NEW JERSEY LEAGUE OF CONSERVATION VOTERS EDUCATION FUND; SIERRA CLUB,

Petitioners

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION

TRANSCONTINENTAL GAS PIPE LINE CO., LLC,

Intervenor Respondent

---

Environmental Protection Agency
(Eastern District of Pennsylvania 0000-25-012.1 LUP250001)

---

Argued on July 8, 2026

Before: KRAUSE, FREEMAN and ROTH, *Circuit Judges*

(Opinion filed: September 8, 2026)

Jackson P. Garrity (**Argued**)
Natural Resources Defense Council
20 N Wacker Drive
Suite 1600
Chicago, IL 60606

Mark A. Izeman
Natural Resources Defense Council
40 W. 20th Street
New York, NY 10011

Jared E. Knicley
Natural Resources Defense Council
1152 15th Street NW
Suite 300
Washington, DC 20005

Counsel for Petitioner Natural Resources Defense Council

Kaitlin Morrison (**Argued**)
Christopher D. Miller
Eastern Environmental Law Center
One Gateway Center
Suite 2600
Newark, NJ 07102

Counsel for Petitioners NY/NJ Baykeeper, Princeton Manor Homeowners Association, Central Jersey Safe Energy Coalition, Food & Water Watch, New Jersey League of Conservation Voters Education Fund, and Sierra Club

Nathaniel F. Rubin (**Argued**)
Kristina L. Miles
Sara N. Torres
Jordan Viana
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625

Counsel for Respondent

Richard G. Scott (**Argued**)
Christine A. Roy
Rutter & Roy, LLP
2052 Route 35
Suite 103
Wall, NJ 07719

Counsel for Intervenor Respondent

David R. Kott
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ 07102

Counsel for Amicus Respondent New Jersey Business & Industry Association

Clifford M. Naeve
Skadden Arps Slate Meagher & Flom

1440 New York Avenue NW
Washington, DC 20005

Counsel for Amicus Respondents
Interstate Natural Gas Association of
America and American Petroleum
Institute

---

OPINION OF THE COURT

---

ROTH, *Circuit Judge*

In these consolidated petitions, several environmental organizations challenge a Water Quality Certification issued by the New Jersey Department of Environmental Protection (NJDEP) to Transcontinental Gas Pipe Line Company, LLC (Transco) for its proposed Northeast Supply Enhancement Project (NESE). The project would expand Transco's existing interstate natural gas pipeline system, in part by constructing a new pipeline segment beneath the Raritan Bay. Where the new segment crosses New Jersey waters, its installation would require dredging the bay floor, stirring up sediment containing toxic contaminants. The environmental groups contend that NJDEP arbitrarily reversed its earlier denial of certification, certified the project before resolving essential monitoring requirements and corrective measures, failed to explain why it concluded the project will comply with New Jersey's water quality standards, and denied the public an adequate opportunity to comment. For the reasons that follow, we will

grant the petitions, vacate the Water Quality Certification, and remand to NJDEP for further proceedings.

**A. Regulatory Background**

Transco's proposed pipeline extension is subject to both federal and state permitting requirements. Pursuant to the Natural Gas Act of 1938, the Federal Energy Regulatory Commission (FERC) has exclusive authority to approve the construction and operation of interstate natural gas facilities.[1] No company may construct or extend facilities for the interstate transportation of natural gas without first obtaining a Certificate of Public Convenience and Necessity from FERC.[2] As a condition of FERC approval, an applicant must also secure any additional state or federal approvals required by law, including a Water Quality Certification under § 401 of the Clean Water Act.[3]

Section 401 of the Clean Water Act requires an applicant seeking a federal license or permit for an activity

---

[1] 15 U.S.C. § 717f; *Delaware Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot. (Riverkeeper I)*, 833 F.3d 360, 388 (3d Cir. 2016).

[2] 15 U.S.C. § 717f(c), (e). Before issuing a Certificate, FERC must find that the proposed facilities are "required by the present or future public convenience and necessity" and must assess the project's environmental effects under the National Environmental Policy Act. *Id.* §§ 717f(e), 717n(b)(1); *see* 42 U.S.C. § 4321.

[3] 33 U.S.C. § 1341; *Delaware Riverkeeper Network v. Sec'y of Pa. Dep't of Env't Prot. (Riverkeeper II)*, 870 F.3d 171, 174 (3d Cir. 2017).

"which may result in any discharge into the navigable waters" of the United States to obtain a Water Quality Certification "from the State in which the discharge originates or will originate."[4] The certifying state agency must determine that the discharge "will comply" with the applicable provisions of the Clean Water Act and state water quality standards.[5] Any certification must also "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure" that compliance.[6]

NJDEP issues Water Quality Certifications in New Jersey[7] and administers the State's water quality regulations, including those governing new dredging for submerged pipelines (the New Dredging Rule)[8] and the Surface Water Quality Standards.[9] The New Dredging Rule requires dredging-related turbidity—that is, water cloudiness caused by suspended particles—and other water quality parameters to meet the Surface Water Quality Standards.[10] The New Dredging Rule also authorizes NJDEP to require a permittee to conduct water quality monitoring, and provides that NJDEP "will work cooperatively with the applicant to fashion acceptable control measures" when modeling predicts an exceedance of the Surface Water Quality Standards or sediment testing reveals significant contamination.[11]

---

[4] 33 U.S.C. § 1341(a)(1).
[5] *Id.*
[6] *Id.* § 1341(d); *see PUD No. 1 of Jefferson Cnty. v. Washington Dep't of Ecology*, 511 U.S. 700, 711–13 (1994).
[7] *See* N.J. Admin. Code § 7:7A–2.1(a), (d).
[8] *Id.* § 7:7–12.7.
[9] *Id.* §§ 7:9B–1.1 to –1.16.
[10] *Id.* § 7:7–12.7(c)(10)(iii).
[11] *Id.* § 7:7–12.7(c)(10)(iii)–(iv).

The applicable Surface Water Quality Standards depend on the designated use of the waterbody at issue.[12] The Raritan Bay waters crossed by the proposed pipeline are classified as saline estuarine (SE1) and saline coastal (SC) waters,[13] with designated uses that include shellfish harvesting, preservation of the existing ecosystem, and primary contact recreation.[14] The water quality standards protect those uses through narrative and numeric criteria for turbidity, suspended solids, and toxic substances.[15] For example, in saline waters, the standards prohibit toxic substances at concentrations harmful to humans or aquatic life and set a human-health criterion of .00022 micrograms per liter for 4,4'–DDE (a breakdown product of the pesticide DDT).[16] All state surface waters are subject to New Jersey's "antidegradation" policy, which directs that a waterbody's "[e]xisting uses shall be maintained and protected."[17]

### B. NJDEP's Review of NESE

#### 1. The 2019 Denial

In March 2017, Transco applied to FERC for a Certificate of Public Convenience and Necessity for NESE, which would expand Transco's existing interstate natural gas pipeline system to carry additional gas from Pennsylvania to

---

[12] *See id.* § 7:9B–1.15.
[13] *Id.* § 7:9B–1.15(c), (h).
[14] *Id.* § 7:9B–1.12(d), (g).
[15] *Id.* § 7:9B–1.14(d), (f).
[16] *Id.* § 7:9B–1.14(d)(12), (f)(7).
[17] *Id.* § 7:9B–1.5(d)(1).

New York through New Jersey. The New Jersey portion of the project includes the construction of a new compressor station in Franklin Township,[18] an onshore pipeline segment known as the Madison Loop, and the Raritan Bay Loop, a pipeline segment that will require approximately six miles of offshore construction in New Jersey waters.[19] The underwater portions of the Raritan Bay Loop will require Transco to dredge a trench, install the pipeline, and then backfill the trench, disturbing seabed sediment along the way.

Transco applied for a New Jersey Water Quality Certification in June 2018.[20] Over the next year, NJDEP flagged deficiencies in the application and Transco responded with supplemental filings.

On June 5, 2019, NJDEP denied Transco's NESE application without prejudice. The denial rested on several grounds, including detrimental impacts on freshwater wetlands near the new compressor station, Transco's failure to demonstrate the "compelling public need" for the pipeline expansion as required by New Jersey's Freshwater Wetlands Protection Act,[21] and insufficient information to determine

---

[18] A compressor station is a facility that "increase[s] the pressure and rate of flow" in a pipeline so that gas can continue moving through the system. *See Riverkeeper I*, 833 F.3d at 369.

[19] A loop is a "section[] of pipe connected to the main pipeline system that reduce[s] the loss of gas pressure and increase[s] the flow efficiency of the system." *Id.*

[20] Transco had voluntarily withdrawn an earlier application filed in July 2017.

[21] N.J. Stat. Ann. §§ 13:9B–1 to –30.

whether the Raritan Bay Loop would comply with state water quality standards.[22] As to water quality, NJDEP identified sediment samples from the Raritan Bay route that exceeded screening benchmarks for several substances, including arsenic, manganese, mercury, polychlorinated biphenyls (PCBs), and 4,4'–DDE. Those benchmarks indicated an increased likelihood of "adverse effects to benthic communities," or organisms that live on or near the bottom of the ocean.[23]

Because the samples and proposed dredging plans "indicate[d] there could be potential impact to water quality," and "Transco did not provide modeling to show that turbidity concentrations and water quality parameters for the identified chemicals of concern downstream and upstream of the dredging site will meet the [Surface Water Quality Standards]," NJDEP concluded that "Transco ha[d] not sufficiently demonstrated how it would avoid adverse impacts to surface water quality."[24] The denial letter informed Transco that "[a]ny resubmittal of [the] NESE Project application must include a modeling analysis for the above referenced parameters that demonstrates compliance with the [Surface Water Quality Standards], through the implementation of appropriate best management practices . . ., to avoid adverse water quality impacts."[25]

---

[22] JA 106–14.
[23] *Id.* at 112.
[24] *Id.* at 114.
[25] *Id.*

**2. The 2020 Denial**

A week later, on June 12, 2019, Transco filed a new application. On June 25, NJDEP issued a technical-deficiency letter requesting, among other things, a modeling analysis for the contaminants NJDEP had identified in its 2019 denial as exceeding screening benchmarks. A few days later, Transco submitted a contaminant modeling report titled *NESE Contaminant Transport Modeling Results for New Jersey Waters* (the *Contaminant Report*). The report predicted contaminant concentrations 500 feet from dredging under different operating conditions, including reduced dredging rates and pauses during slack tide, when tidal currents are weakest. The modeled operating conditions, Transco averred, would avoid exceedances of the Surface Water Quality Standards.

In November 2019, Transco voluntarily withdrew its application.[26] Following the withdrawal, NJDEP sent Transco a letter identifying additional information that any future submission would need to include. Although NJDEP acknowledged receipt of the *Contaminant Report*, it determined that Transco still "did not provide any information as to the means of monitoring the proposed dredging . . . to ensure that [best management practices] and operational procedures would be properly implemented to comply with [the] Surface Water Quality Standards."[27] NJDEP further

---

[26] Transco had previously withdrawn and resubmitted permit materials to afford NJDEP more time for review. The record does not indicate whether the November 2019 withdrawal served the same purpose.
[27] *Id.* at 743.

explained that Transco had not identified adaptive management procedures—preplanned construction adjustments in response to monitoring results—that could be implemented if dredging exceeded those standards.

In January 2020, Transco resubmitted its application with a draft Water Quality Monitoring Plan that included proposed adaptive management measures. In May 2020, New York denied Transco's corresponding Water Quality Certification for the New York portion of NESE. NJDEP consequently denied Transco's New Jersey application the same day, explaining that without a functional endpoint in New York, Transco had not demonstrated the compelling public need required by New Jersey's wetlands rules. NJDEP expressly stated that it "need not resolve any further issues" raised by the application.[28]

**3. The 2025 Certification**

In May 2025, Transco again applied to New Jersey for a Water Quality Certification and other necessary state permits for NESE. Transco described the project's scope as unchanged and its application as "essentially identical to the application[] reviewed by [NJDEP] in 2020," except for revisions necessitated by intervening changes to New Jersey's stormwater regulations.[29] The application incorporated the *Contaminant Report* and the Water Quality Monitoring Plan developed after the 2019 denial.

---

[28] *Id.* at 124.
[29] *Id.* at 564.

NJDEP deemed the application administratively complete on June 23, 2025, and opened a public comment period from July 16 to September 25, 2025. NJDEP posted Transco's application materials on its website and held a public hearing in early September. Commenters raised several substantive concerns about NESE. They asserted that Transco's 2025 application was "nearly identical" to its 2020 application;[30] that its modeling still showed potential exceedances of limits governing toxic pollutants; that the Water Quality Monitoring Plan tracked only turbidity, not toxic substances; and that the proposed monitoring locations were too far from dredging to assess compliance with the Surface Water Quality Standards.

While the public comment period remained open, NJDEP requested revisions to Transco's stormwater materials for the new compressor station site. When Transco submitted a revised stormwater report in August, NJDEP did not post the revised report to its project website.

NJDEP's review of Transco's application continued after the public comment period closed. On October 30, NJDEP sought clarification on several aspects of the Water Quality Monitoring Plan, including the threshold for triggering corrective measures in response to increased turbidity, the number and placement of monitoring locations, the data Transco would provide to NJDEP, the deadline for reporting exceedances, and whether operations would cease if corrective measures failed.

---

[30] *Id.* at 242.

Eight days later, on November 7, 2025, New York issued its certification for NESE.[31] Later that same day, NJDEP issued the Water Quality Certification now before us.

Two conditions in the Water Quality Certification are especially pertinent for our purposes. *First*, Transco must submit a Water Quality Monitoring Plan "for review within 60 days of issuance of [the certification]."[32] NJDEP directed that the plan must include "one monitoring location within the operation," two "outside of the operation," and a "control point" to measure background conditions.[33] The monitoring locations "should be calculated based on the modeling analysis for the rate of operation," and Transco must conduct continuous visual observations, record turbidity twice daily,

---

[31] That certification, which was recently upheld by the U.S. Court of Appeals for the Second Circuit, s*ee Raritan Baykeeper, Inc. v. N.Y. State Dep't of Env't Conservation*, No. 25-2938, 2026 WL 2453538 (2d Cir. Aug. 21, 2026) (summary order), rests on a materially different state administrative record than the one before us. For example, the Water Quality Certification (WQC) issued by the New York State Department of Environmental Conservation (NYSDEC) "require[d] NYSDEC to review and approve" the majority of Transco's compliance plans before construction commenced, provided for an "independent third-party monitor with stop-work authority," and set out toxicity limits for roughly a dozen pollutants in the certification itself. *Id*. at 13-15. As explained below, *see infra* Part III.B, the New Jersey certification before us lacks these safeguards and leaves mitigation response largely to Transco's discretion.

[32] JA 16.

[33] *Id.*

and make monitoring data available to NJDEP within twenty-four hours of collection.[34]

*Second*, Transco must submit an Adaptive Management Plan containing "a course of action, some or all of which may be employed in any given situation" to "reduce or mitigate the effects of observed increases in turbidity."[35]

The Water Quality Certification also imposes several dredging-related restrictions. For instance, Transco must use closed clamshell dredging buckets designed to limit sediment dispersion, reduce the dredging rate in the portion of the route with the highest predicted contaminant concentrations, conduct dredging during slack tide in that same area, and follow specific restrictions on refilling the trench and disposing of dredged sediment.

Accompanying the Water Quality Certification were engineering, environmental, dredging, and threatened and endangered species reports created by NJDEP, as well as the agency's response to public comments. In response to commenters' water quality concerns, NJDEP stated that, based on Transco's modeling, and through the use of best management practices and monitoring, "any temporary increases in turbidity or contaminant levels are expected to be minimal and will not result in long-term impacts to water quality or aquatic life."[36]

---

[34] *Id.*
[35] *Id.* at 17.
[36] *Id.* at 425.

**C. Procedural History**

On November 18, 2025, Petitioner Natural Resources Defense Council (NRDC) filed a petition for review in the United States Court of Appeals for the Second Circuit challenging New Jersey's Water Quality Certification for NESE. That same day, New York/New Jersey Baykeeper, together with Princeton Manor Homeowners Association, Central Jersey Safe Energy Coalition, Food & Water Watch, New Jersey League of Conservation Voters Education Fund, and the Sierra Club (collectively, the Baykeeper Petitioners), filed a separate petition in the same court challenging the same certification. Transco intervened as a respondent in both matters. The Second Circuit Court of Appeals transferred the petitions to this Court, and we consolidated them. The New Jersey Business & Industry Association filed an amicus brief in support of Transco.

**II.**

Pursuant to the Natural Gas Act, we have "original and exclusive" jurisdiction to review state administrative agency

grants of water quality certifications under § 401 of the Clean Water Act.[37]

"[W]e review *de novo* state agency interpretation of federal law, and review under the arbitrary and capricious standard state action taken pursuant to federal law."[38] Under federal law, agency action is arbitrary and capricious when it "fails to examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection

[37] 15 U.S.C. § 717r(d)(1); *Riverkeeper I*, 833 F.3d at 370–73. While neither NJDEP nor Transco contest Petitioners' Article III standing, we have an independent duty to ensure that we have jurisdiction to hear these petitions. *See Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) (explaining "associational standing requires an association to show that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit") (cleaned up). Petitioners submitted declarations from members who regularly use Raritan Bay and nearby waters for recreation and aesthetic enjoyment and who describe concerns that dredging-related pollution will impair those uses. Their alleged injuries are fairly traceable to the challenged certification and would be redressed by vacatur. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–85 (2000). Accordingly, we find the Petitioners have standing. *See id.*

[38] *Riverkeeper I*, 833 F.3d at 377.

between the facts found and the choice made."[39] Although a reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," it "may not supply a reasoned basis for the agency's action that the agency itself has not given."[40] Even so, "we apply a 'harmless error' analysis," meaning that "mistakes that have no bearing on the substantive decision of an agency do not prejudice a party."[41]

When a state agency interprets state law, we afford its interpretation the same level of deference it would receive under state law.[42] Under New Jersey law, an agency charged with administering a statutory scheme is ordinarily entitled to substantial deference in construing statutes and regulations within its area of authority.[43]

## III.

Petitioners challenge the Water Quality Certification on four principal grounds. They argue that NJDEP (1) arbitrarily reversed its 2019 certification denial, (2) unlawfully deferred material monitoring and adaptive management requirements,

---

[39] *Id.* (quoting *Motor Vehicle Manfs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)) (cleaned up).
[40] *State Farm*, 463 U.S. at 43 (citations omitted).
[41] *Riverkeeper I*, 833 F.3d at 377 (citation omitted).
[42] *See Riverkeeper II*, 870 F.3d at 181; *Twp. of Bordentown v. FERC*, 903 F.3d 234, 270 (3d Cir. 2018).
[43] *See E. Bay Drywall, LLC v. Dep't of Lab. and Workforce Dev.*, 278 A.3d 783, 792 (N.J. 2022) (citing *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 456 (N.J. 2015)).

(3) inadequately explained how the project complies with New Jersey's water quality standards, and (4) deprived the public of a meaningful opportunity to comment. We reject the first argument, but we agree that NJDEP improperly left material monitoring and adaptive management terms for later resolution without making NJDEP approval of the final plans a prerequisite to dredging. We also conclude that NJDEP failed to adequately explain its finding that NESE will meet state water quality criteria. Because those defects require vacatur, we need not decide the public participation claims.

**A. The Alleged Reversal**

We begin with NRDC's contention that NJDEP arbitrarily reversed its 2019 certification denial. NRDC argues that NJDEP arbitrarily reversed course by approving Transco's 2025 application after denying certification in 2019 based on water quality concerns, without acknowledging or explaining its change in position.[44] NRDC's argument, however, overlooks the different evidentiary records underlying the two decisions.

---

[44] The parties dispute whether *F.C.C. v. Fox Television Stations, Inc.* and related cases—which require agencies to acknowledge and explain certain changes in policy or agency practice—apply to successive permit decisions like those at issue here. *See, e.g.*, 556 U.S. 502 (2009); *Logic Tech. Dev. LLC v. FDA,* 84 F.4th 537 (3d Cir. 2023). We need not wade into that debate because NRDC's argument rests on the premise that the application NJDEP approved in 2025 did not materially differ from the one it denied in 2019. As explained below, we disagree.

NJDEP's 2019 denial did not state that NESE could *never* comply with New Jersey's water quality standards. Rather, NJDEP concluded that Transco had not yet demonstrated compliance—a conclusion borne of a lack of data. The agency observed that Transco had "not sufficiently demonstrated how it would avoid adverse impacts to surface water quality," and directed that any renewed application include "a modeling analysis . . . that demonstrates compliance with the [Surface Water Quality Standards]," as well as appropriate best management practices or other controls.[45]

Transco responded by submitting the *Contaminant Report*, which modeled predicted contaminant concentrations under various dredging scenarios, including reduced dredging rates and slack-tide restrictions. Transco also later developed and submitted a Water Quality Monitoring Plan in response to NJDEP's ongoing concerns about monitoring and adaptive management. During its 2020 review, NJDEP did not reject those supplemental materials; instead, NJDEP denied Transco's application solely because New York had rejected Transco's corresponding NESE application.

NRDC seizes on Transco's statement in its 2025 cover letter that its application was "essentially identical" to the one NJDEP reviewed in 2020, offering the statement as further evidence that the application had not materially changed since NJDEP's 2019 water quality finding.[46] Transco's choice of words proves less than NRDC supposes. By 2020, NJDEP had before it the additional contaminant modeling and technical materials Transco had developed to address the agency's water

---

[45] JA 114.
[46] *Id.* at 564.

quality concerns. And, as noted, NJDEP's denial that year did not reach those materials on the merits. We accordingly conclude that NJDEP's approval of a materially different application in 2025 does not amount to the arbitrary reversal NRDC alleges.

### B. Deferred Monitoring and Adaptive Management Terms

Petitioners next argue that NJDEP acted arbitrarily and capriciously when it issued the Water Quality Certification before Transco finalized its Water Quality Monitoring Plan and Adaptive Management Plan. They contend that § 401 of the Clean Water Act required NJDEP to determine, before certification, that NESE would comply with New Jersey's water quality standards, yet the Water Quality Certification deferred critical monitoring and corrective measures for later resolution. NJDEP and Transco answer that § 401 allows conditional certifications, that the Water Quality Certification imposes enforceable monitoring and response obligations, and that NJDEP retained authority to review and approve the post-certification plans.

Section 401 requires the certifying state agency to certify that the discharge from the proposed activity "will comply" with the applicable provisions of the Clean Water Act, including applicable federal and state water quality standards.[47] The certification itself must "set forth" any limitations and monitoring requirements "necessary to assure"

[47] 33 U.S.C. § 1341(a)(1).

such compliance, and those requirements “shall become a condition on any Federal license or permit.”[48]

NJDEP principally relies on our decision in *Delaware Riverkeeper Network v. Secretary Pennsylvania Department of Environmental Protection (Riverkeeper I).*[49] In *Riverkeeper I*, the Pennsylvania Department of Environmental Protection (PADEP) issued a § 401 Water Quality Certification before completing an environmental assessment required for a separate state permit.[50] We upheld the certification, finding PADEP’s order of operations permissible, because construction could not begin until the agency reviewed the assessment and issued the separate permit.[51] In other words, although PADEP had deferred review, it did not abandon it.

We rejected a similar sequencing argument in *Delaware Riverkeeper Network v. Secretary Pennsylvania Department of Environmental Protection (Riverkeeper III)*.[52] There, PADEP certified water quality compliance based on Transco’s pledge to demonstrate substantive compliance in later permit applications, rather than in the Water Quality Certification application itself.[53] Like *Riverkeeper I*, construction remained contingent on subsequent agency approval before work could begin.[54] So, we upheld the Water Quality Certification.[55]

---

[48] *Id.* § 1341(d); *PUD No. 1*, 511 U.S. at 712–13.
[49] 833 F.3d at 367.
[50] *Id.* at 385–88.
[51] *Id.* at 385–86.
[52] 903 F.3d 65 (3d Cir. 2018).
[53] *Id.* at 76–77.
[54] *See id.*
[55] *See id.* at 78.

Petitioners instead direct us to *Waterkeeper Alliance, Inc. v. EPA*.[56] In *Waterkeeper*, the Second Circuit Court of Appeals examined an EPA rule governing discharge permits for concentrated animal feeding operations, or large livestock farms.[57] The rule required each operation to develop a nutrient management plan but did not require the permitting authority—whether the EPA or an authorized state agency—to review that plan before issuing a permit.[58] Our sister circuit invalidated the rule, determining the Clean Water Act allows permit issuance only when the permitting authority determines that the proposed discharge will comply with applicable pollution limits and standards.[59] Thus, the permitting authority had to determine whether each nutrient management plan satisfied the rule's substantive requirements before issuing a permit.[60] Without that review, the rule did "nothing to ensure" that each operation had developed a compliant plan and instead created an "impermissible self-regulatory permitting regime."[61]

---

[56] 399 F.3d 486 (2d Cir. 2005).

[57] *Id.* at 498–99.

[58] *Id.*

[59] *Id.* at 502.

[60] *See id.* at 499–502.

[61] *Id.* at 498–99. *Waterkeeper* also held that the terms of the nutrient management plans were themselves "effluent limitations," meaning restrictions on pollutant discharges, and therefore had to appear in the discharge permits. *Id.* at 502. But NRDC does not contend that the monitoring and adaptive management requirements left for later resolution are effluent limits, so *Waterkeeper*'s alternative basis for invalidating the EPA rule is inapposite here.

This case falls somewhere between our line of *Riverkeeper* cases and *Waterkeeper*. NJDEP has not, as in *Waterkeeper*, left Transco to write the terms of its own compliance. The Water Quality Certification at issue here imposes several concrete restrictions on dredging: it prescribes dredging practices designed to limit sediment dispersion, requires turbidity monitoring, and instructs Transco to finalize both a Water Quality Monitoring Plan and an Adaptive Management Plan. But *Riverkeeper I* and *Riverkeeper III* support NJDEP only if, like PADEP, NJDEP retained authority to approve the outstanding material plans before dredging could begin. The certification's text shows otherwise.

Take Condition 9, which requires Transco to submit the Water Quality Monitoring Plan "for review within 60 days of issuance of [the] permit."[62] The text obligates "review," not "approval," and says nothing about approval before dredging can begin.[63] Even assuming "review" implies that NJDEP has the authority to accept or reject the plan, Condition 11 is barer still when it comes to what must happen and when.

Condition 11 requires Transco to submit an Adaptive Management Plan "consist[ing] of a course of action, some or all of which may be employed in any given situation," but sets no deadline for submission and does not condition certification

[62] JA 16.

[63] *Id.* *Compare* Merriam-Webster's Collegiate Dictionary 1360 (12th ed. 2025) (defining "review" as "an act or process of carefully looking at or examining the quality, condition, etc., of something or someone") *with id.* at 86 (defining "approve" as "to accept as satisfactory" or "to give formal or official sanction to").

on NJDEP's approval of said plan.[64] And by providing that "some or all" measures "*may* be employed," Condition 11 does not even require Transco to abide by any specified action when turbidity increases.[65]

Nor does Condition 6 salvage the Water Quality Certification. It requires Transco, before dredging, to obtain "[a]ll required local, state and federal approvals for the work."[66] Read in context, that general catchall refers to permits and other governmental authorizations required for the work, not to the individual plans Transco must submit under *this* certification. In any event, Condition 6 does not identify approval of either plan as one of the "required" approvals, and nothing in the certification guarantees that either plan will be reviewed as part of a later permit before dredging, nor have Respondents argued so.

NJDEP points to Transco's representation that it would "adhere to an NJDEP–approved" monitoring plan as evidence that the agency retained approval authority.[67] That representation, however, is buried in the May 2025 Environmental Report that Transco submitted with its application. It appears nowhere in the Water Quality Certification's enforceable conditions. A regulated party's representation in its application does not amount to an enforceable condition precedent to construction.

---

[64] JA 17.
[65] *Id.* (emphasis added).
[66] *Id.* at 16.
[67] *Id.* at 612; NJDEP Br. 37.

Elsewhere, by contrast, the Water Quality Certification expressly requires NJDEP approval before specified work may proceed. For example, Condition 15 provides that "[p]rior to backfilling the trenches," Transco "shall receive an approval from [NJDEP] and [the] Army Corps of Engineers."[68] Condition 21 likewise directs Transco to submit the dredging inspector's resume "to [NJDEP] for review and receive written approval prior to the initiation of dredging."[69] The omission of comparable language in Conditions 9 and 11 is therefore stark.

The Water Quality Monitoring and Adaptive Management Plans were plainly critical to NJDEP's conclusion that NESE would comply with New Jersey's water quality standards. NJDEP denied certification in 2019 in part because Transco had not shown that dredging would avoid adverse water quality impacts. And in 2025, NJDEP expressly relied on "modeling, monitoring, and [best management practices]" to conclude that "any temporary increases in turbidity or contaminant levels" would be minimal.[70]

Yet only eight days before certification, NJDEP recognized that material aspects of the Water Quality Monitoring and Adaptive Management Plans remained unsettled. It pressed Transco to clarify the turbidity threshold that would trigger mitigation measures, the timeframe for reporting an exceedance, and whether dredging would stop if corrective measures failed. While the Water Quality Certification ultimately addresses some water quality requirements—including sampling locations, monitoring

---

[68] JA 17.
[69] *Id.*
[70] *Id.* at 425.

frequency, and data reporting—it failed to resolve several of the substantive questions NJDEP itself had flagged. The certification essentially deferred the core of the adaptive management scheme to later plans that are no longer subject to NJDEP's approval before dredging begins. Thus, compared to *Riverkeeper I* and *Riverkeeper III*, a key safeguard is missing: no prescribed NJDEP approval stands between the unfinished plans and dredging.[71]

Ultimately, our review turns on the certification that NJDEP issued, not the certification the agency now describes.[72] To be clear, we do not suggest that § 401 categorically forbids an agency from requiring monitoring or adaptive management plans after certification. Nor do we conclude that every monitoring threshold or corrective measure must appear on the face of the certification. We recognize that some implementation details will necessarily require refinement as work progresses and field conditions change. Nevertheless, there is a critical distinction between refining details under a mandatory approval process and leaving material compliance terms to plans that the agency

---

[71] *See also Riverkeeper I*, 833 F.3d at 385–87 (upholding certification because construction remained contingent on PADEP's later substantive review and approval); *Riverkeeper III*, 903 F.3d at 76–77 (same).

[72] *See State Farm*, 463 U.S. at 50 ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action."); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (establishing that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency").

need not approve before work begins.[73] Because material monitoring and response terms remained unresolved and no later NJDEP approval was required before dredging could begin, we conclude that NJDEP acted arbitrarily and capriciously in issuing the Water Quality Certification.[74]

### C. NJDEP's Explanation of Compliance

The Water Quality Certification is deficient in another respect. Even apart from the deferred plans, NJDEP's decisional documents do not adequately explain its conclusion that Transco's dredging will comply with New Jersey's water quality standards. Three points in the record reveal that NJDEP's conclusion outruns its explanation: its treatment of the 500-foot modeling boundary and predicted 4,4'–DDE concentrations, its reliance on turbidity monitoring, and its

---

[73] *Compare Sierra Club v. EPA*, 972 F.3d 290, 307–08 (3d Cir. 2020) (vacating EPA approval of a state air pollution plan that deferred to regulated operators what data and calculations were sufficient to demonstrate compliance, leaving "no discernible enforcement mechanism"), *with Twp. of Bordentown*, 903 F.3d at 259, 261 n.15 (upholding FERC's decision despite incomplete information about affected private wells where the certificate required Transco to identify the wells before construction, conduct pre-and post-construction monitoring, and report any resulting problems, and FERC retained authority to require additional measures).

[74] Having resolved this issue under arbitrary-and-capricious review, we have no occasion to reach Petitioners' alternative theory that the certification independently violates § 401 of the Clean Water Act by deferring material monitoring and response terms to later plans.

assessment of the shellfish evidence in the record. We address each in turn.

**1. The 500-Foot Boundary and DDE**

The Baykeeper Petitioners argue that NJDEP unlawfully treated the 500-foot modeling boundary used in Transco's *Contaminant Report* as a regulatory mixing zone, which is a defined area surrounding a discharge where water quality criteria may be exceeded, so long as the applicable standards are met at the zone's outer boundary.[75] In support, Petitioners point to Transco's repeated description of the 500-foot boundary as the "500' mixing zone edge." They further note that New Jersey prohibits regulatory mixing zones for new discharges of certain pollutants, including 4,4'–DDE, mercury, and PCBs.[76]

NJDEP and Transco reject the notion that a regulatory mixing zone was requested or approved. They maintain that New Jersey's mixing-zone provisions apply to wastewater effluent—meaning liquid waste discharged into the water—not sediment resuspended during dredging, and they explain that Transco used mixing-zone terminology because New York applies mixing zones to dredging projects. They also stress that neither the Water Quality Certification nor NJDEP's supporting reports establishes a mixing zone.

We agree with NJDEP and Transco that the Water Quality Certification, by its terms, does not formally establish

---

[75] *See* N.J. Admin. Code § 7:9B-1.5(h)(1)(ii) (requiring surface water quality criteria to be met at the edge of a regulatory mixing zone).

[76] *See id.* § 7:9B–1.5(h)(5)(vii).

a regulatory mixing zone, nor did NJDEP purport to do so in any of the certification's accompanying documents. Whatever its label, though, the 500-foot line anchored Transco's toxic contaminant analysis. Transco compared modeled contaminant concentrations with New Jersey's water quality criteria at that distance, but not in waters closer to dredging. NJDEP itself also repeatedly referred to a "500-foot mixing zone." For instance, at a June 2019 meeting, NJDEP advised Transco that a "500-foot mixing zone could be assumed for contaminants in New Jersey."[77] Petitioners therefore ask a fair question. Why did results at 500 feet establish compliance throughout the affected waters?

NJDEP responds that New Jersey's New Dredging Rule, which addresses compliance at the dredging site, governs this project instead of New Jersey's mixing-zone provisions. Subsection (iii) of the New Dredging Rule states that "[t]urbidity concentrations (that is, suspended sediments) and other water-quality parameters at, downstream, and upstream of the dredging site . . . shall meet [the] applicable Surface Water Quality Standards at N.J.A.C. 7:9B."[78] Subsection (iv) then provides that "[i]f predicted water quality parameters are likely to exceed Surface Water Quality Standards . . . or if pre-dredging chemical analysis of dredged material, including surface water and ground water quality predictive analyses, reveals significant contamination, then [NJDEP] will work cooperatively with the applicant to fashion acceptable control measures."[79]

---

[77] *See, e.g.*, JA 733.
[78] N.J. Admin. Code § 7:7–12.7(c)(10)(iii).
[79] *Id.* § 7:7–12.7(c)(10)(iv).

The parties offer competing interpretations of subsection (iv). The Baykeeper Petitioners read subsection (iv) to require control measures that keep dredging within the standards prescribed by subsection (iii). NJDEP, conversely, reads subsection (iv) as allowing temporary predicted exceedances if best management practices and other controls sufficiently reduce their effects.

As explained above, we ordinarily defer to NJDEP's reasonable interpretation of its own regulations.[80] Here, however, the Water Quality Certification and NJDEP's response to public comments both fail to explain how subsection (iv) operates alongside subsection (iii). More specifically, neither explains whether subsection (iv) permits temporary exceedances despite subsection (iii)'s command that water quality parameters "shall meet" the applicable standards.[81] We cannot uphold certification based on an interpretation the agency first supplied in litigation.[82]

The significance of the 500-foot boundary might have remained academic had no modeled contaminant concentration raised a compliance concern. But 4,4'–DDE does. At 500 feet, Transco's model predicted 4,4'–DDE concentrations numerically above New Jersey's human-health criterion.

---

[80] *See supra* Part II.
[81] N.J. Admin. Code § 7:7–12.7(c)(10)(iii).
[82] *See State Farm*, 463 U.S. at 50; *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (noting judicial review rests on the administrative record, not "some new record made initially in the reviewing court" or "post-hoc rationalizations made after the disputed action") (cleaned up).

Transco's *Contaminant Report* estimated the concentrations of several pollutants that dredging would release from the Raritan Bay's sediment. It then compared those predictions with New Jersey's acute and chronic aquatic-life criteria, which set limits to protect aquatic organisms from short- and long-term exposure.[83] Because New Jersey has no acute or chronic aquatic-life criterion for 4,4'–DDE, the report did not compare its predicted 4,4'–DDE concentrations against either standard. New Jersey does, however, set a separate human-health criterion for 4,4'–DDE of .00022 micrograms per liter.[84]

At two sampling locations, the *Contaminant Report* predicted that the highest 4,4'–DDE concentrations at 500 feet would be .001 and .003 micrograms per liter, assuming a dredging rate of 7,500 cubic feet per hour. Both predicted concentrations numerically exceed the human-health criterion, with the latter exceeding it *more than thirteenfold*. Yet the report never compared those predicted concentrations against the human-health criterion. Although the final Water Quality Certification reduced the rate of dredging to 4,800 cubic feet per hour and required slack-tide operations in the relevant area, the *Contaminant Report* did not recalculate the predicted 4,4'–DDE concentrations under those revised conditions. Accordingly, neither the Water Quality Certification nor NJDEP's response to public comments identifies the 4,4'–DDE concentration expected under the final operating conditions.

---

[83] Acute criteria generally protect against effects from a one-hour exposure, whereas chronic criteria address a four-day exposure. *See* N.J. Admin. Code § 7:9B–1.14(f)(1)–(2).
[84] *Id.* § 7:9B–1.14(f)(7).

Transco attempts to plug this gap in the record by arguing that increases in 4,4'–DDE concentrations will be brief, that ambient conditions will return within one to six hours, and that shellfish harvesting for human consumption is prohibited in the affected area. However, NJDEP did not clearly adopt those specific rationales. The agency instead noted, in response to public concerns about toxic contaminants, that "criteria do not exist for acute and chronic surface water quality standards for 4,4'–DDE," and then reasoned that "overall levels of contaminants *in the mixing zone* decrease with best management practices" and that, with those practices and monitoring, "dredging impacts *will be minimized*."[85] A prediction that contaminant levels will "decrease" is not a finding that they will adhere to New Jersey's human-health criterion. And a finding that dredging impacts "will be minimized" does not explain whether New Jersey law permits a short-term exceedance in waters closer to dredging.

NJDEP could have reconciled the 4,4'–DDE result by, for example, explaining why the human-health criterion was inapplicable, requiring Transco to model 4,4'–DDE under the final dredging conditions, or identifying a state-law basis for allowing a short-term exceedance. Its current decisional documents take none of those paths.

In short, NJDEP failed to adequately explain why 500 feet was the relevant boundary for its contaminant review or how the predicted 4,4'–DDE concentrations supported

[85] JA 425 (emphases added).

certification.[86] Without more, we cannot discern how NJDEP concluded that Transco's dredging will comply with New Jersey's water quality standards.

**2. Turbidity Monitoring**

The Baykeeper Petitioners next challenge the Water Quality Certification's reliance on turbidity monitoring rather than direct monitoring of the toxic contaminants disturbed by dredging. They argue that the Water Quality Certification cannot assure compliance with New Jersey's toxic-substance criteria because it requires monitoring only for turbidity, not for 4,4'–DDE, PCBs, mercury, or the other contaminants identified in the dredging area.

NJDEP and Transco counter that the New Dredging Rule gives NJDEP discretion to determine what water quality parameters should be monitored. NJDEP specifically argues that turbidity monitoring alone can be "sufficient to assure water quality standards," and that its "construction[] of [its] own regulations [is] powerful evidence of their meaning."[87] Transco adds that NJDEP advised it that chemical contaminant monitoring is not typically required and that turbidity monitoring ordinarily suffices to evaluate surface water quality exceedances.

---

[86] *See Chenery*, 332 U.S. at 196–97 (emphasizing that the agency's "basis must be set forth with such clarity as to be understandable" so that a court is not "compelled to guess at the theory underlying the agency's action").

[87] NJDEP Br. 54 n.12 (citing *E. Bay Drywall,* 278 A.3d at 792).

NJDEP and Transco are correct that the New Dredging Rule vests NJDEP with discretion: it provides that the agency "*may* require the permittee to conduct biological, physical, and chemical water quality monitoring before, during, and after dredging and disposal operations to ensure that water quality standards are not exceeded."[88] We are persuaded that the regulation's permissive language does not mandate direct monitoring of every contaminant.

That said, NJDEP was still required to "examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."[89] Technical expertise does not relieve an agency of its obligation to articulate the basis for its decision.[90]

Here, too, NJDEP's explanation falls short. The record makes clear that toxic contaminants lay at the heart of NJDEP's water quality concerns throughout its review of NESE. Water quality concerns figured prominently in the agency's 2019 denial. Moreover, in its response to public comments in 2025, NJDEP reasoned that, "[b]ased on the modeling, monitoring, and [best management practices] in place, any temporary increases in turbidity *or contaminant levels* are expected to be

---

[88] N.J. Admin. Code § 7:7–12.7(c)(10)(iii) (emphasis added).
[89] *State Farm*, 463 U.S. at 43 (cleaned up); *accord Riverkeeper I*, 833 F.3d at 377.
[90] *Sierra Club*, 972 F.3d at 298 ("[T]he agency cannot reach whatever conclusion it likes and then defend it with vague allusions to its own expertise; instead, the agency must support its conclusion with demonstrable reasoning based on the facts in the record.").

minimal."[91] Yet the Water Quality Certification requires monitoring *only* for turbidity. NJDEP has not explained how monitoring turbidity alone assures compliance with the separate standards governing 4,4'–DDE, PCBs, mercury, and the other contaminants at issue. Monitoring water cloudiness is not self-evidently the same as monitoring toxic contaminants; if NJDEP relied on the former as a proxy for the latter, it had to say so and explain why.[92]

NJDEP was not required to select Petitioners' preferred monitoring method, but it *was* required to connect its chosen method to the pollutants and criteria that drove its water quality concerns. Its failure to do so was arbitrary and capricious.

### 3. Shellfish Findings

NRDC additionally contests NJDEP's conclusion that NESE will not imperil shellfish. As discussed earlier, the affected waters here are designated for shellfish harvesting, and the applicable Surface Water Quality Standards protect that designated use.[93] In response to public concerns about dredging impacts on shellfish habitat, NJDEP stated that it had consulted with the New Jersey Marine Resources Administration (MRA), which oversees New Jersey's fish and shellfish, to assess NESE's impacts to shellfish and

---

[91] JA 425 (emphasis added).

[92] *See Ohio v. EPA*, 603 U.S. 279, 293–95 (2024) (finding agency action likely arbitrary where EPA failed to explain whether an assumption underlying its methodology affected the result and observing that, "if there is an explanation, it does not appear in the final rule").

[93] N.J. Admin. Code § 7:9B–1.12(d), (g).

commercial shellfish harvesters. According to NJDEP, the MRA determined "that the Project's sedimentation rates are anticipated to be within surf clam tolerance, [and] the impacts to the habitat are temporary and will return to baseline conditions within one to three years."[94] As a result, NJDEP maintains the project would not "result in [the] destruction, condemnation or contamination of surf clam habitat."[95]

NRDC argues that the MRA memorandum made no such finding. We agree. The memorandum directly quoted Transco's prediction that surf clam populations would recover within one to three years, but nowhere in the memorandum does the MRA adopt or endorse that view. Instead, the MRA determined that the project "will directly and indirectly impact productive surf clam beds," could cause mortality and physiological stress, and poses particular risks to surf clams, which "are more sensitive and susceptible to the impacts of increased turbidity and smothering" from sediment plumes.[96]

While the MRA found that impacts would be temporary to *some* clams, that finding was with respect to hard clams—an entirely different species. Indeed, the MRA expressly distinguished the two: "Unlike hard clams, surf clams do not have the ability to close their shells completely in the presence of increased turbidity."[97]

NJDEP therefore attributed to the MRA conclusions about surf clams that the MRA never made. An agency's

---

[94] JA 436.
[95] *Id.*
[96] *Id.* at 313.
[97] *Id.*

decision is "arbitrary and capricious" when it "offer[s] an explanation for its decision that runs counter to the evidence" before it.[98] NJDEP was free to adopt Transco's prediction that surf clam populations would recover within one to three years, but it did not purport to do so. Rather, it attributed Transco's prediction to the MRA, and so this error bears directly on the agency's stated rationale. Combined with the deferred compliance terms and unexplained technical issues already discussed, this mischaracterization further prevents us from discerning the basis for NJDEP's assurance of compliance.

### D. Public Participation

Petitioners' remaining arguments concern public participation. NRDC argues that by postponing the final Water Quality Monitoring Plan and Adaptive Management Plan until after certification, NJDEP insulated the final water quality control measures from public comment. The Baykeeper Petitioners train their challenge on Transco's revised stormwater materials, contending that commenters spent the public comment period reviewing and criticizing the May 2025 report, only for Transco to replace it with a materially different August 2025 report that NJDEP neither posted on the project website nor flagged to the public. Accordingly, they argue that NJDEP certified the project based on revised technical materials the public never had an opportunity to address.

NJDEP and Transco counter that the application included draft monitoring and adaptive management plans that drew public comment, and that Transco submitted the revised stormwater report more than a month before the comment

---

[98] *See State Farm*, 463 U.S. at 43.

period closed. They note that the public notice identified locations where application materials could be reviewed even if NJDEP never posted the report to the project website, and they further argue that the Petitioners have shown no prejudice since they have not identified any substantive argument they lost the opportunity to raise.

Section 401 of the Clean Water Act requires states to establish procedures for public notice of Water Quality Certification applications and, where appropriate, procedures for public hearings.[99] More broadly, the Clean Water Act provides that "[p]ublic participation in the development, revision, and enforcement of any . . . plan, or program established by the [EPA] Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States."[100] Consistent with that directive, we have observed that interested members of the public should have a full opportunity to weigh in before an agency relies on the technical materials underlying its decision, though a party challenging an alleged defect in the public comment process must show prejudice resulting from said error.[101]

Because we vacate the certification on other grounds, we need not decide whether NJDEP's procedures independently violated the Clean Water Act or New Jersey's

---

[99] 33 U.S.C. § 1341(a)(1).
[100] *Id.* § 1251(e); *see also Waterkeeper*, 399 F.3d at 503–04.
[101] *See Riverkeeper III*, 903 F.3d at 76 (denying a public participation challenge where "all interested parties . . . ha[d] a full opportunity to weigh in when [the agency] consider[ed] applications for those permits . . . .").

notice requirements. Should NJDEP renew the certification on remand, it will have the opportunity to cure any potential lack of adequate opportunity for public participation.[102]

IV.

When an agency fails to adequately explain the basis for its decision, our ordinary course is to vacate and remand so the agency may exercise its delegated authority in the first instance.[103] Although the administrative record documents years of agency review, repeated requests for additional information, and numerous project-specific restrictions, our task is to evaluate the certification NJDEP ultimately issued and the reasons the agency gave for it. On remand, NJDEP remains free to supplement its explanation, require additional submissions or analyses, issue a new or revised certification, or reach a different result. We leave those specific choices to NJDEP.

For the foregoing reasons, we will grant the petitions, vacate the Water Quality Certification, and remand for further proceedings consistent with this opinion.

---

[102] *See Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 411–12 (3d Cir. 2004), as amended (June 3, 2016).

[103] *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Sierra Club*, 972 F.3d at 309 (vacating EPA's approval of new state air quality standards and remanding to the EPA).